1  **MANDANA D. FARHANG**
   **P.O. BOX 274**
2  **TIBURON, CA 94920**
   **TEL: (415) 577-6540**
3  **EMAIL: MANDANAFARHANG@GMAIL.COM**

4  Plaintiff

*FILED*

MAY 2 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

8              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**

9

10  **MANDANA D. PLAINTIFF**, an individual    Case No.:  **CV 08-___ 2658**

11              Plaintiff,                      **COMPLAINT FOR DAMAGES**            **HRL**

            vs.
12                                              1.  **BREACH OF CONTRACT**
    **INDIAN INSTITUTE OF TECHNOLOGY,**          2.  **BREACH OF FIDUCIARY DUTY**
13  **KHARAGPUR**, an Indian Institute of        3.  **BREACH OF THE COVENANT OF**
    Technology incorporated under the 'Institutes    **GOOD FAITH AND FAIR**
14  of Technology Act, 1961", **TECHNOLOGY**          **DEALING**
    **ENTREPRENEURSHIP AND TRAINING**           4.  **FRAUD AND DECEIT**
15  **SOCIETY**, an Indian society, **PARTHA P.** 5.  **INTERFERENCE WITH**
    **CHAKRABARTI, PALLAB DASGUPTA,**                 **PROSPECTIVE ECONOMIC**
16  **GURASHISH S. BRAR, RAKESH GUPTA,**             **CONRACT**
    **PRAVANJAN CHOUDHURY, SUBRAT**             6.  **TORTIOUS INTERFERENCE**
17  **PANDA, ANIMESH NASKAR**, and **DOES 1**   7.  **CONVERSION**
    **through 100**, inclusive,                 8.  **CONSPIRACY/AIDING AND**
18                                                   **ABETTING**
                Defendants.
19                                              **DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

                        COMPLAINT - 1

Plaintiff Mandana D. Farhang alleges as follows:

## **INTRODUCTION**

1.     This is an action for damages arising out of Defendants' fraudulent conduct and conspiracy of lies and deceit in connection with the development and marketing of certain intellectual property and rights thereof, owned by Plaintiff and her affiliates and protected by a Non-Disclosure Agreement (NDA). Through a series of intentional misrepresentations, certain of the Defendants devised a scheme to induce Plaintiff and her affiliates to entrust Defendants with the property (under the NDA) and to enter into a cross border partnership in India, under false pretense, and with the intention to defraud Plaintiff and her affiliates and to convert and misappropriate the intellectual property for Defendants' own personal economic gain. Defendants' acts and omissions have caused Plaintiff substantial monetary harm. Through this action, Plaintiff seeks an award of compensatory damages against each of the Defendants for their wrongful conduct. Because Defendants' actions were malicious, fraudulent and oppressive, Plaintiff is also entitled to an award of punitive damages against each of the Defendants' in an amount sufficient to punish and make an example of them. In addition, Plaintiff reserves its right to amend this complaint to bring actions pursuant to 18 U.S.C § 1962, for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) against one or more of the Defendants.

## **JURISDICTION & VENUE**

2.     This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 (diversity of citizenship; amount in controversy; costs). Pursuant to 28 U.S.C § 1391 a substantial part of the events, acts or omissions giving rise to the claims herein occurred in the

1 County of Santa Clara, State of California and upon information and belief, all of the Defendants

2 except one are aliens. In addition, the executed NDA from which this dispute stems states:

3
4
5
6
7
8

> "This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of California without application of the principles of conflicts of law. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Santa Clara County, California, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in California, such personal jurisdiction shall be nonexclusive."

9
10    3.    In addition, Plaintiff invokes the supplemental jurisdiction of this Court, 28 U.S.C

11 § 1367 over claims based upon laws of the State of California.

12                        **INTRADISTRICT ASSIGNMENT**

13    4.    Intradistrict assignment of this action lies in the San Jose Division pursuant to

14 Civil L.R. 3-2(c) because a substantial part of the events or omissions which give rise to the

15 claim occurred in the County of Santa Clara. In addition as stated in paragraph 2 above, each of

16
17 the parties consented to the exclusive personal jurisdiction of the federal and state courts of Santa

18 Clara County, California.

19                              **THE PARTIES**

20    5.    Mandana D. Plaintiff ("Plaintiff") brings this action as an individual, and citizen

21
22 of the State of California. Plaintiff and her affiliates ("TNR") own full right and title to the

23 intellectual property and other property described herein ("the IP").

24    6.    Defendant Indian Institute of Technology, Kharagpur ("IIT Kharagpur") is, upon

25 information and belief, an Indian institute incorporated under the 'Institutes of Technology Act,

26
27 1961" as amended by the "Institutes of Technology (Amendment) Act 1963". Its principal place

28 of business is in the city of Kharagpur in the State of West Bengal, India.

7.    Defendant Technology Incubation and Training Society ("the Incubation Society") is, upon information and belief, an Indian society affiliated with and incorporated by IIT Kharagpur under the Societies Registration Act, 1860. Its principal place of business is on the premises of IIT Kharagpur.

8.    Defendant Partha Chakrabarti ("Chakrabarti") is Dean, Sponsored Research & Industrial Consultancy and Professor, Computer Science & Engineering at IIT Kharagpur; and Secretary and Permanent Member of the Governing Body of the Incubation Society. He is, upon information and belief, a citizen and resident of India.

9.    Defendant Pallab Dasgupta ("Dasgupta") is a Professor, Computer Science & Engineering and "Professor-in-charge", Advanced VLSI Lab at IIT Kharagpur. Dasgupta is, upon information and belief, a citizen and resident of India.

10.   Defendant Gurashish Brar ("Brar") is, upon information and belief, a citizen of the State of Georgia.

11.   Defendant Rakesh Gupta ("Gupta") is, upon information and belief, a citizen and resident of India.

12.   Defendant Pravanjan Choudhury ("Choudury") is, upon information and belief, a citizen and resident of India.

13.   Defendant Subrat Panda ("Panda") is, upon information and belief, a citizen and resident of India.

14.   Defendant Animesh Naskar ("Naskar") is, upon information and belief, a citizen and resident of India.

15.   Plaintiff is presently unaware of the true names and capacities of Defendants named herein as Does 1 through 100, inclusive, and therefore sues them by such fictitious names.

Plaintiff will amend this complaint to allege the true names and capacities of these Defendants when the same have been ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that Plaintiff's damages were proximately caused by their conduct. The Doe Defendants are private individuals, associations, partnerships, corporations or other entities who participated in the wrongful conduct complained of herein in ways which are unknown to Plaintiff at this time.

16.     Plaintiff is informed and believes, and on that basis alleges, that at all times herein material that Defendants, and each of them, were the agents, employees, partners, joint venturers, co-conspirators, owners, principals and employers of the remaining Defendants, and each of them are, and at all times herein mentioned were acting within the course and scope of that agency, employment, partnership, joint venture, conspiracy or ownership. Plaintiff is further informed and believes and based thereon alleges, that the acts and conduct alleged herein were known to, and authorized, directed, and/or ratified by the presidents, chairmen, officers, directors, professors, deans, head of departments, "in-charges" and board members of Defendants' corporations, societies, departments, institutions and entities, and each of them. Plaintiff is further informed and believes and based thereon alleges, that Defendants IIT Kharagpur and the Incubation Society exercised total dominion and control over the remaining Defendants and each was the alter ego of the other. Plaintiff is further informed and believes and based thereon alleges that Defendant Chakrabarti exercised total dominion and control over Defendant Dasgupta, Defendants Brar, Gupta, Choudhury, and Panda ("the Engineers") and Defendant Naskar and that each was the alter ego of the other.

17.    Plaintiff is informed and believes and based thereon alleges that the employees, agents, students, professors, deans, officers, directors and/or managing agents of defendants IIT Kharagpur and the Incubation Society, authorized, directed and/or ratified the wrongful acts of the employees, agents, students, professors, deans, officers, directors, managing agents and other representatives of said Defendants and, consequently, all Defendants and jointly and severally liable to Plaintiff.

18.    Plaintiff is informed and believes, and on that basis alleges, that at all times herein material, each Defendant conspired with his/her co-Defendants and with others by entering into agreements to commit the wrongful and tortuous acts contained herein and each Defendant participated in or committed a wrongful act in furtherance of said conspiracy which resulted in injury to the Plaintiff.

19.    Whenever and wherever reference is made in this Complaint to any conduct by Defendant or Defendants, such allegations and references shall also be deemed to mean the conduct of each of the Defendants, acting individually, jointly and severally.

20.    Whenever and wherever reference is made to individuals who are not named as Defendants in this Complaint, but were employees/agents of Defendants, such individuals at all relevant times acted on behalf of Defendants IIT Kharapur and the Incubation Society and are named in this Complaint within the scope of their respective employments.

21.    Whenever and wherever reference is made in this Complaint to the term "IIT Kharagpur/Chakrabarti", such references shall be deemed to mean Defendant Chakrabarti acting on behalf of Defendants IIT Kharagpur and the Incubation Society (once it became formed), and on behalf of himself individually.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

22.    In or about May 2003 Plaintiff and IIT Kharagpur/Chakrabarti initiated discussions to enter into partnership whereby they would form a joint venture company (to become Cool e-mobile Pvt. Ltd.) and herein after referred to as "Cool e-mobile" to further develop and market the IP that at the time, Plaintiff owned rights and title to. As part of these discussions, Plaintiff emphasized that as a business person with no direct technical know-how, she wished to team up with the "best and brightest" technical partners possible, and that she would need to trust and rely heavily upon those partners for all technical matters.

23.    Defendant Chakrabarti confirmed in an email transmitted to Plaintiff on May 21, 2003, that on behalf of IIT Kharagpur he would traveling from India to Europe and then to the United States to Santa Clara County, California, where IIT Kharagpur and its affiliates conduct commerce and maintain business relationships. Chakrabarti's email states "I quickly read your two emails with great interest. I will re-read it again and get back to you. I shall be in Europe next week and in US from June 1 to June 12. Where are you located? I have a packed schedule with meetings all over the Bay area -- Intel, Sun, National Semiconductors, HP, Cadence, Synopsys, etc." Subsequently, on June 5, 2003 Chakrabarti and Plaintiff convened a meeting in California to discuss the IP and the proposed partnership.

24.    During this meeting, Chakrabarti represented to Plaintiff amongst other things, that IIT Kharagpur was a trustworthy and reputable organization that could be entrusted with the IP. Plaintiff and Chakrabarti mutually expressed a keen interest to discuss a partnership and Chakrabarti requested to take the IP back to IIT Kharagpur for review. Plaintiff presented Chakrabarti with an NDA that she requested IIT Kharagpur and all who would view the IP, to sign. The following day, on June 6 2003 Chakrabarti informed Plaintiff via an email that he sent

from California "I will possibly have to refer to my University office with the NDA as it seems to bind them up as well. I will get back to you on this and try to have a discussion before I leave. I am sure that we will find a mutually agreeable working solution to start it up."

25.    On or about June 10, 2003 Chakrabarti informed Plaintiff via email that "all people who see the documents you give should sign this NDA" and "we will keep all documents that you give in a separate place in the computer so that the access is restricted to those who have signed the NDA only."

26.    Upon his return to IIT Kharagpur, and on or about July 1, 2003, via telephone Chakrabarti confirmed that IIT Kharagpur could be party to a private partnership and that he personally could serve as Chief Technology Officer of a private company while remaining in his duties at IIT Kharagpur. During the call, Plaintiff reiterated that these two factors were of crucial importance to her and to the proposed partnership.

27. On July 15 2003, after negotiating the NDA with Plaintiff, Chakrabarti informed Plaintiff via email "I have just make [sic] a case for this NDA to our Institute. I have talked to the Dean informally also. Our Head has signed." Via email on or about July 21, 2003 Chakrabarti informed that he too, received authorization to sign the NDA from the "Dean of Sponsored Research" on behalf of IIT Kharagpur. Subsequently in an email on August 12, 2003 Chakrabarti informed that Defendant Dasgupta had signed the NDA. In the email he states "Yes, Pallab [Dasgupta] and I signed the same version. Pallab is a brilliant young faculty a very close collaborator of mine for many years. We have been working together on research and industry projects for several years now."

28.    On August 11, 2003 IIT Kharagpur/Chakrabarti first transmitted two executed copies of the NDAs to Plaintiff via email, followed by two copies that arrived via U.S. Mail

shortly thereafter. After emailing the signed NDAs on or about August 12, 2003, Chakrabarti directed Plaintiff via email to deliver the IP to IIT Kharagpur as follows: "...Please tell me when you will send the detailed information, code etc for us to examine. Are you sendihng [sic] it by Fedex? If so, please send it to:

> Prof. Partha Pratim Chakravarty
>
> Department of Computer Sc & Engineering
>
> IIT Kharagpur Extension Centre
>
> Near tank-14
>
> HC Block sector3 , Salt Lake
>
> Calcutta 700091 India

This is the IIT Kolkata address."

Plaintiff complied and sent the IP via Federal Express to IIT Kharagpur.

29.    On or about January 31, 2004, several months after IIT Kharagpur/Chakrabarti, Dasgupta and one or more of the Engineers reviewed the code, Chakrabarti emailed Plaintiff as follows: "I have also called up some of my best ex-students who are agreeable to form a team/company here. I am working with IIT on an incubation effort as well. We should try to gel this well...."

30.    Upon further review of the IP by IIT Kharagpur/Chakrabarti, Dasgupta and one or more of the Engineers over the course of the following months, IIT Kharagpur/Chakrabarti informed Plaintiff via telephone and email communications, amongst other things, that:

(a)    The IP had been reviewed by a team at IIT Kharagpur "hand picked" by Chakrabarti. In an email February 13, 2004 Chakrabari wrote to Plaintiff: "...I have called some of my best ex-students to see if they would like to work. Subrat Panda,

whom I talked abut [sic] earlier and now Rakesh Gupta have signed the NDA and seen the literature and are reviewing it. I may ask one more person to see it before we decide on the core team. Pallab and self will be there from faculty. We, however, need to discuss the total percentage that will be available to the IIT team in terms of equity. I would like to know your views on that."

(b)    In a phone call in February 2003, Chakrabarti confirmed that the IP was "an excellent idea" that should be quickly commercialized; during the call, when Plaintiff requested confirmation, he reiterated that IIT Kharagpur could and would be a partner in the formation of Cool e-mobile to further develop and market the IP; that Chakrabarti would personally serve as the Chief Technology Officer of Cool e-mobile and be a direct shareholder of the same (while maintaining his employment at IIT Kharagpur); that Dasgupta would serve as the Vice President of Engineering of Cool e-mobile and be a direct shareholder of the same (while maintaining his employment at IIT Kharagpur); that IIT Kharagpur/Chakrabarti would assemble, maintain and manage a core team of "the best" IIT Kharagpur engineers; that Chakrabarti and Dasgupta in their respective roles noted above and the engineers would contribute their skills and labor to Cool e-mobile in exchange for a direct share ownership of a portion of the shares of Cool e-mobile.

(c)    In various emails that he transmitted, including one dated one dated May 12, 2005 and one dated June 18, 2005 as noted herein, IIT Kharagpur/Chakrabarti confirmed that Cool e-mobile would be enrolled as a "Member" of IIT Kharagpur's "incubator programme" (the Incubation Society). In an email dated June 18, 2004 Chakrabarti wrote to Plaintiff: "...Since we would like to work it out as an incubation from IIT KGP, it is good for the registered office to be at KGP."

31.     Regarding the amount of shares that would be allocated to IIT Kharagpur, Chakrabarti, Dasgupta and the team of core engineers in exchange for their contribution of skills and labor, in an email dated February 13, 2004 and in a subsequent phone call, Chakrabarti asked Plaintiff to suggest an amount. Plaintiff offered 10% to Chakrabarti personally, pursuant to his role as the Chief Technology Officer of Cool e-mobile, and an additional 1% each for Dasgupta and each member of the core engineering team. Plaintiff requested Chakrabarti to inform her of the amount of shares required by IIT Kharagpur since he was its representative and acting on its behalf. IIT Kharagpur/Chakrabarti counter-offered for a total of 21% of the shares of Cool e-mobile for IIT Kharagpur, Chakrabarti, Dasgupta and the Engineers. Plaintiff accepted.

32.     Chakrabarti then requested Plaintiff to retain U.S.-based counsel to create an optimal cross-border structure that included Cool e-mobile as well as a philanthropic entity (this entity becoming Tuff N'Ready Global Philanthropic Holdings S.A. or TNR) that would own shares of Cool e-mobile and use the future economic proceeds therefrom, to provide future "seed funding" to incubate the ideas of students at IIT Kharagpur, and to serve as a "company foundation" that would embark upon other philanthropic services such as "micro-lending".

33.     Plaintiff agreed that in exchange for the promises made in paragraph 30 and all sub paragraphs amongst others, she would retain legal counsel to accomplish the following:

(a)     Create an optimal cross-border structure to include Cool e-mobile and TNR for the purpose described in paragraph 32.

(b)     Prepare to transfer right and title of the IP to Cool e-mobile (once formed) for further development and marketing

(c)     Allocate 21% of the shares of Cool e-mobile (once formed) to IIT Kharagpur, Chakrabarti, Dasgupta and the Engineers.

34.     In or about March 2004, IIT Kharagpur/Chakrabarti and Plaintiff, mutually agreed on all of the terms set forth in paragraphs 30 through 33 above and all subparagraphs, and each agreed to perform according to its obligations, thus entering into partnership.

35.     Beginning in March 2004 and continuing through May 2006, IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers, acting in concert, and in order to further their plan to take control of the IP for their own use and economic benefit to the exclusion of Plaintiff, began their false and fraudulent campaign to convince Plaintiff that they were further developing the IP on behalf of Cool e-mobile and that the IP would be marketed to the Indian Railways and to other customers on behalf of Cool e-mobile. On the following dates amongst others, each of the Defendants named, transmitted to Plaintiff or to the individual hired to perform part-time duties of a chief financial officer in California ("CFO") or to TNR's counsel in the United States, email communications regarding the purported development of the IP and/or efforts to secure the Indian Railways or other customers on behalf of Cool e-mobile and the partnership, when in fact their motive was to take control of the IP and misappropriate it for their own economic gain.

**Emails from IIT Kharagpur/Chakrabari:**

March 16, 2004; February 19, 2005; March 3, 2005; March 4, 2005; March 7, 2005; March 23, 2005; and April 24, 2005.

**Emails from Defendant Dasgupta:**

November 4, 2004; November 15, 2004; November 18, 2004; November 28, 2004; December 1, 2004; December 2, 2004; December 3, 2004; and February 20, 2005.

**Emails from Defendant Brar:**

1   May 17, 2004; May 25, 2005; June 25 2004; January 3, 2005; January 23, 2005; February 18,

2   2005; February 20, 2005; March 3 2005; March 6 2005; June 23 2005; June 25 2005; June 27

3   2005; June 30, 2005; July 1 2005; August 8 2005; August 9 2005; March 11 2006; March 16

4   2006; April 4, 2006; and April 6 2006.

5

6   **Emails from Defendant Gupta**:

7   February 16, 2005; March 1, 2005; March 3, 2005; March 7, 2005; March 17, 2006; March 19,

8   2006; March 22, 2006; March 28, 2006; April 4, 2006;

9
    **Emails from Defendant Choudhury**:
10
    March 3, 2005; March 14 2005; March 22, 2005; and May 5, 2005.
11

12  **Emails from Defendant Panda**:

13  November 25, 2004; December 20, 2004; April 13, 2004; April 20, 2004; February 20, 2005;

14  April 17, 2005; June 19, 2005; June 27, 2005; June 28, 2005; June 29, 2005; and April 4, 2006.

15
            36.    In or about March 2004, IIT Kharagpur/Chakarabarti requested to modify one of
16
    the terms of the contract, while the others remained the same, insisting that Cool e-mobile be
17
    formed in the State of West Bengal in India. They expressed concern about the heavy tax burden
18
19  that they, as foreigners, would face if Cool e-mobile was formed outside of India. This was

20  communicated to Plaintiff in a telephone communication and mentioned in an email that

21  Chakrabarti transmitted to Plaintiff on or about June 18 2004, that states "…Also we would like
22
    to register this through the Registrar of Companies at Kolkata."
23

24          37.    IIT Kharagpur/Chakrabarti persuaded Plaintiff and TNR to form Cool e-mobile in

25  India by alleging amongst other things, that for the task of signing up Indian customers, Plaintiff,

26  TNR and Cool e-mobile could rely on IIT Kharagpur and its "highest level contacts in
27
    government and industry". Furthermore, Chakrabarti stated that as "part of an IIT", Cool e-
28

mobile could forgo the otherwise mandatory tender process when signing up the largest Indian government entities such as the "Indian Railways". In an email transmitted to Plaintiff on June 16, 2004 IIT Chakrabarti wrote: "…Coming to the the [sic] need I mentioned when tackling early customers. If I go now, I will have to go on behalf of IIT. Othewise [sic] nothing else will cut as much ice as my relationship with IIT…."

38.     Furthermore, in an effort to persuade Plaintiff and TNR to form the Company in India, IIT Kharagpur/Chakrabarti promised that they, along with Dasgupta and the Engineers would move quickly to secure the Indian Railways in order that they, the most coveted customer in all of India, would be Cool e-mobile's first customer.

39.     Plaintiff and TNR agreed that the entity Cool e-mobile could be formed in India, based on the condition that all of its business functions other than technology development and marketing to Indian customers, including but not limited to the following, would be based in California:

(a)     Maintenance and management of its intellectual property portfolio

(b)     Sources of its working and investment capital (once Cool e-mobile was formed)

(c)     The location of its financial and accounting records to be managed by a California based Chief Financial Officer

(d)     The creation of its branding and business strategy, via its California-based co-Founder and future co-Chief Executive Officer

IIT Kharagpur/Chakrabarti agreed to the terms as specified in sub paragraphs (a) through (d) above, and after considering and relying upon the statements and representations made by IIT Kharagpur/Chakrabarti in paragraphs 33, 36 and 37, amongst others, and in trust and reliance on

IIT Kharagpur's reputation, Plaintiff and TNR agreed to form Cool e-mobile in India, and requested counsel to modify the structure accordingly.

40.     In fact Plaintiff was so enthusiastic about signing up the Indian Railways as the first customer, that she named the joint venture company Cool e-mobile, after the infamous porters of the Indian Railways who carry the heavy luggage of passengers on their heads.

41.     According to a February 2008 article published by Forbes.com "The state-run Indian Railways is the main mode of long-distance travel in India, ferrying about 15 million passengers per day. It is also the country's single-largest employer, with about 1.4 million on its payroll. The Railways are expected to report revenues of about $4.62 billion as of March 31 [2008] and have a cash surplus of $6.26 billion."

42.     Cool e-mobile's demonstrative application that was developed for the Indian Railways ("the TTE Assistant") and that is part of the IP, was designed to demonstrate how their Traveling Ticket Exchangers ("TTEs") could utilize a hand held device to run data from their Passenger Reservation System (PRS) locally on the device, so that while on board the trains the TTEs could, amongst other things, track passenger information (e.g. to quickly locate the doctors on board in case of an emergency), identify vacant berths for a wait-listed passenger, issue tickets instantly, and subsequently update the PRS using the hand held device.

43.     In June 2004, while the structure was being implemented and the IP was being further developed by IIT Kharagpur, Chakrabarti, Dasgupta and the Engineers, allegedly on behalf of Cool e-mobile with business input from Plaintiff and pursuant to the oral and written agreements described herein, Chakrabarti contacted Plaintiff and informed her that IIT Kharagpur/Chakrabarti had successfully secured a high level meeting with the Indian Railways. IIT Kharagpur/Chakrabarti also suggested that since forming an Indian company "will take over

a year" that the Indian Railways be permitted to remit payment for licensing of the IP and related services (including build-out of the TTE Assistant) *directly* to IIT Kharagpur. In the same regard, in a series of emails dated June 16, 2004 to June 28, 2004, IIT Kharagpur/Chakrabarti requested that IIT Kharagpur be given permission to market and sell the technology until Cool e-mobile was formed. IIT Kharagpur/Chakrabarti stated that if the permission was not granted immediately, Cool e-mobile would lose the opportunity to present the IP at the upcoming meeting. Regarding the same, in an email transmitted to Plaintiff on June 16, 2004, IIT Kharagpur/Chakrabarti wrote: "...The final company formation will take time. If we do not use this time now, we will lose the early customers. That is delaying my visits to various places..." In subsequent emails Chakrabarti implied, as in the past, that he and IIT Kharagpur had a close knit relationship with the top brass of the Indian Railways. In an email dated June 22, 2004 transmitted to Plaintiff, Chakrabarti wrote: "...I need to clarify that I shall be going to the Railways on various project proposals from IIT including this. This will be a part of a mega project. So in order for me to be able to talk about this technology without getting into a problem, I need a clear signal from you that I am allowed to do so on behalf of IIT." On June 25 2004 Chakrabarti emailed: "I will be meeting them [Indian Railways] with a whole range of activities including IT infrastructure. Many faculty members and their research in involved. This is where I will try to place this activity of ours. TTE [TTE Assistant] is just a small application. I will have to explain the potential. I will have to explain several applications that will cut costs, add revenue and increase safety. Only then will they make a large investment." June 25, 2004: "...I am not demoing anything in the first meeting. That will come later. I wil [sic] go [to Indian Railways] with a set of proposals and then work on them..." June 28: "...I will be meeting with the Head of Railways for all sorts of IIT projects. I can discuss this technology only if your give

me clear permission. Else I can only speak in generic terms. I will be doing this next week and what I can see from the plans that TNR's counsel has discussed, the company or the joint relationship with IIT is not going to come up that soon. So I guess that I will have to keep this out of the agenda and it will be a major loss of opportunity." As a result of this fear that without the permission IIT Kharagpur/Chakrabarti were aggressively requesting, the partnership would suffer great economic loss, Plaintiff requested counsel to prepare a document that would provide IIT Kharagpur a conditional and temporary license to develop and market the IP as a placeholder for Cool e-mobile. Counsel therefore prepared and forwarded to IIT Kharagpur/Chakrabarti said document ("the Letter of Intent to Temporarily Market the IP"). However Plaintiff did not agree to allow IIT Kharagpur to accept payments or revenues from the Indian Railways, or from anyone, on behalf of Plaintiff, TNR, Cool e-mobile, or the IP. After confirmation that the letter was requested from counsel, Chakrabarti emailed the following the same day: "Thank you. I have already sent out an agenda for my Railway meeting. I will add this in. Its not a problem." Therefore confirming that he was planning on discussing the IP with the "the Head of the Railways", who at the time was Minister Laloo Prasad Yadav, in or about July 2004.

44. In a telephone communication in or about July 2004, Chakrabarti stated that since IIT Kharagpur would be responsible for signing up India's largest customers such as the India Railways on behalf of Cool e-mobile, and not only performing technical duties, IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers requested that one of the terms of the existing agreement be modified, with all others remaining the same, such that their allotment of shares would be increased. In an email that he sent to Plaintiff on July 13, 2004, Chakrabarti wrote: "Regarding percentages, it would be good to get somewhere around 25% for us". Plaintiff

agreed to request counsel to allocate the additional shares to IIT Kharagpur, Chakrabarti, Dasgupta and the Engineers, increasing their total shares to 25%.

45.    In furtherance of the effort to attempt to gain control of the IP, on July 13, 2004, Chakrabarti emailed Plaintiff the following: "For an Indian Venture that is incubating in IIT, it will be difficult for a foreigner [Plaintiff] to be the Chairperson of the Board. Nearly all incubation companies are expected to have a large representation from IIT, which we have."

46.    In August 2004, Chakrabarti transmitted an email on August 24, 2004 to Plaintiff, and others stating the following: "As per our rules, for incubation the institute needs 3% holding and not 2%. We must make appropriate changes wherever appropriate…." In a subsequent email dated August 27, 2004, Chakrabarti wrote that IIT Kharagpur had approved and would sign the Letter of Intent to Temporarily Market the IP. The email, transmitted to Plaintiff, TNR counsel and others, states: "Dear Ron, IIT has approved the signing of the agreement. The only change suggested now is that regarding incubation, 2% should be made 3%. Please let me know the next steps. Regards PPC." Amongst other things, the letter that was approved confirmed that (1) IIT Kharagpur and Chakrabarti would both be parties in the formation of Cool e-mobile and (2) Chakrabarti would serve as Co-Founder, Chief Technology Officer and Member of the Board of Directors. Once again, Plaintiff complied and requested counsel to allocate the additional shares to IIT Kharagpur, increasing the total to 28%.

47.    In the ensuing months, after all wishes were granted by Plaintiff, and after having been approved for signature by IIT Kharagpur, neither IIT Kharagpur nor Chakrabarti signed Letter of Intent to Temporarily Market the IP, and there was no further mention of a meeting with the Indian Railways. When questioned about their progress with respect to these activities, Chakrabarti apologized and blamed his hectic travel schedule for the delays. All the while, IIT

Kharagpur, Chakrabarti, Dasgupta and the Engineers continued to develop the IP as evidenced by emails containing periodic technology status reports received via email from IIT Kharagpur showing the notation "© Cool e-mobile, IIT Kharagpur".

48.    In November 2004, Defendant Dasgupta traveled from India to Santa Clara County, California and engaged in a lengthy meeting with Plaintiff and CFO. The purpose of this meeting was to further effect the fraudulent scheme to take control of and misappropriate the IP for Defendants' economic gain. Dasgupta led Plaintiff to believe that the further developments that were underway with the IP and where being made for the benefit of Plaintiff, TNR and Cool e-mobile. During the meeting, Plaintiff stressed the importance of signing up the Indian Railways immediately and Dasgupta agreed and showed Plaintiff and CFO a co-branded Power Point Presentation entitled "Cool e-mobile Development and Road Map" containing the stamp logo of IIT Kharagpur and containing several pages of descriptions and a picture of the hand held device containing the TTE Assistant demonstrative application for the Indian Railways. Both Plaintiff and CFO discussed with Dasgupta that Cool e-mobile's plan was to start a pilot project with the Indian Railways and then acquire a company to do full deployment and integration.

49.    On or about November 19, 2004, IIT Chakrabarti transmitted via email the following to Plaintiff: "I have a meeting with Wipro Chairman tomorrow. This is the second largest IT company in India after the Tatas. Do you think I should talk to him about collaborating on this?"

50.    On December 16, 2004, Chakrabarti included the following text in his edits of the Cool e-mobile Business Plan, which he transmitted to Plaintiff via email: "Cool e-mobile was founded in 2004 by its Co-Founders Ms. Mandana Plaintiff, an entrepreneur, and Dr. Partha Pratim Chakrabarti, Professor of Computer Science & Engineering and currently Dean of

Sponsored Research & Industrial Consultancy at Indian Institute of Technology, Kharagpur (IIT KGP). The Company is a privately held Indian joint venture between the Co-Founders and IIT KGP, and is a member of IIT's technology incubation program." In the business plan that he transmitted via email he also wrote the following about Cool e-mobile's TTE Assistant application for the Indian Railways: "The Indian Railways is the largest public sector company in India and possibly the single largest employer of people in the world. Cool e-mobile has targeted the Indian Railways as a primary customer with a very large potential base of workflow applications that are easily designable using the developed technology. As a first application, the Company has developed the Traveling Ticket Examiner (TTE) application where a TTE on a train can upload his/her workload while entraining, perform a variety of functions like ticket examination, confirmation, issue, downloading new reservations from different stations and uploading the required information from various intermittent hotspots on the way. This will help the railways have a continuous information system at a very low cost of ownership compared to other always connected technologies. This application has potential extension to other areas like maintenance, repair, accident monitoring, etc – issues of paramount importance to the Indian Railways. A number of applications for other utility organizations are also planned."

51.    During this time frame, Plaintiff informed Chakrabarti, Dasgupta and the Engineers, amongst others, that on her information and belief, the most likely acquirer of the IP in the future would be IBM. This was noted in the business plan that IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers reviewed and edited. In order to achieve the future long term goal of building Cool e-mobile and positioning the IP for a sale to IBM, Plaintiff requested that all further developments of the IP go hand-in-glove with IBM's technology offerings.

52.    On or about December 18, 2004 IIT Kharagpur/Chakrabarti transmitted via email to Plaintiff, the following: "...Few more issues: have been advised that it is important for me to break up the total of 28% of our side into 26 + 2 (for IIT) instead of 25 + 3. This is beacuse [sic] for foreign JVs, it is important for the Indian party to have at least 26%. I can get a sign off from IIT on this...."

53.    In or about January 2005, Chakrabarti requested Plaintiff to hire a specific local Indian counsel ("Sandersons and Morgans") without informing Plaintiff or TNR's counsel that Sandersons and Morgans was already counsel to IIT Kharagpur and the Incubation Society. During this same period of time Chakrabarti informed Plaintiff and the individual hired to perform part-time duties of a chief operating officer ("COO") that he was moving ahead aggressively to sign up the Indian Railways as Cool e-mobile's first customer.

54.    Defendant Gupta transmitted an email on behalf of himself as well as Defendants Dasgupta, Brar, Choudhury and Panda on February 15, 2005 confirming that Defendant Chakrabarti had agreed to, and was acting in the capacity of Chief Technology Officer of Cool e-mobile. The email states: "...The last few days have been quite eventful with respect to PXML. A lot of discussion has been going on regarding the current status, future directions and prospective customers etc. However Dr. P. P. Chakrabarti being the CTO and a technical person we wish to take directions directly from him. I guess this would be acceptable to all. Thanks Rakesh on Behalf of the Dev Team". In this same regard on May 11, 2005 Chakrabarti transmitted an email to Plaintiff and COO regarding his planned meetings with the Indian Railways that states: "...When Cool-e is formed, I or Pallab can use two cards because we are employees of IIT and (will become) formal members of Cool-e."

55.     In March 2005, When COO asked for details of any and all meetings IIT Kharagpur/Chakrabarti had with the Railways and details of those, since Chakrabarti had requested the Letter of Intent to Temporarily Market the IP in order to attend a meeting with "the Head of the Railways", Chakrabarti wrote an email to COO and Plaintiff on March 18, 2005 "...As I said, they did not respond to our request for a meeting. There has [sic] been elections in Bihar this month and so the minister did not convene any meeting. That is why I said that there has been nothing on that front. My contact has requested me to wait for some more time. But I think that now I will approach at a different level. I will keep you informed as soon as there is any change in status...." Further to that email on the same date, Chakrabarti wrote: "...No we must not let go of the Railways plan. I will move on to Plan B after we have reviewed and finalized the next steps in the technical plan...."

56.     In or about May 2005, two years after it was fraudulently represented by IIT Kharagpur/Chakrabarti that IIT Kharagpur would be a direct owner and partner of Cool e-mobile, Chakrabarti transmitted an email on May 12, 2005 to Plaintiff and COO that stated the following: "...IIT as per Govt act cannot form a JV company with anyone." In addition, the email stated: "IIT allow [sic] it to develop under its incubation program, that too as under the Incubation Society that IIT has set up...." In a telephone communication with Plaintiff during the same time frame, Chakrabarti claimed that the Incubation Society would take over the responsibilities and shares of IIT Kharagpur in Cool e-mobile. Chakrabarti also stressed that for all intents and purposes IIT Kharagpur and the Incubation Society were one and the same. Plaintiff and TNR accepted the modification.

57.     In an email dated May 16, 2005 Chakrabati wrote to Plaintiff: "...I will be visiting US for the PanIIT meet at Washington where I will be a speaker and a participant on behalf of IIT Kharagpur. On my way back, I will come to California just before I leave...."

58.     On June 1, 2005 Chakrabarti and Plaintiff met in Santa Clara County. When Plaintiff expressed her disappointment that Cool e-mobile could not be a partnership with IIT Kharagpur directly, as Chakrabarti had represented on many occasions in phone and email communications, Chakrabarti repeated the statements as referenced in paragraph 55, and stated, amongst other things the Incubation Society was being formed solely for the purpose of perfecting the partnership with Plaintiff and TNR. Chakrabarti stated that this new arrangement was in fact better because Cool e-mobile's admission as "member" of the incubator program, amongst other things, would enable it to have full access to the expertise of the IIT Kharagpur institution and faculty; receive complimentary office space at IIT Kharagpur; and utilize the "logo of IIT Kharagpur" next to its own, on its business cards and letterhead.

59.     During the June 1 meeting, Chakrabarti requested Plaintiff to wire him $100,000 so that he could secure the long promised contract with the Indian Railways. Chakrabarti attempted to instill fear of economic loss into Plaintiff by stating that if she did not wire the $100,000.00, IIT Kharagpur would lose the ability to sign up the Indian Railways on behalf of Cool e-mobile, and Plaintiff, TNR and Cool e-mobile would suffer great economic loss. When Chakrabarti refused to provide a detailed allocation for the large lump sum payment, Plaintiff rejected the request and urged him to keep his promise to move quickly to sign up the Indian Railways as Cool e-mobile's first customer.

60.     While Chakrabarti continued to stall in his efforts to secure the Indian Railways as Cool e-mobile's first customer, Plaintiff requested COO to schedule a meeting with the Indian

1    Railways for the same purpose and on behalf of Cool e-mobile. Upon meeting with a top

2    Minister of the Indian Railways to discuss Cool e-mobile and the IP, COO received an invitation

3    to make a formal presentation to the relevant decision making committee. Via an email dated

4
5    June 14, 2005 transmitted to Plaintiff and COO, and in order to gain control of the marketing of

6    the IP to the Indian Railways, Chakrabarti wrote: "The address used should be one for

7    communication as well. But we must use an appropriate address. I suggest you use the following:

8    Cool-e Mobile (I do not know if you will write "Pvt Ltd" or not here) c/o Incubation Programme

9
10   (TIETS) Sponsored Research and Industrial Consultancy Indian Institute of Technology,

11   Kharagpur Kharagpur [sic] 721302 India." Furthermore, in an email dated June 18, 2005

12   Chakrabarti wrote: "...Please find attached the document on the Railways that you may send out.

13   It contains a summary of both the technical details and Railways applicability. More details can

14   be provided in the discussions and presentations. Please also find below (after the mail text) a

15
16   small writeup [sic] which you may use it in the covering letter appropriately...." The content for

17   the proposed cover letter to the Indian Railways transmitted by Chakrabarti in the same email

18   was as follows: "Recently, in a collaborative research programme [sic] under the incubation

19   programme [sic] of IIT Kharagpur and using the world class experience of the IIT in this

20   domain, we have developed a unique mobile applications technology based on handheld devices

21
22   that could develop into a complete distributed paperless workflow for Railway operations. As a

23   first example, we have developed an on-train Travelling [sic] Ticket Examiner (TTE) Assistant

24   using which TTEs on a train can load specific information railway regarding passengers, check

25   in the traveling passengers, fill up the vacant seats from waitlisted passengers, etc. The data can

26   be transferred to the central system and network as and when the train passes some station that

27   has electronic reservation connectivity. The technology requires only intermittent connectivity at

28

1   relevant places only, something that is easily achievable in the Railways at a cost effective and

2   secure manner. The technology has the capability to be generalized to other applications like

3   repair personnel who can get relevant on-line help during maintenance and can log on their work

4
    and then can diversify to the whole organization. This will be unique not only to India but
5
6   possibly to the whole world in terms of such a large deployment. The technology is unique and

7   patent pending."

8        61.   In June 2005, when asked why he and IIT Kharagpur had not yet signed the Letter

9   of Intent to Temporarily Market the IP, Chakrabarti stated that IIT Kharagpur/Chakrabarti,
10
    Dasgpupta and the Engineers had met and conferred and they wanted to make one modification
11
12  in the agreement, while the rest would remain the same: they wanted anti-dilution protection for

13  their ownership interests in Cool e-mobile (the "IIT Kharagpur Anti Dilution Provision"). In

14  furtherance of their plan to gain control over the IP, and in order to stall in the formation of Cool

15  e-mobile so that in order to attempt to claim sole ownership rights to the developments of the IP,
16
17  Chakrabarti transmitted an email to Plaintiff on June 25, 2005 on behalf of IIT Kharagpur,

18  Dasgupta and the Engineers "…I [sic] question came up among us here on the dilution of shares

19  when an investor comes on board. I have been on the understanding that our 25% and IIT 3%

20  shares will not get diluted on the initial investment upto [sic] $30million. I am however not clear
21
22  what your thoughts or view are in this matter. Can you please let me know." Plaintiff informed

23  Chakrabarti that after consulting with California counsel who specialized in venture capital

24  financings, it was understood that this term was unprecedented and would likely make Cool e-

25  mobile unattractive to prospective investors. Chakrabarti voiced the opinion that he and IIT

26  Kharagpur felt it was "fair" given the amount of value IIT Kharagpur would bring to Cool e-
27
28  mobile. Plaintiff spent the next several months consulting with numerous attorneys to structure

1    the IIT Kharagpur Anti Dilution Provision in such a way as to also protect the rights of future

2    investors. The only solution was for Plaintiff and TNR to sacrifice and set aside a substantial

3    portion of their shares for the benefit of IIT Kharagpur, the Incubation Society, Chakrabarti,

4
     Dasgupta and the Engineers, which they did.

5
6         62.    After being notified that the drafting of the IIT Kharagpur Anti Dilution Provision

7    was complete and had been granted, IIT Kharagpur/Chakrabarti was requested to sign the revised

8    Letter of Intent to Temporarily Market the IP. In an attempt to deceive Plaintiff and TNR, to

9
     indefinitely stall the formation of Cool e-mobile, and in furtherance of Defendants' plan to gain
10
11   control of the IP so that Defendants' could attempt to represent it to the Indian Railways and to

12   others as their own, Chakrabarti suddenly stated that he was not permitted to sign on behalf of

13   the Incubation Society and he rejected the idea of waiting until the Letter of Intent to

14   Temporarily Market the IP was signed before sending details of the IP to the Indian Railways.

15
     On July 6, 2005 Chakrabarti transmitted the following email to Plaintiff "This [Letter of Intent to
16
17   Temporarily Market the IP] has now to be placed for Society approval...I will do what is needed

18   from my end. Dont [sic] worry about that. However, I am not clear why we are delaying sending

19   the letter and documents to the Railways. I guess that I will be going to be present at the first

20   meeting. I have some authority to state that the relationship is there... I strongly recommend that

21
22   the technical documents promised to the Railways be sent as per schedule." Chakrabarti did not

23   reveal that he was in fact was the Secretary and a Permanent Member of the Governing Body of

24   the Incubation Society.

25        63.    In mid-July 2005 after realizing that Plaintiff and TNR would not authorize IIT

26   Kharagpur/Chakrabarti to send the technical details of the IP to the Indian Railways or to anyone

27   else without the required documentation of the Letter to Temporarily Market the IP, realizing
28

that Defendants' scheme was not going according to plan, on July 29, 2005 Chakrabarti

transmitted the following email to Plaintiff: "…I have some information that is important for me

to share with you. It seems that one of my crucial team members stationed at IIT Kharagpur will

be leaving IIT and taking up jobs elsewhere very soon. I am not sure when the other will leave

also… Also one member is moving to US. In view of this, with no one here in IIT it will become

very difficult (actually impossible) for me to provide quick response to clients like Railways and

others. The US team cannot come here for every meeting and those who join new jobs cannot

respond also. With no one from the core team around, I do not know how we will be able to

proceed at the required pace if and when things get started. I have to therefore rethink my whole

participation and I wanted to let you know early…" When Plaintiff reminded IIT

Kharagpur/Chakrabarti of its responsibilities pursuant to the agreed upon terms of the

partnership, and that it was their responsibility to "recruit and maintain" a core team of engineers

for Cool e-mobile, Chakrabarti transmitted the following via email to Plaintiff on July 31, 2005

"…Then [sic] chances of all leaving is less than 1% and if needed I can stop it with personal

intervention... Please continue with your plans and programmes [sic]."

      64.     In August 2005, without the prior knowledge of Plaintiff or COO, and in an effort

to deceive Plaintiff and TNR in to believing that Cool e-mobile and the IP would be admitted as

a member of the Incubation Society, in order to coerce Plaintiff and TNR by causing them to fear

that they would suffer economic loss if they did not to authorize Defendants to send the technical

details of the IP to the Indian Railways without execution of the Letter to Temporarily Market

the IP, Chakrabarti transmitted the following via email to Plaintiff on or about August 30, 2005:

"A technical committee of the Incubation Society at IIT met with external experts to examine

the various incubation proposals. Pallab, Subrat and Pravanjan made the presentation on behalf

of Coole [sic]. I was in the Committee and so did not present it myself. It would have been good if we had the company incorporated by now…I am not sure what the status is with the Railways, but I get to understand that some equivalent technologies are coming into the space."

65.     In October 2005, after more than two years of meeting IIT Kharagpur/Chakrabarti's, Dasgputa's and the Engineers' demands, and relying on their material misrepresentations to enter into the partnership in the first place, in a deceitful and malicious effort to cause Plaintiff and TNR's withdrawal from the partnership so they could claim the IP as their own, misappropriate the IP for their sole economic gain and so they could attempt to cover up the fact that Chakrabarti's and Dasgupta's promises to serve as Chief Technology Officer and Vice President of Engineering of Cool e-mobile were fraudulent, Chakrabarti suddenly informed Plaintiff that (1) neither IIT Kharagpur nor the Incubation Society could be a partner in Cool e-mobile (as IIT Kharagpur/Chakrabarti represented pursuant to paragraph 55) and (2) Chakrabarti personally could, but "would not" keep a formal role as Co-Founder and Chief Technology Officer of Cool e-mobile because Cool e-mobile would be "better served" if he instead served as the Incubation Society's nominee on an informal Advisory Board. In an email transmitted to Plaintiff on October 7, 2005, Chakrabarti wrote: "I did not take up being the Co-Founder/CTO, etc for myself" and "I do not wish to have anything and will not take up any formal role…" and "…Let me get into an advisory non formal role to help you see the project to fruition…." Regarding the Indian Railways, in the same email and once again attempting to instill fear of economic loss into Plaintiff and TNR in order to obtain control of the IP and send the technical details to the Indian Railways on behalf of IIT Kharagpur without signing the Letter of Intent to Temporarily Market the IP, Chakrabarti stated: "…you will find later that you will get into trouble to get a contract directly. Please wait and see. So, I suggest that you think about this very

carefully and decide on the next steps." In a subsequent email he transmitted on October 7 2005, Chakrabarti wrote: "I think that my contribution will be most fruitful if I do not take any formal role in Coole [sic]." On October 8 he wrote: "...Please consider keeping me out of any formal role. I will help otherwise..." and "...At present, my mind says that if I keep a formal role and shares, I will not be able to play a clear and frank role needed for the success of Coole [sic]...." An email transmitted to Plaintiff and others by Defendant Gupta on November 21, 2005 confirmed that although no one informed Plaintiff or TNR, the Engineers were aware that Dasgupta too, would not maintain his "formal role" as the Vice President of Engineering.

66.    From that point forward until January 2006, IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers assured Plaintiff and TNR that they were committed to the success of Cool e-mobile and that they would meet their obligations to Plaintiff and TNR. In January 2006, a meeting was held in Kolkata, India between Chakrabarti (representing himself, IIT Kharagpur and the Incubation Society), COO and Sandersons and Morgans, during which IIT Kharagpur/Chakrabarti orally promised amongst other things, that the following actions would take place:

(a) IIT Kharagpur/Chakrabarti would replace Chakrabarti with a Chief Technology Officer that U.S. based investors would feel was as qualified and experienced as Chakrabarti

(b) IIT Kharagpur/Chakrabarti would replace Dasgupta with a Vice President of Engineering that U.S. based investors would feel was as qualified and experienced as Dasgupta

(c) IIT Kharagpur/Chakrabarti would replace Chakrabarti with a competent person who was capable of signing up India's largest corporate and government clients,

1    and in the meantime Chakrabarti would assist COO in signing up the first five customers

2    including the Indian Railways.

3        67.    In the following months, after Chakrabarti urged Plaintiff and TNR to accept IIT

4
5    Kharagpur/Chakrabarti's oral promises outlined in paragraph 65 and all subparagraphs, that were

6    made in the presence of one or more witnesses, and Plaintiff requested the promises in writing,

7    IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers began a pattern of avoiding their

8    responsibilities. On April 3, 2006 Chakrabarti wrote in an email: "…it is essential for everyone

9
10   to go ahead without me having any formal role, responsibility or stake now. I can help through

11   IIT as part of the Society and therefore it was urgent to quickly work out the details with the

12   team, form the Company under the Indian Company's Act and get into the Incubation

13   programme [sic]." On April 6, 2006 an email transmitted by Panda to Plaintiff and others stated:

14   "PPC [Chakrabarti] has clearly explained to us the reasons why he will not play a formal role in

15
16   the company and we all have accepted this. He has been helping us always with our efforts and

17   plans and has assured us that he will continue to do so."

18       68.    Out of concern, Plaintiff and TNR requested their counsel to fly to India to meet

19   with the Defendants and understand the reasons for their actions. Upon sending repeated requests

20   to meet, neither Plaintiff nor TNR's counsel received a response.

21
22       69.    In furtherance of the plan to claim the IP as their own, misappropriate it and cause

23   damage and harm to Plaintiff and TNR, knowing that Plaintiff and TNR's counsel were arriving

24   in India in the next two weeks, Defendant Naskar in an effort to deceive Plaintiff and TNR,

25   assumed the identity of the "Ex-Officio Secretary TIETS" (the Inclubation Society)" and in that

26   capacity transmitted an email from the email address of the Dean of Sponsored Research (i.e.

27   Defendant Chakrabarti) with the subject "Inclusion in Incubation Programme of TIETS:

28

Submission of Documents", stating "On behalf of the competent authority I am very happy to inform you that based on the recommendations of the technical Committee, the TIETS Governing Body in its meeting on 20th March 2006 has ratified inclusion of your proposed technology development under the Incubation Programme [sic]..." pending receipt of some formal documentation that had to be submitted within 10 days.

70.    TNR's counsel responded immediately to the acceptance letter, requesting clarification on several matters and requesting an extension of time due to Plaintiff's and his pre-arranged trip to India the following weeks. Neither IIT Kharagpur/Chakrabarti, nor Naskar responded to any of the phone calls or emails. Sandersons and Morgans, who also repeatedly attempted to contact the Defendants via phone and email regarding the Incubation Society acceptance letter, received no response regarding the matter either.

71.    Before departing for India in the middle of May 2006, Plaintiff and TNR's counsel informed IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers that Plaintiff had secured an opportunity to present a demonstration of the IP to a large prospective customer, and they requested a copy of the IP for said opportunity. After Chakrabarti, Dasgupta and the Engineers failed to acknowledge or respond to the repeated requests for assistance, Plaintiff and TNR's counsel requested Defendant Brar (in the U.S.) to install a demonstrative application of the IP on a hand held device that Plaintiff planned to use. Brar refused to comply with the request, said that he was required to have the permission of IIT Kharagpur/Chakrabarti in order to comply, and stated that he had not received such permission. Plaintiff never received a copy of the IP and was forced to cancel the presentation with the prospective customer.

72.    Upon reaching Kolkata, India, Plaintiff was made to plead in order to obtain a meeting with IIT Kharagpur/Chakrabarti. During a brief meeting that was also attended by

TNR's counsel and Sandersons and Morgans, Chakrabarti showed little interest in continuing with the project. By the end, however, he invited Plaintiff and TNR's counsel to visit IIT Kharagpur (five hours by car) and agreed to consider going forward and requesting the Engineers and Dasgupata to do the same.

73.    At IIT Kharagpur, Plaintiff and TNR's counsel met with IIT Kharagpur/Chakrabarti. When Plaintiff requested to meet with the one or more of Engineers, Chakrabarti made an excuse for each, claiming reasons for their unavailability and absence from IIT Kharagpur for several days. Once again, Plaintiff requested a copy of the IP and provided Naskar with hardware upon which to install it. Then, a second meeting was scheduled with Chakrabarti for the following morning and a third meeting was to be held with Chakrabarti, Dasgupta and one or more of the Engineers in Kolkata on May 26th 2006 to finalize and sign documents. Prior to their scheduled meeting with Chakrabarti the next morning, Plaintiff and TNR's counsel met with the Director of IIT Kharagpur, Mr. S.K. Dube, who welcomed them to the campus and congratulated them for their acceptance into the Incubation Society. Upon learning that Chakrabarti did not show up for the meeting, the Director's office suggested that Plaintiff and TNR's counsel meet with several of the other faculty and members of the Governing Body of the Incubation Society, which they did.

74.    The next day, Plaintiff and TNR's counsel were informed that Chakrabarti had to flee campus on an emergency and would not be available. Neither would the Engineers. Plaintiff and TNR's counsel contacted the Director's office and were informed that he too had gone away for some urgent meetings. The following morning, a messenger arrived at Plaintiff's designated accommodation at IIT Kharagpur, carrying the hardware that Plaintiff had deposited with Naskar for the purpose of receiving the IP. No IP was provided.

75.     Plaintiff and TNR's counsel returned to Kolkata in preparation for the meeting with IIT Kharagpur/Chakrabarti, Dasgupta and one or more of the Engineers. Although all efforts were made to reach them and confirm their attendance, and arrangements were made for the attendance of legal counsel and the COO from overseas, none of the Defendants appeared for the arranged meeting.

76.     On May 28, 2006, Plaintiff's and TNR's Indian corporate counsel ("Singhania"), who was working around the clock to form Cool e-mobile Pvt. Ltd. in compliance with one of the conditions of the letter of acceptance from the Incubation Society, made one final attempt to negotiate reconciliation with IIT Kharagpur, the Incubation Society and the remaining Defendants by sending formal correspondence outlining the concerns and suggesting a remedy. The correspondence included a copy of Cool e-mobile's confidential business plan (marked as such) and copies of various legal documents including one or more versions of the Letter of Intent to Temporarily Market the IP. The correspondence was sent to IIT Kharagpur and to the Members of the Governing Board of the Incubation Society, one of whom was a "Mr. P. Bhattacharya, Dy. [Deputy] General Manager, IBM Global Services, IBM India Pvt. Ltd."

77.     On June 6, 2006 IIT Kharagpur and the Incubation Society, through their counsel, made it be known and confirmed that Chakrabarti had been acting in the capacity as the representative of IIT Kharagpur, and they formally rejected further dialogue regarding the partnership.

78.     As a first measure, and in an effort to recover the IP from the Defendants, Plaintiff and Singhania met with the Deputy Inspector of Police of the Criminal Investigation Division of the State of West Bengal, Mr. Mitra. After hearing an account of the events, Mr. Mitra recommended Plaintiff to file a formal criminal complaint for investigation and assured

Plaintiff that the matter would be taken very seriously. Subsequently, a criminal complaint was filed and is pending.

79.     In July 2006, and in order to mitigate the damages, Plaintiff requested COO to send a proposal to the Indian Railways in compliance with their invitation to do so.

80.     In August, 2006, Defendants purported to return to Singhania one copy of the IP. The package included a cover letter from IIT Kharagpur/the Incubation Society's counsel stating that Plaintiff had no right to utilize the IP without the permission of IIT Kharagpur.

81.     In January 2007, Cool e-mobile India Pvt. Ltd. received a letter from the Indian Railways serving as a formal invitation to submit the technical details of the IP and to appear for a demonstration in their office in Lucknow, India.

82.     In 2007, IIT Kharagpur formed a division "under the auspices of Sponsored Research & Industrial Consultancy" (i.e. under Chakrabarti) called the "Technology Transfer Group (TTG)". According to its own web site "This group aims at working towards achieving the target of successfully transferring technologies developed in-house to the industry…this group is a first of its kind in the IIT system or for that matter any other Research Centre in the Country".

83.     In February and in March 2007, Plaintiff read in the Indian press that the 2007-2008 budget of the Indian Railways included a provision for a "pilot project" that would tie the Indian Railways' Passenger Reservation System to hand held devices that would be provided to the TTEs so that using the hand helds, they could immediately check berth availability and assign passenger seats for wait-listed customers. Various newspapers and magazines made the announcement and described precisely the TTE Assistant developed from the IP. For example, on February 27, 2007 an *EFY New Network* article stated: "The Indian Railways is also

considering a proposal to provide handheld computer terminals to TTEs, in reserved coaches. The TTE will feed in the current vacancy position, coach wise and berth wise into these handheld terminals. These terminals will be directly linked to the PRS system to transmit the berth reservation position from running trains to the PRS system. Based on this information, the PRS will allot vacant berths to waitlisted passengers at ensuing stations. Hand held terminals will be made available to the TTEs on four pairs of trains next year." On "March 15, 2007, Devarshi Upadhyay in *merinews* wrote: "A proposal to provide hand held computer terminals to TTEs is on the anvil. The way it will work is that the TTEs will feed in the current vacancy position, coach wise and berth wise in the hand held terminals, which will be directly linked to the passenger reservation system (PRS) to enable allotment of vacant berths to wait-listed passengers at ensuing stations."

84.     On information and belief that it was in fact TNR's and Cool e-mobile's TTE Assistant and IP that was being referred to, Plaintiff continued to pursue the goal of perfecting a demonstration for the Indian Railways. With no engineering team, no TTE Assistant demo, no technical know-how, and despite being informed repeatedly by IIT Kharagpur/Chakrabarti that without (1) a "stamp of approval" of the IP from an Indian Institute of Technology (2) the credentials of a Chief Technology Offer such as Chakrabarti (3) an engineering team with the credentials of the Engineers (4) a Vice President of Engineering with credentials such as Dasgupta's, the probability of obtaining the contract from the Indian Railways would be nil, Plaintiff and TNR attempted to recruit and hire a technical team to build a new TTE Assistant to present to the Indian Railways. Although COO was able to locate one engineer in Nepal with the expertise necessary to review and understand the IP and build a demo illustrating the

functionality of the TTE Assistant, because of having to start from scratch, amongst other challenges, their efforts did not materialize.

85.    In March 2008, after opening a box of documents that COO had obtained from IIT Kharagpur during a trip there, Plaintiff noted a research report by IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers that she had never seen, entitled "Survey of the Indian Railways Backend" that contained an in-depth review and analysis of the computer and database systems of the Indian Railways, knowledge of which was required for the build-out of the TTE Assistant and other hand held mobile applications that were the subject of the IP.

86.    In May 2008, Plaintiff noticed an article in the Economic Times of India, printed on March 15, 2008, that once again referred to the same hand held TTE project for the Indian Railways; however this time it described the TTE Assistant's marketing materials almost word-for-word and confirmed that the project had been awarded to IBM. It further stated that the total investment for the TTE project would be "Rs. 200 Crore" (approximately $46 million dollars). The article quoted an Indian Railways official saying "In 2008, we hope to provide handhelds in 100 trains including Rajdhanis, Jan Shatabdis, Garib Raths and Shatabdis. Later, the project would be implemented in all the entire Indian Railways network".

87.    Defendants have caused Plaintiff and TNR irreparable harm and significant monetary damages by their wrongful conduct and by fraudulently and maliciously conspiring to take control of the IP in order to misappropriate it, and in or to ensure that Plaintiff and TNR did not achieve the contract with the Indian Railways. Furthermore, as stated above, IBM has gained the contract with the Indian Railways utilizing the same technological solution as Plaintiff's and TNR's.

///

1

## FIRST CLAIM FOR RELIEF

2

### (Breach of Contract Against All Defendants)

3

4

5

88.    The allegations set forth in each and every paragraph and sub paragraph above are realleged and incorporated by reference as if fully set forth herein.

6

7

89.    Pursuant to the terms of the NDA, Defendants made certain promises, including but not limited to protecting and holding in confidence the IP that was entrusted to them.

8

9

10

Defendants further entered into and promised to fulfill the oral and written contracts described herein above, amongst others.

11

12

90.    Defendants have breached the NDA and each of the contracts described herein above.

13

14

91.    Plaintiff has substantially performed all of her obligations under each of the contracts except where such performance has been excused or prevented by Defendants.

15

16

17

92.    Plaintiff has suffered damages as a result of Defendants' breach of each of the aforementioned contracts.

18

19

93.    Wherefore, Plaintiff seeks monetary damages from the Defendants according to proof at trial.

20

### SECOND CLAIM FOR RELIEF

21

22

### (Breach of Fiduciary Duty Against All Defendants)

23

24

94.    The allegations set forth in each and every paragraph above are realleged and incorporated by reference as if fully set forth herein.

25

26

27

95.    At all material times relevant hereto, Defendants owed a fiduciary duty to Plaintiff as partners.

28

96.    Defendants have breached their fiduciary duties as owed to Plaintiff.

1  Plaintiff has substantially performed all of her obligations under each of the contracts except

2  where such performance has been excused or prevented by Defendants.

3      97.    Plaintiff has suffered damages as a result of Defendants' breaches of their

4

5  fiduciary duties to Plaintiff.

6      98.    Wherefore, Plaintiff seeks monetary damages from the Defendants according to

7  proof at trial. Because of Defendants' actions, and each of them, were taken maliciously,

8  fraudulently and oppressively, Plaintiff is entitled to an award of punitive damages.

9                              THIRD CLAIM FOR RELIEF

10

11      (Breach of the Covenant of Good Faith And Fair Dealing Against All Defendants)

12      99.    The allegations set forth in each and every paragraph and sub paragraph above are

13  realleged and incorporated by reference as if fully set forth herein.

14      100.    By entering into the contracts described herein above amongst others, each

15
   Defendant was bound by the covenant of good faith and fair dealing implied in every contract
16

17  within the State of California.

18      101.    Through the acts and omissions described and set forth above, Defendants

19  together and each in their individual capacity, breached the covenant of good faith and fair

20  dealing.

21
        102.    Defendants' breaches, and each of them, were made in bad faith, therefore
22

23  entitling Plaintiff to compensatory damages. Moreover, because of Defendants' actions, and each

24  of them, were taken maliciously, fraudulently and oppressively, Plaintiff is entitled to an award

25  of punitive damages.

26  ///

27
   ///
28

## FOURTH CLAIM FOR RELIEF

### (Fraudulent Inducement Against All Defendants)

103.   The allegations set forth in each and every paragraph and sub paragraph above are realleged and incorporated by reference as if fully set forth herein.

104.   Defendants IIT Kharagpur/Chakrabarti fraudulently induced Plaintiff and TNR to entrust Defendants with the IP under NDA and to enter into a partnership to further develop and market the IP by falsely representing, among other things, the contents described herein above.

105.   Defendants IIT Kharagpur/Chakrabarti, Dasgupta, Brar, Gupta, Choudhury and Panda, acting in concert, and in order to further their plan to take control of the IP, convert it and misappropriate the IP for their own use and economic benefit to the exclusion of Plaintiff and TNR, constructed a conspiracy of lies and deceit to convince Plaintiff and TNR that they were further developing and planning to market the IP on behalf of TNR and Cool e-mobile.

106.   Defendant Chakrabarti further fraudulently induced Plaintiff to incur additional costs and harmful delays to retain local Indian counsel to form and perfect Cool e-mobile without informing Plaintiff or TNR that Defendants IIT Kharagpur, the Incubation Society had already engaged the same counsel.

107.   Defendant Naskar acted fraudulently in accordance with paragraph 68, and in maliciously misleading Plaintiff and TNR regarding Cool e-mobile's purported acceptance into the Incubation Society and as to the whereabouts of the Engineers during Plaintiff's May 2006 trip to IIT Kharagpur.

108.   Defendants knew of the falsity of these misrepresentations or omissions of material facts and made the representations or failed to disclose material facts to Plaintiff for the purpose of inducing Plaintiff and TNR to entrust Defendants with the IP pursuant to the terms of

the NDA, to agree to form a partnership and to invest significant amounts of time and money in the partnership.

109.    Plaintiff justifiably relied on Defendants' false representations or omissions of material facts.

110.    Plaintiff has suffered damages as a result of Defendants' misrepresentations or omissions of material fact.

111.    Wherefore, Plaintiff seeks compensatory and punitive damages in an amount sufficient to punish Defendants and make an example of them.

## FIFTH CLAIM FOR RELIEF

### (Interference With Prospective Economic Contract Against All Defendants)

112.    The allegations set forth in each and every paragraph and sub paragraph above are realleged and incorporated by reference as if fully set forth herein.

113.    Defendants interfered with Plaintiff's and TNR's prospective economic contracts by failing to fulfill their promises so Cool e-mobile could secure the Indian Railways contract and enabling the contract to go to IBM. Furthermore, upon request in May 2006, Defendants refused to provide Plaintiff or TNR's counsel with the IP when they were informed that Plaintiff had an important meeting planned with a prospective customer.

114.    Plaintiff has suffered damages as a result of Defendants' interferences in Plaintiff's and TNR's prospective economic contracts.

115.    Wherefore, Plaintiff seeks monetary damages from the Defendants according to proof at trial. Because of Defendants' actions, and each of them, were taken maliciously, fraudulently and oppressively, Plaintiff is entitled to an award of punitive damages.

///

SIXTH CLAIM FOR RELIEF

(Tortious Interference Against All Defendants)

116.     The allegations set forth in each and every paragraph and sub paragraph above are realleged and incorporated by reference as if fully set forth herein.

117.     Defendants tortiously interfered with Plaintiff's contract with Sandersons and Morgans by convincing Sandersons and Morgans to breach its contract with Plaintiff and disrupting the ability of Sandersons and Morgans to perform its obligations under the contract, thereby preventing Plaintiff from receiving the performance promised.

118.     Furthermore, Defendants tortiously interfered with Plaintiffs business relationships by preventing Plaintiff from successfully establishing and maintaining a business relationship with prospective customers such as the Indian Railways.

119.     Plaintiff has suffered damages as a result of Defendants' tortious interferences in Plaintiff's contract and with its business relationships.

120.     Wherefore, Plaintiff seeks monetary damages from the Defendants according to proof at trial. Because of Defendants' actions, and each of them, were taken maliciously, fraudulently and oppressively, Plaintiff is entitled to an award of punitive damages.

SEVETH CLAIM FOR RELIEF

(Conversion Against All Defendants)

121.     The allegations set forth in each and every paragraph and sub paragraph above are realleged and incorporated by reference as if fully set forth herein.

122.     At all times hereto, Plaintiff and TNR were and are the sole and rightful owners of the IP.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

123.    As set forth herein above, Defendants took possession of a copy of the IP pursuant to the NDA and fraudulently converted the IP for their own use and gain, or in a manner to harm Plaintiff and TNR.

124.    On or about May 16, 2006 Plaintiff and TNR's counsel made their first demand of the immediate return of the IP from Defendants, and after that date through and June of that same year Plaintiff and TNR's counsel made subsequent demands. Notwithstanding the demands for the return of the IP, Defendants have failed and refused to return all copies of the IP and to remove from use the IP. In a letter dated August 31, 2006, Defendants alleged amongst other things that they were returning "one" copy of the IP to Plaintiff, they indicated that they would retain a copy of some of the IP and in addition they stated that Plaintiff was not permitted to utilize the IP without Defendants' permission.

125.    As a direct and proximate result of Defendants' wrongful conversion of the IP, Plaintiff has suffered damages in an amount that is not yet fully ascertainable. Between the time of Defendants' conversion of the IP and the filing of this Complaint, Plaintiff has expended substantial time and economic resources in legal fees, costs, lost contracts and lost economic opportunities in pursuit of the return and protection of the IP and its removal from unlawful use.

126.    Wherefore, Plaintiff seeks monetary damages from the Defendants according to proof at trial. Because of Defendants' actions, and each of them, were taken maliciously, fraudulently and oppressively, Plaintiff is entitled to an award of punitive damages.

## EIGHTH CLAIM FOR RELIEF

### (Conspiracy/Aiding And Abetting Against All Defendants)

127.    The allegations set forth in each and every paragraph and sub paragraph above are realleged and incorporated by reference as if fully set forth herein.

1    128.    In committing the aforementioned acts, Defendants IIT Kharagpur, the Incubation

2  Society, Chakrabarti, Dasgupta, Brar, Gupta, Choudhury, Panda and Naskar operated as a group

3  and knowingly and willfully conspired with, agreed with and aided and abetted each with the

4
5  other, to perform the wrongful acts and omissions that have caused Plaintiff and TNR substantial

6  monetary harm.

7    129.    Wherefore, Plaintiff seeks monetary damages from the Defendants according to

8  proof at trial. Because of Defendants' actions, and each of them, were taken maliciously,

9
   fraudulently and oppressively, Plaintiff is entitled to an award of punitive damages.
10
11    130.    For the reasons stated herein above, all Defendants are jointly and severally liable

12  to Plaintiff for all damages in this Complaint.

13                                              Respectfully submitted,

14  Dated this _27_ day of May, 2008

15
16                                              By: _____

17
18                                              MANDANA D. FARHANG

19                                              Plaintiff

20

21

22

23

24

25

26

27

28

1

## **REQUEST FOR JURY TRIAL**

2

Plaintiff hereby demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil

3

Procedure.

4

5

Respectfully submitted,

6

Dated this _27_ day of May, 2008

7

By: _____

8

9

MANDANA D. FARHANG

10

11

Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 44

JS 44 (Rev. 12/07)(cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

MANDANA D. FARHANG

### DEFENDANTS

INDIAN INSTITUTE OF TECHNOLOGY, KHARAGPUR and (SEE ATTACHMENT)

**(b)** County of Residence of First Listed Plaintiff  MARIN COUNTY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

MANDANA D. FARHANG
P.O. BOX 274
TIBURON, CA 94920

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **LABOR** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | | ☐ 710 Fair Labor Standards | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | | Act | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | | ☐ 720 Labor/Mgmt. Relations | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | | ☐ 730 Labor/Mgmt.Reporting | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | & Disclosure Act | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 740 Railway Labor Act | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | | ☐ 790 Other Labor Litigation | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | ☐ 791 Empl. Ret. Inc. | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | Security Act | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— | ☐ 540 Mandamus & Other | | ☐ 870 Taxes (U.S. Plaintiff | Determination |
| | Employment | ☐ 550 Civil Rights | | or Defendant) | Under Equal Access |
| | ☐ 446 Amer. w/Disabilities— | ☐ 555 Prison Condition | | ☐ 871 IRS—Third Party | to Justice |
| | Other | | **IMMIGRATION** | 26 USC 7609 | ☐ 950 Constitutionality of |
| | ☐ 440 Other Civil Rights | | ☐ 462 Naturalization Application | | State Statutes |
| | | | ☐ 463 Habeas Corpus – | | |
| | | | Alien Detainee | | |
| | | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C § 1332

Brief description of cause:
Diversity of citizenship; amount in controversy; costs

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE

DATE May 27, 2008

SIGNATURE OF ATTORNEY OF RECORD  Mandana D. Farhang

**ATTACHMENT TO**
**CIVIL COVER SHEET**

Defendants:

1. INDIAN INSTITUTE OF TECHNOLOGY, KHARAGPUR, an Indian Institute of Technology incorporated under the 'Institutes of Technology Act, 1961"
2. TECHNOLOGY ENTREPRENEURSHIP AND TRAINING SOCIETY, an Indian society
3. PARTHA P. CHAKRABARTI
4. PALLAB DASGUPTA
5. GURASHISH S. BRAR
6. RAKESH GUPTA
7. PRAVANJAN CHOUDHURY
8. SUBRAT PANDA
9. ANIMESH NASKAR
10. DOES 1 through 100, inclusive