1   Micah R. Jacobs (State Bar No. 174630)
    MBV LAW LLP
2   855 Front Street
    San Francisco, California 94111
3   Telephone: 415-781-4400
    Facsimile: 415-989-5143
4   E-mail: mjacobs@mbvlaw.com

5   Sanjiv N. Singh (State Bar No. 193525)
    SANJIV N. SINGH, A PROFESSIONAL LAW
6   CORPORATION
    P.O. Box 225815
7   San Francisco CA, 94122
    Telephone: 415-816-5548
8   E-mail: ssingh@sanjivnsingh.com

9   Attorneys for Plaintiffs
    MANDANA D. FARHANG and M.A. MOBILE LTD.
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14  M.A. MOBILE LTD., a limited liability       CASE NO. C-08-02658-RMW (HRL)
    company chartered in Dominica; and
15  MANDANA D. FARHANG,
                                                 PLAINTIFFS' MEMORANDUM IN
16              Plaintiffs,                       OPPOSITION TO DEFENDANT'S
                                                 MOTION TO DISMISS SECOND
17       v.                                       AMENDED COMPLAINT
                                                 PURSUANT TO FED.R.CIV.P.
18  INDIAN INSTITUTE OF TECHNOLOGY               12(B)(6)
    KHARAGPUR, an Indian Institute of
19  Technology incorporated under the
    "Institutes of Technology Act, 1961";
20  TECHNOLOGY ENTERPRENEURSHIP              Date:    May 28, 2010
    AND TRAINING SOCIETY, an Indian          Time:    9:00 a.m.
21  society; PARTHA P. CHAKRABARTI;          Dept.:   Courtroom 6, 4th Floor
    PALLAB DASGUPTA; GURASHISH S.            Judge:   Honorable Ronald M. Whyte
22  BRAR; RAKESH GUPTA; PRAVANJAN
    CHOUDHRY; SUBRAT PANDA;
23  ANIMESH NASKAR, and DOES 1 through
    100, inclusive,
24
                Defendants.
25

26

27

28

## TABLE OF CONTENTS

I.   INTRODUCTION................................................................................................1

II.  BACKGROUND ................................................................................................1

   A.  Procedural Background ................................................................................1

   B.  Specific Factual Rebuttals ..........................................................................2

       1.  IITK lured Plaintiff into a Joint Venture, *not* Vice Versa.........................2

       2.  ..The Proposal To Bypass The Mandatory Tender Process Originated From IITK, Not From Plaintiff...........................................................................2

       3.  Defendants Incorrectly Allege That The SAC Is Devoid Of Any Specific Information Regarding Plaintiff's Responsibilities In The Joint Venture. .............2

       4.  Defendants Wrongly State That A "Temporary License" Discussion Is Further Evidence That The Joint Venture Was Not Ever Formed And Reflected The Tenuous Nature Of The Relationship. ..............................................................3

       5.  IITK Falsely Claims That It Spent Three Years Enhancing Plaintiff's Technology Without Compensation Rightfully Due To It. .........................................4

       6.  IITK Incorrectly Claims That Plaintiff Sent "A Confidential Business Plan" To IBM. ............................................................................................4

       7.  IITK Claims That Plaintiff Further Disclosed Her "Technology" To The Railways In An Attempt To Land The Railways As A Customer. ..............................4

III. LEGAL ARGUMENTS.......................................................................................5

   A.  M.A. Mobile Ltd. Is Qualified To Do Business In California And Has Standing To Bring Suit. ...........................................................................................5

   B.  The SAC Pleads Facts Supporting Claims For Breach Of The Non Disclosure Agreement. ...........................................................................................5

       1.  The SAC Pleads An Enforceable Joint Venture Agreement Existed Between Plaintiffs And Defendant IITK. ..................................................................7

   C.  The Terms Of The Joint Venture Are Not Vague; Both Defendants' And Plaintiffs' Responsibilities Were Clearly Understood And Reflected In Their Communications, Actions, And The Draft Agreements Which Defendants Stated Were Expressly Approved And Ready For Signature. .....................................................11

   D.  Plaintiffs' Fraud And Breach Of Fiduciary Duty Claims Are Not Pre-Empted........13

   E.  The SAC Alleges a Fiduciary Duty and Rejects Defendant's Contention that the Joint Venture Did Not Exist.......................................................................14

   F.  Plaintiffs Fraud Claims Fully Satisfy Rule 9(b)'s Particularity Requirement...........16

       1.  Relevant parties.............................................................................16

i

| | 2. | Time | 16 |
| | 3. | Statements made and other fraudulent actions | 16 |
| | 4. | Place | 17 |
| | 5. | Specific Delineation of each Defendant's role in the fraud | 17 |
| G. | | The Elements Of Fraud Are Clearly Pleaded In The SAC. | 18 |
| | 1. | Misrepresentation of fact | 18 |
| | 2. | Knowledge of the falsity | 19 |
| | 3. | Intent | 19 |
| | 4. | Justifiable reliance | 20 |
| | 5. | Resulting Damage | 21 |
| H. | | The SAC Sufficiently Pleads a Claim for Trade Secret Misappropriation | 21 |
| IV. | | CONCLUSION | 24 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

ii

# TABLE OF AUTHORITIES

## Cases

*Andrews Farms v. Calcot, Ltd.*.................................................................................................20

*Andrews Farms v. Calcot, Ltd.*, 527 F.Supp.2d 1239, 1252 (E.D. Cal. 2007 ..............................21

*Banner Ent., Inc. v. Super. Ct.*, 62 Cal. App. 4th 348, 358 (1998) ................................................10

*Cahill v. Liberty Mutual Insurance*, 80 F.3d 339 (9th Cir. 1996).....................................................5

*Connor v. Great Western Saving and Loan Association*, 69 Cal.2d 850 (1968) ...........................11

*Dealertrack, Inc. v. Huber*, 460 F. Supp. 2d 1177, 1184 (C.D. Cal. 2006) ...................................24

*Diodes v Franzen*, 260 Cal.App.2d 244, 252 (1968). ...........................................................22, 23

*Engalla v. Permanente Medical Group, Inc.*, 115 Cal. 4th 951, 974 (1997)...............................19

*Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 WL 2345027 *10 (S.D. Cal. 2007) .......24

*Goodworth Holdings Inc. v. Suh* F. Supp. 2d 947, 956 (N.D. Cal. 2002) ....................................10

*Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 171 Cal. App. 4th 939 (2009). ..13

*Pellegrini v. Weiss*, 165 Cal.App.4th 515, 525 (2008) ..........................................................11, 13

## Rules

12(b)(6) ...........................................................................................................................................24

12(b)(6), .............................................................................................................................................1

1  **I.   INTRODUCTION**

2        As has been extensively detailed in the Second Amended Complaint (hereinafter "SAC"),

3  Plaintiff Mandana D. Farhang ("Farhang"), and the affiliate she owns, Plaintiff M.A. Mobile Ltd.

4  ("M.A. Mobile"), revealed highly confidential and extremely valuable technology relating to a

5  new platform for mobile computing ("Plaintiff's Technology") to one of India's premier

6  technology development centers, Defendant Indian Institute of Technology at Kharagpur

7  ("IITK").  Plaintiff's Technology was and is compelling, enabling dynamic, real time parsing of

8  data on mobile handheld devices.  In good faith, after executing a Non Disclosure Agreement

9  (hereinafter "NDA") with IITK permitting IITK access to Plaintiff Technology, Farhang and her

10  affiliates were lured into a supposed joint venture ("Joint Venture") with IITK and permitted

11  IITK to begin development work on Plaintiff Technology.  Defendants' numerous breaches in

12  connection with the NDA, the Joint Venture and Plaintiff's Technology have been alleged and

13  described in considerable detail in the Second Amended Complaint.  Defendant now seeks to

14  dismiss Plaintiffs' claims on the basis of Fed. R. Civ. P 12(b)(6), by mischaracterizing or

15  ignoring the allegations in Plaintiffs' Second Amended Complaint.  Plaintiffs submit this brief in

16  full response to Defendant's motion, and hereby urge the Court to deny the motion.  In the event

17  the Court grants any part of the motion, Plaintiffs hereby request leave of Court to amend their

18  claims accordingly.

19  **II.   BACKGROUND**

20        **A.   Procedural Background**

21        Farhang, acting *pro se*, filed the Original Complaint on May 27, 2008, asserting claims

22  for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and

23  fair dealing, fraud, interference, conversion, and conspiracy. (Dkt. No. 1.)

24        Defendant IITK filed a motion to dismiss for failure to state a claim pursuant to Rule

25  12(b)(6) and a separate motion based on the Court's lack of personal and subject matter

26  jurisdiction. Dkt. Nos. 44, 45.  Farhang, still acting *pro se*, then filed a First Amended Complaint

27  ("FAC") to attempt to address the concerns raised in IITK's Motion to Dismiss. (Dkt No. 57.)

28  The Court then heard and denied Plaintiff's Motion to Disqualify Counsel. On January 26, 2010,

855 FRONT STREET
SAN FRANCISCO CA 94111
MBV LAW LLP

1

1  the Court denied IITK's motion to dismiss for lack of jurisdiction, finding that IITK was not

2  entitled to sovereign immunity because this was a commercial transaction, but dismissed two of

3  Farhang's claims, and granted her leave to amend. (Dkt No 107.)  Plaintiffs, now represented by

4  current counsel, filed a Second Amended Complaint ("SAC") which amended the two dismissed

5  claims per leave granted by the Court and clarified the legal and factual basis for all of the claims

6  included in the Complaint.  IITK then filed this Motion to Dismiss, and only later filed a Motion

7  to Stay.

8      **B.**    **Specific Factual Rebuttals**

9      The detailed allegations in the SAC are described more fully below.  We will however

10  rebut a few of the numerous clearly erroneous statements made in IITK's latest summary of facts.

11          **1.**    **IITK lured Plaintiff into a Joint Venture, *not* Vice Versa.**

12      The original communication sent to and replied to by Defendant Chakrabarti was in April

13  (and resent in May) of 2003.  SAC ¶2(b)(2).   Plaintiff did send an introductory e-mail based on

14  recommendations of IITK alumni and based on IITK strategic presence in Silicon Valley and

15  IITK advertising its capacity to assist with technology development. Dkt No 64-5;  SAC ¶

16  2(c)(1).  Upon receipt of Plaintiff's e-mail, IITK then engaged in a systematic campaign over

17  many years to consummate a relationship with Plaintiff.  SAC ¶ 2(c)(1)-(3).   Against the larger

18  body of facts, the fact that Plaintiff sent the "first" e-mail is irrelevant.

19          **2.**    **The Proposal To Bypass The Mandatory Tender Process Originated**
20                       **From IITK, Not From Plaintiff.**

21      Plaintiffs approached IITK with a platform for launching their technology with Indian

22  Railways.  The notion that the mandatory tender process could be bypassed originated from IITK,

23  not Plaintiffs.  SAC ¶51.  Indeed, IITK made this promise as a means to secure Plaintiffs project

24  and gain access to the technology.  SAC ¶51.  It was the kind of promise that only a government

25  entity could make, and IITK leveraged that to its advantage.

26          **3.**    **Defendants Incorrectly Allege That The SAC Is Devoid Of Any**
                     **Specific Information Regarding Plaintiff's Responsibilities In The**
27                       **Joint Venture.**

28      Plaintiffs are surprised that Defendants, despite requesting an extension for filing their

2

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO CA 94111

12(b)(6) motion, seem to repeatedly ignore the contents of the Second Amended Complaint. There are numerous examples of Plaintiff devoting her *own* business expertise and innumerous man hours to the project, in addition to the countless hours of her counsel and affiliates.  SAC ¶ 33.  Moreover, Plaintiff spent considerable time interfacing with her affiliates such as Varsha Singh and counsel such as Ron Jenkins and local Indian counsel hired to form the Indian entity which IITK requested as part of the Joint Venture.  SAC ¶¶ 2(b)(2), 57, 68, 81(c).  Plaintiff was present at all of the original formation meetings, many of the key strategic meetings and conference calls, and was the principal point of communication with IITK for all of the key business decisions. SAC ¶¶ 33, 38, 42, 44, 52, 54(a) and 54(b).  Finally, we should add that discovery will show and the SAC has already alleged circulation of specific Joint Venture documents which IITK representatives stated were approved and ready for signature, and which clearly embodied the Joint Venture arrangements, which had been proceeding without documentation and with a very clear understanding of Plaintiff responsibilities.   SAC ¶¶ 33(e), 41, 2(c)(5).

> **4.    Defendants Wrongly State That A "Temporary License" Discussion Is Further Evidence That The Joint Venture Was Not Ever Formed And Reflected The Tenuous Nature Of The Relationship.**

Defendants have clearly misconstrued the significance of the temporary license.  The temporary license was a document drafted *specifically* because Defendant Chakrabarti, in an unanticipated series of e-mails from June 16 to June 28, 2004, demanded that any meetings by the Joint Venture with the Indian Railways would require that the technology be presented as IITK technology because formation of Cool e-Mobile would take time and that any initial payments would need to be paid directly to IITK.  SAC ¶ 37.  This was obviously worrisome and suspicious to Plaintiffs, especially given that the Joint Venture was already operating, Defendant Chakrabarti was presenting himself as Chief Technology Officer of the Joint Venture (not IITK), and Defendants had obtained access to Plaintiff Technology and permission to begin developing it on the reasonable assumption of an ongoing Joint Venture.  SAC ¶ 34.  Circumstances surrounding the temporary license are outlined in the Second Amended Complaint.  SAC ¶ 37.  In brief, the temporary license was never executed because it was not needed.  SAC ¶ 37.

3

M B V   L A W   L L P
855  FRONT  STREET
SAN FRANCISCO  CA 94111

### 5. IITK Falsely Claims That It Spent Three Years Enhancing Plaintiff's Technology Without Compensation Rightfully Due To It.

This contention is incorrect. IITK entered into a Joint Venture with Plaintiff with the understanding of equity stakes to be issued. SAC ¶ 33, 38. The understandings were specifically and expressly articulated in numerous e-mails and drafts. In fact, even more compellingly, every time IITK sent an e-mail that they were in full agreement with the Joint Venture documentation but needed additional equity, Plaintiff complied. SAC ¶¶ 38, 40. IITK's initial request for a 25% equity stake ultimately was finalized at 28% of the Joint Venture. SAC ¶¶ 33, 38 The only reason the equity stakes were not *officially* issued was due to IITK's repeated and ultimately nefarious ploys not to sign documents, despite repeated express assertions that the arrangement was approved (not "about to be approved", not " to be approved", but plainly and simply "approved") and that signatures were imminent. SAC ¶ 40. No individual or entity in the Joint Venture was being paid in any other manner.

### 6. IITK Incorrectly Claims That Plaintiff Sent "A Confidential Business Plan" To IBM.

This is simply not true, and sheds light on what will probably prove to be the nexus of egregious breach and malfeasance. The confidential business plan was submitted to the Incubation Society, in specific coordination with IITK, and language approved by Defendant Chakrabarti specifically stated that it was an "IITK incubation society." SAC ¶ 43 The Incubation Society was presented to Plaintiff as an entity controlled by IITK, and Plaintiff was told that it was set up to provide a convenient mechanism by which IITK could take equity interests in early stage companies and pursue Joint Ventures. SAC ¶ 50. Because the Incubation Society was presented as a vehicle of IITK, Plaintiffs reasonably believed that no additional confidentiality protections were required. SAC ¶¶ 39, 43, 50, 52. Thus, the alleged transmission of a "confidential business plan" to IBM was in reality transmission of the business plan, at the specific request of IITK, to IITK's Incubation Society on which the IBM Deputy General Manager sat.

### 7. IITK Claims That Plaintiff Further Disclosed Her "Technology" To The Railways In An Attempt To Land The Railways As A Customer.

The truth is that Plaintiff at no time disclosed confidential information or trade secrets to

4

1  the Indian Railways.   Plaintiff only disclosed information to the Indian Railways at two times,

2  both of which involved high level proposals and "invitations to present", the kind of proposals

3  that would precede signing of an NDA and which involved disclosure of high level concept to

4  gain the invitation to present. SAC ¶ 52.  No source code was disclosed or provided, no were any

5  trade secrets, internal documents or other such confidential information. SAC ¶ 52.

6  ## III.   LEGAL ARGUMENTS

7      Defendant has cited numerous cases in support of its contention that Plaintiff's Second

8  Amended Complaint fails to state a claim on which relief can be granted.  It is clear, however,

9  that courts have only granted Rule12(b)(6) dismissals where failures of pleading were obvious:

10  no plausible allegations for relevant elements, essential elements omitted, and the like.  For

11  example, in *Cahill v. Liberty Mutual Insurance*, 80 F.3d 339 (9th Cir. 1996) cited by the

12  Defendants, the court's analysis focused on the very precise language of an insurance coverage

13  provision which clearly and unequivocally could not cover the kind of "advertising injury"

14  alleged by Plaintiffs: "Given the precise language and the context of the advertising injury

15  clause, an insured could not reasonably have expected that the policy would cover the damages

16  the Cahills are seeking." *Id.*

### A.   M.A. Mobile Ltd. Is Qualified To Do Business In California And Has Standing To Bring Suit.

M.A. Mobile is qualified to do business in California and we request the Court to confirm

that M.A. Mobile should now have standing to bring suit.  Pursuant to California Corporation

Code S 2203 (c), we are submitting to the clerk of the Court evidence of the payment of the

applicable fees and a franchise tax certificate of good standing.  Declaration of Micah R. Jacobs,

Exhibit B.

### B.   The SAC Pleads Facts Supporting Claims For Breach Of The Non Disclosure Agreement.

Unlike in *Cahill* where the plaintiff could not specifically plead how the insurance

coverage obligation was triggered, Plaintiffs here plead very specifically as to the language of the

NDA and how the NDA was specifically breached.  The NDA is disclosed in the SAC, and

contains precise and specific provisions as to what are permitted disclosures and very clearly and

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO  CA 94111

5

1   specifically states that no license for development was granted. SAC ¶29. Defendants argue that

2   the SAC fails to allege any facts demonstrating to whom IITK improperly disclosed the

3   Technology or how and when it did so. This is plainly false. The SAC specifically states that

4   IITK improperly disclosed the Technology to the Indian Railways and to certain private

5   companies like IBM with representatives sitting on the Incubation Board. SAC ¶ 59. It

6   specifically articulates two plausible theories of transmission, one via the Indian Railways (by

7   way of IITK engineers and Defendant Chakrabarti communicating with Railway personnel) and

8   the other via IBM (by way of IBM sitting on the IITK Incubation Society board which had been

9   trusted with confidential information), and specifically outlines the uncanny timing of the access

10  IITK gave both entities to Plaintiff's Technology and the rapid announcement by the Indian

11  Railways and IBM of strikingly similar technology. SAC ¶¶ 43-49. The SAC states specifically

12  how Defendant Chakrabarti was dialoguing with the Indian Railways for IITK's sole benefit

13  while deliberately stalling on the Joint Venture approaching the Indian Railways on its own.

14  SAC ¶ 45. Indeed, the SAC articulates his contradictory statements on his dialogue with the

15  Indian Railways and the discovery of a box of documents indicating that Defendant Chakrabarti

16  and his engineers had been talking to the Indian Railways at a detailed level for a long time

17  despite their contrary assertions to Plaintiffs. SAC ¶ 45-46. Defendants' contention that the

18  transmission of confidential information to IBM occurred voluntarily via transmission to the

19  Incubation Society is absurd and in fact, as we view it currently, reflects Defendants possibly true

20  motives and modus operandi of the Incubation Society—as a platform for gaining access to

21  emerging technology for exploitation. The acknowledged disclosure to IBM raises the exact

22  kinds of plausible allegation supported by specific facts consistent with a well pleaded complaint.

23        Defendants also incorrectly argue that Plaintiffs fail to plead any facts showing that IITK

24  made, used or sold the intellectual property for its own account. As stated above, the SAC

25  specifically pleads that Plaintiff's Technology was transmitted to IBM and to the Indian

26  Railways, both of whom launched for-profit deals with significant monetary value soon after

27  IITK inexplicably terminated the parties' multi-year relationship. SAC ¶¶ 47-48. The SAC also

28  specifically pleads and refers to Defendants' own admission in the Indian Complaint that they

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO  CA 94111

6

1    were using the technology to develop their own suite of applications, of which the railways

2    application was only one. SAC ¶ 59. This is in plain violation of the terms of the NDA which

3    would have required Plaintiffs consent for any such independent development efforts, and in

4    contradiction of the Joint Venture vehicle which specifically authorized development only for the

5    Joint Venture and not for IITK's own benefit.

6         Defendants argue that Plaintiff failed to specify what items had not been returned to

7    Plaintiffs and further argue that "Farhang concedes that IITK returned the only item she gave it,

8    the 'IP.'" and then cite Dkt. No. 1, ¶ 80. We refer the Court to that citation where it plainly

9    states: "In August 2006, Defendant *purported* [emphasis added] to return to Singhania one copy

10   of the IP." Dkt. No. 1, ¶ 80  How Defendants drew their conclusion from this sentence is frankly

11   a mystery to Plaintiffs. It is plainly stated that Defendant "purported" to return one copy of the

12   IP, which clearly denotes Plaintiffs belief that not all of the IP had been returned. It clearly states

13   in the SAC: "Documentation relating to business plans, trade secrets not disclosed in the patent,

14   and other Confidential Information have not been returned to date and is believed to reside on the

15   premises of IITK and also may be in the possession of certain individual Defendants in India and

16   the United States." SAC ¶ 62(c).

17        Defendants argue that there is no contractual obligation identified requiring return of

18   information. Paragraph 8 of the NDA specifically highlights Defendants obligations to return

19   confidential information and is expressly cited in the SAC. SAC ¶ 29.

   **1.    The SAC Pleads An Enforceable Joint Venture Agreement Existed
          Between Plaintiffs And Defendant IITK.**

20
21        The NDA executed by Plaintiffs and Defendants in 2003 clearly stated that Defendants

22   could not develop Plaintiffs Technology—*i.e.*, the NDA did not grant a development license of

23   any kind to Defendants. SAC ¶ 29. It is critical for the Court to understand that the <u>only</u> manner

24   by which Defendants obtained the consent to develop Plaintiff's Technology for a railway project

25   or any other purpose was via the establishment of a Joint Venture and the licenses and consents

26   contained therein. There was no other alternative explanation and moreover, even if there might

27   be, Plaintiffs plead numerous facts to support that a Joint Venture plausibly existed and was

28

7

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO, CA 94111

1    plausibly breached or used as a vehicle for fraud. Elements and attributes of the Joint Venture

2    were clearly pleaded: (i) Plaintiff would permit Defendant to begin development of Technology

3    for a pilot railway project. In return for their work, Defendant would receive an equity share of

4    the 28% of the venture. SAC ¶ 33(c). The common undertaking was launching a mobile device

5    solution for the Indian Railways, and the equity was allocated so that profits were clearly shared

6    and not just incidental piecemeal payments for separate services. SAC ¶ 33 (a) – (e); (ii)

7    Defendant Chakrabarti would act as Chief Technology Officer of the Joint Venture, (not of IITK

8    or any department of IITK or any other related project.) SAC ¶ 33 (b); (iii) Cool e-Mobile would

9    be the official Joint Venture entity. SAC ¶ 33 and 33(a) Defendants insisted that the Joint

10   Venture set up an Indian vehicle for issuance of shares. Plaintiffs complied with this request and

11   set up Cool e-Mobile Pvt Limited. SAC ¶ 33 and 33(a). "Cool e-Mobile" was used by all parties

12   as the operative name for the Joint Venture and appeared on numerous documents including e-

13   mails, presentations, internal development papers, and source code, and clearly reflected the

14   active existence of the Joint Venture. SAC ¶¶ 41, 42, 43; (iv) There was a clear joint control and

15   decision making. While Plaintiffs decisions guided the strategic marketing issues and how to

16   position the product, Defendants exerted significant control in the engineering leadership and

17   how the product would be positioned specifically vis a vis the Indian Railways. SAC ¶ 33(b),

18   Defendants also had significant control over the day to day development work done by the

19   engineering team, and also exerted control at any time that Plaintiff tried to expedite meeting

20   with the Indian Railways or meet with the Indian Railways on their own. SAC ¶¶ 33 (b), 52, 53.

21            Defendant has made numerous specific assertions regarding the lack of an enforceable

22   Joint Venture that are plainly erroneous. For example, Defendants erroneously state that Farhang

23   conceded that IITK had informed her by May 2005 that it was incapable of contracting with her,

24   and that Farhang accepted the termination. Dkt No 112, page 7. Defendants cite Paragraph 56 of

25   the Original Complaint and Paragraph 52 of the SAC. Dkt No 1, ¶ 56; SAC ¶ 52. We encourage

26   the Court (and Defendants) to review the portion of the Original Complaint and SAC they have

27   cited. The Original Complaint clearly states that Defendants told Plaintiffs that the Incubation

28   Society would be used as an alternate IITK vehicle for continuing the Joint Venture; Defendant

8

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO CA 94111

1    Chakrabarti stated that both in telephone conversations and during his in-person meeting with

2    Plaintiffs. Dkt No 1. ¶¶ 56-59; see also SAC ¶¶ 33(e), 39, 50. The most compelling evidence

3    that the Joint Venture would continue and that Plaintiffs never accepted a termination was that

4    after May 2005 Defendant Chakrabarti issued numerous instructions and requests in accordance

5    with the continuing Joint Venture. Dkt No 1, ¶¶ 59, 60; see also SAC ¶¶ 52, 54(b),

6    Defendants issued modification of simple mechanics (i.e. replacing IITK with the IITK

7    Incubation Society for share issuance purposes but without changing the fundamental structure,

8    nature or operation of the Joint Venture); Plaintiffs accepted the modification and both parties

9    moved forward with the ongoing Joint Venture.

10          Defendants have also attempted to argue that any claim of an oral contract would be time

11   barred because the alleged breaches in question occurred more than two years prior to May 27,

12   2008.  In reality, the breach of the Joint Venture, breach of NDA, fraud, and misappropriation of

13   trade secret were ongoing acts which Plaintiffs did not become aware of until after May 27 2006.

14   Also as stated in the SAC, and as other documents will show at trial and as already mentioned in

15   the Original Complaint, Plaintiffs' did not become aware of all of the breaches until 2007 and

16   2008. This is repeatedly born out by the entire SAC which shows the elaborate web of

17   contradictory statements issued by IITK aimed to lull Plaintiffs into believing that a Joint Venture

18   was proceeding ultimately via the Incubation Society.  SAC ¶ 50 – 53. 63, 65 (where Plaintiffs

19   tried as late as 2007 to work with the so called IP returned to them, believing that the project

20   might still be salvageable based on representations that the IP was returned when in fact it was

21   not) 70, 75. Most importantly, in connection with actual transmission of trade secrets to third

22   parties, Plaintiffs did not confirm their worst suspicions until 2008 when Plaintiffs discovered

23   that shockingly similar technology had been announced in a lucrative deal between two of the

24   parties with known access to the technology via IITK and the Incubation Society. SAC ¶¶ 47, 48,

25   49.

26          Defendants also try to argue that the lack of writing is fatal to Plaintiff's claim because it

27   was expected that the Joint Venture would be memorialized in writing.

28          Defendants cite *Banner Ent., Inc. v. Super. Ct.*, 62 Cal. App. 4th 348, 358 (1998) for the

M B V   L A W   L L P
855  FRONT  STREET
SAN FRANCISCO  CA  94111

9

1   rule that "when it is clear that both parties contemplate that acceptance of a contract's terms

2   would be in writing, the failure to sign the agreement means that no binding agreement is

3   created." *Id.* The *Banner* case has been misapplied in this instance. The *Banner* ruling is that

4   both parties would have had to expressly agree that a signature was essential for ratification of an

5   agreement and operation of the joint venture. *Id.* at 358. Where there was not express agreement

6   regarding the necessity of a signature, however, oral agreements can be enforceable and the court

7   will look to the surrounding facts and circumstances. *Id.* In *Banner* there was only a short and

8   focused period in which a potential agreement may have existed and the appellate level dispute

9   focused on the very limited question of whether an agreement for mandatory arbitration was

10  made orally. *Id.* In this case, the joint venture spanned over a period of years with numerous e-

11  mails, actions, written terms and statements corroborating all of the details of the Joint Venture.

12  SAC ¶¶ 33(a) – (e), 54 (a) – (c).

13         Defendants have tried to argue that the essential elements of the joint venture were not

14  agreed upon by the parties. Defendants cite *Goodworth Holdings Inc. v. Suh* F. Supp. 2d 947,

15  956 (N.D. Cal. 2002). In *Goodworth*, the court did not find a joint venture not because one

16  single element was missing but because the purported agreement exhibited <u>multiple</u> undecided

17  elements: "The term sheet indicates that the division of profits, who the parties to the agreement

18  would be, and what role each party would play in the transaction was not determined." *Id.*

19  Review of the case law reveals that in fact, there is no single element whose absence would be

20  dispositive. Indeed, case law suggests that "[w]hether a joint venture relationship exists is a

21  question of fact, depending on the intention of the parties." *Pellegrini v. Weiss*, 165 Cal.App.4th

22  515, 525 (2008). In *Connor v. Great Western Saving and Loan Association*, 69 Cal.2d 850

23  (1968), also cited by the Defendants, the Court did not find a joint venture because it was devoid

24  of any common interest. Each member would get its respective fees for services provided in the

25  project, but there was literally no unified interest—i.e. no sharing of profits. *Id* at 863. The

26  arrangement was missing the "joint" in joint venture.

27         This case is quite different. The SAC alleges a clear common undertaking—i.e.

28  development of hand-held mobile computing devices and presentation to Indian Railways. The

10

1   SAC documents numerous e-mails, teleconferences, and planning documents which reflect the

2   collaboration. SAC ¶ 33 (a)-(e), 50, 51, 52, 53, 54 (a) – (c). The Joint Venture was clear—there

3   was a clear agreement to share profits, the equity sharing was definitive (thought of course with

4   late requests by Defendants, after many months of express agreement by Defendants, on vesting

5   and precisely how they would be distributed within the IITK network, all of which requests were

6   agreed to by Plaintiffs). SAC ¶ 33 (a) – (e), 38, 40.

7           And contrary to Defendant's arguments, there was clearly joint control of the Joint

8   Venture. For example, when Plaintiff tried to communicate directly with the engineering team

9   during a period when Defendant Chakrabarti was neglecting his duties, both the engineering team

10  and Defendant Chakrabarti balked, insisting that project leadership for the engineering team be

11  maintained with Defendant Chakrabarti as the Chief Technology Officer of the Joint Venture.

12  SAC ¶ 33(b)

13          Defendants also try to rebut the existence of joint control by stating that "IITK was to sign

14  the Indian Railways as Cool e-Mobile's first customer, yet IITK was not permitted to market the

15  Technology to Indian Railways without Farhang's permission." Dkt No 112, page 10.  In fact, it

16  was IITK's Defendant Chakrabarti who insisted on controlling the interface with Indian

17  Railways, which control Plaintiffs would later learn belied his intent of securing an independent

18  relationship with the Railways for the benefit of IITK alone. SAC ¶ 52, 53.

19      **C.   The Terms Of The Joint Venture Are Not Vague; Both Defendants' And**
            **Plaintiffs' Responsibilities Were Clearly Understood And Reflected In Their**
20          **Communications, Actions, And The Draft Agreements Which Defendants**
            **Stated Were Expressly Approved And Ready For Signature.**
21

22          Defendants incorrectly allege that "the SAC does not provide any facts showing what

23  "develop and exploit" means, how IITK was expected to carry such a promise out, who would

24  own the 'developed and exploited' technology, or what evidence there is that IITK failed to

25  perform its promise." Dkt No 112, page 10   The SAC alleges more than adequate delineation of

26  Defendant's responsibilities under the Joint Venture. The SAC specifically states that

27  development and exploitation of the technology involved, primarily, production of a demo of the

28  technology and production of related marketing materials, both of which would be used for the

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO CA 94111

1   ultimate goal and indeed "ultimate obligation" of attempting to secure the Indian Railways as a

2   customer;  the SAC specifically defines exploitation in these terms.  SAC ¶ 33(e).   The SAC

3   goes well beyond mere definition of IITK's development and exploitation responsibilities, and

4   provides rich description of other agreed upon elements and ongoing activities, including

5   Defendant's Chakrabarti's agreement to act as the Chief Technology Officer, business plan

6   assembly, the plan for the Indian Railways pilot demo, etc.  SAC ¶¶ 1, 33, 43.

7          Defendants also allege that the SAC is equally unclear as to Plaintiffs' obligations and is

8   "completely devoid of facts demonstrating what Plaintiffs offered in exchange for IITK's offer to

9   develop the technology."  Dkt No 1, page 10.  The SAC provides more than adequate delineation

10  of Plaintiff's specific roles in the Joint Venture.  Plaintiffs Farhang and MA Mobile Ltd provided

11  the Technology upon which the Joint Venture was based, provided critical "coordination" and/or

12  meetings on all activates of the Joint Venture, provided assistance in the form of teleconferences,

13  meetings and designated Plaintiff agents to move forward the production of the demo and

14  marketing plans, and provided the vast majority of the corporate and administrative assistance

15  setting up the Joint venture entity (Cool e-Mobile Pvt. Ltd) and handling all of the various legal

16  and administrative requests which Defendants issued during the course of the relationship.  SAC

17  ¶¶ 33, 33(a), 33(e), 38, 42.

18         Defendants' contention that M.A. Mobile was not required to do anything in the Joint

19  Venture is equally erroneous.  M.A. Mobile, as stated clearly in the SAC, owned a good portion

20  of the intellectual property that was licensed to the Joint Venture for Defendant to exploit and

21  utilize.  The licensing of this technology was the backbone of the Joint Venture.  SAC ¶¶

22  (2)(b)(2).

23         Finally, it should be noted that the vast majority of the specific oral agreements regarding

24  Plaintiffs' and Defendants' roles and responsibilities in the Joint Venture, were also reflected in

25  and corroborated by the written terms and conditions of the Joint Venture which were circulated

26  between the parties.  SAC ¶ 2(a)(2).  Moreover as case law shows, "[a] Joint Venture agreement

27  may be informal or oral."  *Pellegrini v. Weiss*, 165 Cal.App.4th 515, 525 (2008).  It should be

28  highlighted that Defendant Chakrabarti, in addition to his verbal agreement to these terms on

M B V   L A W   L L P
855  F R O N T   S T R E E T
SAN FRANCISCO   CA 94111

12

1   behalf of IITK, also expressly told Plaintiffs that the written terms had been approved and were

2   awaiting the formality of signature.  SAC ¶¶ 33(e), 40, 54(b). These representations were made

3   so that the Joint Venture could continue to move forward while IITK exploited the technology.

### D.   Plaintiffs' Fraud And Breach Of Fiduciary Duty Claims Are Not Pre-Empted.

California Civil Code Section 3426.7(b) "preempts common law claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.'" *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 171 Cal. App. 4th 939 (2009). However, unlike in the cases cited by Defendants, Plaintiffs' fraud and breach of fiduciary duty claims contain distinct elements that are not dependent on the misappropriation allegation.  It is plainly stated in the SAC that "*independent* [emphasis added] of Plaintiff's work with Technology or Confidential Information, Defendant [used ]Plaintiff's other business resources, business guidance, staff, and time to further a project ultimately intended for IITK's sole benefit." SAC ¶ 74.  The SAC narrates in detail how this nucleus of facts is quire distinct from the nucleus of facts regarding the misappropriation of Plaintiff Technology and confidential information.  The business resources, staff and time included the time of Plaintiffs designated business consultants and agents who worked closely with Defendants on marketing, strategy and operations of the Joint Venture, and included Plaintiff Farhang's own innumerous man hours and own personal capital expended in pursuit of setting up the Joint Venture.  Such resources, staff and time were quite separate from the Plaintiff Technology (which was owned and licensed by M.A. Mobile) and confidential information (which existed in hard copy, soft copy and verbal form and related to marketing, target customers, global strategy, source code, development challenges and issues, etc.)

Similarly, in connection with Plaintiff's fraud claims, it is clearly stated in the SAC that Defendants, *independent* of their fraudulent activities targeting Plaintiff Technology and confidential information,  Defendants aimed to induce Farhang to lend significant business resources in the form of guidance, time, consulting resources, and man hours of Plaintiffs' designated agents (including Varsha Singh, Ronald Jenkins and others) to the Joint Venture by

MBV LAW LLP   855 FRONT STREET   SAN FRANCISCO   CA 94111

13

1     promising a Joint Venture that would mutually benefit the participants but ultimately using

2     Plaintiffs' time, resources, man hours and expert consultants to further their own business plans

3     to develop what they hoped would be their own mobile technology suite.  SAC ¶¶ 2(b)(2), 57, 68,

4     81(c).

5         Thus, both the fiduciary duty and fraud claim contain claims and specific factual

6     allegations that are not pre-empted by California Civil Code Section 3426.7(b).

7        **E.**      **The SAC Alleges a Fiduciary Duty and Rejects Defendant's Contention that**

8             **the Joint Venture Did Not Exist.**

        Defendants' first argument is that they had no fiduciary duty to Plaintiffs because there

9     was no Joint Venture because Defendants informed Plaintiff that IITK could not enter into a Joint

10    Venture, and Plaintiffs accepted.  Dkt No. 1, page 11.  As alleged in the SAC, a Joint Venture <u>did</u>

11    exist because IITK found other ways to make it happen

12        Defendants' second argument that no fiduciary duty existed is equally erroneous,

13    contending that Plaintiffs had a superior position to IITK and that no fiduciary duty could exist.

14    Defendants' assertions to support this proposition are egregiously inaccurate and false.  IITK's

15    Incubation Society and IITK team members had agreed to collectively a 28% equity share, not a

16    3% equity share.  SAC ¶ 40.  IITK's unique and superior position stemmed from its role as a

17    government institution (which it repeatedly used to leverage additional benefits from Plaintiffs

18    using the promise of bypassing the tender process to secure the Indian Railways), its role as

19    technology experts, and finally, as an incubation society in which emerging growth companies

20    could trust that the confidentiality of their information would be protected, particularly where the

21    incubation society was an IITK vehicle and IITK had entered into an explicit confidentiality

22    agreement with Plaintiffs.  SAC, ¶ 52.

23        Defendants assert that Plaintiffs controlled the course of the project and that Plaintiff

24    Farhang was CEO of Cool e-Mobile while IITK held no position.  This is plainly false.

25    Defendant Chakrabarti, by his own description, was the acting CTO of the Joint Venture, namely

26    Cool e-Mobile.  SAC ¶ 33 (c).  Defendant Pallab Dasgupta was acting as the Vice President of

27    the Joint Venture.  SAC ¶ 54.  As has been documented above, Defendant Chakrabarti, in his

28

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

14

1    capacity as Chief Technology Officer for the Joint Venture and Dean of SRIC for IITK, wielded

2    superior influence over all of the engineering team. SAC ¶ 33 (c).  Defendant Chakrabarti and the

3    engineering team did not let Plaintiffs give them direction, but instead insisted that all direction

4    for the engineering project come from Defendant Chakrabarti.  SAC ¶ 33(c).

5         Defendants wrongly assert that Plaintiff was to have the right to vote every non-IITK-

6    related share as she saw fit, and neglect to mention that Defendant Chakrabarti was to be issued

7    25% of the total outstanding equity and IITK an additional 3% as requested for acceptance to the

8    incubation program.  Dkt No 64-2, Exhibit B, page 6; see also SAC ¶ 40.   The proposed voting

9    agreement was thus to be limited to the other non IITK shareholders other than Mandana, all of

10   whom were small holders who were personal friends, colleagues or service providers of Plaintiff

11   Farhang.  Dkt No 64-2, Exhibit B, page 5; see also SAC ¶ 40; see also Dkt No 64-2, Exhibit B,

12   page 5.  As is customary for early stage companies in Silicon Valley, she set up the voting right

13   clause so that such small shareholders who were not involved with actual operations and day to

14   day work of the Company would not delay consents required for vital financing transactions that

15   would require shareholder approval.

16        Finally, in further tenuous arguments against the existence of the Joint Venture,

17   Defendants wrongly point to Plaintiffs "superior" control, citing Plaintiff's refusal to wire

18   Defendant Chakrabarti USD100,000 and their refusal to allow Defendant Chakrabarti to present

19   the TTE solution as an IITK product rather than a Joint Venture creation. Dkt No 112, page 12.

20   The only instances in which Plaintiffs exerted control over IITK's interface with the Railways

21   were those instances where Defendant Chakrabarti seemed to be putting IITK's name and

22   financial interest ahead of the Joint Venture, going so far as to suggest that Plaintiff should wire

23   him personally the USD 100,000 so that he could approach the Railways and insisting that IITK's

24   name be used to the exclusion of the Joint Venture designation. SAC ¶¶ 52, 53; see also Dkt No

25   1, ¶ 59.  Defendant's Chakrabarti's insistence that IITK alone be credited with the mobile

26   applications development allegedly to gain leverage with the Indian Railways was inconsistent

27   with the plans which the Joint Venture had developed for presentation of their proposal. SAC ¶

28   41.

15

M B V   L A W   L L P
855  FRONT  STREET
SAN FRANCISCO  CA  94111

**F.      Plaintiffs Fraud Claims Fully Satisfy Rule 9(b)'s Particularity Requirement**

The SAC clearly pleads facts of the fraud that are evidentiary in nature.  The following is a catalogue of those evidentiary facts with specific references to where they appear in the SAC.

### 1.      Relevant parties

The SAC specifically identifies the parties engaged in fraud:  Defendant Chakrabarti, and the individual defendants named in the complaint, all acting on behalf of IITK and the Incubation Society.  SAC ¶¶ 33(b) (Chakrabarti implicated in fraudulent actions), 42 (Dasgupta implicated in fraudulent actions), 46 (Chakrabarti, Dasgupta, and all of the Engineers implicated in concealing information about interaction with Railways), and 57 (Dasgupta, Brar, Gupta, Choudhury and Panda all knowingly participating in emails sent to Plaintiff with false representations).  With regards to the receipt of the fraudulently obtained trade secrets and Plaintiff Technology, the SAC also identifies two potential witnesses and recipients of the inappropriately transmitted information and technology, IBM and the Indian Railways.  SAC ¶¶ 46 – 49.

### 2.      Time

The SAC delineates in more than ample detail the events of the fraudulent transactions, describing how Defendant Chakrabarti and the other individual defendants used phone calls, e-mails and in person meetings in 2004-2006 to give the impression of negotiating and consummating a Joint Venture, but all the while using the pretense of negotiation and then the pretense of an operational Joint Venture to build enhancements from the core Technology and transmit those enhancements and all the market trade secrets and confidential business information to the Indian Railways, IBM and possible others.   SAC ¶¶ 33 – 52.

### 3.      Statements made and other fraudulent actions

The SAC gives specific dates, cites specific news articles and pieces of evidence  corroborating the suspected time course, and cites specific quotations, events and statements which validate the timeline and the perpetration of fraud by the Defendants.  SAC ¶¶ 33-52.  The above cited portions of the SAC not only lay out step by step the contradictory fraudulent statements and actions of Defendant Chakrabarti and his team, but place these events in a

16

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO   CA 94111

1   chronology that culminated compellingly in the discovery of a storage box with railway

2   documents indicating Defendants had contact with the Railways when they stated in fact they did

3   not and culminating ultimately in the announcement of the same technology being used by two

4   entities who had direct access to the Technology and to confidential information through their

5   relationship with IITK and/or the Incubation Society.  SAC ¶¶ 37-52.

6                              **4.    Place**

7          The SAC clearly highlights how fraudulent e-mails were sent from India to the United

8   States, how fraudulent teleconferences were conducted between the United States and India, and

9   how Defendants were acting fraudulently in connection with their development efforts physically

10  in India on the IITK campus.  SAC ¶¶ 37-52.

11                  **5.    Specific Delineation of each Defendant's role in the fraud**

12         Plaintiffs have informed each Defendant of their alleged participation in the fraudulent

13  scheme.  The SAC specifically identified numerous instances of Defendant Chakrabarti's

14  fraudulent acts and statements.  We are mystified by Defendants assertion that these references

15  are confusing.  Where there are references to IITK and/or Defendant Chakrabarti, it is simply to

16  clarify to the Court that Defendant Chakrabarti was acting on behalf of IITK. SAC ¶¶ 37-52.

17         The SAC specifically identified several instances of Defendant's Dasgupta's participation

18  in the fraudulent scheme: Paragraph 38 (where they request additional shares and give the

19  impression of an ongoing Joint Venture), Paragraph 41 (where defendant Dasgupta is noted to

20  continue to have access to the technology and produce documents portraying the technology as

21  part of the Joint Venture), Paragraph 42 and 54(a) (where defendant Dasgupta is identified as

22  having traveled to California and made specific fraudulent representations to induce reliance by

23  Defendant and secure continued access to the Technology) and numerous other instances where

24  Dasgupta is implicated as one of the Engineers.  SAC ¶¶ 38, 41, 42, 46, 54(a), 54(c), 55(c)(4).

25         The SAC specifically identified numerous instances of Defendant Brar's role in the

26  fraudulent scheme:  Paragraph 57 (where it specifically states that Defendant Brar was knowingly

27  copied on e-mails containing false statements sent to Plaintiff and made no effort to correct the

28  fraud or inform Plaintiff of the falsities.) and Paragraph 58 (where defendant Brar is named as

M B V   L A W   L L P
855   FRONT   STREET
SAN FRANCISCO   CA   94111

17

1   one of the individual defendants who knowingly used Plaintiffs resources such as agent Varsha

2   Singh's time to perform tasks ultimately designed to further IITK's objectives to build a suite of

3   mobile solutions rather than for the proper and approved purpose of the railway Joint Venture).

4   SAC ¶¶ 57, 58.

5          The SAC similarly identified fraudulent actions of the other individually named

6   defendants in numerous places throughout the SAC, implicating all of the named individual

7   defendants in knowingly participating in the fraudulent e-mails which falsely gave Plaintiffs the

8   impression of an operational Joint Venture when in fact Defendants were exploiting the

9   Technology for their own benefit and knowingly participating in the use of Plaintiff's business

10  resources to further their own objectives rather than the objectives of the Joint Venture.  SAC ¶¶

11  33(b), 38, 41, 46, 57, 58.

12         **G.     The Elements Of Fraud Are Clearly Pleaded In The SAC**.

13         Defendants have attempted to summarize what they feel is the theory of fraud in the SAC,

14  and once again their summary is wrong.  Rather than attempting to interpret their summary,

15  which is frankly confusing and bears little resemblance to what is actually in the SAC, we will

16  simply refer the Court and Defendants to the appropriate portions of the SAC where the elements

17  are pleaded.  We agree with Defendants that the elements of fraud are:  (i)  misrepresentation of

18  fact; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting

19  damage. *Engalla v. Permanente Medical Group, Inc.*, 115 Cal. 4th 951, 974 (1997).

20         **1.     Misrepresentation of fact**

21         Misrepresentation of fact is detailed in great detail in Paragraphs 37-52 where it clearly

22  states how Defendant Chakrabarti and other Defendants represented that they were working on

23  behalf of the Joint Venture, but then ultimately were found to be working on their own broader

24  suite of mobile technology which they admitted to building using Plaintiff Technology of which

25  the railway project (the supposed focus of the Joint Venture) was only part.  It was ultimately

26  found that they were communicating with the Indian Railways when they repeatedly asserted that

27  they were not.  They also repeatedly misrepresented to Plaintiffs that the Joint Venture was

28  approved (again, not "about to be approved" or "likely approved" but plainly and simply

MBV LAW LLP   855 FRONT STREET   SAN FRANCISCO   CA 94111

1   approved) when in fact it was later disclosed that it was not because Defendants had made the

2   decision to exploit Plaintiffs Technology for their own benefit. SAC ¶¶ 37-52.

### 2.   Knowledge of the falsity

4        Knowledge of the falsity of their statements is evidenced and specifically cited throughout

5   the SAC. For example, Paragraph 55 specifically pleads various pieces of evidence establishing

6   Defendants knowledge of their false representations, including most compellingly the fact that all

7   of the Defendants participated in the sham Joint Venture despite their knowledge under Indian

8   law that they could not hold the job titles they requested and despite their knowledge that

9   Defendant Chakrabarti could not be a CTO of the Joint Venture. SAC ¶ 55. They persisted in

10   this sham for more than a year while they exploited Plaintiff's Technology. Other examples of

11   the knowledge of falsity are found in Paragraph 46, where Plaintiffs discovered a box containing

12   a report prepared by all of the Defendants detailing the backend operations of the Indian

13   Railways at a computer and database level, knowledge of which was critical to the TTE project.

14   Defendant had claimed they were not interfacing with the Indian Railways, and that the Indian

15   Railways independently acquired the TTE technology, and yet their own records indicate active

16   interface between IITK personnel and Indian Railways staff. SAC ¶46. There is no other

17   plausible means by which Defendants would have had access to such detailed accounting of the

18   Indian Railways backend.

### 3.   Intent

20        Intent to defraud is similarly detailed throughout the SAC. *Andrews Farms v. Calcot, Ltd*

21   describes misrepresentations that were made with "the intent to deceive plaintiffs and conceal

22   both the losses from the Palm Bluffs Development and the unauthorized charge to the proceeds

23   of the cotton sales. The intent was to deceive plaintiffs and have plaintiffs rely on said

24   misrepresentation." . 527 F.Supp.2d 1239, 1252 (E.D. Cal. 2007) Paragraph 53 of the SAC

25   conveys the unusual attempts by IITK to delay the Joint Venture from interfacing with the Indian

26   Railways, at the very time when IITK should have been promoting the interface but instead were

27   developing their own plans for approaching the Indian Railways and/or a third party for their own

28   benefit. SAC ¶ 53. Paragraph 53 conveys in great detail how when Plaintiffs secured a meeting

19

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO, CA 94111

1  on their own, Defendants suddenly claimed the demo was not ready despite recent previous

2  statements that the demo was ready when they thought IITK would control the interface with the

3  Indian Railways. SAC ¶ 53.  Paragraph 55 delineates clear evidence of specific fraudulent intent,

4  narrating how despite their express statements that Plaintiffs had been admitted to the Incubation

5  Society, Defendants subsequently took actions and had knowledge which clearly reflected that

6  they never intended for Cool e-Mobile to successfully enroll in the program or succeed as a Joint

7  Venture. SAC ¶55.  The SAC also delineates how Defendant Chakrabarti in particular made

8  express statements that the Joint Venture was approved, and then sent incredulous e-mails

9  indicating that the only reason he had not signed the actual physical documents was because of a

10  "hectic" travel schedule. SAC ¶41. He would then abandon the Joint Venture several months later

11  and deliberately thwart  the Joint Venture and ultimately literally fled the IITK campus when

12  Plaintiffs arrived to have in person meetings in 2006 in an attempt to learn what had become of

13  the Technology and why Defendants were so eminently unresponsive and unavailable.  SAC ¶

14  33(e), 52.

15               **4.**      **Justifiable reliance**

16          Justifiable reliance has been plead and described in great detail throughout the SAC.  The

17  *Andrews Farms* court suggested that allegations of reliance need not even be alleged with

18  particularity. *Andrews Farms v. Calcot, Ltd.*, 527 F.Supp.2d 1239, 1252 (E.D. Cal. 2007)

19  ("Defendants fail to cite to any authority that Rule 9(b) requires more particular pleading for the

20  element of reliance."). (Despite this, the SAC documents with great particularity how Plaintiffs

21  relied on Defendants Chakrabarti's repeated assurances that the Joint Venture was approved and

22  that documentation was simply a formality. SAC ¶ 33(e), 37 - 52.  The reliance was reasonable

23  because Defendant Chakrabarti was a high level officer of IITK, in charge of the SRIC and

24  presented himself as both authorized and knowledgeable on the mechanics to ensure that the Joint

25  Venture would move forward. SAC ¶ 15, 33(b).  The reliance was further reasonable because

26  IITK was a government entity and thus there was a reasonable belief that high level officials like

27  Defendant Chakrabarti would be well versed in what was permitted and what was not.  SAC ¶¶

28  52, 85.  Finally, Paragraphs 37-52, as referenced above, document the numerous statements and

20

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

1   actions made by Defendant Chakrabarti and other Defendants that the project was moving

2   forward and the Technology being developed for the Joint Venture.  SAC ¶¶ 37-52;  see also

3   SAC ¶¶ 56(a)-(c).

4               **5.**     **Resulting Damage**

5          Resulting Damage has been amply pleaded by the SAC.  Paragraph 65, among others,

6   clearly delineates the nature of the damages, the theory of loss (i.e. from loss of the Indian

7   Railway project due to breach of the Joint Venture and fiduciary duty and in alternative the loss

8   of valuable intellectual property from direct transmission of Plaintiff Technology to third party

9   recipients).  SAC ¶ 65;  see also SAC ¶ 47-49, 65.

10  **H.**    **The SAC Sufficiently Pleads a Claim for Trade Secret Misappropriation**

11         Defendants erroneously contend that Plaintiffs lack standing to bring a claim under the

12  Trade Secrets Act because they have not shown that they own the intellectual property.  First,

13  Defendants have misstated what the Original Complaint actually says.  The actual language of

14  the Original Complaint reads as follows: "Mandana D. Plaintiff ("Plaintiff") brings this action as

15  an individual, and citizen of the State of California. Plaintiff and her affiliates *[emphasis added to*

16  *emphasize the deliberate use of the plural]* ("TNR") own full right and title to the intellectual

17  property and other property described herein ("the IP")."  Dkt No 1., ¶ 5.  Thus, it is clear from a

18  plain reading of the Original Complaint language that "TNR" was the defined term for all of her

19  "affiliates *[emphasis added to emphasize the deliberate use of the plural]*" which at that time

20  included M.A. Mobile Ltd (the owner of Plaintiff Technology along with Plaintiff Farhang).

21  Thus, the statement in the Original Complaint is actually factually correct because M.A. Mobile

22  was one of her affiliates at that time, and "TNR" was a defined term for those affiliates (not the

23  defined term for the Tuff N' Ready entity specifically by itself as Defendants assumed.)  This

24  Court has already heard evidence on M.A. Mobile's role in this action, its position as a principal

25  owner of the Intellectual Property, Plaintiff Farhang's ownership interests in M.A. Mobile, and

26  Plaintiff Farhang's third party beneficiary status as a Plaintiff in connection with M.A. Mobile's

27  status as the owner of the intellectual property.  Dkt No 107, Order Denying Motion To Dismiss

28  for Lack of Subject Matter Jurisdiction.  The SAC also explains in considerable detail;

M B V   L A W   L L P
855   FRONT   STREET
SAN FRANCISCO   CA 94111

21

1   background information on the relationship of M.A. Mobile to Plaintiff and to Plaintiffs

2   Technology.  SAC ¶¶ 2(b)(2), 10-12.

3        Plaintiffs clearly describe the trade secrets with particularity.   Unless Defendants are

4   expecting Plaintiff to disclose trade secret in publicly filed court documents, Plaintiffs have gone

5   well beyond the mere assertion of secrecy and have detailed as much detail as they can about

6   their trade secret technology and other business trade secrets without compromising the current

7   trade secret status of the technology.  Indeed, a plaintiff need not "spell out the details of the trade

8   secret to avoid a demurrer." *Diodes v Franzen*, 260 Cal.App.2d 244, 252 (1968).  Rather, a

9   plaintiff must merely describe the secret to provide notice of "issues which must be met at the

10  time of trial and to provide reasonable guidance in ascertaining the scope of appropriate

11  discovery." *Id.* Specific details including patent citation and what the technology accomplishes

12  and its unique attributes are highlighted  in the SAC. SAC ¶ 25-26.  Finally, the specific trade

13  secret status of the information has been documented extensively in the SAC, where the non

14  published status of the patent is stipulated and also where the need for secrecy is explicitly stated

15  given the presence of other competing technologies in the mobile solution space.  SAC ¶ 98.

16  Moreover, the SAC specifically notes that trade secrets also include business trade secrets

17  regarding Plaintiffs global strategy for the Technology, target global customers and global

18  marketing plan.  SAC ¶ 27, 62 (c).

19       Plaintiffs have shown that their trade secrets have independent confidential value because

20  of their secrecy.  Specifically, the SAC articulates how because of the presence of other

21  competing mobile technologies, it was imperative to keep Plaintiffs' unique mobile solution

22  (including all detailed technical descriptions, architecture, and source code) secret.  SAC ¶ 99.

23       Defendants' reference to SAC ¶ 27 in its wild attack on Plaintiff trade secret claims

24  makes little sense to Plaintiff Counsel.  Paragraph 27 has very little to do with trade secrets and is

25  largely and clearly, by simple plain English reading, a narration of the confidential information at

26  issue.  Paragraph 27 of the SAC begins:  "In addition to the confidential patent-pending

27  Technology, Plaintiffs' intellectual property rights include "Confidential Information" related to

28  the above-described invention that includes but is not limited to the following: . . ."  So what

22

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

M B V   L A W   L L P
855   FRONT   STREET
SAN FRANCISCO   CA 94111

1    Defendants call a "laundry list of potential trade secrets" was actually a list of confidential

2    information. Dkt No 112, Section G(2)(a).  The trade secrets are identified specifically <u>elsewhere</u>

3    in the preceding SAC Paragraphs 25-26 and much later in Paragraph 27.  SAC ¶¶ 25-27.

4    Plaintiff's trade secrets were the result of reasonable efforts to maintain secrecy.  Plaintiff

5    exercised reasonable efforts to maintain the secrecy of its trade secret information and

6    technology.  Plaintiff filed and maintained non published status with the USPTO and insisted that

7    anyone who had access to the actual technology or any of their trade secrets executed an NDA.

8    SAC ¶ 98-99.  It is true that Plaintiff submitted high level disclosures to the Indian Railways, but

9    these disclosures were edited of all critical confidential and trade secret information and were the

10    high level version of the business plan which IITK and Plaintiffs worked on specifically for non

11    confidential disclosures that were meant to facilitate business discussion and set the stage for

12    execution of an NDA and further revealing of confidential and trade secret information at the

13    appropriate time. SAC ¶ 52.  *See Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 WL

14    2345027 *10 (S.D. Cal. 2007)(requiring only *reasonable* steps to ensure secrecy); *Dealertrack,*

15    *Inc. v. Huber,* 460 F. Supp. 2d 1177, 1184 (C.D. Cal. 2006) (same).

16         The SAC contains significant narration of the steps Plaintiff used to maintain its secrecy.

17    SAC ¶¶ 98 – 99.  The two cited instances of disclosure to the Indian Railways were precisely of

18    the kind indicated above—disclosure of information or demo of technology pursuant to NDA.

19    SAC ¶ 52

20         IITK should have no ownership rights over the intellectual property of the Joint Venture.

21    Defendants absurdly assert that IITK owns the technology it developed.  This is plainly and

22    unequivocally false.  As has been stated above, Plaintiffs and Defendants entered into an NDA

23    which specifically stated that it was not granting a development license of any kind.  SAC ¶29.

24    Defendants began work on Plaintiffs Technology by entering a Joint Venture which only granted

25    license to develop Plaintiff Technology for the Joint Venture. SAC ¶¶ 30-33   The Joint Venture

26    was a sham which Defendants used to continue its access to Plaintiff's Technology, and now

27    Defendants should not be able to assert ownership over the very technology that they would have

28    had no license to develop but for the Joint Venture.  SAC ¶¶ 33-52. If in the alternative, the Joint

23

1   Venture was not a sham but simply an arrangement which Defendants woefully and egregiously

2   breached and ultimately abandoned, there is still no basis for Defendants to assert ownership over

3   the derivative technology.  They have admitted the technology was derivative in the Indian

4   Complaints, and have made no meaningful assertions that it was independently developed.  Dkt

5   50, Exhibit A. Moreover, the numerous drafts articulating the core agreements of the Joint

6   Venture, to which Defendant Chakrabarti indicated express agreement on multiple occasions,

7   clearly indicate that the Technology would be owned by the Joint Venture and not by IITK.  Dkt

8   No 64-2, Exhibit B.

9 **IV.**    **CONCLUSION**

10     Plaintiffs' Second Amended Complaint is highly detailed and exceeds all minimum

11   pleadings standards. Plaintiffs respectfully submit that Defendant's Motion to Dismiss Pursuant

12   to Fed.R. Civ. Pr 12(b)(6) should be denied.

13

14   DATED:  May 7, 2010                  MBV LAW LLP

15

16                               /s/ Micah R. Jacobs

                               Micah R. Jacobs

17                               Attorneys For Plaintiffs

                               MANDANA D. FARHANG and M.A. MOBILE

18                                LTD.

19

20

21

22

23

24

25

26

27

28

24