Micah R. Jacobs (State Bar No. 174630)
MBV LAW LLP
855 Front Street
San Francisco, California 94111
Telephone: 415-781-4400
Facsimile: 415-989-5143
Email: Mjacobs@mbvlaw.com

Sanjiv N. Singh (State Bar No. 193525)
SANJIV N. SINGH, A PROFESSIONAL LAW
CORPORATION
P.O. Box 225815
San Francisco CA, 94122
Telephone: 415-816-5548
Email: ssingh@sanjivnsingh.com

Attorneys for Plaintiffs
MANDANA D. FARHANG and M.A. MOBILE LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| M.A. MOBILE LTD., a limited liability company chartered in Dominica; and MANDANA D. FARHANG, <br><br> Plaintiffs, <br><br> v. <br><br> INDIAN INSTITUTE OF TECHNOLOGY KHARAGPUR, an Indian Institute of Technology incorporated under the "Institutes of Technology Act, 1961"; TECHNOLOGY ENTERPRENEURSHIP AND TRAINING SOCIETY, an Indian society; PARTHA P. CHAKRABARTI; PALLAB DASGUPTA; GURASHISH S. BRAR; RAKESH GUPTA; PRAVANJAN CHOUDHRY; SUBRAT PANDA; ANIMESH NASKAR, and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO. C-08-02658-RMW (HRL) <br><br> **THIRD AMENDED COMPLAINT FOR:** <br> 1) **BREACH OF THE NDA AGREEMENT;** <br> 2) **BREACH OF JOINT VENTURE AGREEMENTS;** <br> 3) **BREACH OF FIDUCIARY DUTY;** <br> 4) **FRAUD; AND** <br> 5) **MISAPPROPRIATION OF TRADE SECRETS** |

1       Plaintiffs Mandana D. Farhang and M.A. Mobile Ltd. complain against Defendants and

2  allege:

3                                   **INTRODUCTION**

4       1.     In 2003, seasoned entrepreneur, Plaintiff Mandana D. Farhang ("Farhang"), and

5  the affiliate she owned, Plaintiff M.A. Mobile Ltd. ("M.A. Mobile"), revealed highly confidential

6  and extremely valuable technology relating to a new platform for mobile computing to one of

7  India's premier technology development centers, Defendant Indian Institute of Technology at

8  Kharagpur ("IITK"). The technology was and is compelling, enabling dynamic, realtime parsing

9  of data on mobile handheld devices. In good faith, Farhang and her affiliates were lured into a

10  supposed joint venture ("Joint Venture") with IITK. During the course of this relationship,

11  Farhang and her affiliates, through execution of a Non Disclosure Agreement, revealed not only

12  critical technology and confidential information but also disclosed critical trade secrets relating to

13  marketing, business strategies and the various applications for which the technology could be

14  used. Farhang and her affiliates also proffered extensive resources to IITK to further the Joint

15  Venture, in the form of significant expert consulting by Farhang's affiliates and agents, Farhang's

16  own time and expertise in business development, and numerous other business resources and

17  expenditures. In return, IITK entered into a Joint Venture with Farhang and M.A. Mobile and

18  promised to develop the advanced prototype that Plaintiffs provided to them for specific

19  application with the Indian Railways, a highly coveted customer that IITK promised it could

20  deliver because of its influential status in India. Regrettably, and quite shockingly, after many

21  years of fraudulently lulling Plaintiffs into a belief that a Joint Venture was ongoing, Plaintiffs

22  discovered that Defendants breached their obligations under the NDA and under the Joint

23  Venture and, instead, they misappropriated Plaintiffs' technology and the Joint Venture's

24  customers for their own benefit, giving the technology to IBM and ultimately to the Indian

25  Railways and possibly others. As facts would ultimately demonstrate, IITK and the other

26  Defendants never intended to pursue a Joint Venture but instead were using the pretense of a

27  Joint Venture to seize the technology for their own benefit. In this manner, as the Joint Venture

28  was a sham and simply a vehicle to obtain access to Plaintiff's technology, it is highly probable

M B V   L A W   L L P

8 5 5   F R O N T   S T R E E T

S A N   F R A N C I S C O   C A   9 4 1 1 1

1

that IITK and the other Defendants were breaching the non-use provisions of the NDA in a

substantial and ongoing manner from the moment they induced Plaintiffs to believe that a Joint

Venture had been established.  Evidence will show that IITK revealed (or caused others to reveal)

the technology to third parties for their own benefit (including third parties at IBM, the Indian

Railways, and possibly to other unknown third parties), exploited the technology internally for

their own benefit to create applications that rightfully belong to Plaintiffs, and ultimately blocked

Plaintiffs from approaching the Indian Railways so that Defendants could attempt to benefit from

the relationship (and its enormous profits) for themselves and/or provide a platform by which

their business partner IBM could launch a similar deal with the Indian Railways with the same

technology.  Plaintiffs continue to lose significant profits that could have been derived from a

reasonable sale, licensing or marketing of the technology which they diligently worked to

develop and they are being irreparably harmed by Defendants' conduct as alleged herein.

## SUBJECT MATTER JURISDICTION

2.      This Court has subject matter jurisdiction over Plaintiffs' claims against

Defendant Indian Institute of Technology, Kharagpur ("IITK") and Defendant Technology

Incubation and Entrepreneurship Training Society (also named herein as "Technology

Entrepreneurship  and Training Society") ("TIETS") under 28 U.S.C. § 1330, in that:

(a)      IITK and TIETS are "foreign states" as defined by 28 U.S.C. § 1603.

(b)      IITK and TIETS are subject, in this action, to the exception to foreign

sovereign immunity created by 28 U.S.C. § 1605(a)(1), and waived their immunity to suit in that:

(1)      IITK's and TIETS's conduct in breach of, arising out of, and/or

related to a certain mutual nondisclosure agreement (the "NDA") between all Defendants and

Farhang's assignor and/or affiliate, M.A. Mobile,  to which agreement Farhang is also an

intended third party beneficiary, forms the basis of the present action;

(2)      IITK and other Defendants were aware that Farhang was an

intended third party beneficiary of the NDA because Farhang and/or other circumstances

informed IITK on numerous occasions that she was contractually entitled to any profits from

M.A. Mobile's technology and intellectual property and/or that she was the real beneficiary of the

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

2

NDA.  Specifically:  (i) On June 25, 2003, Farhang entered into a contractual arrangement with M.A. Mobile that entitled her to 100% of the revenue derived from or through the technology and intellectual property covered by the NDA (hereinafter "Technology" as further defined below).  Declaration of Mandana D. Farhang, filed August 31, 2009: ¶ 6 and Exhibit A of said Declaration; (ii) Farhang informed IITK and its representatives prior to the execution of the NDA and subsequently that she maintained significant financial interest in M.A. Mobile and the use and protection of the Technology covered by the NDA directly impacted said financial interests.  *Id.* ¶ 6, 21; (iii) Emails to IITK's representatives before execution of the NDA, and after assignment of M.A. Mobile rights to Farhang, clearly state that Farhang had significant interests in the Technology:  "Although I left the mobile company in late 2000, as of last week, *I own all of its intellectual property* [emphasis added] and I am in the process of evaluating the best way to go forward.  In my view, I have two choices:  sell the IP to a large company, or build a company with outside funding. I would like to explore the IP with you to see if there is a potential fit and to determine if you are interested in being involved."  Email from Mandana D. Farhang to Defendant Partha P. Chakrabarti, dated April 27, 2003, attached to the Second Amended Complaint as Exhibit A; (iv) IITK was further aware of Farhang's direct financial and legal interests in the Technology covered by the NDA because all of the proposed Letters of Intent exchanged between the parties over the next three years, including versions Defendants have already submitted to the Court--which governed the use of, commercialization of, and proposed profit and equity shares in connection with, the Technology covered by the NDA--explicitly designated Farhang as a named individual and member of the proposed Joint Venture:  "This letter will confirm the shared intention of M.A. Mobile Ltd. (the "Company"), Ms. Mandana Farhang ("Ms. Farhang"), Dr. Partha Pratim Chakrabarti ("PPC"), and the Indian Institute of Technology Kharagpur ("IIT") (collectively, the "Parties") to form an Indian Joint Venture for the purpose of developing and marketing certain patent-pending technology. . ."  Declaration of Partha P. Chakrabarti, filed July 23, 2009:  Exhibit A of said Declaration;  see also *Id*. at Exhibit B of said Declaration; and (v) Communications between Farhang's counsel and IITK representatives refer to Farhang *individually* as the relevant client in connection with work to

23853.01\\432061.DOC

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    create suitable cross border vehicles for housing the Technology:  "Dear Dr. Chakrabarti and

2    Engineering Team:  I am very pleased to write to you on behalf of *my client Ms. Mandana*

3    *Farhang* [emphasis added], to advise you that I have commenced work to design and implement

4    a cross border corporate and commercial structure that will enable the efficient development and

5    exploitation of certain intellectual properties…" Correspondence from F. Ronald Jenkins to

6    Defendant Partha P. Chakrabarti, dated April 28, 2004, attached to the Second Amended

7    Complaint as Exhibit B.

8               (3)     IITK and TIETS freely and expressly agreed, in the NDA, that

9    "[t]his Agreement shall be governed in all respects by the laws of the United States of America

10   and by the laws of the State of California . . . ."; and

11              (4)     IITK and TIETS further freely and expressly agreed, in the NDA,

12   that "[e]ach of the parties irrevocably consents to the exclusive personal jurisdiction of the

13   federal and state courts located in Santa Clara County, California, as applicable, for any matter

14   arising out of or related to this Agreement."

15              (5)     The NDA confers further standing on Farhang to assert

16   jurisdictional and other claims under the NDA given that the NDA preamble clearly defines

17   "M.A. Mobile" to include "corporate affiliates" and Farhang, as a person or entity who

18   maintained majority control of M.A. Mobile, is clearly one of said corporate affiliates.  Said

19   language also operates as further notice to IITK that Mandana Farhang was an intended third

20   party beneficiary.

21              (c)     IITK and TIETS are further subject, in this action, to the exception to

22   foreign sovereign immunity created by 28 U.S.C. § 1605(a)(2), in that the action is based upon

23   the conduct of those Defendants which is at issue in the present action, which constituted

24   commercial activity by those Defendants inside the United States.  This lawsuit is also based

25   upon acts performed in the United States by the foreign sovereign Defendants in connection with

26   a commercial activity of the foreign sovereign Defendants elsewhere.  The conduct of those

27   foreign sovereign Defendants which is at issue in the present action also constituted commercial

28   activity by those Defendants, outside the United States, which caused a direct effect in the United

4

1  States. Specifically:

2          (1)      IITK and TIETS engaged in a global technology consultancy and

3  incubator (both of which engaged in significant private venture activity, taking equity interests in

4  companies in return for assistance with technology development) which conducted and sought to

5  conduct business in India and in the United States, specifically in California in Silicon Valley.

6  IITK engaged in strategic press interviews advertising its global technology activities to the

7  United States, including a February 2003 article read by Farhang before she executed the NDA

8  later that year, and IITK representatives sent emails to California to secure Farhang's business

9  and her continued work with IITK and the IITK incubation program through a Joint Venture.

10  Supplemental Declaration of Micah R. Jacobs, filed January 21, 2009, with Exhibits.  See also

11  Declaration of Mandana D. Farhang, filed August 31, 2009, with Exhibits.

12          (2)      IITK and TIETS's technology incubator operations specifically

13  targeted Farhang and the Technology, both of which were located in the Bay Area of California,

14  sending Indian representatives like Partha P. Chakrabarti to meet with Farhang in the United

15  States in California in furtherance of executing an NDA under California law by which IITK and

16  TIETS would have access to the Technology.  *Id.*

17          (3)      IITK also used its California based representatives, namely IIT

18  Kharagpur Life Fellow Bijoy Chatterjee, to meet with Farhang in California for the purpose of

19  securing access to the Technology and executing the NDA.

20          (4)      Through the numerous emails sent to California, meetings in

21  California with Farhang and M.A. Mobile, and the promise of its technology development  and

22  other incubation resources in exchange for equity in a company set up to commercialize and

23  profit from the Technology, IITK and TIETS entered or pretended to enter into a Joint Venture

24  agreement with M.A. Mobile (and later with other planned M.A. Mobile affiliates) and Farhang,

25  individually; the full scope of the Joint Venture and a more detailed chronological overview of

26  the facts underlying jurisdiction and claims asserted under this Third Amended Complaint is

27  found below beginning with Paragraph 33.

28          (5)      The Joint Venture agreement initially contemplated and required

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

5

that 72 % of the profits earned through the development and marketing of the Technology and its

enhancements would be paid to M.A. Mobile at its principal place of business in Marin County,

California, and to Farhang, individually, at her residence in Marin County, California.  Even after

IITK and TIETS put significant pressure to dilute Plaintiffs' interests, later drafts would require

that Farhang and other American based shareholders were still entitled to significant profits.

Defendants have acknowledged the existence of these drafts in their previous filings to the Court.

Declaration of Partha P. Chakrabarti, filed July 23, 2009:  Exhibit A of said Declaration; see also

*Id*. at Exhibit B of said Declaration.

(6)     After purporting to participate in said Joint Venture, IITK and

TIETS continued their commercial activities, namely the work and development of the

Technology at their labs in India and efforts to exploit the Technology for commercial gain for

their own benefit and to the exclusion of Plaintiffs.  Access to the Technology was granted to

them via execution of the NDA, a document which Plaintiffs only executed after IITK engaged in

significant targeted commercial activities in the United States persuading Farhang and M.A.

Mobile to do business with IITK.  Defendants continued to gain access to Plaintiffs' Technology

and Confidential Information through the Joint Venture or their fraudulent promises of Joint

Venture.  Instead of pursuing development of the Technology and recruitment of customers on

behalf of the Joint Venture or with suitable deference to their obligations under the NDA, IITK

and TIETS misappropriated the Technology for their own account, disclosed the Technology to

individuals not bound but whom  should have been bound by the NDA including representatives

of IBM sitting on IITK's Incubation Society, and used Plaintiffs' business resources (Farhang's

time, significant business resources, intellectual property and her designated agents) to further

their own business objectives to the exclusion of Plaintiffs.

(7)     As a result of Defendants' commercial activities in India (the Joint

Venture, and the operation of its technology consultancy and incubator to exploit Farhang's

Technology), IITK did not comply with its obligations to return the Technology to Farhang and

M.A. Mobile in the United States at M.A. Mobile's address specified in the NDA, and IITK

deprived Farhang and M.A. Mobile of the profits and payments they would have received at their

6

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1   respective addresses in California had Defendants participated appropriately in the Joint Venture

2   they purported to form with Farhang and her affiliates.

3        3.      This Court has subject matter jurisdiction over Plaintiff's claims against

4   Defendants Partha P. Chakrabarti, Pallab Dasgupta, Gurashish S. Brar, Rakesh Gupta, Pravanjan

5   Choudhury, Subrat Panda, and Animesh Naskar under 28 U.S.C. § 1332, in that:

6            (a)      Farhang is a citizen of the State of California and all of those Defendants

7   are citizens of either India or the State of Washington; and

8            (b)      The matter in controversy in this action exceeds the value of $75,000,

9   exclusive of interests and costs.

10                          **PERSONAL JURISDICTION**

11       4.      This Court has personal jurisdiction over Defendants IITK and TIETS in that:

12           (a)      IITK's and TIETS's conduct in breach of, arising out of, and/or related to

13   the NDA forms the basis of the present action.

14           (b)      IITK and TIETS freely and expressly agreed, in the NDA, that "[e]ach of

15   the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state

16   courts located in Santa Clara County, California, as applicable, for any matter arising out of

17   related to this Agreement."

18           (c)      IITK's and TIETS's conduct in breach of, arising out of, and/or related to

19   the NDA, involved intentional tortious acts expressly aimed at M.A. Mobile and Farhang,

20   individually, in Marin County, California, and those acts caused harm which those Defendants

21   knew or should have known was likely to be suffered by M.A. Mobile and by Farhang,

22   individually, in Marin County, California.

23           (d)      Plaintiffs are informed and believe that IITK and TIETS, at all times

24   relevant to this Third Amended Complaint, had substantial, continuous, and systematic business

25   contacts with and within this judicial district.  Specifically:

26               (1)      Plaintiffs are informed and believe that IITK, at all times relevant

27   to this Third Amended Complaint, had numerous consulting contracts with clients such as

28   National Semiconductor, Intel, Motorola, Hewlett-Packard, Sun Microsystems, and Cadence, all

7

located in Santa Clara County, California;

(2)     Plaintiffs are informed and believe that IITK is presently involved, on an ongoing basis, in computer science and engineering projects for numerous American corporate clients – *e.g.*, Google, Intel, National Semiconductor, and Si2 Microsystems – that are located in Santa Clara County, California;

(3)     Plaintiffs are informed and believe that TIETS presently has an ownership interest in a company called Minekey.com, which is located in Santa Clara County, California and which also has R&D Offices at IITK's Kharagpur campus;

(4)     Plaintiffs are informed and believe that IITK's Advanced VLSI Lab has numerous research and consulting contracts with corporate clients in the United States, including National Semiconductor in California;

(5)     Plaintiffs are informed and believe that IITK uses the IIT Foundation, a 501(c)(3) tax exempt entity in the United States, to raise funds amongst its extensive California based alumni for its capital development, venture activities, and other internal development purposes and IIT Foundation is involved, with the stated purpose of raising funds for IITK, in extensive fundraising, business networking, and promotion activities in California and specifically in Silicon Valley; Plaintiffs are informed and believe that IIT Foundation is a corporate alter ego of IITK during the time that IITK engaged in the breach of contract and/or fraud and misappropriation alleged under this Third Amended Complaint; IIT Foundation raises funds in California and the United States from IITK alumni using its 501 (c)(3) status for the stated and express purpose of providing direct financial support for the capital development and for-profit business activities of IITK and individual Defendants working for IITK, including IITK and its individual Defendants' venture activities;  IIT Foundation operates in direct coordination with IITK management, directing funds to IITK operations including the business activities that formed the conduct upon which Plaintiff's claims were based;  IIT Foundation representatives such as IIT Kharagpur Life Fellow Bijoy Chatterjee participated directly in persuading Plaintiff to give IITK access to Farhang's Technology, meeting with her in the United States prior to the execution of the NDA, sending her emails in the United States prior

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

8

to the execution of the NDA for the purpose of gaining access to the Technology, and using IIT Foundation connections to Bay Area resources such as law firms to advise IITK on its feigned participation in the Joint Venture;  IIT Foundation has an obvious unity of interest with IITK;  its express purpose is "enhancing the capability of Indian Institute of Technology, Kharagpur" and its "primary objective is to raise funds for IITK," as stated clearly on the IIT Foundation website, copies of which have been previously submitted to this Court.  IIT Foundation has no separate physical address from IITK, and uses a United States P.O. Box;  IIT Foundation, as clearly stated on its website, admits that key management decisions including monetary expenditures and use of funds is not made independently but is made only in coordination with the leadership of IIT Kharagpur in India;  the business units of IITK, such as the Advanced VLSI Lab, which generate revenue for IITK's business and technology units, have been extensively underwritten by the IIT Foundation;  these same business and technology units committed the breaches, fraud, and misappropriation outlined in this Third Amended Complaint;

(6)     Plaintiffs are informed and believe that IITK has numerous alliances and partnerships with California based research entities such as UC Berkeley, and that such activities are closely linked to their commercial and technology development activities;

(7)     Plaintiffs are informed and believe that IITK, through its technology consultancy, private venture and incubator activities, actively owns equity shares in start up companies with IITK alumni based in California; and

(8)     Plaintiffs are informed and believe that IITK has formally and informally engaged U.S. based counsel to further its activities in U.S. based technology transactions.

5.     This Court has personal jurisdiction over Defendants Partha P. Chakrabarti, Pallab Dasgupta, Gurashish S. Brar, Rakesh Gupta, Pravanjan Choudhury, Subrat Panda, and Animesh Naskar, in that:

(a)     Those Defendants' conduct in breach of, arising out of, and/or related to the NDA forms the basis of the present action.

(b)     Those Defendants freely and expressly agreed, in the NDA, that "[e]ach of

9

the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Santa Clara County, California, as applicable, for any matter arising out of or related to this Agreement."

(c)     Those Defendants' conduct in breach of, arising out of, and/or related to the NDA involved intentional tortious acts expressly aimed at M.A. Mobile and Farhang, individually, in Marin County, California, and those acts caused harm which those Defendants knew or should have known was likely to be suffered by M.A. Mobile and by Farhang, individually, in Marin County, California.

## VENUE

6.     Venue in this judicial district is proper under 28 U.S.C. § 1391(a), in that:

(a)     A substantial part of the events or omissions giving rise to Farhang's claims occurred in this judicial district.

(b)     Each of the Defendants is subject to personal jurisdiction in this judicial district on the grounds that, among other things, each of those Defendants agreed freely and expressly agreed, in the NDA, that it/he "irrevocably consents to the exclusive personal jurisdiction of the federal and state Courts located in Santa Clara County, California, as applicable, for any matter arising out of or relating to" the NDA; Defendants' conduct in breach of, arising out of, and/or related to the NDA forms the basis of this action; and there is no district in which the action may otherwise be brought.

(c)     Plaintiffs are informed and believe that Defendant IITK has prominent, well known local counsel actively litigating the matter, has governmental assets, cash and resources to handle its defense efforts, regularly sends its employees (including many of the named individual Defendants) to the United States and specifically to California for business, and is capable of receiving a fair trial in the United States given that the courts here are intimately familiar with the various corporate and sophisticated intellectual property legal and factual issues relevant to the case, and are also experienced with resolution of complex multinational matters.

(d)     Plaintiffs are informed and believe that concurrent proceedings in India (hereinafter the "Indian Proceedings") were filed *ex parte* without service to Farhang, Cool e-

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

mobile, or M.A. Mobile, and then subsequently filed only with alleged service to Cool e-mobile. These Indian Proceedings were filed in June 2009 more than one year after Farhang commenced this action in United States District Court, Northern District of California, in May 2008.  The Indian Proceedings were filed in a court that, while certainly an esteemed body in its own jurisdiction, has much less experience resolving complex, multinational disputes under United States and California laws regarding intellectual property developed in Silicon Valley and other parts of the world.  The filings submitted by Defendants by their Indian counsel to the High Court of Kolkatta are rife with egregious factual errors, making false and misleading statements about the ownership of the intellectual property, the nature of the relationship between M.A. Mobile, IITK, Mandana D. Farhang and other Defendants, and making false and misleading statements about the status of the patent with the USPTO that reflect  a fundamental lack of understanding regarding basic principles of intellectual property law and USPTO regulations.  IITK obtained, on false pretense, an injunction from the High Court in Kolkatha enjoining Plaintiffs from using or exploiting their own Technology, wrongfully depriving Plaintiffs of their rights, and causing additional irreparable harm.

       (e)     Plaintiffs have retained Indian counsel who prepared and then filed a Petition in the High Court of Kolkata to dismiss and/or stay the Indian Proceedings given that substantially similar claims on the practically same set of facts were filed more than 1 year previously in the United States with clear contractual and factual basis for subject matter and personal jurisdiction and no significant venue concerns given the nature of the dispute and the nature of the Defendant.  Dkt. No. 133, Paragraph 5.

## INTRADISTRICT ASSIGNMENT

       7.     Intradistrict assignment of this action to the San Jose Division of this judicial district is proper under Civil Local Rule 3-2(c), in that:

       (a)     A substantial part of the events or omissions giving rise to Farhang's claims occurred in Santa Clara County, California.

       (b)     Each of the Defendants expressly and freely agreed, in the NDA, that it/he "irrevocably consents to the exclusive personal jurisdiction of the federal and state

11

M B V    L A W    L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

courts located in Santa Clara County, California, as applicable, for any matter arising out of, and/or relating to" the NDA; and Defendants' conduct in breach of, arising out of, and/or related to the NDA forms the basis of this action.

## THE PARTIES

8.     Plaintiff Mandana D. Farhang is a citizen of Marin County, California.

9.     Plaintiff M.A. Mobile Ltd. is a limited liability company chartered in Dominica, operating from California ("M.A. Mobile").

10.    At all times relevant to this action Farhang has been the sole owner of M.A. Mobile.[1] (See **Exhibit A** attached to this Third Amended Complaint referenced in Footnote 1

---

[1]     Defendants have presented a flurry of allegations about the lack of clarity about ownership of the intellectual property that is subject of this litigation. Defendants have cast doubt, in its briefs and before the Court, as to the nature of the entity "TNR" and have foisted on the Court the false impression that TNR is some kind of secret, sinister shell company harbored by Plaintiff that was not disclosed to them and which raises serious doubts about the ownership of the intellectual property. Plaintiffs reject this entirely and will attempt again to clarify this matter for the Court. First, Plaintiffs already noted for the Court that the reference to TNR to include "affiliates" (plural) was a deliberate decision by Plaintiff to leave some flexibility as to whether or not to leave the intellectual property allocated between herself and M.A. Mobile Ltd. in M.A. Mobile Ltd., or to transfer it to Tuff N'Ready Global Philanthropic Holdings. Dkt. No. 1. Second, given that the Court appears to have been swayed by Defendants false allegations and has made allusions to a potential "sham" nature of the TNR reference, Plaintiffs wish to clarify the origin of the entity for the Court. What the Court was not aware of, understandably, and what Defense counsel seem also to be unaware of, surprisingly, is that Tuff N' Ready Global Philanthropic Holdings S.A. was **not** a mystery entity known only to Plaintiff Farhang or which had been set up as some alter ego of Plaintiff Farhang. Indeed, it was quite the opposite. Plaintiff Farhang had expended her own legal resources to set up Tuff N Ready Global Philanthropic Holdings S.A. with the intent that the entity serve the following purposes: (i) to own a portion of Plaintiff Farhang's shares to be used for philanthropic purposes in India; (ii) to serve as a vehicle to hold the intellectual property both prior to transfer to the Joint Venture (based on advice from tax counsel who was responsible for creating the structure for the Joint Venture, and as reflected in the LOI provided to IIT), and possibly after termination of the Joint Venture to consolidate M.A. Mobile Ltd. and this entity which was already formed for the Joint Venture; (iii) to be used as the Joint Venture's Company Foundation for philanthropic work such a microlending, providing scholarships to IITK students and to sponsor incubation efforts at IITK; and (iv) to own Plaintiff Farhang's rights to the Tuff n'Ready device so that free handsets could also be distributed to rural populations for the microlending initiative that Plaintiff planned to pursue as part of the Company's philanthropic efforts. The concept and formation of Tuff N'Ready Global Holdings S.A. was fully known to Defendant Partha Chakrabarti, as evidenced by the following e-mail attached as **Exhibit A** to this Third Amended Complaint, was mentioned in the LOI drafts-and as evidenced by the fact that the entity is explicitly referred to by Defendants in their very first Motion to Dismiss which they subsequently withdrew in 2009 which states, in support of their failed motions to dismiss the matter on jurisdictional grounds: "Importantly, Cool e-mobile was to be partially owned by TNR, which would "use the future economic proceeds [from Cool e-mobile] to provide future 'seed funding' to incubate the ideas of students at IIT Kharagpur" in India. *Id.* ¶ 32. Farhang engaged two separate law firms to assist in her dealings

1   below and attached to this Third Amended Complaint.)  As an intended third party beneficiary,

2   Farhang seeks recovery for whatever damages, loss and injury M.A. Mobile may have suffered as

3   a result of the wrongful conduct of Defendants set forth in this Third Amended Complaint

4   because such damages, loss and injury ultimately accrued to her and deprived her of the

5   substantial and direct benefits and protections she anticipated from the Joint Venture and/or

6   NDA.  M.A. Mobile seeks recovery for whatever damages, loss and injury M.A. Mobile may

7   have suffered as a result of the wrongful conduct of Defendants set forth in this Third Amended

8   Complaint.  Farhang may also stand in the shoes of M.A. Mobile as an assignee of M.A. Mobile

9   given that, as of June 25, 2003 there was an assignment of *certain* interests in the Technology.

10  While claims were not known to Farhang, and could not have been discovered, as of the date of

11  the assignment, other proprietary rights and intellectual property rights, such as the right to

12  priority from already prior filed applications, were conveyed as of the date of transfer as

13  evidenced by the plain language of the Agreement.  Farhang may also assert rights under the

14

15  related to Cool e-mobile, both of which were located in India." Defendant IITK's Motion to
    Dismiss Complaint for Lack of Subject Matter Jurisdiction, Personal Jurisdiction, and Pursuant to
16  Doctrine Forum Non Conveniens, filed 6-17-2009 and withdrawn 7-10-2009.  Despite these
    earlier assertions, Defendants now frame Tuff N'Ready Global Holdings S.A. as if it were a
17  mystery entity clouding the ownership of the intellectual property in dispute.

18       Indeed, when Plaintiff filed the 2008 Complaint, she was still uncertain whether she
19  would ever use the Tuff N'Ready Global Philanthropic Holdings S.A. entity for anything.  Since
    she had spent considerable resources to set it up, she considered whether she might use it as the
20  ultimate repository for the intellectual property even if IITK had abandoned the Joint Venture and
    thus the concept of using Tuff N'Ready Global Philanthropic Holdings S.A. as a philanthropic
21  entity in which IITK would participate.  She thus referenced it in the original complaint with the
    intent that she might transfer the intellectual property from M.A. Mobile and herself to Tuff
22  N'Ready Global Holdings S.A. if she ever was able to revive the Joint Venture or the core
    business.  She however never ultimately executed the transfer because she was advised
23  (informally when she was pro se and then later formally by counsel) to leave the intellectual
    property where it had originally resided (with M.A. Mobile).  We are troubled and do not really
24  comprehend why the fact that Plaintiff Farhang may have considered using another company to
    house the intellectual property, and why a purely innocent and understandable typo in Paragraph
25  32 of the Original Complaint, raise concerns of "sham" representations.  Defendants were fully
    aware of the existence and nature of Tuff N'Ready and Plaintiffs have adequately explained why
26  the entity was not ultimately used.  Plaintiffs submit that Defendants have, as they have done
    before, created a flurry of allegations over a matter that is quite simple.  We thus submit to the
27  Court that the existence of M.A. Mobile Ltd and Tuff N'Ready Global Philanthropic Holdings
    S.A. do not hide some sinister motive or reflect some suspicious or sham irregularity of
28  ownership by Plaintiff Farhang.  They were simply part of her early efforts to structure the
    Company.

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO  CA 94111

NDA and the subsequent Joint Venture as a corporate affiliate of M.A. Mobile because the NDA, by which IITK and TIETS gained access to the Technology and launched all further wrongful conduct, specifically defines M.A. Mobile to include all of M.A. Mobile Ltd.'s "corporate affiliates." Farhang, as the sole shareholder of M.A. Mobile, is clearly a corporate affiliate of M.A. Mobile Ltd. M.A. Mobile and Farhang, individually, as an intended third-party beneficiary, named member of the Joint Venture, assignee and/or corporate affiliate, suffered damages as a result of the wrongful conduct of Defendants.

11. The Technology relates to mobile device technology that enables dynamic data access and data parsing with numerous novel applications in numerous vertical markets and is described in greater detail under Paragraphs 25-27 below.

12. On or about June 25, 2003, Farhang caused ownership of the Technology to be transferred to M.A. Mobile. As part of the consideration for that transfer, M.A. Mobile assigned to Farhang, among other things certain rights in the Technology:

> ". . . 100% of all worldwide economic interest in any and all monies ASSIGNOR receives. is due or in the future may be due from the inventions and improvements ("SUBJECT MATTER") that are disclosed in the provisional application filed under 35 U.S.C. $1 11(a) or non-provisional application filed under 35 U.S.C. $1 11(a) and entitled Dynamic Rendering Of Content That Includes Query Expressions ("APPLICATION"). . .The APPLICATION claims from provisional application filed on February 22, 2000, now bearing U.S. application serial number 601184.093 and claims priority from provisional application, filed on March 2, 2000, now bearing U.S. application serial number 60/186.556.

> . . . 100% of all worldwide economic interest in any and all monies ASSIGNOR receives, is due or in the future may be due from: (a) the SUSJECT MATTER (b) the APPLICATION: (c) all applications claiming priority from the APPLICATION; (d) all provisional, utility, divisional, continuation, substitute, renewal, reissue, and other applications related thereto or derived therefrom which have been <u>or</u> may be filed in the United States or elsewhere in the world; (e) all patents (including reissues and re-examinations) which may be granted on the applications related to (a) or set forth in (a), (c), and (d) above; and (f) all right of priority in the APPLICATION and in any underlying provisional or foreign application, together with all rights to recover damages for infringement of those rights.

> . . .100% of all rights, title, interest, and obligation in, all claims ASSIGNOR has or may have in the future against any person, entity, or government, arising out of or relating to any and all rights, assets and/or intellectual property owned by ASSIGNOR in the past, present, or future. ASSIGNOR hereby does and will automatically assign any such any and

all such future claims to assignee as they arise,"

Declaration of Mandana D. Farhang, filed August 31, 2009: ¶ 6 and Exhibit A of said Declaration.

13.     Plaintiffs are informed and believe that IITK is, and at all times relevant to this Third Amended Complaint was, an Indian institute incorporated under the Indian "Institutes of Technology Act, 1961" as amended by the Indian "Institutes of Technology (Amendment) Act, 1963," with its principal place of business in Kharagpur, West Bengal, India.  Plaintiffs are informed and believe that IITK is, and at all times relevant to this Third Amended Complaint was, funded and run by, and an arm of, the government of India.

14.     Plaintiffs are informed and believe that TIETS is, and at all times relevant to this Third Amended Complaint was, an Indian society affiliated with and incorporated by IITK under the Indian Societies Registration Act, with its principal place of business on the premises of IITK in Kharagpur, West Bengal, India and was repeatedly presented as an IITK entity to Plaintiffs. Plaintiffs are informed and believe that the Incubation Society is, and at all times relevant to this Third Amended Complaint was, funded and run by, and an arm of, the government of India.

15.     Plaintiffs are informed and believe that Defendant Partha P. Chakrabarti is, and at all times relevant to this Third Amended Complaint was, Dean, Sponsored Research and Industrial Consultancy and Professor, Computer Science and Engineering at IITK, as well as Secretary and Permanent Member of the Governing Body of the Incubation Society, and was at all times relevant to this Third Amended Complaint authorized by IITK and TIETS to enter into agreements on behalf of IITK and TIETS that would thereby become legally binding upon IITK and TIETS.  Plaintiffs are informed and believe that Partha P. Chakrabarti is and was a key representative coordinating efforts of IITK, TIETS (or the IITK Incubation Society) and IITK's affiliates to achieve their general business objectives under the technology consultancy and incubator, and to specifically gain access to Farhang's Technology.  Plaintiffs are informed and believe that Defendant Partha P. Chakrabarti is a citizen of India.

16.     Plaintiffs are informed and believe that Defendant Pallab Dasgupta is, and at all

1    times relevant to this Third Amended Complaint was, Professor, Computer Science and

2    Engineering, and Professor-in-Charge, Advanced VLSI Lab at IITK. Plaintiffs are informed and

3    believe that Defendant Pallab Dasgupta is a citizen of India.

4         17.    Plaintiffs are informed and believe that Defendant Gurashish Brar is a citizen of

5    the State of Washington and resides in the State of Washington.  Defendant Gurashish Brar has

6    been dismissed by the Court from this proceeding; nothing in this complaint is intended to waive

7    any rights Plaintiff may have for subsequent appeal of this dismissal.

8         18.    Plaintiffs are informed and believe that Defendant Rakesh Gupta is a citizen of

9    India and may presently reside in India.

10        19.    Plaintiffs are informed and believe that Defendant Pravanjan Choudhury is a

11   citizen of India.

12        20.    Plaintiffs are informed and believe that Defendant Subrat Panda is a citizen of

13   India.

14        21.    Plaintiffs are informed and believe that Defendant Animesh Naskar is a citizen of

15   India.

16        22.    Plaintiffs are informed and believe that each of the Defendants, themselves and/or

17   by and through their agents or co-conspirators and at all times relevant to this Third Amended

18   Complaint, stood in the role and/or relationship of agent, employee, partner, Joint Venturer,

19   coconspirator, owner, principal, and/or employer of each of the remaining Defendants.

20        23.    Plaintiffs are informed and believe that each of the Defendants at all times

21   relevant to this Third Amended Complaint engaged in the wrongful conduct set forth in this

22   Third Amended Complaint while acting within the scope of said role and/or relationship.

23        24.    Plaintiffs are informed and believe that every aspect of the wrongful conduct of

24   each of the Defendants set forth in this Third Amended Complaint was:  (a) elicited, intended,

25   and approved of, prior to the occurrence of that conduct, by each of the remaining Defendants;

26   and (b) known to and ratified by each of the remaining Defendants subsequent to the occurrence

27   of that conduct.

28

**THIRD AMENDED COMPLAINT – CASE NO. C-08-02658-RMW (HRL)**

23853.01\\432061.DOC

# FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

**A.   Plaintiffs Own Valuable Intellectual Property Rights.**

25.     Plaintiffs own certain cutting edge mobile device Technology, including patent pending systems, confidential information, and trade secrets.  This Technology, and the Confidential Information associated therewith, is and was particularly valuable because it not only enables fluid mobile access of data through handheld devices, but also enables *dynamic, real-time* access and parsing of data that is not dependent upon continuous wireless data connection.  The dynamic aspect of the access and parsing is particularly attractive to industries, such as railways, that use mobile workforces, dependent on large volumes of data, to provide services in the field to multiple customers.  As a result of Defendants' conduct as alleged herein and on-going conduct to deprive Plaintiffs of their rights, Plaintiffs are losing and continue to lose valuable opportunities to commercialize the Technology and valuable associated trade secrets in other vertical markets.  Plaintiffs are suffering irreparable harm by being deprived of the use of their Technology.

26.     The Technology is currently patent pending with a non-published status to protect certain trade secrets, and is articulated in the provisional application filed under 35 U.S.C. §111(b) and non-provisional application filed under 35 U.S.C. § 111(a), entitled *Dynamic Rendering Of Content That Includes Query Expressions*, which was filed on February 15, 2001, and now bears U.S. application serial number 09/788,311 (the application claims priority from provisional application filed on February 22, 2000, now bearing U.S. application serial number 60/184,093 and claims priority from provisional application, filed on March 2, 2000, now bearing U.S. application number 60/186,556).  Plaintiffs are informed and believe that the patent application has <u>not</u> been published and the details of the pending patent application remain highly confidential.  Plaintiffs' patent application is being prosecuted by the Silicon Valley law firm Fenwick & West LLP.  Plaintiffs have made an administration motion to submit various trade secret and highly confidential documents to the Court to give the Court a better understanding of the trade secrets at issue here.  Please see **Administrative Motion To File Selected Documents In Support of Plaintiffs' Third Amended Complaint Under Seal Pursuant to Civil Local**

M B V    L A W    L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1 **Rule 79-5 and Civil Local Rule 7-11.** (hereinafter **"June 21, 2010 Motion To Seal"**).  In

2 addition to the sealed Exhibits attached hereto, the following is an expanded, non-confidential

3 overview of Plaintiffs' Technology:

4        (a)      Plaintiffs' Technology is a standards-based, mobile application

5 development environment that enables development and full execution of enterprise level

6 applications on mobile devices without requiring a wireless connection.  At the core of Plaintiffs'

7 trade secret technology is a novel mobile markup language intended to replace the universally

8 known Wireless Markup Language defined and promoted by the well recognized and accepted

9 Wireless Application Protocol.  Plaintiffs' mobile markup language was and is particularly novel

10 because of its ability to dynamically render data in a markup language, its ability to interface with

11 existing legacy applications often found in large enterprise deployments, and its ability to enable

12 users to interact with large enterprise level applications without the need for a constant wireless

13 connection.

14        (b)      The core functionality of the  trade secret system which Plaintiffs disclosed

15 to Defendants was as follows:  a graphical user interface development tool that uses Plaintiff's

16 proprietary mobile markup language to build mobile enterprise applications (the applications

17 could also be built by hand coding using the mobile markup language the way a programmer

18 types lines of code);  installation of any of said applications on any mobile device running

19 Windows mobile operating systems, Linux, Palm but also adaptable to run on other mobile

20 operating systems; integration of the mobile applications with any customer's existing backend

21 infrastructure including the customer's existing legacy applications; and execution of said mobile

22 enterprise applications containing enterprise level data on the mobile devices.  Plaintiffs, prior to,

23 during, and after the Joint Venture, called the technology "Pocket XML" or PXML.  Attached

24 hereto and incorporated herein are sealed exhibits Exhibit S1, Exhibit S2, Exhibit S3, Exhibit S4,

25 and Exhibit S5.

26        (c)      Application of the technology to the Indian Railways was part of

27 Plaintiffs' confidential and trade secret strategy to go after worldwide railways and utilities, but

28 use the Indian Railways as the pilot project.  The Indian Railways embodiment of the technology

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

18

was called, by the Joint Venture, the Traveling Ticket Examiner ("TTE") Assistant which conveyed the fact that the technology provided a handheld, mobile device powered by the novel PXML technology that would allow the ticket examiners or TTEs to access seating data, train schedules, and other travel and passenger data without requiring local connectivity.  Please see sealed Exhibit S2 and Exhibit S3 attached hereto and incorporated herein.

27.    In addition to the confidential and trade secret patent-pending Technology, Plaintiffs' intellectual property rights include trade secrets relating to the above invention that were not disclosed in the patent and also trade secrets relating to M.A. Mobile's and Farhang's business, customers, or related strategies.  Although Plaintiffs disclosed to Defendants, during introductory e-mails, the usual customary high level descriptions of the markets in which the technology could be deployed (*i.e.*, mobile workforce applications and mobile internet with specific focus on large enterprises burdened by existing legacy mobile applications), they did not share their intimate plans of deployment until the NDA had been executed and Defendants explicitly requested guidance as to how the technology could be deployed, revenue projections, and execution of a coordinated marketing campaign with simultaneous introduction of the branded Tuff N Ready device.  Attached hereto as sealed Exhibits S1 and S2.

In response to Defendants' inquiries, Plaintiffs provided the following confidential trade secret information relating to business implementations and marketing strategies:

(i)    Numerous emails, business plan edits, and other documents setting forth confidential market plans, including specific descriptions of which vertical markets to focus on, why certain vertical markets would need the technology more (railways, airlines, etc) and how to approach each different vertical market (*i.e.*, the need for demos demonstrating particular features attractive to a given vertical—for example, see (iii) below); attached hereto as Exhibit S1 and Exhibit S2.

(ii)    The idea of subsidizing the cost of a branded proprietary device, in the future, to complement and run the mobile applications, and specifications as to what the device would be called (*i.e.*, "Tuff N'Ready"), how it would make the technology more attractive and affordable to specific potential customers, and some of its key attributes (*i.e.*, that it would be

19

ruggedized for use in outdoor environments such as railway stations, remote rural settings, etc); it is important to note that while the concept of such a device had been disclosed at a high level without confidentiality protection, all the specs for the device and the specific attributes of the device were not disclosed without the NDA.  (It is also important to understand that the name "Tuff N' Ready:" which was then used for the planned global philanthropic entity, was inspired by the concept of the device, further evidence that the corporate entity by the same name was not some alter ego of Plaintiff Farhang and was always inspired by and related to the goals of the Joint Venture.)  Attached hereto as Exhibit S2.

(iii)     Detailed market analysis and confidential market intelligence for a mobile TTE Application to be marketed to the Indian Railways.  Plaintiffs had developed the idea of going after railways and airlines as early adopter customers long before discussions with IITK, and found the Indian Railway a specifically valuable prospect because the novelty of not being dependent on wireless connection for operation of the applications would be particularly attractive to a railway that traveled into numerous remote rural locations without adequate connectivity;

(iv)     Market intelligence and confidential specifications for other applications of the technology, including descriptions of how it could be used in the financial sector, healthcare sector, etc.  It should also be noted that Defendants were provided critical pending patent application documents and early business plan documents which contained specific descriptions of embodiments of the technology; attached hereto as Exhibit S1 and Exhibit S2.

(v)     Market intelligence and confidential identification of IBM as a key strategic target for partnering and potentially for acquisition of the company or technology. Plaintiffs specifically articulated how IBM was significantly involved in backend systems but lacked any kind of integrated mobile solution as powerful as Plaintiffs', and specifically discussed with Defendants how Plaintiffs' Technology could be valuable to IBM as a partner or acquirer based on confidential market and technology analysis.  Dkt. No. 1, Paragraph 51. Plaintiffs even gave specific directives that all development of the technology should be done in a manner so as to be compatible with IBM's relevant solutions.  Dkt. No 1, Paragraph 51.  It was

23853.01\\432061.DOC

1    clear that the trade secret strategy of going after IBM as the key potential acquirer originated

2    from Plaintiff, as evidenced by several key references in the edits of the highly confidential

3    business plan drafts.  Attached hereto as Exhibit S2, which on page 9 of the Exhibit, contains a

4    specific reference to IBM for potential acquisition and credits Plaintiff Farhang with the idea.)

5            It should be noted that Defendants have made numerous false allegations that Plaintiffs

6    did not use appropriate NDA protection when discussing Plaintiffs Technology with other third

7    parties prior to Plaintiffs relationship with Defendants.  When at Ikonodyne Inc. (the predecessor

8    company which owned the intellectual property before Plaintiff Farhang acquired rights to it) and

9    at all times, Plaintiffs has used industry standard care to only provide high level summaries of the

10   technology, consistent with the common practice of "onion peeling" to elicit interest, and then to

11   disclose trade secrets and confidential details only with protection of NDA.   Plaintiffs have made

12   a motion to submit to the Court under seal, pursuant to Civil Local Rule 79-5, an example of

13   typical third party e-mails showing Plaintiff Farhang using industry standard care and requesting

14   NDA protection for disclosure of confidential business trade secrets and implementations.

15   Attached hereto as Exhibit S6. These e-mails, which are just one example, amply demonstrate

16   Plaintiff Farhang's use of appropriate care in maintaining secrecy of both the core technology and

17   its business applications.  It should also be noted that Defendants allegations regarding Plaintiffs

18   alleged disclosures to the Indian Railways are similarly inaccurate.  Plaintiffs never disclosed

19   trade secrets or information requiring an NDA to the Indian Railways.  Plaintiffs only disclosed

20   to the Indian Railways high level information (to elicit interest) that had been approved by Partha

21   Chakrabarti for disclosure without NDA protection.  When Plaintiffs COO informed Defendant

22   Chakrabarti that she wanted to send the high level packet in 2005, prior to an NDA, Defendant

23   Chakrabarti explicitly approved a "teaser" packet for dissemination the Indian Railways:  "Please

24   find attached the document on the Railways that you may send out.  It contains a summary of the

25   technical details and Railway applicability.  More details can be provided in the discussions and

26   presentations.  Please also find below (after the mail text) a small writeup which you may use it

27   in the covering letter appropriately."

28

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

21

B.    **In May 2003, IITK Signed a Non-Disclosure Agreement to Gain Access to Plaintiffs' Technology and Confidential Information.**

28.    Beginning in May, 2003, Defendant Partha P. Chakrabarti engaged in email communication with Farhang to discuss the Technology which Plaintiffs were wishing to sell, license, and/or use as the basis for a Joint Venture to execute a global strategy of providing mobile technology to large industrial and corporate customers.  Through several strategic meetings in California arranged by Partha P. Chakrabarti, and through the efforts of California based IIT Kharagpur Life Fellow Bijoy Chatterjee (who emailed Farhang in California and also met with Farhang in California), IITK persuaded Farhang to provide it with access to the Technology as specified below.  It was expressly understood and stated on numerous occasions that the relationship between Plaintiffs and IITK would be one of a Joint Venture, and though IITK was using resources and members of its technology consultancy group, that all parties involved were not working for cash compensation or in a consulting engagement but rather in furtherance of the objectives of a Joint Venture as joint equity/stake holders as further set forth below.

29.    On or about August 11, 2003, IITK, through its authorized representative, Defendant Partha P. Chakrabarti, acting on behalf of IITK, and also through a second authorized representative, Pallab Dasgupta, also acting on behalf of IITK, entered into the Non-Disclosure Agreement (the "NDA Agreement") with Plaintiffs and subsequently gained access to the Technology.  The NDA provides, in relevant part:

> "In order to protect certain confidential information, M.A. MOBILE LTD, and its corporate affiliates ("M.A. MOBILE"), and the "Participant" identified below, agree that:
>
>     **1. Protection of Information**: . . . The Recipient may only disclose Confidential Information to those of the Recipient's employees and contractors who need to know such information and who have previously agreed to be bound by terms and conditions substantially similar to those of this Agreement.  . . .
>
>     **6. Rights**: This Agreement does not grant any proprietary rights, by license or otherwise, to any Confidential Information of the other party disclosed pursuant to this Agreement, or to any invention or any

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on or related to such Confidential Information.  Neither party shall make, have made, use or sell for any purpose any product or other item using, incorporating, or derived from any Confidential Information of the other party. …

      **8**.  Upon termination of this Agreement or upon written demand by either party, each party shall cease immediately all use of the other party's Confidential Information and return promptly to the other party all documents and other tangible materials relating to or containing the other party's Confidential Information and all copies thereof.  Each party shall certify in writing that it has returned all material relating to or containing the other party's confidential information. …

      **10.**  This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of California without application of the principles of conflicts of law. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Santa Clara County, California, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in California, such personal jurisdiction shall be nonexclusive.

A true copy of the NDA Agreement was attached as Exhibit A to the First Amended Complaint and incorporated herein by this reference.  In the NDA Agreement, M.A. Mobile's stated address is P.O. Box 274, Tiburon, CA 94920.

     30.     Plaintiffs are informed and believe that each of the Defendants executed the NDA and that IITK was therefore required, pursuant to the above-quoted provision of the NDA, to have each Defendant execute the NDA.

     31.     Following Defendants' execution of the NDA Agreement, Plaintiffs and/or their appointed agents began presenting their Technology and Confidential Information to Defendants who, in turn, began to inspect and to evaluate the Technology.  The following details reveal how Defendants obtained critical trade secret source code:

     (a)     On or around August 12, 2003, after executing and transmitting the NDA to Plaintiff Farhang, Defendants requested a copy of the source code (*i.e.*, the code that comprises the core of the novel Mobile Markup Language or "MML") and demos utilizing Plaintiffs' MML and related applications.  Dkt. No. 1, p. 9.  Upon receiving this request, Plaintiff Farhang transmitted a copy of the CD containing a confidential prototype of the mobile technology application as well as pertinent source code.

23

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    (b)    Specifically, the CD included:  (i) highly confidential source code that

2    comprises the core of the MML and enables it to be rendered on a mobile device; (ii) an

3    executable comprising demo applications utilizing the MML and (iii) other critical source code

4    and technology documentation.  Defendants also have in their possession a CD and other

5    documentation relating to enhancements to Plaintiffs' Technology allegedly made by Defendants

6    using Plaintiffs' Technology; these alleged enhancements will be the subject of discovery and

7    also contain source code, derivative works, architecture, annotations and other related

8    documentation that are Plaintiffs' trade secrets or, at a minimum, belong to the alleged Joint

9    Venture and should be treated as trade secrets of the Joint Venture.

10    (c)    As has already been disclosed, Defendants have tried to argue that the CD

11    and source code disclosed to them by Plaintiffs was non-functional.  This is not correct.  The

12    temporary and quickly  resolved problems in functionality encountered by Defendants'

13    development team were largely related to routine issues with Defendants operating certain third

14    party modules (*i.e.*, modules enabling operation of the program that did not relate to the primary

15    and novel code itself but were needed to run the program) on their own development platform.  It

16    should be noted that such platform and third party module issues are routine in software

17    development, expected, and easily addressed.  They do not and did not reflect an inherent flaw or

18    problem with the source code or the core functionality of the prototype provided to Defendants or

19    the novelty of the MML provided to Defendants.

20    (d)    It should also be noted that it was always understood by the parties that

21    any enhancements made by Defendants, with Plaintiffs' vision and guidance, to further enable

22    the technology, were extensions of Plaintiffs trade secret technology and specifications provided

23    to Defendants by Plaintiffs and should rightfully have been used only by the Joint Venture.

24    (e)    Plaintiffs will provide to the Court, under seal, portions of the initial

25    specifications and documents which Plaintiffs provided to the Defendants upon execution of the

26    NDA.  Attached hereto as Exhibit S1.

27    32.    Defendants, having been given the opportunity to inspect and evaluate the

28    Technology and other Confidential Information pursuant to the NDA, realized immediately that

24

the Technology was of great originality and extremely valuable and that the confidential business plans, including commercialization strategies *vis-a-vis* the Indian Railways, were of great economic value. Defendants then embarked upon a course of conduct intended to lull Plaintiffs into the belief that the parties were forming a Joint Venture when, in fact, Defendants never intended to form a Joint Venture and instead sought to deprive Plaintiffs of their valuable rights and to willfully misappropriate the Technology and Confidential Information from Plaintiffs and for Defendants' own use. It is critical to understand that, as stated above in Paragraph 29, Clause 6 of the NDA specifically prohibited Defendants from making, using or selling for any purpose any product or other item using, incorporating, or derived from any Confidential Information of Plaintiffs. The Court has observed that an enforceable Joint Venture Agreement (detailed below) would effectively supersede the NDA agreement on the issue of use of Plaintiff Technology, but this assumes that the Joint Venture agreement was not a sham fraudulently used by Defendants to gain access to the Technology and/or that the Joint Venture actually existed, which Defendants have denied. In their various motions attacking the pleadings in this action and challenging this Court's jurisdiction, Defendants deny that any Joint Venture ever came into existence. As will be further detailed below, particularly in amended allegations under Paragraph 45-49 and elsewhere, the facts strongly suggest that Defendants either fraudulently breached the Joint Venture Agreement or had never intended to enter a Joint Venture Agreement and were fraudulently using the pretext of a Joint Venture Agreement to gain access to Plaintiff Technology. Only through formal discovery, which Defendants seem determined to delay for so long as possible, will Plaintiffs be able to determine the dimensions and timing of the alleged breaches and this makes the question of whether there was a breach of the Non-Use Provisions of the NDA a triable issue of fact. It is undisputed that without the existence of a Joint Venture, Clause 6 of the NDA would govern any use of Plaintiffs' Technology and it has been admittedly breached by IITK because it has admitted making what is claims are "enhancements" to such technology. As the Court is aware, the Defendants admitted to use of the IP in their Indian Complaint filed in June of 2009 before the High Court of Kolkata. To deny Plaintiffs the right to plead breach of the NDA Non-Use clause as an alternative cause of action, pending further discovery as to whether there was an

M B V   L A W   L L P

8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

25

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    enforceable Joint Venture Agreement, as Plaintiffs claim, or whether the Joint Venture

2    Agreement was a sham from its inception aimed to bypass Clause 6 of the NDA, as Defendants

3    now seem to argue, would be severely prejudicial to Plaintiffs legitimate rights of recovery in this

4    case.

5    **C.    The Parties Entered Into a Joint Venture Agreement, or Defendants Fraudulently
         Misled Plaintiffs into Believing a Joint Venture Had Been Formed.**

6

7           33.    Almost immediately after analyzing the Technology and Confidential Information

8    under the NDA, Defendants recognized their value and immediately began to launch a Joint

9    Venture to commercially exploit the Technology and implement Plaintiffs' confidential business

10   and marketing plans.  IITK insisted that Plaintiffs create an Indian corporate entity to further the

11   Joint Venture's initial goal of developing and exploiting the Technology and Confidential

12   Information and obtaining the Indian Railways as Cool e-mobile's first customer.  It was

13   understood, throughout this time, that Plaintiffs would still coordinate activities from California

14   and the United States where both Farhang and M.A. Mobile and many of their agents resided

15   and/or were headquartered.   The Indian entity created as the Joint Venture vehicle, at the specific

16   request and urging of IITK, was Cool e-mobile Pvt Ltd (hereinafter "Cool e-mobile").   Cool e-

17   mobile was located in India at the demand of IITK.  IITK further promised that Defendant Partha

18   P. Chakrabarti would act as the Chief Technology Officer (CTO) of the Joint Venture vehicle,

19   and that together with the proposed joint equity interests of IITK, these elements of IITK

20   participation and control, which are further detailed below, would ensure that Cool e-mobile, as

21   the Joint Venture vehicle, could obtain access to the Indian Railways as a first customer without

22   having to pursue the usual bidding or tender process required of other non governmental, third

23   party vendors.  Salient elements of the Joint Venture included:

24          (a)    Plaintiff formed Cool e-mobile at Defendant's specific request.  Cool e-mobile

25   was used as the Joint Venture name to third parties and internally by Defendants on numerous

26   occasions, evidencing their knowledge and agreement that a Joint Venture was moving forward;

27          (b)    Defendant Partha Chakrabarti received an appointment and purported to act as Co-

28   Founder of the Joint Venture, and purported to act in various other official capacities including

                                                                                                      26

M B V   L A W   L L P

8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    Chief Technology Officer on behalf of the Joint Venture.  The following are just a few examples

2    from the wealth of evidence that the Joint Venture was real and very much proceeding, and was

3    not merely a "prospective business relationship that never materialized" as Defendants have

4    disingenuously asserted:  (i)  repeated email references by individual Defendants that Partha

5    Chakrabarti was the Chief Technology Officer, a title which he only held in the Joint Venture and

6    had no meaning in his larger role at IITK;  (ii)  specific request from the IITK engineering team

7    that they would only take directions from Defendant Chakrabarti because of his title as Chief

8    Technology Officer of the Joint Venture, despite periods of long absence and non response by

9    Defendant Chakrabarti; and (iii) the Defendants' numerous ongoing representations, by email,

10   teleconference and in person meetings, that they were working to develop the Technology in

11   furtherance of the Joint Venture.

12         (c)      In exchange and as consideration for his and IITK's services as described above

13   supposedly on behalf of the Joint Venture, Defendant Partha Chakrabarti requested initially a

14   28% equity share for IITK in the Joint Venture, 25% of which he then later requested to be

15   assigned to him personally so that he could "distribute" it amongst the IITK engineering team

16   who were also members of the Joint Venture.  It should be emphasized that at no time did

17   Plaintiffs agree to or promise to provide cash compensation to Partha Chakrabarti, any of the

18   individual Defendants, or to IITK.  As would have been expected for an early stage venture of

19   this kind and at this time, it was expressly understood that all participants were entering into the

20   Joint Venture in return for equity interests and the promise of future profits based on those equity

21   interests, and not for cash compensation or salaries.

22         (d)      Defendants agreed early on that all IITK team members would be subject to a four

23   year vesting schedule to provide appropriate incentive for their continued involvement with the

24   program.  Defendants would later raise issues over the vesting without warning as a mechanism

25   to delay presentation to the Indian Railways.

26         (e)      The parties agreed early on to the basic terms of the Joint Venture.  Defendant

27   Partha Chakrabarti and his agents, including certain Indian lawyers, made explicit representations

28   to Plaintiffs that the Joint Venture would be approved and was permitted, then explicitly

27

represented that it *was* approved via the incubation program and that Cool e-mobile had been admitted to the incubator program, and throughout explicitly represented that Partha Chakrabarti's signature and documentation was a matter of formality and that the only delay was due to internal administrative formalities.  During this entire period, Partha Chakrabarti and other individual Defendants continued to exploit the Technology, finalizing demos and marketing plans with the assistance of Plaintiff and Plaintiff's agents on the understanding and representation by IITK that a Joint Venture was already in place regardless of the formalities of memorializing the Joint Venture with appropriate documentation.  Plaintiffs, in reliance on these repeated assurances, continued to work with Defendants on the Joint Venture.  There are numerous emails showing that individual Defendants wanted Plaintiffs to believe that a Joint Venture existed, made statements and took acts consistent with the purported Joint Venture, but then when asked to deliver on the ultimate obligation of the Joint Venture in connection with securing Indian Railways as a customer, fled their obligations (and indeed quite literally fled the physical premises of IITK when Plaintiff Farhang, her counsel, and her agents traveled to IITK to find out why the individual Defendants were not responding to their repeated requests to release the Technology and finalize the documentation so that the much anticipated Indian Railways handheld TTE project could be launched).

34.     Although Defendants advanced one excuse after another to delay final execution of the Joint Venture, they induced Plaintiffs to continue working with Defendants and providing further details of the Technology by misrepresenting the urgency of negotiations with the Indian Railways.

35.     According to a February 2008 article published by Forbes.com "The state-run Indian Railways is the main mode of long-distance travel in India, ferrying about 15 million passengers per day. It is also the country's single-largest employer, with about 1.4 million on its payroll. The Railways are expected to report revenues of about $4.62 billion as of March 31 [2008] and have a cash surplus of $6.26 billion."

36.     The demonstrative application that was developed for the Indian Railways ("the TTE Assistant"), was designed to demonstrate how their Traveling Ticket Exchangers ("TTEs")

1  could utilize a hand held device to run data from their Passenger Reservation System (PRS)

2  locally on the device, so that while on board the trains the TTEs could, amongst other things,

3  track passenger information (*e.g.*, to quickly locate the doctors on board in case of an

4  emergency), identify vacant berths for a wait-listed passenger, issue tickets instantly, and

5  subsequently update the PRS using the hand held device.

6         37.     In June 2004, while the Joint Venture structure was still being negotiated,

7  Defendant Chakrabarti contacted Farhang and informed her that IITK/Chakrabarti had

8  successfully secured a high level meeting with the Indian Railways.  IITK/Chakrabarti also

9  disingenuously advised that since forming an Indian company and completing the Joint Venture

10 would still take time, Defendants asked that the Indian Railways be permitted to remit payment

11 for licensing of the Technology and related services (including build-out of the TTE Assistant)

12 *directly* to IIT Kharagpur so that it could immediately negotiate with Indian Railways.  In a series

13 of emails dated June 16, 2004 to June 28, 2004, IITK/Chakrabarti requested permission to market

14 and sell the technology during the time it took to form Cool e-mobile.  IITK/Chakrabarti stated

15 that if the permission was not granted immediately, Cool e-mobile would lose the opportunity to

16 present the Technology at the upcoming meeting with the Indian Railways.  In an email

17 transmitted to Plaintiff on June 16, 2004, IITK/Chakrabarti wrote:  "…The final company

18 formation will take time. If we do not use this time now, we will lose the early customers. That is

19 delaying my visits to various places…"  In subsequent emails Chakrabarti implied, as in the past,

20 that he and IIT Kharagpur had a close knit relationship with the top brass of the Indian Railways.

21 In an email dated June 22, 2004 transmitted to Plaintiff, Chakrabarti wrote: "…I need to clarify

22 that I shall be going to the Railways on various project proposals from IIT including this. This

23 will be a part of a mega project. So in order for me to be able to talk about this technology

24 without getting into a problem, I need a clear signal from you that I am allowed to do so on

25 behalf of IIT." On June 25, 2004 Chakrabarti emailed: "I will be meeting them [Indian Railways]

26 with a whole range of activities including IT infrastructure. Many faculty members and their

27 research in involved.  This is where I will try to place this activity of ours. TTE [TTE Assistant]

28 is just a small application. I will have to explain the potential. I will have to explain several

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O ,   C A   9 4 1 1 1

29

applications that will cut costs, add revenue and increase safety. Only then will they make a large investment." June 25, 2004: "…I am not demoing anything in the first meeting. That will come later. I wil [sic] go [to Indian Railways] with a set of proposals and then work on them…" June 28: "…I will be meeting with the Head of Railways for all sorts of IIT projects. I can discuss this technology only if your give me clear permission. Else I can only speak in generic terms. I will be doing this next week and what I can see from the plans that TNR's counsel has discussed, the company or the joint relationship with IIT is not going to come up that soon. So I guess that I will have to keep this out of the agenda and it will be a major loss of opportunity." As a result of this fear that without the permission Defendants were aggressively requesting, the Joint Venture would suffer great economic loss, Plaintiffs requested counsel to prepare a document that would provide IIT Kharagpur a conditional and temporary license to develop and market the IP as a placeholder for Cool e-mobile.  Plaintiffs' counsel therefore prepared and forwarded to IIT Kharagpur/Chakrabarti said document ("the Letter of Intent to Temporarily Market the IP"). However, Plaintiffs did not agree to allow IITK to accept payments or revenues from the Indian Railways, or from anyone, on Plaintiffs' behalf.  After confirmation that the letter was requested from counsel, Chakrabarti emailed the following the same day: "Thank you. I have already sent out an agenda for my Railway meeting. I will add this in. Its not a problem."  Therefore confirming that he was planning on discussing the IP with the "the Head of the Railways", who at the time was Minister Laloo Prasad Yadav, in or about July 2004.

38.    In a telephone communication in or about July 2004, Chakrabarti stated that since IIT Kharagpur would be responsible for signing up India's largest customers such as the India Railways on behalf of Cool e-mobile, and not only performing technical duties, IIT Kharagpur/Chakrabarti, Dasgupta and the Engineers requested that one of the terms of the existing agreement be modified, with all others remaining the same, such that their allotment of shares would be increased. In an email that he sent to Plaintiff on July 13, 2004, Chakrabarti wrote: "Regarding percentages, it would be good to get somewhere around 25% for us".  Plaintiff agreed to request counsel to allocate the additional shares to IIT Kharagpur, Chakrabarti, Dasgupta and the Engineers, increasing their total shares to 25%.

30

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 I 1 1

39.    In furtherance of the effort to misappropriate the Technology and Confidential Information, on July 13, 2004, Chakrabarti emailed Plaintiff the following: "For an Indian Venture that is incubating in IIT, it will be difficult for a foreigner [Plaintiff] to be the Chairperson of the Board. Nearly all incubation companies are expected to have a large representation from IIT, which we have."

40.    In August 2004, Chakrabarti transmitted an email on August 24, 2004 to Plaintiff, and others stating the following: "As per our rules, for incubation the institute needs 3% holding and not 2%. We must make appropriate changes wherever appropriate…."  In a subsequent email dated August 27, 2004, Chakrabarti wrote that IIT Kharagpur had approved and would sign the Joint Venture documents memorializing the major agreed-upon terms.  The email, transmitted to Plaintiffs' counsel and others, states: "Dear Ron, IIT has approved the signing of the agreement. The only change suggested now is that regarding incubation, 2% should be made 3%.  Please let me know the next steps. Regards PPC." Amongst other things, the letter that was approved confirmed that (1) IIT Kharagpur and Chakrabarti would both be parties in the formation of Cool e-mobile and (2) Chakrabarti would serve as Co-Founder, Chief Technology Officer and Member of the Board of Directors.  Once again, Plaintiffs complied and requested counsel to allocate the additional shares to IIT Kharagpur, increasing the total to 28%.

41.    In the ensuing months, after Plaintiffs accepted Defendants' continually changing demands and after having been approved for signature by IIT Kharagpur, neither IIT Kharagpur nor Chakrabarti signed the Joint Venture documents they had been exchanging and finalizing to memorialize their terms of agreement, and there was no further mention of a meeting with the Indian Railways. When questioned about their progress with respect to these activities, Chakrabarti apologized and blamed his hectic travel schedule for the delays. All the while, IIT Kharagpur, Chakrabarti, Dasgupta and the Engineers continued to develop the Technology as evidenced by emails containing periodic technology status reports received via email from IIT Kharagpur showing the notation "© Cool e-mobile, IIT Kharagpur".

42.    In November 2004, Defendant Dasgupta traveled from India to Santa Clara County, California and engaged in a lengthy meeting with Plaintiff and CFO. The purpose of this

31

meeting was to further effect the fraudulent scheme to take control of and misappropriate the Technology for Defendants' economic gain. Dasgupta led Plaintiff to believe that the further developments that were underway and were being made for the benefit of Plaintiffs and Cool e-mobile. During the meeting, Plaintiff stressed the importance of signing up the Indian Railways immediately and Dasgupta agreed and showed Plaintiff and Plaintiff's CFO a co-branded Power Point Presentation entitled "Cool e-mobile Development and Road Map" containing the stamp logo of IIT Kharagpur and containing several pages of descriptions and a picture of the hand held device containing the TTE Assistant demonstrative application for the Indian Railways. Both Plaintiff and her CFO discussed with Dasgupta that Cool e-mobile's plan was to start a pilot project with the Indian Railways and then acquire a company to do full deployment and integration.

43.    On December 16, 2004, Chakrabarti included the following text in his edits of the Cool e-mobile Business Plan, which he transmitted to Plaintiff via email: "Cool e-mobile was founded in 2004 by its Co-Founders Ms. Mandana Plaintiff, an entrepreneur, and Dr. Partha Pratim Chakrabarti, Professor of Computer Science & Engineering and currently Dean of Sponsored Research & Industrial Consultancy at Indian Institute of Technology, Kharagpur (IIT KGP). The Company is a privately held Indian joint venture between the Co-Founders and IIT KGP, and is a member of IIT's technology incubation program." In the business plan that he transmitted via email he also wrote the following about Cool e-mobile's TTE Assistant application for the Indian Railways: "The Indian Railways is the largest public sector company in India and possibly the single largest employer of people in the world. Cool e-mobile has targeted the Indian Railways as a primary customer with a very large potential base of workflow applications that are easily designable using the developed technology. As a first application, the Company has developed the Traveling Ticket Examiner (TTE) application where a TTE on a train can upload his/her workload while entraining, perform a variety of functions like ticket examination, confirmation, issue, downloading new reservations from different stations and uploading the required information from various intermittent hotspots on the way. This will help the railways have a continuous information system at a very low cost of ownership compared to

32

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

other always connected technologies. This application has potential extension to other areas like maintenance, repair, accident monitoring, etc – issues of paramount importance to the Indian Railways. A number of applications for other utility organizations are also planned."

44.     During this time frame, Plaintiff informed Chakrabarti, Dasgupta and the Engineers, amongst others, that on her information and belief, the most likely acquirer of the Technology and Confidential Information in the future would be IBM.  Attached hereto as Exhibit S2.  **This was a critical trade secret at the time and ultimately, Plaintiffs believe, resulted in Defendants improperly transmitting information to IBM to facilitate both IBM and IITK's ultimate collaboration with the Indian Railways, resulting in great benefit for IITK as the facilitator.  Plaintiff had recognized that there was a significant synergy between Plaintiff Technology offerings and IBM's technology platform:**

(a)     Plaintiffs specifically articulated how IBM was significantly involved in backend systems but lacked any kind of integrated mobile solution as powerful as Plaintiffs'. Dkt. No. 1, Paragraph 51.

(b)     Plaintiffs specifically discussed with Defendants how Plaintiffs' Technology could be valuable to IBM as a partner or acquirer based on confidential market and technology analysis.  Plaintiffs even gave specific directives that all development of the technology should be done in a manner so as to be compatible with IBM's relevant solutions. Dkt. No. 1, Paragraph 51.

45.     Then, after falsely representing the urgency of the meeting with the Indian Railways to gain access to the Technology before the Joint Venture documents were executed, in March 2005, Defendants inexplicably changed course.  When Plaintiffs' agents asked for details of any and all meetings Defendants had with the Indian Railways and for details of those meetings, since Chakrabarti had requested the Letter of Intent to Temporarily Market the IP in order to attend a meeting with "the Head of the Railways", Chakrabarti responded in an email dated March 18, 2005, saying:  "…As I said, they did not respond to our request for a meeting. There has [sic] been elections in Bihar this month and so the minister did not convene any meeting.  That is why I said that there has been nothing on that front. My contact has requested

33

1   me to wait for some more time. But I think that now I will approach at a different level. I will

2   keep you informed as soon as there is any change in status….” Further to that email on the same

3   date, Chakrabarti wrote: “…No we must not let go of the Railways plan. I will move on to Plan B

4   after we have reviewed and finalized the next steps in the technical plan.…”  **The following**

5   **events make it clear that Defendant Chakrabarti and the other Defendants very probably**

6   **improperly revealed and/or directly caused transmission of confidential information to**

7   **IBM, and through IBM or directly by their own actions, ultimately to the Indian Railways:**

8           (a)     Defendants have rigorously denied that they revealed confidential

9   information to IBM, and have claimed instead that Plaintiffs *first* revealed the confidential

10  Business Plan to the Deputy Manager of IBM who was sitting on the IITK Incubation Society

11  Board.  Dkt. No 112.  This is, simply put, a fictional and deceptive ploy foisted on the Court and

12  Plaintiffs appreciate the opportunity granted by the Court to address it fully.  Plaintiffs do not

13  deny and have never denied that in May, 2006, during the course of the final negotiations to try to

14  salvage what ultimately revealed itself as a sham Joint Venture, Plaintiffs sent a copy of the

15  business plan and the terms of the joint venture to the Incubation Society Board which included

16  the Deputy Manager of IBM.  Dkt. No 1, Paragraph 76.  Defendants fail to acknowledge several

17  critical facts which make it clear that this alleged Plaintiff transmission to “IBM” was in fact, and

18  without doubt, an invited communication to the IITK Incubation Society Board where the Board

19  had been repeatedly presented by Defendants as an IITK entity.  The Original Complaint contains

20  numerous examples of how the Incubation Society was presented as an IITK entity to Plaintiffs:

21  Paragraph 29, Paragraph 30(c), Paragraph 45, Paragraph 50, Paragraph 51, and Paragraph 60.

22  Thus, the allegation that Plaintiff disclosed information to IBM was and is absurd.  There was no

23  other communication by Plaintiff with “IBM” except for the communication with the IITK

24  Incubation Society Board on which IBM sat.   We also submit with this Third Amended

25  Complaint an excerpt from the charter documents for TIETS which lists the governing board

26  membership of TIETS, clearly showing that the “IBM” individual in question sat on the board of

27  TIETS and that TIETS was not merely represented as an IITK entity but in fact is an IITK

28  controlled entity.  A copy of the excerpt from the TIETS charter is attached as **Exhibit C** to this

M B V   L A W   L L P

8 5 5   F R O N T   S T R E E T

S A N   F R A N C I S C O   C A   9 4 1 1 1

34

1   Third Amended Complaint.  This charter documents shows that the "IBM" representative, as he

2   sat on the TIETS board, was appointed not in his private capacity as an IBM executive but in his

3   capacity as a TIETS governing board member promoting entrepreneurship at IITK. *Id.*

4          (b)     Defendants also fail to acknowledge another critical and illuminating fact

5   regarding the so called transmission by Plaintiff to "IBM" (reiterating that said transmission was

6   in truth nothing more than a transmission to the IITK Incubation Society.) That is, just a little

7   over one month *prior* to the May, 2006 transmission by Plaintiffs to the IITK Incubation Society

8   (the alleged "IBM" transmission),  on April 19, 2006, Defendant Naskar, acting on behalf of

9   Defendant Chakrabarti and IITK, issued an express invitation to Cool e-Mobile [the entity

10  formed by Plaintiff Farhang as the joint venture vehicle] which stated:  "On behalf of the

11  competent authority, I am very happy to inform you that based on the recommendations of the

12  technical committee, the TIETS Governing Body [*which includes the Deputy Manager of IBM*]

13  has ratified inclusion of your proposed technology development under the Incubation programme

14  . . .In view of the above, you are requested to submit within ten days details of your company

15  including copies of Incorporation Certificate, Memorandum and Articles of Association,

16  available information on intellectual property ownership of the proposed technology, the details

17  of the Company Directors and their ownership."  The letter was signed by Defendant Animesh

18  Naskar, who identified himself first in his capacity as "Administrative Officer (Projects), Office

19  of Dean (SRIC)" and then next to that title included a puzzling title "Ex Officio Secretary

20  TIETS", with both titles listed above the final caption that read "IIT Kkaragpur".  A copy of this

21  e-mail is attached as **Exhibit D** to this Third Amended Complaint.  Defendant Naskar's e-mail

22  was transmitted by IITK to Plaintiff's agents and then to Plaintiff on the same day.  In other

23  words, Plaintiff had been invited to submit information to the governing board of TIETS, and the

24  introduction unequivocally implies that TIETS was *already* familiar with the technology because

25  they were congratulating the Joint Venture for "inclusion of the *proposed* [emphasis added]

26  technology development under the Incubation programme."  *Id.*

27          (c)     In fact, as it turns out, Defendants fail to disclose in their Rule 12(b)(6)

28  diatribes that they had been disclosing information to TIETS all along.  In August of 2005,

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

35

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O ,   C A   9 4 1 1 1

1   almost one year before Plaintiffs sent their business plan to the IITK Incubation Society (the

2   alleged "IBM" transmission), Defendant Chakrabarti wrote an e-mail to Plaintiff Farhang where

3   he noted:  "A technical committee of the Incubation Society at IIT [on which the IBM

4   representative sat] met with external experts to examine the various incubation proposals.  Pallab,

5   Subrat, and Pravanjan [all of whom are Defendants in this action-Defendant Pallab Dasgupta,

6   Defendant Subrat Panda, and Defendant Pravanjan Choudhury] made the presentation on behalf

7   of Cool e-mobile."  Thus, on the one hand, when Defendants' own employees (i.e. the Individual

8   Indian Defendants) disclosed the technology and make presentations to the Incubation Society

9   and external experts in 2005, Defendants frame it as proper and treat it as if it is a disclosure

10  within IITK.  When Plaintiffs send confidential information to the same IITK body, following an

11  express invitation by IITK to do so, Defendants frame it as a transmission to "IBM" for which

12  Defendants disclaim all responsibility.  We urge the Court to remember precisely what

13  Defendants wrote in their Rule 12(b)(6) arguments:  "Indeed, Farhang's admission in the original

14  complaint [that she sent a confidential business plan to TIETS on which an IBM employee sat as

15  governing board member] belies any suggestion that IIT had a role in disseminating information

16  to IBM."  It is quite ironic that in their Rule 12(b)(6) motion, of all places, the Defendants have

17  painted quite an *implausible* fiction for the Court, misleading the Court and the public as to the

18  true nature of the facts at hand.

19          (d)     The truth is that IITK had a direct role in disseminating information

20  without confidentiality protection to IBM.  In view of the repeated representations that the

21  Incubation Society was an IITK entity, in view of the express invitation by IITK to Cool e-

22  mobile and Plaintiff to disclose information to the IITK Incubation Society, and in view of the

23  fact that the IITK Incubation Society had industry members working with it, it was IITK's

24  obligation to make sure that any member of the Incubation Society was bound by a suitable NDA

25  or equivalent confidentiality obligation pursuant to Clause 1 of the NDA which they had

26  executed with Plaintiffs as cited above in Paragraph 29 of this Third Amended Complaint.

27  Whether the Joint Venture was sham or abandoned, the Joint Venture can not and did not negate

28  this key requirement of the NDA.  TIETS was an IITK entity, and any disclosures to it assumed

36

1   IITK had obtained the requisite non disclosure or equivalent protection.  Defendants, who first

2   transmitted information to the IITK Incubation Society and who then subsequently invited

3   Plaintiffs to submit more information to the IITK Incubation Society, now turn around and

4   disclaim all responsibility for the IITK Incubation Society and attempt to foist on the Court a

5   false and misleading tale that Plaintiff transmitted confidential information to "IBM" because

6   Plaintiff submitted information to the IITK Incubation Society.

7           (e)     In summary, confidential information was made available to the Deputy

8   Manager of IBM Pvt Ltd. first by Defendants and then by Defendants requesting Plaintiff to send

9   information to an entity which they represented as an IITK entity but for which they now appear

10  to be disclaiming responsibility.

11          (f)     Most compellingly. despite the explicit instruction to submit the

12  information to the IITK Incubation Society/TIETS in April 2006, and despite Plaintiffs

13  compliance in doing so and reasonable trust that IITK Incubation Society members were bound

14  by the terms of the NDA and/or Joint Venture, Defendants then quickly issued a letter on June 7,

15  2006 summarily rejecting all negotiations:  "My clients also call upon your client not to pursue

16  them further to force them to enter into any LOI or agreement against their will."  It is instructive

17  to note that this letter was issued by counsel who identified themselves as representing both IITK

18  and TIETS, despite the fact that IITK now appears to be disclaiming responsibility for

19  transmission of confidential information to TIETS members who worked for IBM.  It is also

20  instructive to note that this termination was issued summarily only two months after the

21  compilation of an internal status report where Defendants mapped out how many man hours they

22  would need and allocate for critical refinements and further execution of the already complete

23  and functioning Indian Railway application.  Attached hereto as Exhibit S4.

24          (g)     In the wake of the transmissions to IBM--which it is clear occurred as a

25  direct result of Defendant IITK's actions (and not Plaintiff's actions) to facilitate transmission of

26  such information without suitable confidentiality protection binding on the IBM representative--

27  the Indian Railway announced in 2007 a provision for a "pilot project" that would tie the Indian

28  Railways' Passenger Reservation System to hand held devices that would be provided to the

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

37

TTEs so that using the handhelds, they could immediately check berth availability and assign
passenger seats for wait-listed customers. IBM was not yet identified as the vendor at this point,
but the deal between IBM and the Railways was in its formative stages during this time and IBM
had by this date acquired significant information about Pocket XML and the resulting Railway
Application. Various newspapers and magazines made the announcement and described
precisely the TTE Assistant developed from the IP. For example, on February 27, 2007 an *EFY
New Network* article stated: "The Indian Railways is also considering a proposal to provide
handheld computer terminals to TTEs, in reserved coaches. The TTE will feed in the current
vacancy position, coach wise and berth wise into these handheld terminals. These terminals will
be directly linked to the PRS system to transmit the berth reservation position from running trains
to the PRS system. Based on this information, the PRS will allot vacant berths to waitlisted
passengers at ensuing stations. Hand held terminals will be made available to the TTEs on four
pairs of trains next year." On March 15, 2007, Devarshi Upadhyay in *merinews* wrote: "A
proposal to provide hand held computer terminals to TTEs is on the anvil. The way it will work is
that the TTEs will feed in the current vacancy position, coach wise and berth wise in the hand
held terminals, which will be directly linked to the passenger reservation system (PRS) to enable
allotment of vacant berths to wait-listed passengers at ensuing stations." Plaintiffs have attached,
under seal, a copy of various internal documents and Joint Venture business plans so that the
Court may compare these news article descriptions to the contents of the Confidential Business
Plan. Please see sealed exhibits Exhibit S1, Exhibit S2, Exhibit S3, Exhibit S4, and Exhibit S5,
attached hereto and incorporated herein.

(h) Then, in March 2008, less than 24 months after the IBM representative
sitting on TIETS had full access to Plaintiffs' confidential TTE technology, *The Economic Times
of India* confirmed that the pilot TTE project chronicled in various news sources in 2007 had
indeed been awarded to IBM. Further details of this announcement can be found below under
Paragraph 46 and Paragraph 47. Plaintiff, who does not reside or work in India, did not discover
the article until May 2008. A copy of the Economic Times of India article is attached to this
Third Amended Complaint as **Exhibit E** to this Third Amended Complaint

46.     This March 2008 *Economic Times of India* article referred to the same hand held TTE project for the Indian Railways that was mentioned in the various 2007 news reports; however this time it described the TTE Assistant almost word-for-word from the Joint Venture's marketing materials. *Id.*

47.     It further stated that the total investment for the TTE project would be "Rs. 200 Crore" (approximately $46 million dollars). The article quoted an Indian Railways official saying: "In 2008, we hope to provide handhelds in 100 trains including Rajdhanis, Jan Shatabdis, Garib Raths and Shatabdis. Later, the project would be implemented in the entire Indian Railways network". A copy of the Economic Times of India article is attached to this Third Amended Complaint as **Exhibit E** to this Third Amended Complaint. For comparison, we will submit under seal various Joint Venture internal documents describing the technology. It is important to clarify for the Court the significance of the March 2008 news article announcing the pilot project between IBM and the Indian Railways:

(a)     Plaintiffs have chronicled above how IITK facilitated access by IBM to Plaintiffs trade secrets and confidential information and failed to require appropriate confidentiality obligations of its TIETS members including the IBM governing board member. (Please note: Without the benefit of any discovery yet, Plaintiffs' review of the facts so far have revealed two plausible modes of transmission, either to IBM or to the Indian Railways or to both, but it is likely that formal discovery will reveal that Defendants have transmitted the technology to other third parties who have not yet been identified, particularly when considering the reference to the panel of "outside experts" in Defendant Chakrabarti's August 2005 e-mail noted in Paragraph 45(c).)

(b)     When viewed together with the facts disclosed above (concerning the various disclosures to IBM via TIETS that were the direct result of IITK's failure to require appropriate confidentiality protection and IITK's own direct transmission to the IBM governing board member sitting on TIETS), The *Economic Times of India* article confirms that there is a high likelihood and a more than plausible scenario by which Plaintiffs' trade secret source code, trade secret business models and implementations and other confidential information were

39

1   transmitted to the IBM governing board member and then used by IBM for its pilot project with

2   the Indian Railways.

3          (c)     The specific facts regarding the path and manner of transmission,

4   Defendant's failure to deny that IBM received the information as it instead attempts to

5   inappropriately and misleadingly shift responsibility for the transmission to Plaintiff, and the

6   remarkable similarity between Plaintiffs' disclosed TTE assistant technology and the TTE

7   technology announced by IBM and the Indian Railways, all make Plaintiff's claims of

8   misappropriation more than plausible.

9          (d)     It is clear that the *Economic Times of India* article, when viewed together

10  with the details we set forth above regarding the specific transmissions to IBM, provide a more

11  than reasonable basis for inferring that confidential information was improperly disclosed.  We

12  should point out that the significance of the *Economic Times of India* article has nothing to do

13  with whether "marketing materials" were disclosed to the *media*; Plaintiffs do not dispute that

14  marketing materials were disclosed to the media nor have they ever argued that such a disclosure

15  to the media would constitute a breach of confidentiality in this case.  The significance of the

16  *Economic Times of India* article is that it confirms, or at the very least makes it reasonable and

17  very plausible, that the confidential and trade secret information transmitted to IBM as a direct

18  result of IITK's actions resulted in IBM's lucrative and successful pilot partnership with the

19  Indian Railways with what appears to be strikingly similar technology when compared to what

20  was disclosed to the IBM representative sitting on the TIETS governing board.   It is even more

21  jarring because Plaintiff Farhang had shared her trade secret strategy of targeting IBM as an

22  acquisition target in the very early stages of her confidential communications with Defendants.

23  Attached hereto as Exhibit S2.

24          48.     After discovering the *Economic Times of India* article and realizing that Plaintiffs

25  Technology had been misappropriated by IITK, Plaintiff Farhang began reviewing the various

26  materials in her possession relating to the sham Joint Venture.  In 2008, in a box of documents

27  recovered from the sham Joint Venture, Plaintiff Farhang discovered a research report by IIT

28  Kharagpur that she had never seen before, entitled "Survey of the Indian Railways Backend,"

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

40

which contained an in-depth review and analysis of the computer and database systems of the Indian Railways and how Plaintiffs Technology would adapt to it, knowledge of which was required for the build-out of the TTE Assistant and other hand held mobile applications that were the subject of the Technology and Confidential Information.  The significance of this document box deserves careful and detailed explanation and must be viewed in context of the other events and circumstances of this case:

(a)     The "Survey of the Indian Railway Backend" report (hereinafter "Survey") had never been shown to Plaintiff Farhang.  Plaintiff Farhang had been intimately involved in every aspect of the technology development, including decisions about platform choices, whether to use open source components, etc.  And yet the Survey, which is even on its face, clearly of great importance to the core goal of the Joint Venture, had never been shown to her.  The Survey is  a detailed description, using intensive research, for planning how the "PXML technology" (i.e. Plaintiffs Technology also known as Pocket XML technology as articulated in even the earliest Ikonodyne Business Plan provided to Defendant Chakrabarti under NDA and to be provided to this Court under seal) would interface with the Indian Railways passenger reservation system. The Survey contains key sections entitled the "PXML View" and "PXML Advantage" which outline, at a high level, how the PXML technology (Plaintiffs Technology and the Joint Venture Technology) would interface successfully and competitively with the Indian Railways Passenger Reservation System.  In other words, the report was not just a generic overview but was a specific high-level report on how Plaintiffs Technology would synchronize with and implement itself in the backend of the Indian Railways.  Attached hereto as Exhibit S5.

(b)     Defendants have tried to dismiss the Survey by stating that it must have been part of the Joint Venture documents.  This is highly improbable.  Besides the fact that it was never given to Plaintiff, it contains no legend or label linking it to the Joint Venture, despite the fact that other critical reports and summaries contained legend crediting the Joint Venture and/or ITTK Kharagpur.  There are no e-mails or transmissions which Plaintiffs could find which cite the Survey of the Railways Backend, despite it being a critical piece of research; there are numerous e-mails and status reports on far more mundane and less critical aspects of the

technology development.

        (c)      When viewed in context, the Survey is highly suggestive that Defendants were working behind the scenes to facilitate a partnership with the Indian Railways, whether it was via transmission of their "own" enhancements that they built from Plaintiffs Technology or through providing more guidance and critical help to IBM who already had been improperly provided access to Plaintiffs Technology.  Even if the Survey were known to Plaintiffs, its evidentiary value is significant.  Despite the fact his team was working intensively to understand the backend of the Indian Railway, Defendant Chakrabarti gave the distinctly opposite impression to Plaintiff Farhang with puzzling reactions ranging from lukewarm to avoidant when the issue of direct contact was raised, and making several statements which suggested that he had meetings with the Railways but would not disclose the details of those meetings to Plaintiffs. Defendant Chakrabarti's various actions in connection with the Indian Railways and the Survey must be viewed in context and concurrently with the IBM transmissions outlined above. Consider the following integration of the various events:

        (i)      Defendants noted to the Court that there was no evidence of IITK dialoguing with the railway—we disagree strongly with this, and indeed, are not introducing new evidence but simply directing the Court to the evidence already pleaded in the Original Complaint.  Dkt. No. 1. Throughout 2004, Defendant Chakrabarti made statements indicating he was meeting with the Indian Railways on various projects including the TTE hand held project and constantly pressured Plaintiffs for permission to disclose as much detail as possible.  Dkt. No. 1.  Paragraph 43.

        (ii)     In January of 2005, Chakrabarti informed Plaintiff Farhang and her COO that he was moving ahead aggressively to meet with the Indian Railways. Dkt No. 1, Paragraph 53.

        (iii)    In March of 2005, Defendant Chakrabarti then surprisingly and inconsistently stated that he had <u>not</u> met with the Indian Railways because his initial contact had asked him to wait due to ongoing elections, but then

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

1    Defendant Chakrabarti stated that "I think now that I will approach at a

2    different level" which clearly implied that he was going to use a new

3    contact at the Indian Railways (i.e. one "at a different level" than the

4    contact who was asking him to wait.) Dkt. No 1, Paragraph 55.

5    (iii)   Shortly after this, in May of 2005, Defendant Chakrabarti did not update

6    Plaintiffs of any further contacts with the Indian Railways.  However, he

7    did then announce, quite surprisingly, that IITK could not longer

8    technically be part of the joint venture due to technical legal requirements

9    but announced to Plaintiffs that the IITK Incubation Society Board, *on*

10   *which, coincidentally, IBM sat as a governing board member*, which

11   Defendant Chakrabarti represented was essentially the same as IITK,

12   would be taking over IITK's official role in the joint venture.  Dkt. No. 1,

13   Paragraph 56.

14   (v)   Around this period, while Defendant Chakrabarti was making inconsistent

15   statements about contacts with the Railways and then suddenly replacing

16   IITK with the IITK Incubation Society on which IBM sat as a governing

17   board member, Defendant Chakrabarti's team compiled and used the

18   Survey of the Backend of the Railways to adapt Plaintiffs Technology for

19   deployment in the Indian Railways.  Further evidence of this can be found

20   in the PXML Technology Status Report prepared by Defendants Brar,

21   Chaudhary, Gupta, and Panda that will be submitted under seal to this

22   Court.  Attached hereto as Exhibit S4.

23   (vi)   In June of 2005, Defendant Chakrabarti traveled to California and met with

24   Plaintiff Farhang and told her that he needed USD 100,000 to secure the

25   Indian Railways contract but then when asked for itemization of how the

26   funds would be spent, he could not provide such itemization.  Dkt. No. 1,

27   Paragraph 59.  Indeed, it also appeared that as soon as the IITK Incubation

28   Society, with IBM on its Board, became involved in the plans, Defendant

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

43

Chakrabarti began to retreat from his initial "commitment" to bring the Indian Railways to the table with the Joint Venture, and indeed to retreat from his numerous initial statements which strongly implied that he had already disclosed the technology to the Indian Railways as part of his broad disclosures about various technologies that could improve railway efficiency.

(vii)   From June 2005 to August 2005, Defendant Chakrabarti did not disclose any interactions he was having with the Indian Railways. During the period, Plaintiffs, on their own, for the benefit of the Joint Venture, approached the Indian Railways with a high level, non confidential description of their plans to gauge interest to which they received enthusiastic interest. This communication was expressly authorized by Defendant Chakrabarti as described above. When Defendant Chakrabarti heard of this, he immediately insisted that any documents sent to the Railways be approved by him and that it must show the address of the venture at IITK under the Incubation Program. Dkt. No 1., Paragraph 60.

(viii)   Meanwhile, as noted above, during this same period, in August of 2005 Defendant Chakrabarti and several of the Individual Defendants unilaterally decided to make a presentation to TIETS (on which IBM sat) and to some kind of panel of "outside experts" (to date, the identify of these experts have not been identified)—this was the presentation of Plaintiffs Technology to TIETS, on which IBM sat, and occurred almost one year *prior* to Plaintiffs alleged transmission to "IBM" (which we have shown above was actually an invited submission to the same entity, TIETS or the IITK Incubation Society.) These events have been detailed and explained at length above. At this point, Defendant Chakrabarti, given all his numerous statements over two years about dialogues with the Indian railways, was likely talking directly to the Indian Railways, but was more

1    importantly and at the same time facilitating IBM to begin having direct

2    dialogue with the Indian Railways while Defendant IITK provided IBM

3    and/or the Indian Railways critical access to Plaintiffs Technology.

4    49.    The Court has raised the question of whether there is any evidence that IITK

5    "sold" the technology to the Indian Railways or IBM. Dkt No. 143, p. 11, line 15.  With the

6    numerous details revealed in this Third Amended Complaint, and the documents submitted to the

7    Court as exhibits hereto under seal, it should now be clear that there is at the very least a very

8    reasonable and real plausible scenario by which inappropriate and deliberate transmission of

9    Plaintiffs' trade secret, confidential information and/or valuable business opportunities were

10   transmitted by Defendants to IBM and ultimately to the Indian Railways and possibly to other

11   third parties that will be further identified through discovery.  Plaintiffs have established this very

12   real scenario without the benefit of any formal discovery, and Plaintiffs reiterate their requests for

13   permission to conduct discovery notwithstanding Defendants' repeated efforts to delay discovery.

14   The evidence obtained through Plaintiffs' own investigation and due diligence and combined

15   with analysis of the records reflecting Plaintiffs' several years of negotiations and dealings with

16   Defendants shows that Defendants and IITK in particular have benefited from these improper

17   transmissions—the exact amount, nature and timing of the remuneration can not be known at this

18   time without further discovery and audit of IITK and Defendant's financial records including a

19   full audit of SRIC's financial records.  But IITK clearly benefited from the transmission, forging

20   the continuation of its continued lucrative partnerships with both IBM and the Indian Railways.

21   It remains unclear whether IBM or the Indian Railways knew it was receiving Plaintiffs

22   Technology as it is quite possible, given the numerous false allegations in the Indian Complaint,

23   that Defendants were wrongly alleging the technology was their own.  But in return for giving

24   IBM and/or the Indian Railways access to this technology, IBM would continue to provide its

25   expert guidance serving on the Board of TIETS.  It should also be noted that there is a pattern of

26   numerous partnerships and collaborations between IITK and IBM India Pvt Ltd.  Similarly, it

27   should also be noted that IITK has benefited enormously from the disclosure to the Indian

28   Railways.  IITK had long been chasing the Indian Railways as a potential source for

45

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1   collaborations, as indicated by Defendant Chakrabarti's e-mail to Plaintiffs in 2004.  Facilitating

2   the IBM and Indian Railways pilot TTE Assistant project using Plaintiffs' Technology, IITK

3   benefited immensely by establishing itself as a key player, if not the key player, in Railway

4   Research, from which almost certainly other project engagements and remuneration followed.

5   Remarkably, just two years after the 2008 announcement of the IBM-Indian Railways partnership

6   with the TTE Assistant pilot project based on Plaintiffs Technology, the Indian Railways just

7   announced in February of 2010 that it would set up the largest research and development center

8   in IITK's history at IIT Kharagpur.  The initial expected investment by the Indian Railways is

9   nearly USD 25 M.   Defendant Chakrabarti, who at one point claimed to have difficulty securing

10  a meeting with the Indian Railways for the Joint Venture, is now almost certainly critically

11  involved with the operation and budget of this center.  Please see the April 2010 *The Times of*

12  *India* article attached as **Exhibit F** to this Third Amended Complaint.

13       50.     Defendants have caused Plaintiffs irreparable harm and significant monetary

14  damages by their wrongful conduct and by fraudulently and maliciously conspiring to take

15  control of the Technology and Confidential Information in order to misappropriate it, and to

16  ensure that Plaintiffs did not achieve the contract with the Indian Railways. Furthermore, as

17  stated above, IBM has gained the contract with the Indian Railways utilizing the same

18  technological solution Plaintiffs provided to Defendants who, in turn, provided IBM and most

19  probably, through IBM, provided the Indian Railways access to Plaintiffs Technology.  As stated,

20  there may be other third parties (in the utility or medical sector, for example, or in whatever

21  sectors were represented by the panel of "outside experts" who were permitted by IITK to see the

22  Technology) who have been provided access to Plaintiffs  Technology and these third parties

23  might only be discovered through discovery.

24       51.     Throughout the Joint Venture, Defendant Partha P. Chakrabarti purported to act as

25  a CTO of Cool e-mobile, and appeared initially to be coordinating efforts of the IITK engineering

26  team, including other individual Defendants, and gave the appearance that he was working on the

27  development of the Technology for the Joint Venture.  Defendants initially made numerous

28  verbal and email statements that the Joint Venture had been approved by the Indian government

46

as articulated above, but then after nearly many months of conduct under the Joint Venture,
abruptly informed Farhang and her affiliates that a Joint Venture *per se* with the Indian
government was not possible unless it was structured through the IITK Incubation program.
Defendants then persuaded Plaintiffs to continue to work with them on a Joint Venture through
the proposed incubation platform, and ultimately making false statements that Plaintiffs' entity
Cool e-mobile had been admitted to the incubation program.

52.     During the course of the Joint Venture, Defendant Partha P. Chakrabarti and the
other individual Defendants named continued to work on developing the Technology to which
they were granted access pursuant to the NDA, and sent numerous emails, status reports, and
engaged in numerous telephone conferences to California claiming to Farhang that the Joint
Venture was proceeding as planned and that the actual execution of Joint Venture documents was
imminent.  Indeed, on more than one occasion, Defendants told Farhang and Farhang's affiliates,
by email and verbally, that the proposed equity share had been approved, that the Joint Venture
had been approved, that execution of the Joint Venture documents was imminent, and that Cool
e-mobile had been accepted into the IITK incubation program.  During the course of the Joint
Venture, during the same time that IITK continued to have access to and to exploit the
Technology for their own benefit, IITK and individual Defendants attempted to change the initial
proposed equity share of IITK and attempted to obtain additional rights that had not been
disclosed when they first consented to the Joint Venture and had told Farhang that the Joint
Venture had been approved.

53.     During the course of the Joint Venture, Defendants also engaged in specific acts to
delay the Joint Venture from interacting with the Indian Railways so that IITK and other
Defendants could continue to misappropriate the Technology for their own benefit and then
present it to IBM and/or the Indian Railways and secure benefits for themselves.  For example, in
June, 2005, Plaintiffs met with the Indian Railways and received an enthusiastic response and
invitation to present the Joint Venture and discuss a mobile TTE deployment within the Indian
Railways by the Joint Venture.  Plaintiffs' representative then informed both Plaintiff Farhang
and Defendant Chakrabarti by email as to the success of the meeting and requested immediate

47

1   support from IITK, consistent with the terms of the Joint Venture, to move forward.  Defendant

2   Chakrabarti immediately sought to control and restrict her communication with the Indian

3   Railways for the stated purpose of ensuring the best outcome for the Joint Venture, but then

4   deliberately failed to follow through and ultimately prevented the Joint Venture from

5   meaningfully presenting to the Indian Railways, acting repeatedly to thwart meaningful progress

6   of the Joint Venture.  Specifically:  (i) Defendant Chakrabarti and his associates sent internally

7   contradictory communications to the members of the Joint Venture team, indicating that the Joint

8   Venture was approved on the one hand but then later claiming that it was not;  (ii) Defendant

9   Chakrabarti insisted that IITK's name be used ahead of the name of the Joint Venture for the

10  stated reason of giving credibility to the Indian Railways project, but then did not permit the Joint

11  Venture to move forward to meaningfully present the technology to the Indian Railways; and (iii)

12  Defendant Chakrabarti misrepresented routine communications from the United States Patent

13  Office and Plaintiff Counsel to the IITK-based engineering team, neglected his duties as Chief

14  Technology Officer, and then made false and misleading statements to the entire IITK

15  engineering team about ownership of the patent and the status of the patent, using his position of

16  seniority and influence to create division and strife and further thwart the Joint Venture.  All the

17  while, Defendant Chakrabarti and other members of the IITK team continued to work on the

18  Technology, used the Technology to make significant developments for the benefit of IITK, and

19  used Plaintiff business resources, business strategies and other resources for their own benefit.

20  Ultimately, Defendant Chakrabarti and the IITK team took the Technology (and the resulting

21  significant applications they had developed from it) hostage and never returned it to Plaintiffs in

22  useable form.  Though Plaintiffs managed to secure the opportunity to present to the Indian

23  Railways in 2007, IITK had already deprived Plaintiffs of the complete code and necessary

24  modules to ensure that no meaningful demo could be made and were in fact likely assisting both

25  IBM and the Indian Railways in the forging of their partnership using Plaintiffs Technology

26  (whether IBM or the Indian Railways realized they were receiving Plaintiffs Technology remains

27  to be seen) which would culminate in the 2008 announcement of the TTE Assistant pilot project.

28  Since that time Defendants have also made false and misleading statements about the Joint

48

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

1    Venture and the value and ownership of the Technology in publicly filed documents.  The Joint

2    Venture, and the activities of the parties pursuant thereto, in addition to Defendants activities as

3    an industrial and technology consultancy and incubator (described in detail above) which sought

4    to obtain an equity share in Plaintiff's company, created a fiduciary relationship between and

5    among the parties.  IITK had a unique and superior position in the Joint Venture and as a

6    technology expert upon whom Plaintiffs relied for guidance, confidentiality, and loyalty.  As a

7    consultancy/incubator from one of India's premier technology centers, IITK used its reputation

8    and position to obtain access to Plaintiff's global business strategies, business resources and the

9    Technology.  As a government entity, in the setting of the Joint Venture, it represented to

10   Plaintiffs that it could bypass the required tender process to win the Indian Railways as a

11   customer.  It reminded Plaintiff's of its influential and unique position on numerous occasions,

12   explicitly asking Cool e-mobile to list IITK above or at the very least alongside Cool e-mobile in

13   communications with third parties.  Moreover, IITK was very well connected within Indian

14   regulatory, business, legal and technology communities in which the Joint Venture was operating

15   and thus was in a superior position.  IITK used the superior position and the promise of influence

16   to acquire from Plaintiffs critical business information about the railway strategy, including

17   Confidential Information, and access to Technology, and critical business resources such as

18   expert consulting resources, time and the other manhours of Plaintiff agents, and used the

19   information and Technology and resources to its advantage and for its own benefit in an attempt

20   to develop its own mobile technology applications that would ultimately prove to be simply

21   unauthorized enhancements of Plaintiffs Technology.  It should also be noted the Joint Venture

22   did exist regardless of Defendant's assertions regarding the legality of a Joint Venture with the

23   Indian government.  Defendants have tried to argue that, by *Indian* law, a joint venture cannot be

24   formed with the Indian government, a fact which they disclosed to Plaintiffs years after the fact

25   despite the fact they themselves were a government entity doing business globally and had

26   explicitly agreed to a Joint Venture and represented that it was perfectly permissible.  Moreover,

27   by their own explicit statements and admissions, Defendants purported to find a solution to the

28   legal technicality allegedly preventing joint ventures *per se* with the Indian government by using

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO CA 94111

49

M B V   L A W   L L P

8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    the incubation program to continue a Joint Venture via the Incubation Society and through that

2    alternate mechanism request an equity share in Cool e-mobile.  It should be noted that the

3    incubation program was used at that time, and has been used since that time, for IITK to enter

4    into similar arrangements with other startup companies.  Finally, it should be noted that the Joint

5    Venture was formed and enabled by entities that specifically sought to do business under

6    California law, involved entities and individuals from multiple jurisdictions and had planned for

7    the participation and creation of companies chartered under multiple jurisdictions not just India,

8    was lead by M.A. Mobile and Farhang headquartered in California, and was only starting

9    development and marketing efforts in India as part of Plaintiffs' global strategy to go after

10   railways and utilities worldwide.

**D.      Defendants Fraudulently Deceived Plaintiffs to Gain Access to the Technology and
          Plaintiffs' Resources While Exploiting the Technology for Their Own Benefit.**

13          54.     From the outset throughout the Joint Venture, Defendant's made repeatedly

14   contradictory statements about the structure of the Joint Venture, made false statements about

15   their work progress, capacity and involvement, and gave the appearance of trying to secure a

16   meeting with the Indian Railways for the Joint Venture when in fact they were doing nothing

17   tangible to present the Joint Venture to the Indian Railways.  The first real meeting with the

18   Indian Railways only took place because Plaintiff's agent, seeing the unusual delay and strange

19   lack of response by the IITK Team, decided to approach Indian Railways on her own for the

20   benefit of the Joint Venture.  When she impressed the Indian Railways minister and secured an

21   invitation to present the Indian Railways project, IITK and Defendant Partha Chakrabarti

22   immediately took steps to ensure that IITK could control and slow the process so that no

23   meaningful presentation could be made until Defendants could exclude Plaintiffs from the

24   process.  Though prior communications had indicated a demo was ready, IITK changed gears and

25   insisted that the demo was not ready and then insisted that incubation documentation needed to

26   be finalized, all the while working internally to prevent the presentation to the Indian Railways so

27   that in the meanwhile IITK could develop what they wrongly believed and wrongly hoped would

28   be their own applications from the Technology Plaintiff and M.A. Mobile trusted to them.

50

55.     Other examples of false representations included, but were not limited to, the following:

(a)     In a meeting with M.A. Mobile and Farhang, individually, in California in November, 2004, Defendant Pallab Dasgupta showed M.A. Mobile and Farhang, individually, documentation concerning development of enhancements of the Technology and applications for the Indian Railway and other potential customers, and represented to M.A. Mobile and to Farhang, individually, that those enhancements and those applications had been carried out for the benefit of the Joint Venture.

(b)     In various emails transmitted to M.A. Mobile, Farhang, individually, and others in or about May and June, 2005, and at other times, Defendant Partha P. Chakrabarti represented that Defendants would arrange for Cool e-mobile to be enrolled as a member of IITK's "incubator" program in furtherance of the Joint Venture and then represented that Cool e-mobile had been approved for admission to the incubator program.

(c)     Repeatedly during 2004 and 2005, in telephone conversations with, and emails and other documentary transmissions to, M.A. Mobile, Farhang, individually, and others, Defendant Partha P. Chakrabarti represented: (1) that IITK would be a partner in the formation of Cool e-mobile (thus making it possible for Cool e-mobile to avoid the mandatory tender process otherwise required of private companies when entering into contracts with the Indian Railway and other government entities); (2) that Mr. Chakrabarti would personally serve as the chief technology officer of Cool e-mobile (thus lending great prestige to the company); (3) that Mr. Chakrabarti would need to be a direct shareholder of Cool e-mobile (thus giving Mr. Chakrabarti a greater incentive to help the company succeed); (4) that Defendant Pallab Dasgupta would personally serve as the vice-president of engineering of Cool e-mobile (thus lending great prestige to the company); (5) that Mr. Dasgupta would need to be a direct shareholder of Cool e-mobile (thus giving Mr. Chakrabarti a greater incentive to help the company succeed); and (6) that Mr. Chakrabarti and Mr. Dasgupta would secure the Indian Railway, the most coveted potential customer in India for the Joint Venture, as Cool e-mobile's first customer.

56.     Such representations were false, and were known by those Defendants to be false

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

51

at the time they were made, in that:

(a)     The abovementioned enhancements and applications for the Indian Railway had been carried out by those Defendants solely for their own account, and were subsequently used by those Defendants solely for their own account.

(b)     Those Defendants never intended to, and never did, arrange for Cool e-mobile to be enrolled as a member of IITK's "incubator" program.

(c)     The following were clearly evident from communications and facts only subsequently known to Farhang:

(1)     Plaintiffs are informed and believe that IITK was barred, under Indian law, from participating in the Joint Venture but IITK still knowingly furthered a sham Joint Venture to gain access to Farhang's Technology, business resources (consulting time, manhours, resources, etc.), and to thwart Farhang and M.A. Mobile from moving forward with a business or technology that would compete with their own plans for a marketing mobile solutions;

(2)     Plaintiffs are informed and believe that Mr. Chakrabarti was barred, under Indian law, from personally serving as the chief technology officer of Cool e-mobile but still knowingly asked for, assumed, and used this role to further the conspiracy;

(3)     Plaintiffs are informed and believe that Mr. Chakrabarti was barred, under Indian law at that time, from being a direct shareholder of Cool e-mobile but still knowingly asked for a personal equity stake in the project;

(4)     Plaintiffs are informed and believe that Mr. Dasgupta was barred, under Indian law, from personally serving as the vice-president of engineering of Cool e-mobile but still knowingly asked for, assumed, and used this role to further the conspiracy;

(5)     Plaintiffs are informed and believe that Mr. Dasgupta was barred,

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

52

under Indian law, from being a direct shareholder of Cool e-mobile but still knowingly asked for a personal equity stake in the project; and

(6)   Plaintiffs are informed and believe that Mr. Chakrabarti and Mr. Dasgupta never intended to secure, and never did secure, the Indian Railway as a customer for Cool e-mobile, but instead acted to delay and thwart presentation of the product to the Indian Railway at the very time when the Indian Railway expressed strong interest in the project and was willing to view a product demonstration.

57.   Defendants, while secretly intending to further develop the Technology for their own account and to misappropriate the Technology and its enhancements and while secretly intending to use Plaintiffs' business skills, manhours, time and other resources to help to build their own mobile technology platform, did the following:

(a)   deliberately gave the appearance of working together with M.A. Mobile and with Farhang, individually, in creating enhancements to the Technology and applications incorporating the Technology all under the purported banner of a Joint Venture;

(b)   engaged with M.A. Mobile and with Farhang, individually, in meetings, conference calls, and exchanges of emails concerning marketing strategies and technology strategies, repeatedly assuring Farhang and her agents that the Joint Venture was moving forward and approved; and

(c)   feigned memorialization of the Joint Venture via drafting a written letter of intent covering conditional and temporary marketing rights, as well as the allocation of ownership interests in Cool e-mobile, the new entity formed to market the Technology and its enhancements for the benefit of the Joint Venture, all the while making sure that those memorializations were never signed, making internally contradictory statements and numerous last-minute requests for additional benefits and rights, and all the while assuring Farhang that the Joint Venture had already been approved and was ongoing.

58.   On numerous occasions, Pallab Dasgupta, Gurashish S. Brar, Rakesh Gupta,

53

1    Pravanan Choudhury and Subrat Panda were copied on emails sent to Plaintiffs in California

2    where numerous false representations were knowingly made, on behalf of their engineering

3    group and by various members of the group including Dasgupta, Brar and others, about the status

4    of the project, about Defendant Chakrabarti's role as CTO of a Joint Venture, and about the

5    imminence of an Indian Railways presentation.  These individual Defendants were all copied on

6    or participating in email exchanges, where all of the individual Defendants, led by Partha

7    Chakrabarti, knowingly thereby gave Plaintiffs the clearly false message that they were working

8    diligently on the Indian Railways application and that the Joint Venture would be able to present

9    to the Indian Railways.  In reality, however, individual Defendants Pallab Dasgupta, Gurashish S.

10   Brar, Rakesh Gupta, Pravanan Choudhury and Subrat Panda, under the leadership of Partha

11   Chakrabarti, and by IITK Indian counsel's own admission in publicly filed documents in India,

12   were working on other applications in an attempt to use Plaintiffs Technology, trade secrets,

13   business resources, manhours (including time spent by Plaintiff Farhang, Varsha Singh, and

14   numerous other Plaintiff agents) and other Plaintiff business resources to create what they hoped

15   would be their own competitive mobile technology platform but which in reality was simply

16   enhancements of Plaintiffs' Technology.   In reality, several of the Individual Defendants

17   disclosed information to IBM and TIETS, without ensuring that IBM was properly bound by

18   NDA as it should have been pursuant to the NDA, and then instructed Plaintiff to disclose more

19   information to TIETS presenting TIETS as an IITK entity to which Plaintiff reasonably believed

20   it could disclose information pursuant to the NDA and pursuant to the Joint Venture with IITK.

21         59.     Defendants knowingly and fraudulently induced M.A. Mobile and Farhang to lend

22   significant business resources in the form of guidance, time, and manhours of Plaintiffs'

23   designated agents (including Varsha Singh, Ronald Jenkins and others) to the Joint Venture by

24   promising a Joint Venture that would mutually benefit the participants but ultimately using

25   Plaintiffs' time, resources, manhours and expert consultants  to further their own business plans

26   to develop what they hoped would be their own mobile technology platforms--which in fact were

27   ultimately enhancements and modifications of the Technology provided to them.  Defendants

28   used Plaintiff Mandana D. Farhang to coordinate meetings, project updates, and coordinate

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

54

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1   moving the project forward, despite explicit representations by Defendant Chakrabarti that he

2   would devote significant time and leadership to the project.  Defendants, including Defendants

3   Pallab Dasgupta, Gurashish S. Brar, Rakesh Gupta, Pravanan Choudhury and Subrat Panda used

4   Plaintiff's agent Varsha Singh in a similar fashion, inducing her and Plaintiff to believe that their

5   collective efforts would benefit the Joint Venture when in fact their efforts were being used to

6   further Defendant's own business plans.  Defendant also induced Plaintiff to expend thousands of

7   dollars on legal counsel for the Joint Venture (independent of funds expended for her own legal

8   representation), business resources, and other expenses in furtherance of the Joint Venture which

9   IITK had purported to enter.

10          60.     Ultimately, IITK, TIETS, and its affiliates would breach the NDA, the Joint

11  Venture agreements, and their fiduciary duty under the Joint Venture, disclosing the Technology

12  to third parties and developing the Technology for their own benefit.  There is significant

13  evidence that Defendants disclosed the Technology to IBM and through IBM or by Defendants'

14  own direct efforts also to the Indian Railways, thereby facilitating the ultimate pilot project

15  between IBM and the Indian Railways and benefiting themselves by forging stronger and more

16  lucrative partnerships with both IBM and the Indian Railways.  .  In addition, in 2009, Defendant

17  expressly admitted that it used Plaintiff's technology to develop valuable applications, stating:  ".

18  . .[IITK] through its highly qualified faculty and students had immensely developed the

19  technology provided initially by the Defendant No.1 . . . and developed many interesting

20  applications, especially for Indian scenarios like railways." (Indian Complaint filed by IITK in

21  June 2009 in the High Court of Kolkata—the late filing of said Indian Complaint was a maneuver

22  by Defendants to avoid legitimate jurisdictional authority in the United States has been detailed

23  to the Court under previous separate filings and oral argument.)  Thus, it is now undeniable that

24  Defendant used the technology in direct breach of the NDA, circumventing the NDA restrictions

25  on such development by fraudulently clever representations that IITK was participating in a Joint

26  Venture with Plaintiffs.  As will be proven in greater detail at trial, the Joint Venture prove

27  ultimately to be an elaborate sham, and Defendants had used the Joint Venture as a mechanism to

28  breach the NDA and develop technology from the Confidential Information and Plaintiff

55

Technology for the sole benefit of IITK. **Plaintiffs must be able to plead breach of the non-use provision of the NDA because: (i) Defendants claim the Joint Venture did not exist and apparently was a sham from its inception and therefore the Joint Venture did not supplant the NDA with regards to an agreement as to whether Defendants could use Plaintiffs Technology, and (ii) Defendants are being permitted to argue that a Joint Venture did not exist and Plaintiffs must be able to plead breach of the NDA in alternative.** Plaintiffs allege the Joint Venture did exist and that Defendants breached and remain in breach of the Joint Venture Agreement, but if for some reason the Joint Venture Agreement did not exist, then Defendants breached the NDA.

61.     To date, IITK has held hostage the Technology to which Plaintiff granted access and which Plaintiff permitted Defendants to develop and exploit on belief that Defendant was working in furtherance of the Joint Venture. In the meanwhile, shockingly similar technology has surfaced in the hands of key competitors who were sitting on the IITK incubation board; shockingly similar technology, drawing directly off the trade secrets disclosed to Defendants, has appeared in the very same vertical market, the Indian Railways, which Defendants were targeting. Plaintiffs have suffered a grave economic loss as a result of the lost opportunity to secure the Indian Railways as a first customer, and with every month that passes, is losing the opportunity for significant revenue that would arise from further commercialization of the Technology in other markets or the sale of the Technology to a third party for further development.

## AMENDED FIRST CLAIM FOR RELIEF
### (Breach of the NDA Agreement)

62.     Plaintiffs refer to, and by this reference reassert and incorporate in the present claim for relief, each of the allegations set forth in paragraphs 1 through 61 of this Third Amended Complaint. Pursuant to the Court's order issued on June 1, 2010, Plaintiffs have amended the factual allegations to provide additional details on Plaintiffs Technology. Specifically, with regards to evidence of actual transmission of confidential information to IBM and the Indian Railways, please refer to amended factual allegations in Paragraphs 25-27 and

56

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    Paragraphs 44-49 of this Third Amended Complaint.  With regards to the Court's concern that

2    the NDA conflicts with the terms of the Joint Venture and facts underlying the breach of the non-

3    use provisions of the NDA, we refer the Court to amended Paragraph 32 of this Third Amended

4    Complaint and again refer the Court to amended Paragraphs 44-49 which show the scope and

5    duration of the fraudulent actions which make it clear that the Joint Venture was likely a sham

6    from its inception and that Plaintiffs should thus not be deprived of the right to plead breach of

7    the non-use provision of the NDA that would be binding in absence of any Joint Venture.  This

8    Third Amended Complaint also clarifies, for the Court, in Paragraphs 44-49, that Defendants

9    breached the non-disclosure portions of the NDA, specifically Clause 1, by failing to ensure that

10   all IITK agents including the governing board's members of the IITK Incubation Society were

11   bound by equivalent confidentiality protection.

12        63.     The parties entered into a valid written NDA Agreement.  Plaintiffs have fully

13   complied with their obligations under the NDA.  Defendants have breached the NDA.  By May,

14   2006, and possibly prior to that date, Defendants breached the NDA by engaging in one or more

15   of the following acts without the authorization of M.A. Mobile:

16             (a)     disclosing or causing disclosure of  the Technology and Confidential

17   Information to persons or entities who had not previously agreed to be bound by terms and

18   conditions substantially similar to those of the NDA, including specifically the IBM

19   representative sitting on the IITK Incubation Society and members of the Indian Railways and

20   possibly other third parties not yet identified; Defendants, including Defendant Chakrabarti,

21   disclosed Technology and other Confidential Information, including Plaintiff's specific plans for

22   use of the mobile technology in the railway sector, to the IBM representative sitting on TIETS,

23   the Indian Railways, and possibly other corporate entities (including to date an as-of-yet

24   unidentified panel of "experts" shown the Technology by Individual Indian Defendants in 2005)

25   competitive with Plaintiff.  Defendant Chakrabarti disclosed Confidential Information to IBM

26   and ultimately to the Indian Railways and competitive third parties in an attempt to thwart

27   progress of the Joint Venture, and in an attempt to derive benefits from the Technology and

28   Confidential Information for its own account.  Defendants also disclosed technology to members

57

of the IITK community, including members of TIETS who have independent affiliations with third party companies active in the mobile space, who had not executed the NDA as individuals and who had not agreed to be bound by its terms.   The unauthorized disclosures, though not known at the time they occurred, are reasonably believed to have occurred during the course of the Joint Venture and are reasonably believed to have occurred in email, verbal and other documentary form.  It should be noted that IITK, because it has engaged in breaches of the NDA, initially attempted to escape liability by denying that it was bound by the NDA by filing an incomplete copy of the NDA and attempting to assert that the NDA only bound individual Defendants Partha Chakrabarti and Pallab Dasgupta;  Plaintiffs promptly produced the cover letter sent by IITK indicating clearly that Defendants Partha Chakrabarti and Pallab Dasgupta had signed for IITK as an entity and not merely as individuals;

(b)    making, having made, using, and/or selling intellectual property, for Defendants' own account, which used, incorporated, and/or derived from the Technology.  Defendants contend that no Joint Venture was ever formed, but as is detailed above and/or by their own admission in publicly filed documents, purported in fact to form a Joint Venture so IITK engineers could modify, further develop, and ultimately exploit the Technology.

(c)    failing to return Confidential Information in complete form as requested by Plaintiffs.  The NDA expressly required IITK and Defendants to return all Confidential Information and Technology to Plaintiffs.  To date, Defendants have not complied with this obligation.  Only a single CD purporting to contain the original source code with minor "enhancements" was returned.  Documentation relating to business plans, trade secrets not disclosed in the patent, and other Confidential Information have not been returned to date and is believed to reside on the premises of IITK and also may be in the possession of certain individual Defendants in India and the United States.  **This breach is not merely a technical breach from which no damage followed—it entirely thwarted and prevented Plaintiff Farhang and her associates from using their valuable assets and business opportunities, from mitigating damages and salvaging the chance of finding a first customer once it was clear that IITK had abandoned the sham Joint Venture on June 7, 2006.**

**M B V   L A W   L L P**
855 FRONT STREET
SAN FRANCISCO CA 94111

58

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

64.     Because of Defendants' Joint Venture and fraudulent promises contained therein which were ultimately breached, M.A. Mobile did not discover breach of the NDA until after May 27, 2006, and in the exercise of due care could not have discovered that breach prior to that date.  As point of fact, further documents have come to the attention of counsel which make it clear that Plaintiff Farhang, even after May 27, 2006, still had reasonable basis to believe that the Joint Venture might not have been breached by IITK but that Defendant Chakrabarti was acting as a rogue entity on his own.  Indeed, the IITK Incubation Society had just asked the Joint Venture to present its key charter and intellectual property documents in April of 2006 and in part for this reason, Plaintiff Farhang made one last attempt to secure the signature of TIETS and move ahead with the project in May of 2006.  This effort was only completely and clearly rejected for the first time on June 7, 2006 as stated above in Paragraph 63.

65.     Defendants also breached obligations of good faith and fair dealing that are implied in all contracts.

66.     As a proximate result of Defendants' numerous breaches, Plaintiffs have been damaged in an amount subject to proof at trial, but in any case greater than $30,000,000. Plaintiffs will establish at trial, with reasonable certainty, that the Indian Railways, on two separate occasions in 2005 and 2007, requested presentation of the proposed mobile ticketing project by Cool e-mobile and expressed strong interest in moving forward.  In both instances, Defendants' breach of the NDA directly thwarted Cool e-mobile's and/or Plaintiffs' ability to secure Indian Railways as a first customer; Defendants deprived Cool e-mobile and/or Plaintiffs of the modification and applications they had agreed to make from Plaintiffs Technology which were supposed to be demonstrated to the Indian Railways by the Joint Venture.  Defendants disseminated information about the Technology to third parties such as IBM who began working on similar mobile technology with Plaintiffs Technology.  These breaches resulted in not just theoretical loss of customers but the direct loss of the Indian Railways mobile technology project. Based on figures from applicable Indian Railways budget, announcements made by the Indian Railways that it had adopted a mobile product of strikingly similar technology from IBM, and known data regarding a similar mobile deal done during the same time period, Plaintiffs will be

59

M B V    L A W    L L P
8 5 5    F R O N T    S T R E E T
S A N   F R A N C I S C O    C A   9 4 1 1 1

1   able to easily establish that $30,000,000 is a reasonable sum that captures the value of the

2   revenue and benefits which Plaintiffs would derive had the Technology been licensed to the

3   Indian Railways.  Plaintiffs were in prime position to capture the Indian Railways.  Plaintiffs

4   were fraudulently induced by Defendants to believe that Cool e-mobile had the assistance and

5   Joint Venture support of a premier governmental technology institution to clinch the deal.  But,

6   instead of providing real assistance and support to Plaintiffs and Cool e-mobile, as promised,

7   Defendants breached the NDA and the Joint Venture and engaged in further wrongful conduct at

8   the very times when a profitable deal was on the table and could have been easily consummated.

9        67.    Farhang, in her capacity as an intended third party beneficiary of the NDA, and/or

10  as an assignee or corporate affiliate of M.A. Mobile, and M.A. Mobile on its own is entitled to

11  recover those damages herein.

12                          **SECOND CLAIM FOR RELIEF**
13                       **(Breach of Joint Venture Agreements)**

14       68.    Plaintiffs refer to, and by this reference reassert and incorporate in the present

15  claim for relief, each of the allegations set forth in paragraphs 1 through 67 of this Third

16  Amended Complaint.

17       69.    After securing access to the Technology through the NDA and to continue to

18  obtain their access to the Technology, Defendants purported to enter into a Joint Venture with

19  M.A. Mobile and with Farhang, individually, for the express purpose of developing the

20  Technology and marketing the Technology for their collective benefit.

21       70.    Pursuant to that Joint Venture, Defendants agreed that the parties would jointly

22  further develop the Technology and that they would jointly market the Technology and its

23  enhancements, through an Indian entity Cool e-mobile as set forth above.  The request to form

24  Cool e-mobile was in fact a ruse which Defendants used to gain access to the Technology.

25  Defendants ultimately breached the terms of the Joint Venture, including the implied obligations

26  of good faith and fair dealing, by abandoning all efforts to further Technology on behalf of the

27  Joint Venture, and instead working to deliberately move forward their own plans of

28  commercialization at the expense of the Joint Venture:

                                                                                     60

M B V   L A W   L L P

8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1    (a)    Despite accepting the role as CTO, Defendant Partha P Chakrabarti failed

2    to fulfill his obligations as CTO, failed to effectively lead the engineering team, failed to provide

3    appropriate guidance at critical junctures, and failed to deliver on his promise to facilitate

4    introduction to the Indian Railways.

5    (b)    Defendants engaged in acts fraudulently postured to be consistent with the

6    Joint Venture, but then when repeatedly asked to deliver on the ultimate obligation of the Joint

7    Venture in connection with securing Indian Railways as a customer and developing the

8    Technology, breached their obligations and took the Technology hostage.

9    (c)    Defendants  also engaged in specific acts to delay the Joint Venture from

10    interacting with the Indian Railways, sending internally contradictory communications to the

11    members of the Joint Venture team, indicating that the Joint Venture was approved on the one

12    hand but then later claiming that it was not, insisting that IITK's name be used ahead of the name

13    of the Joint Venture for the stated reason of giving credibility to the Indian Railways project, but

14    then not permitting the Joint Venture to move forward to meaningfully present the technology to

15    the Indian Railways,

16    (d)    Though Plaintiffs managed to secure another invitation to present to the

17    Indian Railways in 2007, IITK deprived Plaintiffs of the complete code and third party modules

18    to ensure that no meaningful demo could be made.

19    (e)    During May, 2006, and possibly prior to that date, Defendants breached

20    the Joint Venture when, without informing M.A. Mobile or Farhang or Farhang's affiliates,

21    individually, they:  (a) finalized calculated steps to keep the Technology and its enhancements for

22    their own account, to prevent M.A. Mobile, Cool e-mobile and/or Farhang, individually, from

23    participating in the marketing of the  Technology and its enhancements, and to prevent the

24    Technology and its enhancements from being transferred to the new entity that M.A. Mobile and

25    Farhang, individually, had created pursuant to the terms of the Joint Venture; (b) secretly and

26    fraudulently took steps to implement that decision by concealing material facts from Farhang and

27    Farhang's affiliates and agents; (c) continued to use Farhang and M.A. Mobile's business

28    resources, money expert consultants and manhours for furtherance of the Joint Venture when in

61

1  fact they were developing numerous applications from the Technology in an attempt to build

2  enhancements from the Technology which they did not own.

3    71.    Because of Defendants' efforts to conceal the various breaches of the Joint

4  Venture, M.A. Mobile and Farhang, individually, did not discover these breaches until after

5  May 27, 2006, and did not realize that IITK was responsible for the breaches and that the

6  breaches were not curable until June 7,. 2006, and in the exercise of due care could not have

7  discovered that breaches prior to that date.

8    72.    As a proximate result of Defendants' repudiation and breach of the Joint Venture

9  Agreement, M.A. Mobile and Farhang, individually, have been damaged in an amount subject to

10  proof at trial, but in any case greater than $30,000,000.  That these damages will be reasonably

11  ascertained at trial has been discussed above at length in Paragraph 66.

12    73.    Farhang, in her capacity as an intended third party beneficiary of the NDA, and in

13  her individual capacity as a member of the Joint Venture, and/or as an assignee or corporate

14  affiliate of M.A. Mobile, is entitled to recover those damages herein.

15              **THIRD CLAIM FOR RELIEF**
                      **(DISMISSED)**
16          **(Breach of Fiduciary Duty Against All Defendants)**

17    **74.**   Plaintiffs refer to, and by this reference reassert and incorporate in the present

18  claim for relief, each of the allegations set forth in paragraphs 1 through 73 of this Third

19  Amended Complaint.  **The Court has dismissed this Cause of Action on the grounds that it is**

20  **pre-empted by the Misappropriation of Trade Secrets claim.  Plaintiffs respectfully**

21  **disagree with this decision and reserve the right to appeal or seek reconsideration of the**

22  **dismissal of said cause of action.**

23    75.    Defendants' breach of the Joint Venture, as set forth above, constituted a breach

24  by Defendants of their fiduciary duties to Plaintiffs.  The breach specifically arose from:  (i) as

25  outlined above, Defendants' use of confidential business information including global strategies

26  regarding use of mobile technology for railways, for its own benefit; (ii) as outlined above,

27  specific acts to thwart the progress of the Joint Venture, deceive Plaintiff and other members of

28  the Joint Venture, so that Defendants could move forward and try to build enhancements for their

62

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO  CA 94111

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

own benefit from the Technology which they did not own; (iii) as outlined above, independent of Plaintiff's work with Technology or Confidential Information, Defendant use of Plaintiff's other business resources, business guidance, staff, and time to further a project ultimately intended for IITK's sole benefit.

76.     These breaches were not discovered by Plaintiffs until after May 27, 2006, and in the exercise of due care could not have been discovered by M.A. Mobile or by Farhang, individually, prior to that date.

77.     As a proximate result of Defendants' multiple breaches, Plaintiffs have been damaged in an amount subject to proof at trial, but in any case greater than $30,000,000.

78.     Farhang, in her capacity as an intended third party beneficiary of the NDA between M.A. Mobile and IITK, as the controlling shareholder and thus corporate affiliate of M.A. Mobile in connection with the NDA, as a named individual party in the Joint Venture, and/or as the assignee of M.A. Mobile and in her individual capacity, is entitled to recover those damages herein.

79.     The breaches by Defendants were carried out with malice and in willful disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to an award of exemplary damages against Defendants in an amount sufficient to punish Defendants and to deter Defendants from engaging in similar wrongful conduct in the future.

80.     Farhang, in her capacity as an intended third party beneficiary of the NDA, and/or as an assignee or corporate affiliate of M.A. Mobile, and in her individual capacity as a member of the Joint Venture , is entitled to recover those exemplary damages herein.

**FOURTH CLAIM FOR RELIEF**
**(DISMISSED)**
**(Fraud Against All Defendants)**

**81.**     Plaintiffs refer to, and by this reference reassert and incorporate in the present claim for relief, each of the allegations set forth in paragraphs 1 through 80 of this Third Amended Complaint.  **The Court has dismissed this Cause of Action on the grounds that it is pre-empted by the Misappropriation of Trade Secrets claim.  Plaintiffs respectfully disagree with this decision and reserve the right to appeal dismissal of said cause of action.**

63

82.     In or about September, 2003, Defendants IITK and TIETS, acting through Defendant Partha P. Chakrabarti, together with Defendants Partha P. Chakrabarti and Pallab Dasgupta, in their individual capacities, realized, as noted above, that the Technology was of great originality and value and, if further developed and marketed, would be a source of tremendous profits.  Defendants also realized that the business activities of Plaintiffs would be ultimately competitive with their objectives, and that Plaintiffs had significant business experience, resources, and agents that Defendants could use to further their own business objectives to build enhancements for their own benefit from the Technology which they did not own.  Defendants then conspired and agreed to do the following:

(a)     Induce M.A. Mobile and Farhang, individually, to allow those Defendants to retain, and to participate in the further development of, the Technology by falsely promising that those Defendants would participate with M.A. Mobile and with Farhang, individually, in a Joint Venture (the details of which are set forth above in Paragraph 32 through 60) that would market the Technology and its enhancements; and

(b)     Thereafter, ignore the requirements of the NDA and the Joint Venture arrangement, further develop and market the Technology for those Defendants' own account; and misappropriate the Technology and its enhancements for the sole benefit of IITK.  Claims in connection with misappropriation of trade secrets are asserted specifically under the Fifth Claim for Relief set forth below;

(c)     Induce M.A. Mobile and Farhang to lend significant business resources in the form of guidance, time, consulting resources, and manhours of Plaintiffs' designated agents (including Varsha Singh, Ronald Jenkins and others) to the Joint Venture by promising a Joint Venture that would mutually benefit the participants but ultimately using Plaintiffs' time, resources, manhours and expert consultants to further their own business plans to develop what they hoped would be their own mobile technology suite but which in fact were ultimately enhancements and modifications of the Technology provided to them; and

(d)     make false and misleading statements about Plaintiff's technology in publicly filed documents and in internal communications with the IITK engineering team

64

M B V    L A W    L L P
8 5 5    F R O N T    S T R E E T
S A N    F R A N C I S C O ,    C A    9 4 1 1 1

1    including all named individual Defendants so as to derail the Joint Venture, damage the

2    perceived value of the Technology, and improve their own competitive advantage in the mobile

3    technology space.  Named individual Defendants Pallab Dasgupta, Gurashish S. Brar, Rakesh

4    Gupta, Pravanan Choudhury and Subrat Panda thereby ignored Plaintiff's requests for

5    information and access to the Technology, and cooperated with Defendant Partha Chakrabarti in

6    giving the appearance that the Joint Venture was moving forward but at the last minute, at the

7    very time that Plaintiffs were trying to present the project to the Indian Railways, acting in

8    apparent concert to disappear and providing Plaintiffs no meaningful information or access to the

9    Technology or the status of the Joint Venture.

10    83.    In implementation of that agreement and conspiracy, Defendant Partha P.

11    Chakrabarti, speaking for all of those Defendants, falsely and knowingly represented to M.A.

12    Mobile and to Farhang, individually, by telephone in or about February, 2004, that if M.A.

13    Mobile and Farhang, individually, would allow those Defendants to retain, and to participate in

14    the further development of, the Technology, those Defendants would participate with M.A.

15    Mobile and with Farhang, individually, in a Joint Venture to market the Technology and its

16    enhancements.  Further details of that Joint Venture and all of the Defendants' fraudulent

17    representations and activities are set forth above under Paragraphs 32 through 60, including

18    specific allegations that all of the individual Defendants were actively involved in the fraud

19    against Plaintiffs.

20    84.    The February 2004 representation by Partha Chakrabarti was false, and was

21    known by Defendant Partha P. Chakrabarti, as well as by IITK, TIETS, and Defendant Pallab

22    Dasgupta, to be false at the time it was made, in that those Defendants did not intend to

23    participate with M.A. Mobile and with Farhang, individually, in a Joint Venture that would

24    market the Technology and its enhancements, but rather intended, once they had induced M.A.

25    Mobile and Farhang to allow them to retain, and to participate in the further development of, the

26    Technology, to ignore the requirements of the NDA and the Joint Venture, to further develop and

27    market the Technology for those Defendants' own account, and to misappropriate the

28    Technology and its enhancements, and to engage in business activity for the alleged purpose of

65

1    furthering the Joint Venture but with the real purpose of pursuing a mobile technology strategy

2    for the sole benefit of Defendant's and Defendant's affiliates.  There is a wealth of evidence that

3    individual Defendants intended this fraud from the beginning of their relationship though it was

4    only discovered by Plaintiffs and could not have been discovered by Plaintiffs until after May 27,

5    2006.  As outlined in our overview of factual allegations above from the outset throughout the

6    Joint Venture, Defendant's made repeatedly contradictory statements about the structure of the

7    Joint Venture, made false statements about their work progress, capacity and involvement, and

8    gave the appearance of trying to secure a meeting with the Indian Railways for the Joint Venture

9    when in fact they were doing nothing tangible to present the Joint Venture to the Indian

10    Railways, saving such opportunities for themselves.

11        85.    Defendant Partha P. Chakrabarti made these representations in order to deceive

12    M.A. Mobile and Farhang, individually, and to induce M.A. Mobile and Farhang, individually, to

13    allow those Defendants to retain, and to participate in the further development of, the

14    Technology, and to benefit from Plaintiff's time, manhours and business resources, and to have

15    access to Plaintiff's business strategies, guidance (including naming specific corporate targets for

16    potential acquisition of the Technology), and Plaintiff's confidential and trade secret business

17    plans and globalization strategies, all in service and implementation of those Defendants'

18    conspiracy and agreement as set forth above.

19        86.    M.A. Mobile and Farhang, individually, believed all of Defendant's fraudulent

20    representations and, in reasonable reliance thereon, based on Defendants reputation and position

21    as a government entity and repeated assurances, allowed those Defendants to retain, and to

22    participate in the further development of, the Technology.  But for that belief and that reliance,

23    M.A. Mobile and Farhang, individually, would not have done so.

24        87.    Over the course of the next at least twenty-seven months, those Defendants, in

25    further service and implementation of those Defendants' conspiracy and agreement as set forth

26    above, pretended to be participating with M.A. Mobile and with Farhang, individually, in a Joint

27    Venture that would market the Technology and its enhancements, thereby causing M.A. Mobile

28    and Farhang, individually, to continue to allow those Defendants to further develop the

M B V    L A W    L L P
8 5 5    F R O N T    S T R E E T
S A N   F R A N C I S C O    C A   9 4 1 1 1

66

Technology and to provide Defendants critical business strategies, confidential business communications, and significant business resources, and thus unwittingly to: (i) provide those Defendants with sufficient time and sufficient access to the Technology to allow those Defendants to further develop the Technology for their own account and to misappropriate the Technology and its enhancements and (ii) permit Defendants to further their own mobile technology strategies (which in fact were also in large part taken from Plaintiff's trade secrets and business strategies) by using Plaintiffs time, resources, manhours and expert consultants.

88. During the same time period, those Defendants, again in further service and implementation of those Defendants' conspiracy and agreement as set forth above, made a series of false representations to M.A. Mobile and to Farhang, individually, which were intended to deceive M.A. Mobile and Farhang, individually, and to induce M.A. Mobile and Farhang, individually, to continue to allow those Defendants to retain, and to participate in the further development of, the Technology and thus unwittingly to: (i) provide those Defendants with sufficient time and sufficient access to the Technology to allow those Defendants to further develop the Technology for their own account to facilitate the IBM-Indian Railways pilot project using Plaintiffs Technology and to misappropriate the Technology and its enhancements and (ii) permit Defendants to further their own mobile technology strategies by using Plaintiff time, resources, manhours and expert consulting resources. The complete array of false representations is outlined above in Paragraphs 32 through 61 of the factual allegations.

89. M.A. Mobile and Farhang, individually, believed those and similar representations and, in reasonable reliance thereon, allowed those Defendants to retain, and to participate in the further development of, the Technology. But for that belief and that reliance, M.A. Mobile and Farhang, individually, would not have done so.

90. Those Defendants, having thus obtained the opportunity to retain, and to participate in the further development of, the Technology, in fact did not participate with M.A. Mobile and with Farhang, individually, in a Joint Venture that would own and market the Technology and its enhancements. Instead, those Defendants ignored the requirements of the NDA, further developed the Technology for their own account and misappropriated the

67

1  Technology and its enhancements, and used Plaintiff's time, Plaintiff's agents' time, and Plaintiff

2  other significant business resources to further develop a mobile technology platform that

3  rightfully belonged to Plaintiffs and ultimately provided IBM and the Indian Railways access to

4  the Plaintiffs Technology (as well as possibly other third parties_ and used her business trade

5  secrets and market analysis and market implementations to facilitate the IBM-Indian Railways

6  partnership with technology that is identical to Plaintiffs Technology.

7     91. Those fraudulent acts by those Defendants were not discovered by M.A. Mobile or

8  by Farhang, individually, until after May 27, 2006, and in the exercise of due care could not have

9  been discovered by M.A. Mobile or by Farhang, individually, prior to that date.

10     92. As a proximate result of those fraudulent acts by those Defendants, M.A. Mobile

11  and Farhang, individually, have suffered damages in an amount subject to proof at trial, but in

12  any case greater than $30,000,000.  That these damages will be reasonably ascertained at trial has

13  been discussed above at length in Paragraph 65.

14     93. Farhang, in her capacity as an intended third party beneficiary of the NDA

15  between M.A. Mobile and IITK, as the controlling shareholder and thus corporate affiliate of

16  M.A. Mobile in connection with the NDA, as a named individual party in the Joint Venture,

17  and/or as the assignee of M.A. Mobile and in her individual capacity, is entitled to recover those

18  damages herein.

19     94. The abovementioned fraudulent acts by those Defendants were carried out with

20  malice and in willful disregard for the rights of M.A. Mobile and Farhang, individually.

21     95. M.A. Mobile and Farhang, individually, are therefore entitled to an award of

22  exemplary damages against those Defendants in an amount sufficient to punish those Defendants

23  and to deter those Defendants from engaging in similar wrongful conduct in the future.

24     96. Farhang, in her capacity as an intended third-party beneficiary of the NDA, and/or

25  as an assignee or corporate affiliate of M.A. Mobile, is entitled to recover those exemplary

26  damages herein.

27

28

68

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

## AMENDED FIFTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

97.     Plaintiffs refer to, and by this reference reassert and incorporate in the present claim for relief, each of the allegations set forth in paragraphs 1 through 96 of this Third Amended Complaint.  With regards to the Court and Defendant's observations regarding the entities designated by the defined term "TNR" in the Original Complaint and any relevance it may have to the standing of Plaintiffs to bring this cause of action and allegations of "sham" representations, Plaintiffs feel compelled to insert Footnote 1 in Paragraph 10 of this Third Amended Complaint.  With regards to the Courts request to clarify the scope and nature of the "business models and implementations", Plaintiffs have amended the Complaint to include significant detail on said models and implementations and other business trade secrets in Paragraph 25-27 of this Third Amended Complaint and are also attaching several exhibits hereto under seal which clearly illustrate Plaintiffs' robust disclosure of business models and implementations that were ultimately used by Defendant IITK to disclose technology to IBM and ultimately to the Indian Railways and possibly other third parties not yet identified.  With respects to whether Plaintiff used reasonable efforts to maintain secrecy of the business models and implementations, Plaintiffs have included additional factual allegations under Paragraph 27 and also have attached certain highly confidential documents hereto under seal, exhibits that clearly illustrate that Plaintiffs used reasonable care to protect the trade secret and confidential business models and implementations prior to the relationship with IITK and also during the relationship with IITK and vis a vis the Indian Railways. *Id.*  With regards to whether Defendants misappropriated Plaintiffs Technology for their own benefit, Plaintiffs refer the Court to amended factual allegations in Paragraphs 44-49 demonstrating the clear improper transmission (and the motivation for said transmission dating all the way back to 2004 when Plaintiffs identified IBM as the key target for acquisition of the technology) of Plaintiffs Technology to IBM and ultimately to the Indian Railways, and additional details of how said transmissions have benefited IITK.

98.     At all times relevant to this Third Amended Complaint, the Technology, together

69

1   with its enhancements and other confidential business information, was owned and/or controlled

2   by Farhang and Plaintiffs.

3          99.     At all times relevant to this Third Amended Complaint, the Technology, together

4   with its enhancements and all other confidential business information, has comprised and/or

5   included information that derived independent economic value, actual or potential, from not

6   being generally known to the public or to other persons who could obtain economic value from

7   its disclosure or use, and has been the subject of reasonable efforts by Plaintiffs to maintain its

8   secrecy and was provided to IITK and the individual Defendants under strict confidentiality

9   obligations as set forth in the NDA.  Specifically, Plaintiff disclosed trade secrets regarding

10  specific implementations of the patent pending mobile platform technology described above

11  under Technology and Confidential Information, which patent application remains non-published

12  and confidential.  Some of these trade secrets were contained in the patent, which is pending and

13  specifically filed with a non published status to preserve trade secret protection.  Other equally

14  important trade secrets are not described in the patent summaries and relate to specific business

15  models and implementations which the patent pending technology enables, including specifics

16  regarding the actual implementation of the global railways and Indian Railways project.  In all

17  cases, it is clear that these specific business models and implementations relating to the patent

18  pending technology were critical to Plaintiff's business plans and were designated as strictly

19  confidential and trade secret.  It was known to Plaintiff and Defendants that other competing

20  technology could achieve similar objectives achieved by the Technology, and thus it was

21  imperative to keep the specifics of actual business models and implementations trade secret, at

22  least until securing a first customer and possibly for indefinite time thereafter depending on the

23  nature of the deal struck with a prospective large first customer.  Indeed, it should also be noted

24  that other non railway applications developed from the Technology, by Defendants own

25  admission, as part of the Joint Venture, also are trade secret and have not been described in the

26  patent documentation.  All such applications developed from the Technology should be the

27  property of Plaintiff and were clearly misappropriated by Defendants for their sole benefit.

28         100.    At all times relevant to this Third Amended Complaint, the Technology, together

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

70

1  with its enhancements, has therefore been a "trade secret" as that term is defined by California

2  Civil Code § 3426.1(d).  The specific business models and applications, including the railway

3  application, had not been disclosed via patent or any other channels to the public.  As stated

4  above, it was reasonable that Plaintiffs would expect these applications to be kept secret, given

5  the patent pending status of the Technology, the tremendous investment of resources and time by

6  Plaintiff in acquiring the Technology and in working with Defendants, and given the presence of

7  significant competition in the mobile space to achieve similar objectives and the known demand

8  for solutions to known needs and problems in the mobile platform space.  It was also clear that

9  the trade secrets were of significant value at the time, given the tremendous interest expressed by

10  IITK and its technology experts in the Technology, the strong interest expressed by the Indian

11  Railways when just the mere proposal of the Technology was presented to them, and strong

12  interest shown in the Technology by various other third parties including IBM.  Value of the

13  trade secret can easily be established at trial by reference to these specifics and also by reference

14  to expert testimony on the state of competing technology at that time and the unique aspects of

15  the trade secret implementations and models that employed the patent-pending Technology.

16      101.    Defendants disclosed to IBM and ultimately to the Indian Railways and possibly

17  other third parties or used the Technology and its enhancements without the express or implied

18  consent of Plaintiffs, at the time of which disclosure or use Defendants knew or had reason to

19  know that their knowledge of the Technology, together with its enhancements, had been acquired

20  under circumstances, giving rise to a duty to maintain its secrecy and limit its use.  Specifically,

21  Defendants, including Defendant Chakrabarti, disclosed trade secrets including Plaintiff's

22  specific plans for use of the mobile technology in the railway sector, to other corporate entities

23  such as IBM competitive with Plaintiff who then began seeking to provide a similar solution to

24  the Indian Railways.  Defendants most probably also disclosed such trade secrets to members of

25  the Indian Railways, who had not executed the NDA as individuals and who had not agreed to be

26  bound by its terms.  The unauthorized disclosures, though not known at the time they occurred,

27  are reasonably believed to have occurred during the course of the sham Joint Venture and are

28  reasonably believed to have occurred in email, verbal and other documentary form.  Finally, it

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

71

should be noted that Defendants also engaged in misappropriation by misusing the trade secrets provided to them for their own benefit.  It was expressly understood, when Defendants were provided trade secrets in connection with specific application of the Technology to the Railway space that Defendants would work diligently to use those trade secrets to implement a railway application and secure Indian Railways as a first customer for the Joint Venture.  Instead, Defendants, by their own admission, used the Technology to develop other "interesting applications" as well and to build what they hoped would be their own mobile technology platform but in fact was nothing more than enhancement to Plaintiffs' Technology.  They used the trade secrets provided by Plaintiffs to accomplish this objective, despite the fact that Plaintiffs had not yet authorized them to use the Technology for such broad development purposes.   Most critically, they used the trade secrets to provide IBM and/or the Indian Railways access to Plaintiffs Pocket XML technology and enabled IBM and/or the Indian Railways to forge a partnership using substantially similar if not identical technology in the operation of the TTE system within the Indian Railways.

102.    Such inappropriate disclosure for their own benefit and misuse of the trade secrets regarding specific applications and plans contemplated by the Technology by the Defendants constitute "misappropriation" as that term is defined by California Civil Code § 3426.1(b).

103.    That misappropriation was not discovered by Plaintiffs and, in the exercise of due care, could not have been discovered by Plaintiffs.

104.    As a proximate result of that misappropriation, Plaintiffs have suffered damages in an amount subject to proof at trial, but in any case greater than $30,000,000.  The reasonable basis for these damages can be readily established at trial as has been detailed above, but it is worth reiterating and expanding upon here.  It should be noted specifically that the trade secrets themselves were particularly valuable because Plaintiff had taken great care not to disclose them to individuals who were not bound by confidentiality obligations and to not disclose them to potential competitors. The trade secrets relating to the specifics of the railway implementation, alone, can justify damages for greater than $30,000,000.  Plaintiffs will present evidence at trial showing that the Indian Railway budget contemplated this scope of expenditure.  Plaintiffs will

72

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO CA 94111

1  present evidence, which has been previewed in detail above, that the prospect of securing the

2  Indian Railway as a first and large customer was not speculative but an actual, highly probable

3  prospective deal with a high expected likelihood of success given that Plaintiffs were giving up

4  significant equity in return for participation of an Indian government entity that would give Cool

5  e-mobile prime position to close the deal, without having to go through the mandatory tender

6  process.  Moreover, Plaintiffs will present evidence that the Indian Railways agreed to

7  presentation of the mobile TTE project on two separate occasions; had Defendants not

8  misappropriated trade secrets and Technology for their own use, breached the NDA, breached

9  their fiduciary duties, and engaged in fraud, Plaintiffs would have been able to close a deal with

10  the Indian Railways in a relatively short period of time.

11        105.    Plaintiffs are entitled, pursuant to California Civil Code § 3426.3(a), to recover

12  those damages.

13        106.    Farhang, in her capacity as an intended third-party beneficiary of the NDA

14  between M.A. Mobile and IITK, as the controlling shareholder and thus corporate affiliate of

15  M.A. Mobile in connection with the NDA, as a named individual party in the Joint Venture,

16  and/or as the assignee of M.A. Mobile and in her individual capacity, is entitled to recover those

17  damages herein.

18        107.    As a proximate result of that misappropriation, Defendants have been unjustly

19  enriched.

20        108.    M.A. Mobile is entitled, pursuant to California Civil Code § 3426.3(a), to recover

21  the amount of that unjust enrichment to the extent it may not have been taken into account in

22  computing the damages suffered by M.A. Mobile.

23        109.    Farhang, in her capacity as an intended third party beneficiary of the NDA

24  between M.A. Mobile and IITK, as the controlling shareholder and thus corporate affiliate of

25  M.A. Mobile in connection with the NDA, as a named individual party in the Joint Venture,

26  and/or as the assignee of M.A. Mobile and in her individual capacity, is entitled to recover that

27  amount herein.

28        110.    If neither those damages nor that unjust enrichment is provable, M.A. Mobile is

73

1  entitled, pursuant to California Civil Code § 3426.3(b), to payment of a reasonable royalty for no

2  longer than the period of time Defendants' improper use of the Technology and its enhancements

3  could have been prevented.

4      111.    Farhang, in her capacity as an intended third party beneficiary of the NDA

5  between M.A. Mobile and IITK, as the controlling shareholder and thus corporate affiliate of

6  M.A. Mobile in connection with the NDA, as a named individual party in the Joint Venture,

7  and/or as the assignee of M.A. Mobile and in her individual capacity, is entitled to payment of

8  that royalty herein.

9      112.    That misappropriation by Defendants was "willful" and "malicious," as those

10  terms are used in California Civil Code § 3426.3(c).  M.A. Mobile is entitled, pursuant to

11  California Civil Code § 3426.3(c), to an award of exemplary damages against all Defendants in

12  an amount not exceeding twice any award made herein pursuant to California Civil Code

13  § 3426.3(a) and/or California Civil Code § 3426.3(b).

14      113.    Farhang, in her capacity as an intended third party beneficiary of the NDA

15  between M.A. Mobile and IITK, as the controlling shareholder and thus corporate affiliate of

16  M.A. Mobile in connection with the NDA, as a named individual party in the Joint Venture,

17  and/or as the assignee of M.A. Mobile and in her individual capacity, is entitled to receive that

18  award of exemplary damages herein.

19      114.    That misappropriation by Defendants was "willful" and "malicious," as those

20  terms are used in California Civil Code § 3426.4.  Farhang, in her capacity as an intended third

21  party beneficiary of the NDA between M.A. Mobile and IITK, as the controlling shareholder and

22  thus corporate affiliate of M.A. Mobile in connection with the NDA, as a named individual party

23  in the Joint Venture, and/or as the assignee of M.A. Mobile and in her individual capacity, is

24  entitled, pursuant to California Civil Code § 3426.4, to recover from Defendants in this action her

25  reasonable attorneys' fees and costs incurred herein.

26      115.    Defendants' misappropriation continues to cause irreparable harm to Plaintiffs and

27  Plaintiffs also request preliminary and permanent injunctive relief to prevent Defendants from

28  using Plaintiffs' intellectual property.

74

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1

**PRAYER**

2        1.       Against all Defendants for damages in an amount subject to proof at trial but in

3    any case greater than $30,000,000;

4        2.       Against Defendants IITK, TIETS, Partha P. Chakrabarti, and Pallab Dasgupta, for

5    exemplar damages in an amount sufficient to punish those Defendants and to defer those

6    Defendants from engaging in the future in fraudulent acts similar to those set forth in this Third

7    Amended Complaint;

8        3.       Against all Defendants pursuant to California Civil Code 3426.3 (a) for damages

9    in an amount subject to proof at trial but in any case greater than $30,000,000;

10       4.       Against all Defendants pursuant to California Civil Code 3426.3 (a) for the

11   amount that Defendants have been unjustly enriched, to the extent that such amount may not have

12   been taken into account in computing the damages to which plaintiffs are entitled herein;

13       5.       Against all Defendants, pursuant to California Civil Code 3426.3(b) if neither of

14   the aforementioned damages or unjust enrichment is provable, for payment of a reasonable

15   royalty, for no longer than the period of time Defendant's improper use of the Technology and its

16   enhancements could have been prevented;

17       6.       Against all Defendants, pursuant to California Civil Code 3426.3(c) for an award

18   of exemplary damages against all Defendants in an amount not exceeding twice any award to or

19   recovery by plaintiffs herein pursuant to California Civil Code 3426.3 (a) and/or California Civil

20   Code 3426.3 (b);

21       7.       Preliminary and permanent injunctive relief to prevent Defendants from using

22   Plaintiffs' intellectual property;

23       8.       Against all Defendants, pursuant to California Civil Code 3426.4, for Farhang's

24   reasonable attorney fees and costs incurred herein;

25   ///

26   ///

27   ///

28   ///

75

1      9.      Against all Defendants for Farhang's costs of suit; and

2      10.     Against all Defendants for whatever other relief the Court may deem to be just and

3   proper.

4

5   DATED:  June 21, 2010                  MBV LAW LLP

6

7                                          By  /s/ Micah R. Jacobs
                                              MICAH R. JACOBS
8                                             Attorneys for Plaintiffs
                                              MANDANA D. FARHANG
9                                             and M.A. MOBILE LTD

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD AMENDED COMPLAINT – CASE NO. C-08-02658-RMW (HRL)**

23853.01\\432061.DOC

**EXHIBIT A**

**Mandana Farhang**

| | |
|---|---|
| **From:** | Mandana Farhang [quotientpartners@msn.com] |
| **Sent:** | Tuesday, April 27, 2004 5:59 PM |
| **To:** | 'Dr P. P. Chakrabarti' |
| **Subject:** | Update on call with Ron |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear PPC - I am just providing an update after my conversation with Ron Jenkins. He is back in town now and he will have the letter to us by Friday at the latest. He is very excited to work with us. I am extremely pleased with the work in progress and I look forward to sharing it with you once he has completed his analysis. He will also be speaking with an Indian tax attorney prior to his final recommendation.

One of the things I also discussed with him was including in the structure a Foundation that will receive funding/and or shares of the company to start the incubator we discussed forming at IIT. I would like to get your thoughts on that...

Also if you can come up with some loose numbers as to the appropriate salaries for each member of the team we can start thinking about what to charge the early adopters, etc. It think it is good to start with modest salaries at the beginning because it shows the investors that everyone is interested in the long term goal. But I want to be sure everyone is happy with the numbers and comfortable financially so I will leave that to you.

I am also waiting for Ron's response on the choice of taking in revenues in the name of IIT so we can start that asap. I will let you know what he says.

It was such a wonderful call this morning. Thank you for having everyone present. I believe we are in the process of building an incredible company.

I look forward to talking to you next week. I will send you the list of devices and software by the end of the weekend.

Best,
Mandana

**From:**    Mandana D. Farhang
**Sent:**    Saturday, January 08, 2005 3:21 PM
**To:**    F. Ronald Jenkins; Varsha Singh
**Subject:** what the future holds...



I confess, I do envision these ladies holding a Tuff n'Ready device soon! =)



# EXHIBIT B

OMITTED

**EXHIBIT C**



10 Rs

Technology Incubation and
Entrepreneurship Training
Society
Regulation of Association.


Sd/    A. Ghosh

Registrar of Firms, Societies &
Non-Trading Corpns. West Bengal





10 Rs.

TEN RUPEES

### ~~RULES AND REGULATIONS~~
#### OF
~~UNMESH – A SOCIETY FOR TECHNOLOGY INCUBATION AND ENTREPRENEURSHIP PROMOTION~~ TRAINING SOCIETY

(As per Section 6 of The West Bengal Societies Registration Act, 1961)

1    The name of the Society shall be ~~UNMESH – A Society for~~ Technology Incubation and Entrepreneurship ~~Promotion~~ Training Society

2    DEFINITIONS:

In these rules and regulations unless there is anything repugnant to or inconsistent with the subject or context

     2.1 The word "Society", shall mean "~~UNMESH – A Society for~~ Technology Incubation and Entrepreneurship ~~Promotion~~" Training Society"

     2.2 "Governing Body" and "Committees" shall mean the bodies as constituted under these regulations for the management of the affairs of the Society.

     2.3 "Chairman", means the Director of IIT Kharagpur

     2.4 "Secretary" means the Dean (SRIC), IIT Kharagpur.

     2.5 "Office" shall mean the registered office of the Society.

     2.6 "Members" shall mean the persons appointed as members by the Governing Body

22/9/04

2.7 "Person" shall include any individual, body corporate or any authorities framed either under any law or statute.

2.8 "Registrar" shall mean the Registrar of Societies, West Bengal.

2.9 "Act" shall mean the Societies Registration Act, 1860, and where specifically mentioned the West Bengal Societies Registration Act, 1961.

2.10 "Financial Year" shall mean the period commencing from the first day of April of each year and ending on thirty-first day of March of the immediately following year.

3.   MEMBERS :

Members of the Governing Body of the Society shall consist of the following categories :

3.1 *Permanent Member s:*

The first named members of the Governing Body, as stated in the Memorandum of Association, shall be the permanent members.

3.2 *Other Members :*

The member of the Governing Body shall have the power to admit such institutions or organizations or their representatives, who meet or satisfy the criteria framed in this regard by the Governing Body for admission as members of the Society, shall be members of the Society.

3.3 *Period of Membership :*

The period of membership of non ex-officio or other members shall be for a period of three years, from the date of admission.

3.4 *Admission and Annual Fees :*

The Governing Body shall have the power to frame the rules and guidelines for structure of the fees to be levied on other members upon their admission as a member and continuance thereof.

*Resignation from membership*

Whenever a member wishes to resign from a post or membership of the Society, he will address his resignation to the Chairman and present it to the Secretary. His resignation will take effect only upon its acceptance by the Chairman or by such other members or committee framed by the Governing Body.

3.6 *Rights and obligation of members*

    (a)    Members of the Society are permitted to offer suggestions to the Chairman or Secretary of the Society for development, improvement and benefit of the Society.

    (b)    Members shall have the rights to inspect books of account of the Society with prior notice to the Secretary;

    (c)    Defaulting members shall not be allowed to take part or cast vote in a meeting.

    (d)    One member shall have one vote only.

3.7 *Cession of Membership :*

A member shall cease to be a member of the Society, on expiry of the term of membership, through resignation, through death or where a two-third majority of the Members of the Governing Body, for such reasons deem appropriate and for the benefit of the Society, remove such member or members.

4. GOVERNING BODY:

The Governing Body shall consist of ten members at present designated as the Chairman, Secretary, Treasurer and others as Members as follows:

| Sl. No. | Name and Address | Occupation | Designation |
|---|---|---|---|
| 1. | Prof. S. K. Dube<br>Director's Bungalow<br>IIT Kharagpur – 721 302 | Director, IIT Kharagpur | Ex-officio Chairman |
| 2. | Prof. P. P. Chakrabarti<br>Qr. No. A-5<br>IIT Kharagpur – 721 302 | Dean (SRIC), IIT Kharagpur | Secretary |
| 3. | Prof. S. C. De Sarkar<br>Qr. No. B-47<br>IIT Kharagpur – 721 302 | Faculty Member, IIT Kharagpur | Member |
| 4. | Prof. R. N. Banerjee<br>Qr. No. B-80<br>IIT Kharagpur – 721 302 | Faculty Member, IIT Kharagpur | Member |
| 5 | Prof. S. H. Dey<br>Qr. No. C1-147<br>IIT Kharagpur – 721 302 | Faculty Member, IIT Kharagpur | Member |
| 6 | Dr. D. Bhattacharjee<br>Chief, Research & Development and Scientific Services<br>Tata Steel<br>Jamshedpur – 831 001 | Representative from industry | Member |
| 7. | Mr. Sourhya Roy<br>General Manager, Calcutta SSA<br>W. B. Telecom Circle, BSNL<br>135A, B.R.B. Bose Road<br>Kolkata – 700 001 | Representative from industry | Member |

| 8. | Mr. P. Bhattacharyya<br>Dy. General Manager<br>IBM Global Services<br>IBM India Ltd.<br>Kashi Kunj, Road No. 2<br>Contractor's Area<br>Jamshedpur – 831 001 | Representative from<br>Industry | Member |
|----|----|----|----|
| 9. | Dr. P. P. Das<br>Head of Engineering, Kolkata<br>Interra Systems (India) Pvt. Ltd.<br>2nd Floor, STP-II Building<br>Salt Lake Electronics Complex<br>Plot No. 53, Block DN, Sector – V<br>Bidhannagar, Kolkata – 700 091 | Alumni    of    IIT<br>Kharagpur | Member |
| 10. | Mr. A. P. Trivedi<br>Qr. No. 2BR-29<br>IIT Kharagpur – 721 302 | Deputy    Registrar<br>(F&A) | Treasurer |

The remaining members of the Governing Body shall fill up any casual vacancies in the Governing Body, within eight weeks from the date of such vacancy.

### 4.1 CHAIRMAN:

Chairman of the Society shall ensure that the decisions taken by the Governing Body are implemented. All contracts, suits and documents requiring the signature of any person in order to bind the Society shall be by the Chairman or such other person as he may nominate or in the absence of the nomination, such person as the Governing Body may appoint by resolution duly passed. He shall preside over the meetings of the Governing Body and over the Annual General Meeting, take disciplinary action against employees of the Society for whom he is the appointing authority, on behalf of the Governing Body, advises the Secretary and other Members in any matter requiring urgent attention, call emergent meetings. The Chairman may during the period of his non-availability, authorize the Secretary or any other member to discharge the duties of the Chairman.

### 4.2 SECRETARY:

(i)    He shall convene all meetings of the Society unless otherwise indicated elsewhere in these regulations.

(ii)    He shall maintain minute book of all meetings.

(iii)    He shall issue general circular and notices.

(iv)    He shall receive all applications for membership, which shall be considered as per direction of the Governing Body.

(v)    He shall sign all receipts for all sums received as subscriptions etc.

(vi)    He shall sign and give pay order on all bills for payment.

(vii)    He shall get the accounts of Society audited by a Chartered Accountant.

(viii)    He shall ensure compliance with statutory requirements.

(ix)    He shall exercise such other powers and perform such other duties as may be assigned to him by the Governing Body or the Chairman.

(x)    The Secretary may delegate any or some of the above duties to other officers of the Governing Body or any other person appointed for this purpose with the prior approval of the Governing Body.

(xi)    The Secretary may during his absence from headquarters authorize one of the senior most officers present to sanction advances for traveling allowance; contingencies and medical treatment of the staff and sign and countersign bills on his behalf.

Secretary of the Society will be custodian of all funds and properties. All funds of Society shall be operated upon and dealt with by the Secretary and Treasurer jointly, whether the same is in a Bank or elsewhere.

### 4.3 Treasurer:

The Governing Body shall appoint treasurer. He shall open and maintain an account of Society with any bank or banks approved by the Governing Body, and shall sign, endorse, negotiate and otherwise deal with all cheques, bills of exchanges, securities etc.

**EXHIBIT D**

> ----- Original Message -----
> From: "deansr" <deansr@hijli.iitkgp.ernet.in>
> To: "Subrat Kr. Panda " <subrat@cse.iitkgp.ernet.in>; "Pravanjan
Choudhury"
> <pravanjan@cse.iitkgp.ernet.in>; <rakeshg@gmail.com>
> Cc: <aosr@adm.iitkgp.ernet.in>; "Prof. P. P. Chakrabarti"
> <ppchak@adm.iitkgp.ernet.in>; "deansr" <deansr@hijli.iitkgp.ernet.in>
> Sent: Wednesday, April 19, 2006 12:29 PM
> Subject: Inclusion in Incubation Programme of TIETS: Submission of
Documents
>
>
> > Dear Mr Panda, Mr Gupta and Mr Choudhury,
> >
> > On behalf of the competent authority I am very happy to inform you
> > that based on the recommendations of the technical Committee, the
> > TIETS
> Governing
> > Body in its meeting on 20th March 2006 has ratified inclusion of
> > your proposed technology development under the Incubation Programme
> > subject
to
> > final approval based on submission of details of your company,
technology
> > and persons involved.
> >
> > In view of the above you are requested to submit within ten days
> > details
> of
> > your company including copies of Incorporation Certificate,
> > Memorandum
and
> > Articles of Association, available information on intellectual
> > property ownership of the proposed technology, the details of
> > Company Directors
and
> > their ownership. Once we receive these details, we will inform you
> > of
the
> > next steps.
> >
> > The Governing Body of TIETS would like to congratulate you on having
> reached
> > this stage and looks forward to completing the process of inclusion
> > very soon.
> >
> >
> > Thanking you
> > Yours sincerely
> >
> > Mr A. K Naskar, Administrative Officer (Projects)
> > Office of Dean SRIC & Ex-Officio Secretary TIETS
> > IIT Kharagpur 721302
> > India
> >
> > Tel: +91-3222-282192/ 282195/ 282037
> > Fax: +91-3222-277190
> > Email: deansr@hijli.iitkgp.ernet.in, aosr@adm.iitkgp.ernet.in
> >
> >
> >
>
>
>

2

**EXHIBIT E**

Printed from

# THE ECONOMIC TIMES

Now, palmtops to give berth to waitlisted passengers
15 Mar 2008, 1830 hrs IST, Rajat Guha, TNN



NEW DELHI: You don't have to stand in a queue for getting a berth when your train is about to leave. Now, you can get a reserved seat even inside a train, provided availability of a berth. The travelling ticket examiner (TTE) on board, carrying a palmtop, would be able to identify a vacant berth and issue you a ticket instantly.

The Railways would soon make it mandatory for every TTE to carry a handheld that would be connected to the central server. The passengers would be allotted tickets on first-come-first-served basis. The central server would be closely monitored by the senior railway officials 24×7, an official in the Railways said.

IBM has supplied five such palmtops in select sectors. The Railways are in talks with IBM to install them in all the trains. The investment to arm every TTE with a handheld would be Rs 200 crore.

"In 2008, we hope to provide handhelds in 100 trains including Rajdhanis, Jan Shatabdis, Garib Raths and Shatabdis. Later, the proposal would be implemented in all the entire Indian Railways network," a Rail Bhavan official confirmed.

### Also Read

→ Railways get maximum public grievances

→ DMRC tunnel becomes source of revenue

→ Railways may seek Chinese help in developing stations

→ Railways set to pile up surplus of Rs 1,00,000 cr: Lalu

→ Contactless sensor to ensure high speed trains on track

On a given day, at least 100 berths are vacant in every train. Passengers do not turn up owing to various reasons and the berths are distributed to waitlisted passengers haphazardly on the whims of the TTE. Officials said the discrepancy would soon be removed through close monitoring of the vacant berths.

"The information on vacant berths would be at once displayed on the TTE's palmtop, which he would use to allot berths to passengers when they approach him.

This means, the passenger would get confirmation as soon as he gets the berth. Any fallacy on TTE's part would place him under suspicion and he would be answerable to the authorities," the official said.

The Railways are sure that when implemented, the move would significantly increase transparency in the seat allocation process for waitlisted passengers on trains. The Railways have conducted a pilot project under which TTEs are given handheld devices instead of paper charts to feed details of passengers once the train starts its journey.

The handheld devices are personal digital assistants (PDA) which would be connected to the Railways reservation database, the PRS, through a wireless service provider's broadband network.

A handheld cost Rs 30,000, but Railways expect to purchase these at Rs 25,000 each in bulk.

Powered by Indiatimes

About Us | Advertise with Us | Careers @ TIL | Terms of Use | Privacy Policy | Feedback | Sitemap
Copyright © 2009 Bennett Coleman & Co. Ltd. All rights reserved. For reprint rights: Times Syndication Service
This site is best viewed with Internet Explorer 6.0 or higher; Firefox 2.0 or higher at a minimum screen resolution of 1024x768

**EXHIBIT F**

Printed from

# THE TIMES OF INDIA

## IIT-Kgp to put railways on fast track

Jhimli Mukherjee Pandey, TNN, Apr 30, 2010, 06.10am IST

**Ness Technologies -** Find Leading Technology Services & Solutions At Ness. Ask The Experts.
www.Ness.com

Ads by Google

KOLKATA: Indian Institute of Technology Kharagpur will carry out extensive research on developing cutting edge technologies, including high-speed trains and better security mechanisms, for Indian Railways.

At least 12 areas have been identified by the institute and the railway ministry in which research will be initiated. A Centre for Railway Research (CRR) has been set up by the ministry at the institute, which comprises faculty of at least 10 departments to initiate research in the chosen areas. The railway ministry will pump in an initial amount of Rs 120 crore to get the centre working.

According to the MoU that was recently signed between the ministry and IIT-Kgp, the research would focus on areas such as heavy haul technology, vehicle dynamics, high-speed technologies, energy-efficient traction power supply systems, track research, use of artificial intelligence for predictive maintenance and management, material sciences for railway-related composites, including rubber, polymer and insulation materials, development of integrated/embedded processors for railway applications, applications for access control, security and safety, including biometrics, non-conventional drives and technology, including Maglev, LIM and remote sensing, and measurement of overhead equipment, tracks and signals.

The maximum on-track speed in India has been 130 kmph. Now, the ministry wants Indian trains to enter the high-speed' zone by achieving the global standard of 260 kmph. "We are indeed looking at high-speed trains. This doesn't mean designing only the train and the engine, but also tracks that will support the such trains. So, while a lot of stress would be laid on vehicle dynamics (designing trains that are stable and do not vibrate despite the high speed), a significant portion of the research would focus on developing fracture-proof tracks and sensing equipment that would diagnose failures on time. Withstanding the load of high-speed trains is not easy and would mean extensive relaying of tracks," said Siddhartha Mukherjee, a faculty member of the electrical engineering department who is also a spokesperson for CRR. Magnetic levitation and linear electric motion will also constitute an important part of the research.

Blasts triggered by insurgents by planting explosives on tracks or inside compartments is another cause for concern. The institute has been asked to develop remote-sensing equipment that would preempt such occurrences. "We have been asked to include biometrics while developing the security aspects, making impersonation impossible. Again, remote sensing of track and signal conditions would help provide information on impending dangers and preventing accidents," explained Mukherjee.

CRR will offer PhD programmes in research areas related to the railways. It will also involve IIT BTech and MTech students in research projects and offer course electives related to railway technology. Railway officers will be sent on deputation to CRR to participate in R&D projects and training programmes.

---

## THE TIMES OF INDIA

Powered by *INDIATIMES*

About us     Advertise with us     Terms of use     Privacy policy     Feedback

RSS     Newsletter     TOI Mobile     ePaper     Archives

**Other Times Group news sites**
The Economic Times | इकनॉमिक ट इम्स
ईटीनॉमिक्स टाईम्स | Mumbai Mirror
Times Now | Indiatimes
नवभ रत ट इम्स | मह र ष्ट्र ट इम्स

**Living and entertainment**
Timescity | iDiva | Bollywood | Zoom
**Network**
itimes | Dating & Chat | Email

**Hot on the Web**
Hotklix

**Services**
Book print ads | Online shopping | Business solutions | Book domains | Web hosting
Business email | Free SMS | Free email | Website design | CRM | Tenders | Remit
Cheap air tickets | Matrimonial | Ringtones | Astrology | Jobs | Property | Buy car
eGreetings

Copyright © 2010 Bennett, Coleman & Co. Ltd. All rights reserved. For reprint rights: Times Syndication Service

# EXHIBIT S1

# Submitted Under Seal

# EXHIBIT S2

# Submitted Under Seal

# EXHIBIT S3

# Submitted Under Seal

# EXHIBIT S4

# Submitted Under Seal

# EXHIBIT S5

# Submitted Under Seal

**EXHIBIT S6**

**Submitted Under Seal**