1  Micah R. Jacobs (State Bar No. 174630)
   MBV LAW LLP
2  855 Front Street
   San Francisco, California 94111
3  Telephone:  415-781-4400
   Facsimile:  415-989-5143
4  E-mail:  mjacobs@mbvlaw.com

5  Sanjiv N. Singh (State Bar No. 193525)
   SANJIV N. SINGH, A PROFESSIONAL LAW
6  CORPORATION
   P.O. Box 225815
7  San Francisco CA, 94122
   Telephone:  415-816-5548
8  E-mail:  ssingh@sanjivnsingh.com

9  Attorneys for Plaintiffs
   MANDANA D. FARHANG and M.A. MOBILE LTD.

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14

15  M.A. MOBILE LTD., a limited liability          CASE NO. C-08-02658-RMW (HRL)
    company chartered in Dominica; and
16  MANDANA D. FARHANG,
                                                   PLAINTIFFS' MEMORANDUM IN
17                     Plaintiffs,                 OPPOSITION TO DEFENDANT'S
                                                   MOTION TO DISMISS THIRD
18         v.                                      AMENDED COMPLAINT PURSUANT
                                                   TO FED.R.CIV.P. RULE 8 AND
19  INDIAN INSTITUTE OF TECHNOLOGY                 12(B)(6)
    KHARAGPUR, an Indian Institute of
20  Technology incorporated under the "Institutes
    of Technology Act, 1961"; TECHNOLOGY
21  ENTERPRENEURSHIP AND TRAINING
    SOCIETY, an Indian society; PARTHA P.          Date:      September 3, 2010
22  CHAKRABARTI; PALLAB DASGUPTA;                  Time:      9:00 a.m.
    GURASHISH S. BRAR; RAKESH GUPTA;               Dept.:     Courtroom 6, 4th Floor
23  PRAVANJAN CHOUDHRY; SUBRAT                     Judge:     Honorable Ronald M. Whyte
    PANDA; ANIMESH NASKAR, and DOES
24  1 through 100, inclusive,

25                     Defendants.

26

27

28

MBV  LAW  LLP
855 FRONT STREET
SAN FRANCISCO CA 94111

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS                    CASE NO. C-08-02658-RMW (HRL)

# **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ..................................................................................................... 2

III.  LEGAL ARGUMENT .............................................................................................. 3

  A.  The Third Amended Complaint Does not Violate Rule 8,
      and Plaintiffs Can Easily Redact The "DISMISSED"
      Causes Of Action............................................................................................. 4

  B.  Plaintiffs Have Standing To Bring This Suit, and Defendants'
      Arguments To The Contrary Are Simply Incorrect. ..................................... 6

  C.  The TAC Clearly States A Claim For Breach Of The
      Non-Disclosure And Non- Use Provision Of The NDA. ............................... 6

      1.  The TAC Now Provides Specific Information How
          IITK Violated The Non-Disclosure Provisions Of The
          NDA By Expressly Permitting Disclosure To An IBM
          Representative Without Ensuring That The Representative
          Was Bound By The Terms Of The NDA. ....................................... 6

      2.  Both The Survey And The News Articles Provide
          Additional Credible Support That Defendants
          Improperly Disclosed Plaintiff Technology To
          Either IBM, The Indian Railway, Or Both. .................................. 9

      3.  The TAC Now Sets Forth Explicitly How Defendants
          Breached The Non-Use Provision Of The NDA,
          Abandoning The Joint Venture And Claiming It Never
          Existed But Continuing To Use Plaintiffs Technology
          To Complete A Railway Application And Providing
          Said Application To IBM And/Or The Indian Railways
          In Efforts To Forge Beneficial And Profitable Relationships
          With Both Entities. ....................................................................... 10

      4.  The April 2006 E-Mail From Mr. Naskar Provides
          Additional Compelling Evidence That IITK Disclosed
          Plaintiff Technology To The IBM Deputy Manager
          Sitting On The IITK Incubation Society Board. ......................... 12

      5.  The TAC Now Clearly Establishes That There is A
          More Than Reasonable Inference of IITK
          Disclosure to the Indian Railways. ............................................ 13

MBV LAW LLP
855 FRONT STREET
SAN FRANCISCO CA 94111

6.    Defendants Clearly Admitted They Disclosed
Information to External Experts. ............................................. 14

7.    Defendants New Defense That Plaintiffs Did Not
Intend To Enforce The Non Use Provisions Of
The NDA Is Simply Incorrect And Without Basis................................... 14

8.    Plaintiffs Have Stated A Meaningful Claim For
Breach Of The Non-Return Provisions Of The NDA. ............................. 15

D.    An Enforceable Joint Venture Agreement Existed Between
Plaintiffs And Defendant IITK..................................................... 17

E.    Plaintiffs Claim For Breach of Joint Venture Is Not
Time Barred............................................................................... 20

F.    Plaintiffs Have Sufficiently Plead A Claim for Trade
Secret Misappropriation. ............................................................ 21

1.    Plaintiff Has Used More Than Reasonable Care
To Protect Its Trade Secrets. ...................................................... 22

2.    Plaintiffs Have Disclosed Considerable Detail
Demonstrating Improper Disclosure to IBM
Via The Incubation Society. ...................................................... 24

3.    Plaintiffs Also Likely Disclosed Confidential and
Trade Secret Information To The Indian Railways
and to External Third Parties. ................................................... 24

4.    Defendants Disclosures Have Caused Great Loss And
Harm To Plaintiffs. .................................................................. 24

IV.    CONCLUSION ....................................................................................... 25

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

# TABLE OF AUTHORITIES

**Federal Cases**

*Ashcroft v. Iqbal,*
    129 S. Ct., 1937 (2009) ...............................................................................................3

*Bell Atlantic Corp. v. Twombly*
    127 S. Ct. 1955 (2007) .........................................................................................3, 12

*Bertucelli v. Carreras,*
    467 F.2d 214 (9th Cir. 1972) ...................................................................................4

*Brown v. Knoxville New-Sentinel,*
    41 F.R.D. 283 (E.D. Tenn 1966) ...........................................................................3

*Carrigan v. California State Legislatures,*
    263 F.2d 560 (9th Cir. 1959) ...............................................................................3, 5

*Gillibeau v. City of Richmond,*
    417 F.2d 426 (9th Cir. 1969) ...................................................................................4

*Gordon v. Green,*
    602 F.2d 743 (5th Cir. 1979) ...............................................................................3, 4

*Salahuddin v. Cuomo,*
    861 F.2d 40 (2d Cir. 1988) .....................................................................................4

**State Cases**

*Holmes v. Lerner*,
    74 Cal. App. 4th 442 (1999) ................................................................................ 20

*Rheem Mfg Co. v. United States,*
    57 Cal.2d 621, 21 Cal.Rptr. 802, 371 P.2d 578 (1962) ...................................... 15

**Federal Rules**

Fed. R. Civ. P.
    Rule 12(b)(6) ............................................................................................... passim
    Rule 8 .......................................................................................................... passim
    Rule 8(a)(2) ................................................................................................. passim

## I.     __INTRODUCTION__

As has been extensively documented in the Third Amended Complaint (hereinafter "TAC"), after requiring execution of a Non Disclosure Agreement (hereinafter "NDA"), Plaintiff Mandana D. Farhang ("Farhang"), and the affiliate she owns, Plaintiff M.A. Mobile Ltd. ("M.A. Mobile"), revealed highly confidential and extremely valuable technology relating to a new platform for mobile computing ("Plaintiff Technology") to one of India's premier technology development centers, Defendant Indian Institute of Technology at Kharagpur ("IITK"). Defendants' numerous breaches in connection with the NDA, the ensuing Joint Venture spanning three years of development, and misappropriation of Plaintiff Technology have been alleged and described in considerable detail in the TAC.  (Dkt. # 179, *e.g.* at 12-55.)

It is important to note that the TAC was the end result of Plaintiffs' targeted and diligent efforts to comply with the Court's July 1, 2010 Order asking Plaintiffs to expand the scope of description in certain focused areas of the Second Amended Complaint, specifically in connection with breach of the NDA and misappropriation of trade secrets.  (Dkt. # 143 at 23.)  Plaintiffs' expanded, narrowly-focused disclosures were only made possible by Defendants at long last executing an interim protective order finally permitting service of the TAC.  (Dkt. # 184, Ex. C.) Despite all of this, instead of finally conceding that there are real issues meriting discovery and discussion, Defendants continue in their barrage of motions.  To the ever growing list of motions (ranging from sovereign immunity to trade secret disclosure to their first Rule 12(b)(6) attack), Defendants have filed yet another Rule 12(b)(6) attack with many repetitive and practically duplicative arguments, this time accompanied by a volley of Rule 8(a)(2) arguments that are distracting and have little bearing on the substance of the case.  (Dkt. # 174.)

Plaintiffs submit this brief in full response to Defendants' motion, and hereby urge the Court to deny Defendants' motion.  Defendants' motion seems less about pleading sufficiency and more about what defenses (albeit weak ones) they can postulate at this time, and indeed their arguments seem to be fishing for a premature disclosure of certain facts that would normally only be available at the discovery or trial stage.  The TAC now explains with considerable detail, and in a clear and lucid manner, the manner and extent to which Defendants breached their obligations

under the NDA, breached the joint venture, and misappropriated Plaintiffs trade secrets.  (Dkt. #

179, *e.g.* at 12-55.)  There is now more than a reasonable inference that Defendants are liable for

the breaches alleged, and Defendant's own statements in their own Rule 12(b)(6 ) finally have

begun to reflect that.  (Dkt. # 175 at 22:10-20).  The Rule 8 violations alleged are either false or, in

the case of the innocent failure to redact the TAC of references to dismissed parties and claims, can

easily be remedied without resorting to the draconian and unfair remedy of dismissing the entire

complaint.

## II.    BACKGROUND

    This case is not a simple contractual dispute between two domestic corporations.  It is a

complex, cross-border litigation matter involving parties in the United States and India with causes

of action alleging breaches of an NDA, joint venture, and misappropriation of trade secrets by a

government entity.  (TAC; *see also* Original Complaint at Dkt. # 1.)  Complaints and filings must

be viewed against this backdrop.

    It should also be noted that it is practically irrelevant at this stage to cite what Plaintiff

Mandana D. Farhang, as a pro se litigant, did during the initiation of the litigation in 2008.  (Dkt. #

175 at 2:15-23.)  That being said, as a pro se litigant, she managed admirably, and indeed her

Original Complaint, drafted and filed pro se, included a wealth of detail and factual overview that

has stood the test of time in both its accuracy and relevance to the complaint at hand.  (Dkt. # 1.)  It

should also be noted that the Second Amended Complaint was the first complaint filed by Plaintiff

with counsel.  (Dkt. # 111.)

    This TAC was filed in direct response to the Court's June 1, 2010 Order which granted

leave to the Plaintiffs to expand on their breach of NDA and trade secret misappropriation claims.

(Dkt. # 143 at 23), but which also established that there indeed was a viable breach of joint venture

claim and sufficient allegation of Plaintiff's core trade secret technology.  Plaintiffs greatly

appreciated the Court's leave in this regard because prior to this time they had been quite hesitant to

disclose particular details without the benefit of a protective order or sealed exhibits.  (Dkt. # 168-

169.)  The Court's order set the stage for Plaintiffs to obtain an interim protective order, serve the

TAC, and thereby provide even more detail in connection with the breach of the NDA and the trade

2

1    secret misappropriation.  (Dkt. # 183 at 2:25 – 28, 3:1-6).

2    **III.    LEGAL ARGUMENT**

3           Rule 12(b)(6) permits a defendant to request dismissal for failure to state a claim on which

4    relief can be granted.  Fed. R. Civ. Pr. 12(b)(6).  Plaintiffs and Defendants have already extensively

5    outlined the jurisprudence for the Court in the first Rule 12(b)(6) hearing and briefs, and the Court

6    has set forth its view of Rule 12(b)(6) application.  (Dkt. # 143 at 8:11-20)

7           As Plaintiffs see it, it is clear that where courts have granted Rule 12(b)(6) dismissals

8    upheld on appeal, the failures of pleading were obvious: no reasonable inferences establishing

9    liability or relevant elements, essential elements omitted, and the like.  *See Bell Atlantic Corp. v.*

10   *Twombly*, 127 S. Ct. 1955, 1974 (2007), (where the Supreme Court ruled that, assuming Plaintiffs

11   factual allegations to be true, the allegations "must be enough to raise a right to relief above the

12   speculative level . . . ." and noted that the plaintiffs in the case before the Court had simply failed to

13   establish the essential element of the agreement in their conspiracy claim)*; see also Ashcroft v.*

14   *Iqbal,* 129 S. Ct., 1937, 1951 (2009) (where the court expounded further on the principles

15   underlying *Twombly* and applied *Twombly* to glaring Rule 12(b)(6) deficiencies where for example

16   plaintiff *Iqbal's* allegations that high level government official were involved in the detainment of

17   individuals on the basis of race and religion were unsupported by *any* facts and hence simply bare

18   assertions.)

19          Pursuant to Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim

20   showing the pleader is entitled to relief."  Fed, R. Civ. P. 8(a)(2).  Application of this Rule to

21   dismiss claims is used in those cases where there are flagrant violations.  In *Gordon v. Green*, 602

22   F.2d 743, 745 (5th Cir. 1979), the complaint and related amendments and materials was

23   approximately 4000 pages with numerous instances of confusing statements and muddled

24   descriptions.  *See also Carrigan v. California State Legislatures*, 263 F. 2d 560 (9th Cir. 1959)

25   (where the Court upheld dismissal of a 186 page claim containing significant extraneous

26   information); *see also Brown v. Knoxville New-Sentinel*, 41 F.R.D. 283 (E.D. Tenn 1966) (where

27   the dismissed complaint totaled 117 pages and contained confusing description making it difficult

28   for the Court to separate charges).  It should be noted that Rule 8(a)(2) is applied sparingly and is

3

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO   CA 94111

1    reserved only for those unusual cases where there are truly egregious violations.  Though this

2    aspect of Rule 8(a)(2) is clearly upheld by the 9th Circuit, it is not acknowledged by Defendants

3    discussion of the case law.  In *Gillibeau v. City of Richmond*, 417 F.2d 426 (9th Cir. 1969) the court

4    observed that "a dismissal for a violation under Rule 8(a)(2), is usually confined to instances in

5    which the complaint is so 'verbose, confused and redundant that its true substance, if any, is well

6    disguised.'"  *See also Bertucelli v. Carreras,* 467 F.2d 214, 215 (9th Cir.1972) (per curiam) (where

7    the Court stated that dismissal on the grounds of Rule 8 should not be granted without leave to

8    amend "in all except the most unusual cases"); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d

9    Cir. 1988) (where the Court states "Dismissal. . . is usually reserved for those cases in which the

10   complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if

11   any, is well disguised.")

12       In view of the preceding case law, and our summary of the relevant jurisprudence, Plaintiffs

13   have clearly met the pleading requirements of Rule 12(b)(6) and Rule 8.  The TAC far exceeds the

14   level of speculative pleading, and sets the stage for reasonable inferences that Defendant did indeed

15   breach the NDA, breached the joint venture agreement, and misappropriated Plaintiff's valuable

16   trade secrets and does not violate Rule 8.

17       **A.    The Third Amended Complaint Does not Violate Rule 8, and Plaintiffs Can
              Easily Redact The "DISMISSED" Causes Of Action.**

18

19       Mere reference to page length should not be sufficient grounds for a Rule 8 violation or

20   dismissal.  First, it should be noted that seventy-six (76) pages for complex cross border litigation,

21   much in response to Defendants' and the Court's request for more detail, should not be equated

22   with the kind of "irrational, prolix and redundant pleadings" which courts like *Gordon* or *Brown*

23   decried.  This case spans five years of activity between multiple parties on two different continents,

24   involves a complex joint venture arrangement with sophisticated technology, and involves

25   numerous defendants.  (TAC at 1-2.)  The necessary pleadings establishing jurisdiction, parties and

26   venue requires almost fifteen (15) pages alone. (TAC at 2-16.)

27       Second, the attachment of twelve (12) exhibits to the TAC must be viewed in context.  The

28   Court specifically asked for material which Plaintiffs had been hesitant to disclose because of lack

4

of protective order protections.  (Dkt. # 143 at 23:7-9.)  Five (5) of the twelve exhibits have now been accepted under seal.  (Dkt. # 178.)  The remaining exhibits vastly enrich Plaintiff's allegations (TAC at 12, 18-21, 34, 35, 37-41, 43, 46), though it should be noted that Plaintiffs are turning over significant information at the pleading stage while the Defendants have documented relatively little in support of their theoretical defenses.

Defendants have cited numerous cases of page length violations whose facts bear no resemblance to the facts at hand.  Unlike in *Carrigan*, the TAC is not filled with "hearsay" or "extraneous material" and Defendants fail to give even one example that it is.  Unlike in *Brown*, the Court has not had problem separating the various causes of action; they are clearly labeled and articulated.  (TAC at 56, 60, 69.)  Indeed, Defendants fail to give any examples of how *Brown* would apply other than citing the fact that the Complaint still describes fraudulent actions despite the dismissal of the fraud and breach of fiduciary duty claims.  Plaintiffs note that the dismissed fraud and breach of fiduciary duty claims are labeled "DISMISSED" and Plaintiffs remain agreeable to simply striking the DISMISSED sections for Defendants and the Court.  (TAC at 62, 63.)  The fact that the TAC still otherwise uses words like "fraud" and "sham" is otherwise perfectly appropriate where Plaintiffs were permitted leave to amend a trade secret misappropriation claim that is premised on the allegedly deceptive and fraudulent actions of Defendants.

It is puzzling that Defendants sequentially cite approximately fifteen cases in their lengthy discussion of Rule 8 violations, all of which point to egregious violations ranging from "a confusing a foggy mixture of evidentiary statements, arguments and conclusory matters" to examples of 240 page complaints lacking clarity and brevity.  (Dkt. # 175 at 5:26-27, 6:17-18.)  Plaintiffs submit that none of the cited cases have bearing on the case at hand.  Indeed, Plaintiffs appropriately detailed seventy-six (76) page complaint would actually be only seventy (70) pages if the fraud and breach of fiduciary duty are redacted, of which fifteen (15) pages concerning party, jurisdictional and venue issues are easily separated and sectioned.  (TAC at 2-17, 62-68.)

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O ,   C A   9 4 1 1 1

5

**B.      Plaintiffs Have Standing To Bring This Suit, and Defendants' Arguments To The Contrary Are Simply Incorrect.**

In the July 1, 2010 Order, the Court already concluded that Plaintiffs had standing to bring the trade secret misappropriation claim.  (Dkt. # 143 at 19-20.)  Despite this, Defendants now allege that the Complaint failed to plead appropriately that Plaintiffs own the technology because of a Sealed Exhibit referencing Brian Kenville as one of the inventors of the technology.  (Dkt. # 175 at 6.)  Defendants assume that Brian Kenville was the owner of the technology, citing 37 C.F.R. 3.73, and from that assert that the TAC is defective because "Plaintiffs fail to allege that Mr. Kenville assigned all right, title and interest in the patent "patent pending Technology" to Farhang or M.A. Mobile.  (Dkt. # 175 at 6.)  We are frankly perplexed as to why Defendants are wasting the Court's time and their own time with this argument, except that it seems to re-enforce the notion that Defendant is litigating side issues at the pleading stage.  In the same Exhibit which they consider to be part of the TAC pleadings, it clearly states:  "In 2003, Mandana Farhang acquired the rights to Kenville's technology…" and it should be noted that she did this using the corporate entity she set up to house the intellectual property (M.A. Mobile Ltd) of which she is the sole owner and shareholder.  (TAC, Sealed Ex. S2 at 1; *see also* TAC ¶¶ 10, 12.)

**C.      The TAC Clearly States A Claim For Breach Of The Non-Disclosure And Non-Use Provision Of The NDA.**

On June 1, 2010, the Court found much of the SAC proper;  however, it granted leave to the Plaintiffs to amend its claims concerning breach of the NDA.  Plaintiffs complied with this request, articulating specifically in Paragraphs 25-27, Paragraph 32 and Paragraphs 44-49 among others how the non-disclosure and non-use provisions were breached.

**1.      The TAC Now Provides Specific Information How IITK Violated The Non-Disclosure Provisions Of The NDA By Expressly Permitting Disclosure To An IBM Representative Without Ensuring That The Representative Was Bound By The Terms Of The NDA.**

The TAC expressly states that, per Clause 1 of the NDA, Defendant IITK could only disclose information to employees or contractors who "agreed to be bound by terms and conditions substantially similar to those of this Agreement."  (TAC at 22.)  The IBM representative, employed and engaged as a Governing Board Member of the IITK Incubation Society, acting as an agent of

6

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO   CA 94111

IITK, thus <u>should</u> have executed an NDA or similar agreement, but <u>did not</u> and Defendants have failed to offer any evidence that he did.  (TAC at 14:16-28; *see also* TAC, Ex. C).  Instead, Defendants attempt to shift responsibility for the disclosure by stating that Plaintiff disclosed the information first (Dkt. # 175 at 8:6-7), by stating that TIETS executed the NDA and thus the disclosure to the IBM representative was authorized (Dkt. # 175 at 8:4-6), and by stating that Defendant Chakrabarti's e-mail admitting IITK's prior disclosure to the IITK Incubation Society has been misinterpreted and that technical committees are distinct from the Society itself.  (Dkt. # 175 at 8:10-22.)  Each of these assertions is incorrect.

First, the TAC now presents significant and compelling information that Plaintiff's disclosure to the IITK Incubation Society was not a disclosure to IBM but was an <u>invited</u> disclosure to the IITK Incubation Society Board where the IITK Incubation Society Board was <u>repeatedly</u> represented by Defendants as an IITK entity.  (TAC at 34:16-28; 35:10-21; 36:2-7).

Second, the TAC presents compelling evidence that the <u>first</u> disclosure to the IITK Incubation Society (on which the IBM representative sat) was by IITK itself, as indicated by the cited Chakrabarti e-mail where Defendant Chakrabarti specifically states:  "A technical committee of the Incubation Society at IITK met with external experts to examine the various proposals. Pallab, Subrat and Pravanjan made the presentation on behalf of Coole."  (TAC at 36:1-18; *see also* Dkt. # 176, Sutton Decl., Ex. A).  Defendants now assert that because Incubation Society technical committees within the Incubation Society are *supposedly* distinct from the Governing Board, and because Defendant Chakrabarti did not write that the IBM representative was present, any assertion that IBM necessarily received information is "pure conjecture."  (Dkt. # 175 at 8:10-22.)

Plaintiffs submit that it is more speculative to assert that the IBM representative *may* not have been present, and the burden is on IITK to show that the IBM did not receive the information presented in 2005.  By definition, the Governing Board members run the Incubation Society and thus were privy to any information disclosed to their technical sub-committees, and indeed such sub-committees report their findings to their governing boards and make their minutes available to governing boards.  Moreover, Defendants' assertion that the technical committee is "separate" from the Governing Board is belied by Defendant Chakrabarti's own admission that he too served on the

1   technical committee:  "I was in the Committee and so did not present it myself."  (Dkt. # 176, Ex.

2   A) [and the Naskar e-mail].  Both Defendant Chakrabarti and the IBM representative served on the

3   Governing Board of the Incubation Society, and yet Defendants now assert, by a disingenuous

4   reference to a charter bylaw on structure not operation, that the IBM representative thus *might* not

5   have served on the technical committee even though Defendant Chakrabarti, himself a member of

6   the very same Governing Board (TAC, Ex. C, Section 4), admits to serving on the *same* technical

7   committee.

8          Third, Defendants' assertion that TIETS executed the NDA and thus "as a matter of law,

9   any disclosure to the Incubation society was authorized" (Dkt. # 175 at 8:4-6) is neither factually or

10  legally correct.  For one, it is clearly stated in Clause 1 of the NDA that the recipient agrees to

11  ensure that *individual* employees or contractors are bound by terms and conditions substantially

12  similar to the NDA.  (TAC at 22-23:25-26).  The IBM representative was such an individual as a

13  Governing Board member of TIETS, and so if TIETS or IITK (of which TIETS is a part) did

14  execute the NDA, it was responsible to ensure that he was so bound.  Defendants did not ensure

15  this, and this is a prima facie breach of the disclosure provisions of the NDA.  Even if Defendants

16  somehow later produce evidence alleging that he was appropriately bound, it does not mitigate the

17  overwhelming evidence showing the likely transmission of information from the IBM

18  representative to the Indian Railways. (TAC at 38-40, 42-46).

19         It should be noted that Defendants assertions are Janus faced and illustrate how Defendants

20  appear to argue whatever position is currently convenient to stall this case from progression to

21  legitimate discovery and trial.  Before, Defendants vehemently argued that the IITK Incubation

22  Society was an independent entity for which they disclaimed responsibility and which had replaced

23  Defendant IITK in the joint venture (Dkt. # 143 at 13:4-5), but now when confronted by the clear

24  breach of failing to have the IBM representative execute an NDA, Defendants flip their position.

25  Now, Defendants argue that the unauthorized disclosure to the IBM entity was entirely consistent

26  with the belief that "IIT[K] and the Incubation Society [were] one and the same for the alleged joint

27  venture."  (Dkt. # 175 at 10:7-12).

28         Plaintiffs also wish to remind the Court that discovery has not even begun and IITK is

8

essentially demanding litigation of trial issues and to remind the Court that discovery will likely

yield further breaches of Clause 1 of the NDA.  Defendants admit, in the August 31, 2005

Chakrabarti e-mail that the technology was shared with "external experts."  (Dkt. # 176, Sutton

Decl., Ex. A).  Defendants have been unable to tell the Court who these external experts were and

whether they were suitably bound by equivalent NDA protection.

> ## 2. Both The Survey And The News Articles Provide Additional Credible Support That Defendants Improperly Disclosed Plaintiff Technology To Either IBM, The Indian Railway, Or Both.

Defendants attack the Survey and the cited news articles as if they were the only alleged

support of improper disclosure.  (Dkt. # 175 at 8-9.)  Obviously, both the Survey and the cited news

articles must be viewed in context of the TAC's specific and credible information documenting

Defendants breach of the NDA and misappropriation of trade secrets:  (i) The Survey does not

merely reflect that the IITK team was actively working on the Pocket XML technology, but shows

that they were specifically and actively focused on the Indian Railway application (TAC at 41:11-

21 and Ex. S5); (ii) The Survey, as far as Plaintiffs can tell from diligent review of their own

records, was never given to Farhang who was supposed to be copied on all material reports (TAC

at 41:22-28); (iii) The Survey, as evidenced by the web references, was being assembled during the

same time that Defendant Chakrabarti was giving mixed signals to Farhang and making conflicting

statements about whether he was meeting with the Indian Railways, despite the fact that securing

the Indian Railways was what he had expressly promised when he seduced Plaintiffs into the joint

venture (TAC at 42:15-28, 43:5-22) and despite the fact that the Survey reflected his team's active

and specific work on the Indian Railway application; (iv) the Survey was one of several reports

which make the timing of IITK's abrupt termination of the project highly suspicious because

shortly before their termination, there was substantial evidence indicating completion of the

Railway Application and active planning for implementation and deployment–indeed, the Survey

was likely one of many precursors to the more specific and highly detailed <u>March, 2006 PXML</u>

<u>Status Report</u> that was compiled only three months before Defendant's termination of the

collaboration with Plaintiffs and that mapped out how many manhours would be needed for critical

refinements and features of an *already completed* Indian Railway application.  (TAC at 37:20-23,

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO   CA 94111

Sealed Ex. S4).

The news articles cited as evidence of the Indian Railways acquiring strikingly similar technology shortly after termination of the joint venture must also be evaluated in a similar context. Defendants at long last admit "a similarity in the discussions" between the cited news articles and Plaintiff Technology.  (Dkt. # 175 at 9.)  Defendants then try to argue that the similarity is not surprising because of possible competitors in the market, and then simply make a broad statement that the news articles fail to provide a basis for inferring that confidential information was improperly disclosed.  (Dkt. # 175 at 9:19-21).

The fact is that there is a similarity and the Defendants at long last have admitted this.  *Id.* The TAC now sets forth sealed exhibits which when compared with the news articles descriptions, establishes that the similarity is compelling.  (TAC, Ex. S2-S5.)  It is critical that the Court apply the standard it set forth for adjudication of the previous Rule 12(b)(6) motion:  whether there can be a reasonable inference of liability and for this, the news articles must be viewed in context, not in isolation.  If the technologies are similar as Defendants now concede, there is a reasonable inference of breach of the NDA and misappropriation **when** the admitted similarity is viewed against the numerous other facts set forth in the TAC.  A summary of the key facts is included in **Section C3** below.

> **3.    The TAC Now Sets Forth Explicitly How Defendants Breached The Non-Use Provision Of The NDA, Abandoning The Joint Venture And Claiming It Never Existed But Continuing To Use Plaintiffs Technology To Complete A Railway Application And Providing Said Application To IBM And/Or The Indian Railways In Efforts To Forge Beneficial And Profitable Relationships With Both Entities.**

The TAC now sets forth a compelling synthesis of facts establishing the reasonable inference that Defendants' breach of the *non-disclosure* provisions of the NDA, as set forth above, culminated in and enabled breach of the *non-use* provisions of the NDA and misappropriation:

(i)        IITK, a *government* entity, entered into a Joint Venture to use Plaintiffs' novel Pocket XML technology and business application trade secrets to develop an Indian Railway application.  (TAC at 49:9-23; *see also* Dkt. # 143 at 13-17.)

(ii)        IITK promised to secure the Indian Railways, also a *government* entity, as a

customer, and indeed leveraged a larger share of the Joint Venture equity based on that promise. (TAC at 26:17-23, 30:20-28.)

(iii)    IITK engaged in numerous communications indicating it was approaching the Indian Railways, but then claimed it did not do so (TAC at 30:21-20),  and at the same time had a high level IBM manager serving on the IITK Incubation Board who had <u>not</u> executed suitable non-disclosure protection himself, as required by the NDA, but who had access to the same Plaintiff Technology.  (TAC at 34-37; *see also* TAC, Ex. C and Ex. D.)  The IBM representative received information on Plaintiff Technology but was not bound by NDA as he should have been pursuant to **Clause 1 of the NDA**.  (TAC at 22:24-26.)

(iv)    Despite numerous reports such as the March 18, 2006 <u>Pocket XML Status Report</u> indicating that IITK expended enormous resources and indeed <u>completed</u> the Indian Railway application, in July of 2006, a little more than three months later, IITK inexplicably terminated its relations with Plaintiffs after almost three years of work (TAC, Ex. S4; *see also* TAC at 37:11-23.) In doing so, it  abandoned the Joint Venture, indeed denying its existence, and thereby placed itself in clear violation of **Clause 6 of the NDA** which states unequivocally that Defendants were not otherwise permitted to develop technology from Plaintiffs  Technology.  (TAC at 22-23.)

(v)    Less than one year later, reports surface in the Indian government of a mobile TTE project remarkably similar to Plaintiff Technology.  (TAC at 38:6-21.)  It is important to remember that IITK, as the premier government think tank, would be the primary expected source or facilitator of such a project for the Indian Railways, another government entity. (TAC at 26:17-23, 30:20-28.)  The likelihood of IITK's involvement in this manner is further heightened by Defendant Chakrabarti's repeated communications that he was talking to the Indian Railways about the project (TAC at 30:21-20) and the present fact that IITK is now the major designated research center for all Indian Railway technology development.  (TAC, Ex. F.)

(vi)    Less than one year after that, it was expressly announced that IBM India – the same entity that sat on the IITK Incubation Society Board, was a major collaborator with IITK, and whose individual member was not properly bound by NDA but had access to all of Plaintiffs technological disclosures – would be providing pilot mobile TTE PDA's to the Indian Railways

1    (TAC at 38:22-28)

2          (vii)    Less than one year after this, IITK filed an injunction in India seeking to restrain

3    Plaintiffs from use of their own technology or the Indian Railway application, admitting in their

4    own Indian petition that the Indian Railway application was built using Plaintiff Technology while

5    denying the existence of the Joint Venture, thereby admitting prima facie a breach of Clause 6 of

6    the NDA.  (TAC at 55:16-26.)  In the same breath, they expect the Court and Plaintiffs to believe

7    that they built this Indian Railway application using Plaintiffs Technology, find it important enough

8    to file an injunction over, but now assert that it has nothing to do with a very similar Railway

9    Application which IBM (a major representative on Defendant's Incubation Society Board) has now

10   provided to the Indian Railways (with whom Defendants alleged to have contact, but then claimed

11   they did not, and with whom Defendants now have a multimillion dollar relationship securing the

12   largest railway research centre of its kind at IITK).

13         If a reasonable inference of liability for breach of the non-disclosure and non-use provisions

14   is not achieved by the facts set forth above, then Plaintiffs submit that the *Twombly* and *Iqbal*

15   standards are meaningless.  Plaintiffs implore the Court to recognize the very real claims that rise

16   well above the level of speculation and provide, at the very least, a reasonable inference that

17   Defendants are liable for breach of the NDA (and as further set forth below, based on the same

18   nucleus of facts, misappropriation of trade secrets).

19                 **4.    The April 2006 E-Mail From Mr. Naskar Provides Additional
20                 Compelling Evidence That IITK Disclosed Plaintiff Technology To The
                   IBM Deputy Manager Sitting On The IITK Incubation Society Board.**

21         Plaintiffs have presented overwhelmimg evidence in their TAC that TIETS was repeatedly

22   and expressly represented as an IITK entity via communications like Mr. Naskar's e-mail (TAC at

23   34:16-28; *see also* TAC, Ex. D), that IITK itself had disclosed Plaintiff Technology to TIETS (on

24   whose board IBM sat and governed) long before Farhang via the August 2005 Chakrabarti e-mail

25   (TAC at 35 and Ex. D ) and had in fact invited Farhang to disclose details about her company to

26   TIETS via the Naskar e-mail (TAC, Ex. D) and that Defendants had made numerous

27   representations that TIETS was to take the place of IITK and for all intents and purposes was

28   standing in the shoes as IITK (TAC at 34:16-28.)

**5.    The TAC Now Clearly Establishes That There is A More Than Reasonable Inference of IITK Disclosure to the Indian Railways.**

The TAC now articulates several plausible and indeed probable pathways by which Defendants improperly transmitted Plaintiff Technology and related confidential information to the Indian Railways.  First, as set forth above, the TAC establishes that, without executing suitable NDA protection, Defendant permitted IBM to obtain access to Plaintiff Technology via the Incubation Society, an IITK entity, on which the IBM Deputy Manager sat in his capacity as an IITK Incubation Society Governing Board Member.  Defendant IITK should have required the IBM Deputy Manager to be bound by an NDA, but it did not.  Thus, IITK is directly responsible for the IBM Deputy Manager obtaining Plaintiff Technology and related information and directly responsible for said Manager's highly probable subsequent transmission to the Indian Railways.  Indeed, the Deputy Manager was an agent of IITK, acting in his capacity as a Governing Board Member of the IITK Incubation Society , and any disclosures by him to the Indian Railways, whether he intended it or not, were disclosures of information he received in his capacity as an agent of IITK and which should only have been used in that capacity.

Besides this, there is ample evidence that IITK may have *independently* disclosed information to the Indian Railways.  It has been shown that Defendant Chakrabarti repeatedly claimed he was dialoguing with the Indian Railways, but then inauthentically and implausibly claimed that he was not (TAC at 29-30) while internal documents show an IITK team poised for an Indian Railway Application demonstration with a completed application only two months before their inexplicable termination of their relationship with Plaintiffs (TAC, Ex. S5, PXML Status Report.)  Plaintiffs and the Court are expected to believe that IITK pursued no independent dialogue with the Indian Railways while, just two months before IITK terminated their involvement with Plaintiffs in 2006, Defendants are mapping out hour by hour how they can put the finishing touches on the Indian Railway application for deployment of a pilot project.  *Id*. Within a year of this abrupt and unexpected termination, the Indian Railway makes announcement of a budget allocation for a pilot project of very similar technology, and less than one year after the budget announcement, the IBM and Indian Railways deal is announced.  (TAC at 38:22-28.)

13

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

**6.    Defendants Clearly Admitted They Disclosed Information to External Experts.**

Defendants claim that they did not disclose information regarding Plaintiff Technology to a panel of external experts, and instead, rather incredibly claim that the panel of experts were making presentations to the Incubation Society.  ( Dkt. # 175 at 11:1-11.)  This is absurd and is directly contradicted by the plain English reading and common sense reading of Defendant Chakrabarti's e-mail which states:  "A technical committee of the Incubation Society at IIT met with external experts to examine the various incubation proposals.  Pallab [Dasgupta], Subrat [Panda] and Pravanjan [Choudhury] made the presentation on behalf of Cool [e-Mobile]."  (TAC at 36:1-7; *see also* Dkt. # 176, Sutton Decl., Ex. A.)  It is clear from this quote that IITK's employees, Individual Defendants Dasgupta, Panda and Choudhury, were presenting the Cool e-mobile proposal to the Incubation Society members and the panel of external experts.  There is, literally, no other plausible interpretation of this statement.

Defendants, rather incredulously, have now alleged the exact opposite, claiming that the "various 'external experts' were making presentations to a committee formed by the Incubation Society."  (Dkt. # 175 at 11:7-8).  This is simply incorrect.  "Pallab, Subrat and Pravanjan" refer to the Individual Defendants who were employees of IITK and who were working for the Joint Venture (TAC at 15, ¶ 16; 16, ¶¶ 19-20), not to the external experts; the e-mail explicitly states that this group of Individual Defendants made one of the "incubation proposals" being examined by the external experts and the technical Committee of the Incubation Society. (Dkt. # 176, Sutton Decl., Ex. A.)

**7.    Defendants New Defense That Plaintiffs Did Not Intend To Enforce The Non Use Provisions Of The NDA Is Simply Incorrect And Without Basis.**

As articulated above, Defendant's latest Rule 12(b)(6) attack contains numerous inventive but ultimately incorrect arguments by which Defendant's attempt to evade liability for their actions.  One version of their defense includes a waiver argument that "it was entirely reasonable for IITK to rely on Farhang's "specific directives" and assistance to conclude she did not intend to enforce the non-use provisions of the NDA."  (Dkt. # 175 at 12:17-19.)

There is no dispute that "California courts will find waiver when a party intentionally

14

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1   relinquishes a right, or when that party's acts are so inconsistent with an intent to enforce the right

2   as to induce a reasonable belief that such right has been relinquished.  *Rheem Mfg Co. v. United*

3   *States,* 57 Cal.2d 621, 21 Cal.Rptr. 802, 371 P.2d 578, 581 (1962).  But this rule has no

4   applicability to the case at hand.  Plaintiffs "specific directives" to IIT to develop the technology

5   were grounded on the belief that a joint venture to develop the technology was under way for the

6   mutual benefit of both parties, as evidenced by numerous references by both Plaintiffs and

7   Defendants to the progress and existence of the ongoing joint venture.  (TAC at 35:4-26.)  Nowhere

8   in the TAC is there any allegation or fact indicating that "specific directives" either indicated an

9   intent to relinquish Plaintiff's rights under the NDA or the Joint Venture, nor were Plaintiffs actions

10  inconsistent with the intent to enforce its rights under the NDA or the Joint Venture.  In fact,

11  Plaintiff referenced the NDA and/or Joint venture terms on numerous occasions in the setting of the

12  Joint Venture, as did Defendant.  (TAC at 30:11, with regards to the need for a temporary license;

13  *see also* 21:20-27.)  Moreover, after the Joint Venture had begun, Plaintiffs made it clear that the

14  NDA terms of non-use without consent and/or Joint Venture were fully in effect; Plaintiffs did not

15  permit IITK to freely present the project to the Indian Railways on their own as an "IITK Project"

16  but instead insisted on a temporary license to do so.  *Id.*  Defendants however changed their mind

17  about wanting to present the project on their own and thus informed Farhang they would not need

18  the temporary license.  (TAC at 30:16-18.)

19          In making their waiver argument, Defendants cite the fact that joint venture documents

20  were not executed and cite the ongoing negotiation of those documents as evidence of the alleged

21  waiver. (Dkt. # 175 at 11-12.)  This is simply incorrect analysis.  As stated above, Plaintiffs and

22  Defendants both expressly acknowledged NDA terms while transacting under the NDA. (TAC at

23  30:11, with regards to the need for a temporary license; *see also* 21:20-27.)  Moreover, the Court

24  has already ruled that the existence of the Joint Venture itself did not require written documentation

25  and that the Joint Venture did indeed exist.  (Dkt. # 143 at 13-17.)

26          **8.      Plaintiffs Have Stated A Meaningful Claim For Breach Of The Non-
                      Return Provisions Of The NDA.**

27

28          The Court already ruled that Plaintiffs have established a viable claim for return of the non-

15

1   return provisions of the NDA:

2       In particular, plaintiffs claim that IIT has only returned a single CD containing
3       source code and has failed to return "[d]ocumentation relating to business plans,
        trade secrets not disclosed in the patent, and other Confidential information." *Id.*
        These factual allegations are sufficient to state a claim for breach of the Return
4       Provision of the NDA.  (Dkt. # 143 at 11:19-22.)

5   Defendants have now attacked the Court's conclusion by alleging that the TAC has changed the

6   fundamental nature of this allegation.  This is simply incorrect.  The identical allegation can be

7   found in the Third Amended Complaint.  (TAC at 58:20-24.)

8       It is true that Plaintiffs eliminated the more generic description of "Confidential

9   Information" from this particular paragraph because the TAC, enabled by Defendant's finally

10  executing an interim protective order, contains concrete examples of the kinds of Confidential

11  Information.  Documentation relating to business plans is now illustrated with an actual concrete

12  example of one of the numerous iterations of business plans and confidential comments exchanged

13  between the parties; attachment of the example does not indicate that Defendants returned all

14  documentation relating to business plans.  (TAC, Ex. S2.)  Indeed, the attached example is just one

15  of multiple iterations of the business plans traded between the parties.  (TAC, Ex. S2.)

16      Similarly, trade secrets not disclosed in the patent have now been amply described by the

17  TAC including intimate descriptions of how the technology would be deployed, revenue

18  projections, and specific marketing plans.  (TAC at 19:13-16.)  The TAC included sealed exhibits

19  as examples of the kinds of documents provided, but these examples do not define the universe of

20  such information provided to Defendants.  (TAC, Ex. S1-S5.)

21      Finally, the "defined" term "Confidential Information" is still an explicit part of the NDA,

22  which is referenced and <u>explicitly</u> incorporated by reference in the TAC:  "A true copy of the NDA

23  Agreement was attached as Exhibit A to the First Amended Complaint and incorporated herein by

24  this reference."  (TAC at 23:13-14; *see also* FAC, Ex. A.)  Paragraph 3 of the attached NDA

25  specifically defined "Confidential Information" with nearly identical scope and detail as the

26  language that was redacted, and thus the material description of Confidential Information is still

27  most certainly incorporated by reference in the TAC.  *Id.*

28      Finally, it should be noted that in connection with this latest attack on the breach of return

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1  provisions of the NDA, Defendants have made a puzzling reference to the box of documents

2  containing the Survey and claim that this indicates plaintiffs "admitted that IIT returned a box of

3  documents to them." (Dkt. # 175 at 13:8-9). Plaintiffs made no such admission; they obtained the

4  box of documents through their COO as stated in the Original Complaint. (Dkt. # 1, ¶ 85; *see also*

5  TAC at 40:26-28.) The Survey, like the PXML Status Report, both of which are attached as Sealed

6  Exhibits to the TAC, give examples of the kind of trade secrets not described in the patent that still

7  reside at IITK in their electronic and hard copy files and in the possession of Individual Defendants

8  and almost certainly now in the possession of third parties including possibly IBM, the "external

9  experts" whose identity Defendants seem either incapable or unwilling to disclose, and the Indian

10  Railways. (TAC, Exs. S4-S5.)

**D.  An Enforceable Joint Venture Agreement Existed Between Plaintiffs And Defendant IITK.**

13  Plaintiffs remain perplexed as to why Defendants insist on arguing that a joint venture did

14  not exist. The Court engaged in detailed analysis as to why the Plaintiffs had already established

15  that a Joint Venture existed:

> . . .allegations in the SAC suggest that the parties intended to be bound by the terms of an oral joint venture agreement even though a formal letter of intent had not yet been signed. *See* SAC ¶ 33(e)…Therefore, "the mere fact that a formal written agreement to the same effect has not yet been signed does not alter the binding validity of the oral agreement." *Banner Entm't*, 62 Cal. App. 4th at 358. (Dkt. # 143 at 14: 20-24).

20  Despite the Court's explicit ruling on this issue, Defendants have chosen to re-open this

21  issue. SAC 33(e) was not redacted from the TAC, and exists in its entirety in the TAC. (TAC at

22  27-28, ¶ 33(e).) Defendants try to raise the issue de novo by repeating the same legal arguments

23  they used in the previous Rule 12(b)(6) attack but this time pointing to statements in Plaintiff's

24  revised TAC. For example, they state that paragraph 45(f) constitutes an admission by the parties

25  that material elements of the Joint Venture were still being negotiated. (Dkt. # 175 at 13:20-21.)

26  Nothing in Paragraph 45(f) can be construed in this manner; in fact, the cited paragraph describes

27  Plaintiffs submission of a final request to the Incubation Society board to make good on their

28  promise to execute the LOI documents. (TAC at 34:12-16; 37:11-23.) The "negotiation" was for

17

M B V   L A W   L L P
855 FRONT STREET
SAN FRANCISCO   CA 94111

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O ,   C A   9 4 1 1 1

1   execution of the formalized documents, not for negotiation of the material elements of the Joint

2   Venture which had been set for many months prior to that communication.  As the Court has stated,

3   the lack of a formal written agreement does not mitigate the binding or certain nature of the oral

4   agreement.  (Dkt. # 143 at 13-15.)

5           Defendants now also try to assert that they did not have the requisite intent to form the joint

6   venture because Plaintiffs have asserted that their intentions may have been fraudulent and sham

7   from the inception.  (Dkt. # 175 at 14-15.)  In simple terms, Defendants are asking the Court to

8   accept the following circular and somewhat jaw-dropping argument:  "We entered a joint venture

9   agreement, engaged in numerous actions and communications indicating that we were participating

10  in the joint venture, but because we developed a fraudulent and dishonest additional intent to use

11  the joint venture to access Plaintiff's technology for our own benefit, we have no liability for the

12  breach of joint venture."  Putting aside Plaintiff's clear right to plead in the alternative,  Plaintiffs'

13  statements as to the possible fraudulent intent do not change the fact that Plaintiffs still maintained

14  its intent to enter into the joint venture—indeed, the joint venture was the means by which they

15  initially gained access to the technology.  The Court already ruled that "the SAC alleges facts

16  indicating both mutual intent to create a business and a sufficiently clear understanding regarding

17  the parties' respective obligations."  (Dkt. # 143 at 16:21-22).  Plaintiffs statement that "defendant

18  never intended to form a joint venture" was part of a long description by Plaintiffs setting forth in

19  great detail how Defendants, took actions and made statements manifesting the intent to form a

20  joint venture, but at the same time, as far as Plaintiffs can tell from a retrospective review of all the

21  facts, ultimately had the intent of using the Joint Venture to misappropriate Plaintiffs Technology.

22  The statement "defendant never intended to form a joint venture" was made to convey what their

23  ultimate motive was, but not to literally assert that the intent to enter a joint venture was not

24  manifested.  Finally, the Court ruled in connection with the SAC that the parties had the mutual

25  intent to form a joint venture, regardless of what the parties used the joint venture to accomplish.

26  We will not address the obvious issue of whether it is proper for Defendants to now raise this issue

27  when the clauses upon which they are now basing their current argument (TAC Paragraph 1,

28  Paragraph 2(c)(6)) existed *verbatim* in the SAC (SAC Paragraph 1, Paragraph 2(c)(6)) upon which

18

1    the Court already ruled and found intent to form the joint venture.

2           Similarly, Defendants attack the Breach of Joint Venture claim by again attacking the

3    Court's conclusion that an oral contract existed.  The Court stated, quite clearly, that "the essential

4    elements of a joint venture agreement have been adequately alleged" and gives examples such as

5    the fact that "IIT was to develop and commercially exploit the IP, meaning it was to try to win the

6    Indian Railways as a customer by developing relevant applications, producing marketing materials,

7    creating demonstratives for presenting the technology, and securing access to the Indian Railways."

8    (Dkt. # 143 at 16:20-25.)  The Court cites Paragraph 33, 33(e), 36 and 52 of the SAC.  *Id.*  These

9    Paragraphs are included in their verbatim entirety in the TAC, and yet Defendants have now-

10   reopened the issue.  (TAC, ¶ 33, ¶ 33(e), ¶ 36 and ¶ 53.)

11          Defendants also attempt to argue that Plaintiffs have failed to allege breach of the oral

12   contract.  The Court already concluded, with regards to the SAC, that "Plaintiffs allege that IIT

13   breached the joint venture agreement by completely abandoning the joint venture and exploiting

14   plaintiffs' IP for its own purposes" and cites Paragraph 69 of the SAC.  Paragraph 70 of the TAC

15   (which is Paragraph 69 of the SAC) is now re-attacked by the Defendants.  In this attack, they

16   allege that Plaintiffs "admit" that IITK developed the Technology.  (Dkt. # 175 at 15:13-14).  This

17   is irrelevant; Plaintiffs never disputed that IIT used their trade secrets to develop technology;

18   Plaintiffs contend and have more than specifically alleged that Defendants abandoned the Joint

19   Venture and misappropriated Plaintiff Technology for its own purpose.  (SAC, ¶ 69; TAC, ¶ 70.)

20   The Court accepted these allegations in the SAC, which are repeated verbatim in the TAC, as

21   sufficient for Rule 12(b)(6) purposes in its June 1, 2010 Order.  (Dkt. # 143 at 17:3-4.)

22          Defendants further assert that the allegations of breach in the TAC are "amorphous" and

23   "vague" again citing Paragraph 70 of the TAC (previous Paragraph 69 in the SAC on which the

24   Court already ruled).  We respectfully disagree.  Paragraph 70, like Paragraph 69 of the SAC on

25   which the Court already ruled, contains numerous specific allegations of breach. (TAC, ¶ 70.)

26          Even if the Court accepted Defendants re-assertion that Paragraph 70 allegations contain

27   some vague elements, *which Plaintiffs contend is not true*, the Court has already ruled that "the

28   terms of the joint venture agreement are sufficiently certain to determine whether such a breach has

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O ,   C A   9 4 1 1 1

19

1   occurred. (Dkt. # 143 at 17:4-9.) The allegation of abandonment of the joint venture for the

2   purpose of misappropriating Plaintiff Technology is exactly the kind of complete repudiation

3   contemplated by this Court and the court in *Holmes v. Lerner*, 74 Cal. App. 4th 442, 459 (1999). *Id.*

4          **E.     Plaintiffs Claim For Breach of Joint Venture Is Not Time Barred.**

5          The Court already concluded that Plaintiff's claim for breach of joint venture is not time

6   barred. (Dkt. # 143 at 14:1-2.) The Court specifically cited the SAC's allegation that Plaintiffs did

7   not discover the breaches of the joint venture until after May 27, 2006 and filed the complaint on

8   May 27, 2008. (Dkt. # 143 at 14:3-8.) Despite this, Defendants have attempted to re-open this

9   issue as well despite the Court's findings and despite the fact that the TAC does not differ

10  materially from the SAC on any issues relevant to the statute of limitations. Paragraph 70 of the

11  SAC is now Paragraph 71 of the TAC and contains the identical representation, and also contains

12  the additional specification that Plaintiffs did not actually realize that Defendant IITK was

13  responsible as an institution  and that said breaches were not beyond cure until June 7, 2006.

14  Indeed, Plaintiff received the invitation and congratulation letter in April of 2006 inviting Plaintiff

15  to send details on the Company and technology to the IITK Incubation Society to finalize its

16  acceptance. (TAC, Ex. D.) Plaintiffs sent the letter to the IITK Incubation Society Board in May

17  2006, still reasonably believing that Defendant Chakrabarti and some of the Individual Defendants'

18  evasive behavior did not represent sinister intent by Defendant IITK and Defendant TIETS as a

19  whole. (TAC at 34:12-16). This was particularly reasonable as Defendant Chakrabarti had delayed

20  in the past, but the Technology did ultimately get developed and Defendant Naskar had just sent the

21  promising invitation one month prior for admission to TIETS. (TAC, Ex. D.)

22          Applying the standards articulated by this Court, it is the loss or damage that sets the date

23  for the time bar clock. Plaintiffs were not aware of the loss or damage incurred by said breach until

24  the shocking repudiation sent by Defendants Counsel on June 7, 2006. (TAC at 37:14-16.) Up

25  until this time, Defendant had made numerous representations that the project would move forward

26  and again, to reiterate, had just sent the long awaited and promised admission letter to the

27  Incubation Society heralding at long last their formalization of the joint venture that was already in

28  operation. (TAC, Ex. D.)

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O ,   C A   9 4 1 1 1

20

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

1   Defendants cite several instances of delay and evasive behavior highlighted in the TAC

2   which occurred prior to May 27, 2006.  But these cited instances of delay and evasive actions must

3   be viewed against the numerous representations made by Defendant Chakrabarti that the project

4   was moving forward, by the April 2006 Naskar letter that reasonably convinced Plaintiffs that no

5   loss or damage was occurring and that Defendants were moving forward with their promise of the

6   joint venture by substituting TIETS for IITK, and by the fact that no repudiation by IITK or TIETS

7   was issued until June 7, 2006.  (TAC at 30-32, 37, Ex. D).  Second, the cited instances of Plaintiffs

8   COO deciding to approach the Indian Railways must be viewed against the other relevant facts,

9   where after such approach, Defendant Chakrabarti immediately sought to posture that he would

10   cooperate with her efforts provided IITK would be presented as the main sponsor for the project.

11   (TAC at 21:21-27, 47-48.)  Third, in none of the cited instances, did actual loss or damage accrue.

12   In fact, in every one of the cited instances, Defendants used e-mails, verbal communications, and

13   deceitful actions to convince Plaintiffs they were moving forward and that the ultimate delay was

14   trivial and that they were truly committed to the joint venture with the ultimate assurance in the

15   form of the Naskar e-mail.  (TAC, Ex. D.)

16       **F.**    **Plaintiffs Have Sufficiently Plead A Claim for Trade Secret Misappropriation.**

17   Now that Plaintiffs have offered highly detailed information regarding both the trade secret

18   core technology and the trade secret business applications and implementations, it appears that

19   Defendants have shifted gears yet again in their Rule 12(b)(6) attack.  Defendants now attack the

20   cause of action alleging wrongly that the trade secrets were not reasonably well protected, alleging

21   that there is no evidence of improper disclosure to IBM, the Indian Railways, or to external third

22   parties, and alleging that even if they did improperly disclose or misappropriate trade secrets, no

23   harm resulted to Plaintiffs.  Each of these allegations is incorrect, and there is more than adequate

24   detail pleaded in the TAC to raise a reasonable inference of liability.  ***As with much of their brief,***

25   ***Defendants seem to be arguing defenses rather than pleading specificity, which is not***

26   ***appropriate or dispositive in the Rule 12(b)(6) setting, putting aside the fact that the defenses are***

27   ***without basis in every instance.***

28

### 1. Plaintiff Has Used More Than Reasonable Care To Protect Its Trade Secrets.

Based on distorted and inaccurate information presented by Defendants in their first Rule 12(b)(6) attack, this Court had concluded that it could not determine whether Plaintiffs had used reasonable care to protect the trade secret business implementations. (Dkt. # 143 at 22:10-23.) In the TAC, Plaintiffs addressed each of the issues raised by the Court:

(i)     The alleged disclosure to IBM was actually a disclosure to the IITK Incubation Society Board. The IITK Incubation Society Board and IITK, for the purpose of the Joint Venture and indeed as a matter of fact even outside that context, appear to be one and the same entity and were repeatedly represented as such. (TAC at 34:19-21 citing Dkt. # 1, ¶ 29, 30(c), 45, 50, 51, and 60.) Even this Court in its own ruling concluded that the IITK Incubation Society (aka TIETS) and IITK were represented by Defendants as the same entity: "Based on the allegations in both versions of the complaint, Farhang accepted replacing IIT with IIT's Incubation Society as a party to the joint venture agreement only because she was led to believe they were, for all practical purposes, the same entity." (Dkt. # 143 at 13:13-16.) If the Court believes that there was a reasonable basis for Farhang to believe IITK and IITK's Incubation Society were practically the same entity, then it was perfectly reasonable for her to assume that when she sent documents to the Incubation Society, she was sending documents to a branch of IITK which was either bound by the NDA not to improperly use the information or bound by the terms of the joint venture agreement not to improperly use the information for their own benefit. The IBM representative, as an officer of the IITK Incubation Society Board, was thus either bound by the terms of the NDA as an agent of IITK or bound by the terms of the joint venture in which the IITK Incubation Society had taken the place of IITK. (TAC at 34:16-19). Thus, when Plaintiff sent materials, she was sending them to an entity that had been repeatedly held out as an IITK entity. *Id.* The so called "IBM" representative on the Board was supposed to be serving as an IITK Incubation Society Governing Board Member and thus should have executed an NDA or some equivalent confidentiality protection. (TAC at 34, citing Ex. C which is a copy of the IITK Incubation Society charter documents). It should also be noted that the IBM representative was serving as a Governing Board member with prescribed duties, and thus easily may be viewed either as an "employee" or agent of

22

IITK's Incubation Society and ultimately IITK, again triggering a requirement that he execute and be bound by the NDA or equivalent protection, or that he abide by the terms of the joint venture as an agent of the IITK Incubation Society.  (TAC at 34:24-28, 35:1-3).

(ii)      The disclosure to the IITK Incubation Society was an invited disclosure.  First, as set forth above in (i), Plaintiffs were not merely relying on the Naskar e-mail itself.  The IITK Incubation Society board was held out as an IITK entity and as an active participant in the Joint Venture.  (TAC at 34:19-21 citing Dkt. # 1, ¶ 29, 30(c), 45, 50, 51, and 60.)  Thus, sending material to the Incubation Society was no different to sending information internally within the Joint Venture.  The Naskar e-mail, however, provides even further credence to this view.  (TAC, Ex. D.)  Moreover, Defendant Chakrabarti, who served on the IITK Incubation Society Governing Board and on the technical committee, was already privy to all of the technical details.  (TAC, Ex. C.)

(iii)     The TAC has now set forth in considerable detail that the alleged confidential disclosure by Plaintiff to the Indian Railways were in fact legitimate and authorized disclosures of high level "teaser" information and indeed the disclosures were sanctioned by Defendant Chakrabarti.  (TAC at 21:21-27.)  At no time did Plaintiffs disclose source code or detailed business implementation or application trade secrets that would have required NDA protection to the Indian Railways.  *Id*.

(iv)     The TAC now also discloses an example of e-mails with third parties demonstrating that Plaintiff would seek third party execution of suitable NDA protection before disclosing the trade secret technology to any third parties.  (TAC, Ex. S6, and 21:11-17.)  After the Court ruled in its preliminary findings on Plaintiffs Motion To Seal that it did not see a compelling reason for the e-mails to be sealed and denied the motion to seal, Plaintiffs examined the e-mail carefully and obtained further details about the discussion with the third party and determined that the e-mail discussions were not part of an ongoing joint venture or other arrangement by which the e-mails would have been entitled to confidentiality protection, and the e-mails themselves contain no confidential information.

(v)      Defendants now assert that Defendant disclosed the "mobile markup language" to Sun, disclosed strategic business trade secrets prior to the NDA to Defendant Chakrabarti, and

1   provided technical details to Microsoft, Motorola and Sprint, and for all of these allegations, cite

2   Exhibit A of the Second Amended Complaint.  (SAC, Ex. A; Dkt. # 175 at 19:6-13.)

3           We encourage the Court to review Exhibit A of the SAC.  There is nothing in the e-mail

4   that can be reasonably construed to confirm inappropriate disclosure by Farhang.  As now clearly

5   stated in the TAC, Farhang used NDA protection for any disclosure of confidential information and

6   would have only disclosed high level "teaser" information to third parties who did not execute an

7   NDA, similar to the kind of high level "teaser" information which Defendant Chakrabarti also

8   authorized for disclosure to the Indian Railways prior to execution of an NDA. (TAC at 21:21-27).

9   The e-mail contains no admission by Plaintiffs that inappropriate disclosures were made, and the

10  statement regarding a "free" mobile device strategy to gain market share did not contain any

11  specifics about the attributes of the mobile device, specifics for such a campaign, or how such a

12  marketing campaign would be executed.

<b>2.      Plaintiffs Have Disclosed Considerable Detail Demonstrating Improper Disclosure to IBM Via The Incubation Society.</b>

15          **Section C1-C5** of this brief outline in considerable detail how Defendants improperly

16  disclosed Plaintiffs trade secrets and confidential information to IBM.  ***Please refer to Section C1-***

17  ***C5 above at pp. 6-13.***

<b>3.      Plaintiffs Also Likely Disclosed Confidential and Trade Secret Information To The Indian Railways and to External Third Parties.</b>

20          **Section C5-C6** above set forth in considerable detail how the TAC pleads sufficient detail

21  raising a reasonable inference that Defendants also disclosed trade secret and confidential

22  information to the Indian Railways and external third parties.  ***Please see Section C5-C6 above at***

23  ***pp. 13-14.***

<b>4.      Defendants Disclosures Have Caused Great Loss And Harm To Plaintiffs.</b>

25          Defendants now raise a new argument in their latest Rule 12(b)(6) attack.  Now they allude

26  to the fact that Defendants may have engaged in improper disclosure and misappropriation, but

27  raise the issue of causation.  Applying the standards of *Tate v. Canonica*, it is clear that IITK's

28  actions were a substantial factor in causing plaintiffs injuries.  First, we have already rebutted

24

M B V   L A W   L L P
8 5 5   F R O N T   S T R E E T
S A N   F R A N C I S C O   C A   9 4 1 1 1

Defendant allegations that Plaintiffs engaged in inappropriate disclosure and have made it clear that Plaintiffs used proper care to protect their trade secrets. ***Please see Section F (1)] above.*** Moreover, whether there was other competing technology in the market space does not preclude a successful trade secret misappropriation claim; indeed, the importance of maintaining trade secret status and not improperly disclosing to individuals is heightened by these circumstances and the decision by IITK to have industry representatives on its Incubation Society board without obtaining appropriate confidentiality protection for disclosures is even more egregious in this setting.  Finally, the loss and harm to Plaintiffs as a result of the disclosures has already been plead in the TAC – namely loss of use of valuable technology and Defendants' use of Plaintiffs Technology to obtain a lucrative pilot deal for their strategic partner which likely would have been awarded to Plaintiffs. (TAC at 72-73.)

## IV.   <u>CONCLUSION</u>

For the above reasons, Plaintiffs implore the Court to deny Defendants Motion to Dismiss, preserve the TAC in its currently well pleaded state, and permit this case to at long last move to discovery so that the parties can engage in meaningful pre-trial discussions and exchange of information.


Date:  August 13, 2010                          MBV LAW LLP


                                    By:     <u>/s/ *Micah R. Jacobs*</u>
                                            Micah R. Jacobs
                                            Attorneys for Plaintiffs MANDANA
                                            D. FARHANG and M.A. MOBILE LTD