1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION
Sanjiv N. Singh, Esq. (State Bar No. 193525)
1650 South Amphlett Blvd. Suite 220
San Mateo, CA 94402
Phone: (650) 389-2255
Email: ssingh@sanjivnsingh.com

Micah R. Jacobs (State Bar No. 174630)
JACOBS LAW GROUP SF
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone:  415-445-4696
Facsimile:  415-445-4697
Email:  mjacobs@jacobslawsf.com

Attorneys for Plaintiff M.A. MOBILE LTD.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| M.A. MOBILE LTD., a limited liability company chartered in Dominica;<br><br>Plaintiffs,<br><br>v.<br><br>INDIAN INSTITUTE OF TECHNOLOGY KHARAGPUR, an Indian Institute of Technology incorporated under the "Institutes of Technology Act, 1961"; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: C-08-02658-WHO<br><br><br>PLAINTIFF M.A. MOBILE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT IITK'S MOTION FOR SUMMARY JUDGMENT<br><br>Date: July 10, 2019<br>Time: 2:00 PM<br>Courtroom:  2<br>Judge William H. Orrick |

# Table of Contents

INTRODUCTION ...................................................................................................... 1

BACKGROUND FACTS ............................................................................................ 2

   A.  The Parties ......................................................................................................... 2

     I.   Plaintiff M.A. Mobile Owned Confidential and Proprietary Technology for a new
Mobile Computing Program for XML, or So Called Pocket XML ......................................... 2

     II.  Defendant Indian Institute of Technology Kharagpur is A Premier Technology
Institution and Government Entity with Vast Connections ..................................................... 2

   B.  In 2003, Plaintiff Approached IITK About a Potential Joint Venture to Commercialize the
IP for Mobile Computing and the Parties Signed  An NDA ...................................................... 2

   C.  After the NDA Was Signed, Plaintiff Provided The Confidential Trade Secrets and Source
Code to Defendant IITK for its Analysis of a Potential Joint Venture....................................... 3

   D.  After Its Initial Analysis, IIT Represented it Wanted to Form a Joint Venture to
Commercialize the Technology and the Parties Formed Their Joint Venture ........................... 3

   E.  IITK Develops Prototypes and Discloses Confidential Information to Third Parties ......... 7

   F.  IITK Misrepresents Its Intentions and Deliberately Delays the Joint Venture While It
Continues to Misappropriate the Technology and Discloses it to Third Parties ....................... 8

ARGUMENT ............................................................................................................... 11

   A.  Summary Judgment Is A Drastic Measure to Be Used Sparingly ..................................... 11

   B.  This Court is Not Bound to Defendant's Interpretation of Its Own Foreign Law ............. 12

   C.  The Overwhelming Evidence Shows That the Parties Formed a Joint Venture Under
California Law ........................................................................................................................... 14

     I.   California Law Recognizes Oral and Implied at Law Joint Venture Agreements and
Intent to Form a Joint Venture is a Question of Fact .............................................................. 14

     II.  The Overwhelming Evidence Shows The Parties Intended to Form a Joint Venture and
Reached Agreement on the Material Terms to Form a Joint Venture ..................................... 15

     III.  IITK's Reliance on *Prostar* is Misplaced And *Prostar* is Both Legally And Factually
Distinguishable ....................................................................................................................... 17

     IV.  Plaintiff Has Set Forth Sufficient Evidence to Support Its Claims for Breach of the
NDA and Trade Secrets Misappropriation............................................................................. 19

     V.  Plaintiff Did Not Give Dr. Chakrabarti Complete Discretion in Violating the NDA and
Disclosing Confidential Information....................................................................................... 23

VI.   There Is Substantial Evidence that Defendant Disclosed Plaintiff's Confidential Information to Third Parties ................................................................................................ 24

CONCLUSION ......................................................................................................................... 25

PLAINTIFF'S MEMO. IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: C-08-02658-WHO

# Table of Authorities

**Cases**

*A. K. H. by & through Landeros v. City of Tustin,*
  837 F.3d 1005 (9th Cir. 2016) ................................................................... 17

*Anderson v. Liberty Lobby Inc.,*
  477 U.S. 242 (1986) ................................................................................... 17

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*
  138 S. Ct. 1865 (2008) .......................................................................... 18, 19

*BladeRoom Group Ltd. v. Facebook, Inc.,*
  No. 5:15-cv-01370-EJD, 2018 WL 514923 (N.D. Cal. Jan. 23, 2018) ...................................... 25

*Bladeroom Grp. Ltd. v. Emerson Elec. Co.,*
  331 F. Supp. 3d 977 (N.D. Cal. 2018) ................................................... 26, 30

*Boyd v. Bevilacqua,*
  247 Cal. App. 2d 272 (1966) .............................................................. 19, 24

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ................................................................................... 17

*Drdlik v. Ulrich*
  203 Cal. App. 2d 360 (1962) ..................................................................... 20

*Goodworth Holdings Inc. v. Suh*
  239 F. Supp. 2d 947, 956 (N.D. Cal. 2002) ..................................... 20, 23, 24

*Holmes v. Lerner*
  74 Cal.App.4th 442 (1999) ........................................................................ 21

*Kaljian v. Menezes*
  36 Cal.App.4th 573 (1995) ........................................................................ 20

*Lasry v. Lederman*
  147 Cal. App. 2d 480 (1957) ..................................................................... 20

*Pellegrini v. Weiss*
  165 Cal. App. 4th 515 (2008) ................................................................... 20

*Pollar v. Columbia Broadcasting Sys., Inc.*
  368 U.S. 464 (1962) ................................................................................... 17

*Prostar Wireless Group, LLC v. Domino's Pizza, Inc.,*
  360 F. Supp. 3d at 1008 (N.D. Cal. 2018) .......................................... 22, 23

*Ramirez v. Long Beach Unified Sch. Dist.*
  105 Cal. App. 4th 182 (2002) ................................................................... 20

*Reeves v. Sanderson Plumbing Products*
   530 U.S. 133 (2000) ................................................................................. 17

*Sadugor v. Holstein*
   199 Cal. App. 2d 477 (1962) ................................................................. 20

*Second Measure, Inc. v. Kim*
   143 F. Supp. 3d 961 (N.D. Cal. 2015) ................................................. 21

*Simpson v. Winkelman*
   225 Cal. App. 2d 746 (1964) ................................................................. 20

*Tolan v. Cotton*
   134 S. Ct. 1861, 1863 (2014) ................................................................. 17

*Universal Sales Corp. v. California etc. Mfg. Co.*
   20 Cal. 2d 751 (1942) ............................................................................. 19

*Unruh-Haxton v.Regents of University of California*
   162 Cal. App. 4th 343 (2008) ............................................................... 20

**Statutes**

California Civil Code §3426.1(d) ................................................................. 24

California Civil Code § 3426 ......................................................................... 25

California Uniform Trade Secrets Act CUTSA § 3426(B)(ii) ..................... 28

Fed. R. Civ. P. 56(a) ..................................................................................... 17

Fed. R. Civ. P. 12(b)(6) ................................................................................ 19

## INTRODUCTION

Defendant Indian Institute of Technology Kharagpur ("Defendant" or "IITK") deliberately distorts and hides the pertinent facts of this long-standing case behind irrelevant details in its Motion for Summary Judgement (the "Motion").  Plaintiff M.A. Mobile LTD. ("Plaintiff") respectfully urges the Court to deny the Motion so that Plaintiff can finally have its day in court, a trial on the merits, for the following reasons.

The undisputed evidence establishes that Plaintiff owned novel and valuable intellectual property rights to a new software platform for mobile computing. Plaintiff approached IITK about a potential joint venture to commercialize the innovative technology. After their initial meeting, IITK agreed to review the confidential technology.  Plaintiff then entered into a Non-Disclosure Agreement ("NDA") with IITK.  Declaration of Sanjiv N. Singh ("Singh Decl."), Exs. 1-3; *see also* Declaration of Mandana Farhang In Support of Opposition to Motion ("Farhang Decl.") at ¶¶5-7.  In fact, Plaintiff's first and principle contact at IITK, Dr. Partha Chakrabarti ("Dr. Chakrabarti"), informed Plaintiff that he received approval from IITK to sign the NDA, he signed the NDA on behalf of Defendant, and he expressly acknowledged that the NDA binds IITK as well. *Id.* at Exs. 1-3, 14; Chakrabarti Decl. at ¶15; Farhang Decl. at ¶¶5-7. Only after the NDA was signed, Plaintiff provided all of the confidential source code and related trade secrets to IITK for its review to determine whether to commercialize the technology through a joint venture.

After IITK performed its initial analysis of this novel technology, it obviously concluded the technology was commercially viable, and it wanted to proceed to negotiate and agree upon the core terms of, and launch, a joint venture to market and monetize Plaintiff's technology.

Plaintiff and Defendant entered into an oral joint venture for the purpose of developing, marketing, and monetizing Plaintiff's technology, which itself was transferred to the joint venture. *See e.g.* Singh Decl., Ex. D-1 [Day 1 of Deposition of Mandana Farhang ("Farhang Dep.") at 7:22-8:24]; *see also* Singh Decl., Ex. D-3 [Deposition of Partha Chakrabarti ("Chakrabarti Dep.") at 172:9-174:15, 181:7-17, 182:24-183:9]; Singh Decl., Ex. 15, 30 [Declaration of Varsha Singh ("Varsha Singh Decl.")]; Farhang Decl. at ¶¶8-13. The parties remained in a joint venture, with Defendant accessing and utilizing Plaintiff's technology and then ultimately sharing it with third parties without Plaintiff's authorization

and for its own benefit, and then ultimately abandoning the joint venture to the detriment of Plaintiff. *Id.; see also* Singh Decl., Exs. 9 (at IIT00001890), 10, 21 [at Rog Response 6], 22, and 30 (generally). Shortly after that, the Indian Railways announced a $30 million project with IBM India for what appears to be strikingly similar technology. Singh Decl., Exs. 25-27. This litigation followed when Mandana Farhang filed the original Complaint on May 27, 2008. ECF Dkt. No. 1.

For the past ten years, Defendant IITK has done everything in its power to continue its pattern of delay and obfuscation, by filing motion after motion and numerous appeals, most all of which this Court, the Honorable Ronald Whyte presiding, and the Ninth Circuit rejected over two different appeals, before the U.S. Supreme Court finally rejected its efforts and denied its Writ of Certiorari.  It is time for this case to proceed to trial on all causes of action, and the Court as such should deny this Motion.

## BACKGROUND FACTS

The following summary sets forth the relevant facts and evidence demonstrating how IITK persuaded M.A. Mobile to give it access to the pocketXML technology and exploited that access for its own benefit while breaching the terms of an agreed-upon joint venture:

### A.  The Parties
#### 1.  Plaintiff M.A. Mobile Owned Confidential and Proprietary Technology for a new Mobile Computing Program for XML, or So Called Pocket XML

M.A. Mobile is and was at all relevant times owned by experienced entrepreneur Mandana Farhang, a former executive of the original company that pioneered and invented pocketXML. Farhang Decl. ¶3. Ms. Farhang acquired the patent-pending, valuable technology for M.A. Mobile, and began to commercialize the IP. *Id.* Singh Decl., Exs. 24, 29 (at IIT0000478); Radke Decl., Ex. 2.

#### 2.  Defendant Indian Institute of Technology Kharagpur is A Premier Technology Institution and Government Entity with Vast Connections

Defendant IITK is a premier technology center, does commercial deals globally, and has been a key strategic partner of the Indian Railways. Singh Decl., Exs. 28-29.   During the relevant time period, IITK was partnered in commercial ventures with numerous entities in the United States and represented its commercial connections to Ms. Farhang even in their initial dialogue. Singh Decl.,Ex. 16.

### B.  In 2003, Plaintiff Approached IITK About a Potential Joint Venture to Commercialize the IP for Mobile Computing and the Parties Signed  An NDA

In or around April or May of 2003, Plaintiff reached out to Dr. Chakrabarti to inquire about a collaboration with Defendant in a joint venture.  Farhang Decl., ¶5; Singh Decl., Ex. 16.  Plaintiff gave critical summaries and explanations of the technology to Dr. Chakrabarti in hopes of starting the joint venture with IITK, but also gave IITK vital and trade secret source code it acquired from a predecessor company. Declaration of Partha Chakrabarti In Support of Defendant's Motion for Summary Judgment ("Chakrabarti Decl."), Ex. 2; Singh Decl., Exs. 7 [Declaration of Plaintiff's Technology Expert Jason Frankovitz ("Frankovitz Decl.") at ¶5], 14, 24 [at ¶ 33-36], Farhang Decl. at ¶7. Immediately after Dr. Chakrabarti signed an NDA on behalf of Defendant, Plaintiff sent Dr. Chakrabarti confidential information and source code for the patented technology. *Id*.; Chakrabarti Decl. at ¶ 15. Notably, the NDA contained a clear choice of law provision specifying California law, and that any litigation would proceed in California. Singh Decl., Ex. 2.

### C.  After the NDA Was Signed, Plaintiff Provided The Confidential Trade Secrets and Source Code to Defendant IITK for its Analysis of a Potential Joint Venture

Immediately after Dr. Chakrabarti signed an NDA on behalf of Defendant, Plaintiff sent Dr. Chakrabarti confidential information and source code for a novel, and dynamic new platform for mobile technology which enabled mobile processing of data even in areas with intermittent wireless connectivity, a capability particularly attractive in the emerging mobile workforce at that time particularly in countries like India with large rural areas. Singh Decl., Exs. 16, 24 [at ¶¶33-36], Ex. 29 [at IIT0000478-480]. At that time, a patent application entitled *Dynamic Rendering Of Content That Includes Query Expressions,* which was filed on February 15, 2001, and bore U.S. application serial number 09/788,311 (ultimately issued as US8019770B1) was pending for this confidential technology and associated intellectual properly. After Defendant was provided all this confidential material under the NDA, it conducted its initial analysis and concluded then and throughout the joint venture that the technology was promising and had commercial viability. Singh Decl., Exs. 1-4, 7, 17,  23;  Ex. 24 [Plaintiff Technology Expert Report] and Exs. 31-33. IITK made clear it was interested in proceeding to the next step of forming a joint venture. *Id.*

### D.  After Its Initial Analysis, IITK Represented it Wanted to Form a Joint Venture to Commercialize the Technology and the Parties Formed Their Joint Venture

Plaintiff ultimately gave Dr. Chakrabarti and IITK discretion and control on choosing and hiring the engineering team that would help develop the technology and allow the joint venture to move forward. *See e.g.* Singh Decl., Ex. D-2 [Day 2 of Deposition of Mandana Farhang ("Farhang Dep.") at 325:8-10]; Chakrabarti Decl. at ¶ 9.

In its Motion, Defendant mistakenly claims that it "almost immediately" told Plaintiff that Plaintiff would need to enter into an arrangement with an incubation society rather than with Defendant directly. Motion at p. 8; Chakrabarti Decl., Ex. 17.  In reality, Dr. Chakrabarti did not say that Defendant **cannot** enter into a joint venture but actually told Plaintiff in or around June 2004 that, "**the best thing to do** is to start this as Indian Company based in IIT Kharagpur as part of [IIT's] incubation unit". *See id.* (emphasis added). By the fall of 2004 and no later than the end of the year, the joint venture had been agreed upon with its essential terms and IIT's essential equity position and the parties agreed that IITK would develop the technology for the purpose of securing the Indian Railways as a first customer. See Singh Decl., Exs. D-1 [Farhang Dep. at 7:22-8:24],D-2 [Chakrabarti Dep. at 172:9174:15, 181:7-17, 182:24-183:9],15, and 23 (where Dr. Chakrabarti refers to IITK and his team's ownership in the venture); Farhang Decl. at ¶¶11-14.

The parties clearly intended to, and did form, a joint venture. IITK and M.A. Mobile had a joint interest in the business, an understanding that profits and losses would be shared, and joint control. For example, the joint interest in the business was established by the fall of 2004, when IITK agreed that it would provide the technical expertise to develop the technology that M.A. Mobile brought to it, in return for an agreed upon equity share, and the equity shares were agreed upon and finalized by the Fall of 2004, as evidenced by emails and documents and testimony. For example, on August 27, 2004, IITK wrote to M.A. Mobile's counsel "Dear Ron, IIT has approved the signing of the agreement. The only change suggested now is that regarding incubation, 2% should be made 3%." Farhang Decl. at ¶ 11-14. Indeed, by early in 2005, IITK referred to their stake as "our 25% and IIT3%." Singh Decl. at Ex. 23.

There was a clear understanding that profits and losses would be shared as the equity or ownership interests in the joint venture were agreed upon, and the parties could reasonably infer that profits and losses would be shared proportionately. *See* Singh Decl., Ex. D-1 [Farhang Dep. at 227:18-228:3]. And consistent with Ms. Farhang's deposition testimony, it was understood that as a general

principle the equity would correlate to how the parties would allocate profits and losses—consistent with that general understanding, IITK in 2005 made a special request in June 2005 that an exception be made for dilution due to external investments and requested that the engineers and IITK not get diluted in an investment scenario. Singh Decl. at Ex. 23. This request reflected IITK's general understanding that equity correlate with allocation of loss and profit, and their specific request that in one area (investment) they get special preference in the form of anti-dilution protection. There would be no reason to request anti-dilution protection unless IITK understood that its equity position meant that generally they would be sharing in both profits and losses.

There was also clear evidence of joint control, as documents show Dr. Chakrabarti exerting technical control as the Chief Technical Officer and in emails where he conducted himself as such, keeping source code and technical materials physically at IITK, while M.A. Mobile and its officers exerted control on business issues such as what customers to approach first, how to protect the trade secrets (through execution of the NDA), and packaging the business for marketing and presentations. *See* Singh Decl., Exs. 8. 9, 15, 22, 31-33; Radke Decl. Exs. 41-43; Chakrabarti Decl. at ¶¶19, 48, 66. Joint control was expressly acknowledged in the role or job titles in the PowerPoints prepared by and agreed upon by all parties which summarized the joint venture. Singh Decl., Ex. 17.

Defendant did not make any indication that Defendant supposedly could not be a party to a joint venture with Plaintiff until May of 2005—and even then indicated that in fact it could still participate through the IITK incubation society, by which time Plaintiff and Defendant, through their already-ongoing joint venture, had already begun making significant progress towards the development and marketing of Plaintiff's patented technology and was even requesting anti-dilution protection for itself. *See Motion at p.* 9; *see also* Singh Decl., Ex. D-1 [Farhang Dep.at 27:12-28:8]; Singh Decl., Exs. 17 and 23. In fact, Defendant's representations throughout the years indicated that Defendant was very much involved in the joint venture and operated the incubation society as an extension of itself:

(1)    in July 2003, Dr. Chakrabarti indicated that he needed and received approval from Defendant's Dean of Research to sign the NDA (see Singh Decl., Ex. 1); in this document, Dr. Chakrabarti made no representation of a limitation on IITK to enter into the NDA or joint venture;

(2)      in 2003, when Gurashish Brar began working as an engineer for the joint venture, a copy of the source code for Plaintiff's technology was stored locally on an IIT computer (see Singh Decl., Ex. D-4 [Deposition of Gurashish Brar ("Brar Dep.") at 58:7-60:20]);

(3)      as early as June 2004, Dr. Chakrabarti made it clear that IIT could participate in the joint venture through an incubation program, and again at this time made no mention of any legal impediment preventing IIT's participation (Motion at p. 8; Chakrabarti Decl., Ex. 17);

(4)      in August 2004, Dr. Chakrabarti wrote to Plaintiff that he had to, "first process Ron's letter [the draft letter of intent] **with IIT** and then get into the formal process of writing to the Railways and having meetings" (see Motion at p. 10) but meanwhile the joint venture continued with the development of the technology; Singh Decl., Exs. 11, 15 and 30; *see generally* Farhang Decl., ¶¶9-14.

(5)      in December 2004 Dr. Chakrabarti wrote to the Indian Railways that, "[the TTE application] is being developed **under IIT's incubation programme**" (see Motion at p. 11); *see also* Singh Decl., Exs. D-1 [Farhang Dep. at 27:12-28:8, 39:13-16, 62:12-22], and 4.

(6)      in early 2005, albeit without Plaintiff's authorization, IITK showcased a prototype or demo of the technology to JUSCO; Singh Decl., Ex. 10; it is critical to note that this demo involved an actual confidential prototype and sharing of confidential information (*i.e.* what database fields were included in the prototype), was concealed from Mandana Farhang and M.A. Mobile, and was not merely a high level summary of technology; *Id.*; Singh Decl., Exs. D-1 [Farhang Dep. at 238:17-239:7], D-3 [Chakrabarti Dep. at 175:21-176:1, 176:22-177:2], 10 (where there is explicit reference to IIT and JUSCO discussing the specific database fields in the application), and 30 [(Declaration of Varsha Singh ("Varsha Singh Decl.") at ¶11]; Farhang Decl. at ¶29.

(7)      in June 2005 Dr. Chakrabarti drafted a letter for Plaintiff to send to Indian Railways stating, "Recently, in a collaborative research programme under the **incubation programme of IIT Karagpur** and using the world class experience of the IIT…" (Singh Decl., Ex. 8); Chakrabarti and his engineers also developed other written collateral which clearly acknowledged the existence of the joint venture and listed themselves as participants with job titles in the joint venture including detailed PowerPoints for presentation;  Singh Decl., Ex. 17; by August of 2005, the joint venture was approved for incubation at IITK. *See e.g.* Chakrabarti Decl., Ex. 44.

(8)     in December 2005, Dr. Chakrabarti wrote to Plaintiff's Chief Operating Officer, Varsha Singh, about presenting the technology to Defendant as soon as possible, "If you do not make the first set, you will lose out on a lot of publicity. The first round will get over by January end provided you start the formalities **with IIT** by December." (Singh Decl., Ex. 3);

(9)     Dr. Chakrabarti admitted that Defendant created the incubation society, that the chairs of the incubation society were all faculty or officers working for Defendant, and that the physical location and registered address are on Defendant's campus (*see* Singh Decl., Ex. D-3 [Chakrabarti Dep. at 88:3-89:25]).

**(10)**   Though it was concealed from Ms. Farhang, the technology developed by the joint venture was ultimately accepted to incubation at IITK although this fact (i.e. the admission to the IIT incubation society) was hidden from Ms. Farhang and Plaintiff until documents were revealed during discovery. Singh Decl., Ex. 19-20; *cf.* with Singh Decl. Ex. 18;  *see also* Singh Decl., Ex. D-1 [Farhang Dep. at 64:7-19; 68:18-71:6]; *see* Chakrabarti Decl., Ex. 44 (showing that in fact it was approved for admission almost immediately at the August 2005 meeting); *see also* Singh Decl., Ex. 30 [Varsha Singh Decl. at ¶12]; Farhang Decl. at ¶22.

### E.  IITK Develops Prototypes and Discloses Confidential Information to Third Parties

Regardless of Defendant's belated insistence on having its incubation society serve as a placeholder for Defendant as a joint venture partner, by the fall of 2004 the joint venture between Plaintiff and Defendant had already made significant progress, including formation of the team of engineers and significant progress in further development of the technology so that Dr. Chakrabarti began disclosing the development to third parties such as the Railway. *See* Motion at page 10; *see* Singh Decl., Ex. D-3 [Chakrabarti Dep. at 145:24-148:11]; *see also* Singh Decl. Exs. 4, 8. 15, 17, 20, 24. Moreover, by late December 2004 and early 2005, Plaintiff and the engineers already developed plans to market the technology to Indian Railways and JUSCO. *See e.g.* Chakrabarti Decl. at ¶ 11; Singh Decl., Exs. 4, 10, 11, and D-4[Brar Dep. at 164:13-165]. During this time, Defendant gave misleading comments representing the society to be an arm of IIT. *See* Singh Decl. at Ex. 13; *see also* Singh Decl., Exs. D-1 [Farhang Dep. at 27:12-28:8, 39:13-16, 62:12-22], 4, 7, and 17; Chakrabarti Decl., Exs. 41-43.

### F. IITK Misrepresents Its Intentions and Deliberately Delays the Joint Venture While It Continues to Misappropriate the Technology and Discloses it to Third Parties

By August 2005, Defendant presented confidential information about the technology to the now-formed incubation society as well as other third parties. *See* Motion at page 12; see also Singh Decl., Exs. 9 (at IIT00001890), 10, and 11. In fact, as Plaintiff would only learn after the fact, one of the board members of the incubation society at the time was an IBM-India employee. *See* Singh Decl., Ex. D-3 [Chakrabarti Dep. at 210:9-17]. Dr. Chakrabarti appears to have lied at his deposition about being present at the meeting where the technology was improperly disclosed (Singh Decl., Ex. D-3 [Chakrabarti Dep. at 209:3-6]), claiming he was not, but appears to now concede he was present in his declaration (Chakrabarti Decl. at ¶ 66.). As a result of the 2005 presentation where Defendant disclosed confidential information to third parties who had not signed the NDA, including likely to IBM India, Defendant breached the NDA and its obligations to the joint venture; no members of the incubation society including its private industry members had executed NDAs, and in fact IITK has now conceded it does not even know whether members of the core engineering team (who largely became shortly thereafter part of the private sector) executed the NDA. Singh Decl., Ex. 21 (IIT Interrogatory Response 6); *see also* Singh Decl., Ex. D-5 [Deposition of Pallab Dasgupta ("Dasgupta Dep.") at 96:19-23].

Defendant did not inform Plaintiff, and Plaintiff was not aware, that Defendant considered the incubation society to be a legally separate entity. Singh Decl., Exs. 7, 23, 17; *see also* Singh Decl., Ex. D-1 [Farhang Dep. at 27:12-28:8].  Therefore, when Defendant informed Plaintiff that the engineers had presented the technology to the incubation society, Plaintiff's understanding was that the engineers had presented the technology to Defendant. Singh Decl., Ex. D-1 [Farhang Dep. at 39:15-16]. During this time, under Defendant's supervision and with Defendant's knowledge, not only did the engineers present the patented technology to what Defendant's considered a legally separate entity, Defendant also knew and encouraged the engineers to hide their development and marketing of Plaintiff's patented technology from Plaintiff, and also to hide their admission to the Incubation Society. *See* Singh Decl., Exs. 6, 9, 22; *see also* Singh Decl. Exs. 18, 19, 20, and D-1 [Farhang Dep. at 64:7-19, 68:18-71:6], *see also* Chakrabarti Decl. Ex. 44.  Indeed, there is evidence that by April 2006 Defendant was discussing the technology, unbeknownst to Plaintiff, with transportation ministers in Orissa and investors in Bombay, and had also disclosed the technology to IBM and to JUSCO.  Singh Decl., Exs. 22,  9 (at

- 8 -

IIT00001890), and 10; *see also* Singh Decl., Exs. D-1 [Farhang Dep. at 238:17-239:7], and D-3 [Chakrabarti Dep. at 175:21-176:1, 176:22-177:2, and 210:9-17].

Within a short time following IITK's abandonment of the joint venture with Plaintiff M.A. Mobile, IBM and the Indian Railways announced their $30M pilot program for a mobile ticketing device and program to be deployed on the Indian Railways and having the same features as the pocketXML version of the device developed during the joint venture. Singh Decl., Ex. 27. When asked whether he had been in dialogue with IBM and the Railways on the project, former Defendant Chakrabarti (who was dismissed from this matter only on grounds of sovereign immunity for an individual) gave evasive, guarded and time-qualified answers (all captured on video) suggesting implausible lapses in memory on such vital issues as his compliance with the NDA. Singh Decl., Ex. D-3 [Chakrabarti Dep. at 229:22-230:5; 230:25-232:9].

It is critical to note that the core protected portions of M.A. Mobile's and/or the joint venture's trade secrets included (i) the confidential pocketXML source code which IIT used to develop the Railway application and other prototypes likes the JUSCO (power utility application)  (ii)  the architecture and database backend for the applications developed as part of the joint venture (iii) specific prototypes for the Indian Railways and utility companies developed for demo purposes as part of the joint venture (iv) the idea to target IBM as a key strategic partner or acquirer given its experience with backend development but its then lacking mobile workforce solution and (v) provisional and pending patent application material (which was all confidential and not released because the patent was pending until 2011) which described the novelty of the pocketXML technology. Singh Decl., Exs. 7, 11, 15, 17, 24, 31-33, 34 (at Rog 3); Farhang Decl. at ¶15.

Discovery in this matter revealed that for each of the trade secrets specified, there is evidence that IIT disclosed the trade secrets to third parties without appropriate NDA protection:

(i) For example, Plaintiff's technical expert Jason Frankovitz has opined that the enhanced code developed during the joint venture (which comprised the code used for the prototypes and development platform) clearly contained code provided by M.A. Mobile to IITK. Singh Decl., Exs. 24 [Frankovitz Report at ¶38]; and 7 [at ¶¶4-10].  Evidence now shows that the prototypes, which contained this code, and data on the database backend of the application, were made available to JUSCO without the NDA,

1    and also members of the engineering team who did not sign the NDA. Singh Decl., Exs. 10 (which

2    expressly references the demo and database), 21 [IIT Rog Response at Response 6,where IIT is unable

3    to produce evidence that the actual engineers executed NDAs while they were working on the

4    technology, and where neither JUSCO, nor members of the Incubation Society, nor the Indian Railways

5    are listed], and 9 [at IIT00001890 showing disclosure to technical experts].

6        (ii) Written emails and documents show that Defendant Chakrabarti is reported to have been in

7    dialogue with a transport minister in Orissa and investors in Bombay about the technology, and that also

8    he authorized a trade secret presentation (which had information about the technology backend and

9    infrastructure) to the Incubation Society which had external experts not bound by NDA. *Id.*; *see also*

10   Singh Decl., Ex. 22. When probed during his deposition about such disclosures, Dr. Chakrabarti gave

11   tenuous and implausible responses or could not recollect what happened. *See* Singh Decl., Ex. D-3

12   [Chakrabarti Dep. at 195:25-197:18, 229:22-231:11]; *see also* Chakrabarti Decl., Exs. 41-43.

13       There is also strong circumstantial evidence that these disclosures facilitated or directly aided

14   IBM's pilot project with the Indian Railways which used highly similar technology that debuted after

15   the Incubation Society (on which an IBM representative sat) was provided access to M.A. Mobile and

16   the joint venture's trade secrets. *See* Singh Decl., Ex. D-3 [Chakrabarti Dep. at 229:22-231:11] (where

17   Dr. Chakrabarti contradicts himself and cannot give clear testimony as to whether he discussed the

18   technology with IBM), Dr. Chakrabarti's false statement during his deposition as to whether he attended

19   the Incubation Society meeting (*cf.* Singh Decl., Ex. D-3 [Chakrabarti Dep at 209:3-6] with Chakrabarti

20   Decl., at ¶66; Singh Decl., Ex. 9; and Chakrabarti Decl., Exs. 41-43 (showing disclosure of a

21   confidential, trade secret PowerPoint to the Incubation Society external experts and panel, where IBM

22   was a member of the Society)), and Singh Decl., Ex. 27.  In addition, emails make reference to IIT

23   through Dr. Chakrabarti speaking to a transportation minister in Orissa and *investors in Bombay*. Singh

24   Decl., Ex. 22. Publicly available documents show that the IBM and Indian Railways pilot project for the

25   TTE device was first deployed *in Bombay*. Singh Decl., Exs. 25, 26, 27, 28.

26       Critically, during the joint venture, Dr. Chakrabarti claimed he had no dialogue with the Indian

27   Railways and was not able to get their attention. Singh Decl., Ex. 30 [at ¶¶5-9]. This is implausible;

28   documents reveal that Dr. Chakrabarti, Dean of the government institution IITK, notified the Indian

Railways, another government institution, of the TTE technology in December of 2004. Singh Decl., Ex. 4; Chakrabarti Decl. at Exs. 35-36. The letters were never produced or shown to M.A. Mobile or Ms. Farhang until after litigation commenced. Farhang Decl. at ¶24; Singh Decl., Ex. 30 at ¶¶5-9. During his deposition, Dr. Chakrabarti was expressly asked whether he spoke to IBM about M.A. Mobile's technology, and he answered tenuous and evasively as follows:

> Q [Attorney Singh]:  Did you at this point in time from 2005 through present, did you discuss with any representative at IBM a handheld solution for the travelling ticket examiners for the Indian Railways?
>
> A [Dr. Chakrabarti]: **At least until 2010** definitely no**. I don't remember** discussing with anyone from IBM about handheld ticket travelers of the Railways. But at least during this period of the project under no circumstance. [emphasis added]

Singh Decl., Ex. D-3 [Chakrabarti Dep. at 229:22-230:5]

When asked about the center for Railways Research, he answered as follows:

> Q. So is it correct that you credit yourself for conceptualizing, formulating, initiating and bringing into existence the Centre for Railway Research; is that correct?
>
> A. The original Centre for Railway Research which was set up in IIT Kharagpur, I think some time in 2010, maybe 2011 or 12, I don't remember the exact date, the whole initial conception of Centre for Railway Research was set up with me and several other people in the Institute, and as Dean of SRIC and a keen member of the Institute administration, I was one of the key drivers to define how to set up the Centre for Railway Research.

Singh Decl., Ex. D-3 [Chakrabarti Dep. at 30:5-17].

And yet now, despite emails showing false statements by Dr. Chakrabarti on his involvement in key meetings, and his concealed dialogue with the Railways, transportation ministers, and Bombay investors, and despite his self-professed leadership in IITK and Railway collaborations, IITK will still have the Court and the public believe that it did not have anything to do with the dissemination of M.A. Mobile's trade secret pocketXML technology and the sudden emergence of remarkably similar technology in a pilot project with the Indian Railways. The Court must deny IIT's motion for summary judgment so it can fully evaluate the abundance of such evidence and testimony in this case.

## ARGUMENT

### A.  Summary Judgment Is A Drastic Measure to Be Used Sparingly

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of Plaintiff, the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering material disputed facts on summary judgment, a court must assume the version of material facts asserted by the non-moving party to be correct. *A. K. H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1010 (9th Cir. 2016). Additionally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249 (1986). In *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000), the Supreme Court described the standard: "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence . . ." *Id*. at 300.  In *Pollar v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962) the Supreme Court cautioned that "summary procedures should be used sparingly . . . where motive and intent play lead roles . . . It is only when witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." In this case, Plaintiff has presented more than sufficient evidence to show that Plaintiff and Defendant executed an NDA and were engaged in a joint venture, and that Defendant subsequently breached both the NDA and the joint venture and misappropriated Plaintiff's trade secrets.

## B.  This Court is Not Bound to Defendant's Interpretation of Its Own Foreign Law

Echoing its decade old sovereign immunity arguments, Defendant now cutely cites to their own expert report on the Indian Institutes of Technology Act of 1961 ("The 1961 Act") to claim that IIT was precluded from entering into an oral contract in the United States. *See* Declaration of Brenden E. Radke ("Radke Decl"), Ex. 9.  However, the undisputed facts show that when Plaintiff sent the email to Dr. Chakrabarti to assess Defendant's interest in pursuing the joint venture, Defendant did not inform Plaintiff that Defendant could not legally join the joint venture or that there were procedural formalities required by the 1961 Act. *See* Singh Decl. Exs. 1-4, 16, 17, 23.  In fact, Dr. Chakrabarti signed the NDA (governed by California law) on behalf of Defendant, received confidential information on behalf of Defendant, gathered and formed the team of engineers in furtherance of the joint venture, negotiated

equity ownership, profits, and management of the joint venture, and spent significant time working on Plaintiff's technology, but then abandoned the Joint Venture, met with third parties, and likely misappropriated the technology. *See* Chakrabarti Decl., Ex. 2*;* Defendant's Motion at p. 10-11; Singh Decl., Exs. 4, D-3 [Chakrabarti Dep. at 145:24-148:11], and D-4 [Brar Dep. at 164:13-165:1]; *see also* Singh Decl., Exs. 1-3, 10. 11. 15, 17, 30 (generally); *see generally* Farhang Declaration. Plaintiff initially proposed a joint venture to Defendant, and in connection with the proposed joint venture, Plaintiff sent Defendant an NDA which Defendant executed for the purposes of determining whether it made sense to form the joint venture. Singh Decl., Exs. 1-4, 10, 11, 15, 17. Plaintiff then sent the confidential patented technology to Defendant under the reasonable impression that Defendant was bound to the NDA. IITK completed its initial analysis of the technology and was excited to proceed to the next step of finalizing the terms of the joint venture. Defendant did participate in the joint venture for almost two years. *Id.* and Singh Decl., Exs. 18-20, and 23.

Despite all this, Defendant now argues for the first time in this long-standing case that the law of India applies to determine whether the parties formed a joint venture, and it then offers conflicting opinions that the law of India prohibits this joint venture. The Court should reject this because California law governs the formation of the Joint Venture in this case. Indeed, the parties expressly adopted California in their NDA, and the joint venture followed that. California law expressly allows formation of oral joint venture agreements and even implied joint venture agreements based on basic elements of intent, joint control, profit and loss sharing, and ownership interest. *See Section III. A below.*

Most importantly, as recently clarified by the Supreme Court in *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, "a federal court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials. When a foreign government makes conflicting statements…or, as here, offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission." 138 S. Ct. 1865, 1873 (2018) (internal citations omitted). Here, Defendant has made conflicting statements concerning the impact of Indian law on this point. For example, while it argues that IITK was prohibited from entering into any such joint venture agreement (*see* Motion at 14-15), Dr. Chakrabarti testified he has 25-30 years of experience dealing with these laws, and he does not state that the law prohibits IITK from entering into commercial

joint ventures.  Chakrabarti Decl. at ¶¶ 5-7.  Rather, he states that the law requires IITK to obtain

appropriate authorizations to enter into joint ventures.  *Id.* at ¶ 7.  Indeed, he represented in writing that

he had obtained the very authorization required to complete the joint venture.   In an email dated August

27, 2004, Chakrabarti states: "Dear Ron, IIT has approved the signing of the agreement..."  Farhang

Decl., Ex. 2.  In fact, there have been many inconsistent statements and misrepresentations.  For

example, Chakrabarti then stated that the incubation society would step into the shoes of IIT in the JV.

*Id.*

Also, at no point during the extensive law and motion and appeals in this case did Defendant

ever argue that the law of India should apply to bar some all of Plaintiff's claims. It failed to raise these

arguments during its Rule 12(b)(6) motions, and it should be considered law of the case that California

law applies here. *See e.g.* ECF Dkt. Nos. 143. As instructed by the Court in *Animal Science Products*,

IIT's Indian law arguments here should be viewed with caution as the interpretation directly conflicts

with Defendant's actions and statements to Plaintiff throughout the joint venture. At the very least,

Plaintiff should have the opportunity to cross examine at trial IIT's expert's interpretation of Indian law.

### C.  The Overwhelming Evidence Shows That the Parties Formed a Joint Venture Under California Law

### I.    California Law Recognizes Oral and Implied at Law Joint Venture Agreements and Intent to Form a Joint Venture is a Question of Fact

California law governing the formation of joint venture agreements is described in *Boyd v.*

*Bevilacqua*, 247 Cal. App. 2d 272, 285 (1966):

> The existence of a joint venture depends upon the intention of the parties. (*Universal Sales Corp. v. California etc. Mfg. Co.* (1942) 20 Cal. 2d 751, 764-765 [128 P.2d 665]; *Lasry v. Lederman, supra*, p. 486; *James v. Herbert, supra*.) As was said in the *Universal* case, *supra*: …"Such a contract need not be express; it may be implied from the conduct of the parties. [Citation.]" (20 Cal.2d at pp. 764-765.)  "The law requires little formality in the creation of a joint venture and the agreement is not invalid because it may be indefinite with respect to its details. [Citations.]" (*Lasry v. Lederman, supra*, 147 Cal.App.2d at p. 487; *James v. Herbert, supra*; *Sadugor v. Holstein* (1962) 199 Cal. App. 2d 477, 483 [18 Cal. Rptr. 859]; *Drdlik v. Ulrich* (1962) 203 Cal. App. 2d 360, 365 [21 Cal. Rptr. 642]; *Simpson v. Winkelman* (1964) 225 Cal. App. 2d 746, 750 [37 Cal. Rptr. 721].)"

*Id.* at 285.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: C-08-02658-WHO

As Defendant concedes, "[t]he essential element of a joint venture is an undertaking by two or more persons to carry out a single business enterprise jointly for profit." *See* Motion at 17, citing *Prostar II*, 360 F. Supp. 3d at 1008. "A joint venture agreement may be informal or oral." *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 525 (2008). "It requires an agreement under which the parties have (1) a joint interest in a common business, (2) an understanding that profits and losses will be shared, and (3) a right to joint control." *Ramirez v. Long Beach Unified Sch. Dist.*, 105 Cal. App. 4th 182 (2002). Although "the [joint venture] agreement is not invalid because it may be indefinite with respect to its details," *Lasry v. Lederman*, 147 Cal. App. 2d 480, 487 (1957), "[a] legally binding agreement . . . is not formed where essential elements are reserved for future agreement." *Goodworth Holdings Inc. v. Suh,* 239 F. Supp. 2d 947, 956 (N.D. Cal. 2002) (Alsup, J.), aff'd, 99 F. App'x 806 (9th Cir. 2004).

Critically, "[w]hether a joint venture actually exists depends on the intention of the parties … *where evidence is in dispute the existence or nonexistence of a joint venture is a question of fact to be determined by the jury*.'" *Unruh-Haxton v.Regents of University of California* 162 Cal. App. 4th 343, 370 (2008)   (internal citations omitted and emphasis added). Indeed, Defendants appear to misconstrue California law as applied by federal courts, suggesting that the element of "sharing in profit or loss" must be shown beyond what is required under California law for establishing the existence of a joint venture. Interestingly, Defendant never raised this argument during its extensive albeit failed Rule 12(b)(6) attacks on the joint venture. But most importantly, courts in this Northern District have observed:

> For breach of a partnership or joint venture, the plaintiff must further allege an agreement to participate in the management of the business. *See Kaljian v. Menezes*, 36 Cal.App.4th 573, 586, 42 Cal.Rptr.2d 510 (1995), *as modified on denial of reh'g*, (Aug. 3, 1995) ("An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business."). However, **a plaintiff need not allege further formalities, such as sharing of profits and losses, because the existence of a partnership is determined from "the intent of the parties revealed in the terms of their agreement, conduct, and the surrounding circumstances.**" *See Holmes v. Lerner*, 74 Cal.App.4th 442, 454, 88 Cal.Rptr.2d 130 (1999), *as modified*, (Sept. 7, 1999).

*Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 971–72 (N.D. Cal. 2015) (emphasis added).

## II. The Overwhelming Evidence Shows The Parties Intended to Form a Joint Venture and Reached Agreement on the Material Terms to Form a Joint Venture

All of the required elements of a joint venture are satisfied in this case. The evidence submitted by Plaintiff documenting the parties negotiations, show that IIT and M.A. Mobile objectively intended to form a joint venture (although it appears IITK subjectively was intended to drag out negotiations while it misappropriated technology), IITK via its principal negotiator, Dr. Chakrabarti, repeatedly represented to Plaintiff and its representative Mandana Farhang that IITK intended a joint venture, and the evidence shows that through extensive negotiations, drafts, and correspondence the parties formed a joint venture with strong evidence of joint interest, joint control, joint profit and loss sharing, and multiple other factors (none of which is dispositive, but which are viewed as factors) outlined in the jurisprudence discussed above.

For example, the joint interest in the business was established by the fall of 2004, when IITK agreed that it would provide the technical expertise to develop the technology that M.A. Mobile brought to it, in return for an agreed upon equity share, and the equity shares were agreed upon and finalized by the Fall of 2004, as evidenced by emails and documents and testimony. For example, on August 27, 2004, IIT wrote to M.A. Mobile's counsel "Dear Ron, IIT has approved the signing of the agreement. The only change suggested now is that regarding incubation, 2% should be made 3%" and , by early in 2005, IIT referred to their stake as "our 25% and IIT3%." Singh Decl., Exs. 23, D-1 [Farhang Dep. at 205:15-206:04], and D-3 [Chakrabarti Dep. at 179:22-180:3]; Farhang Decl. at ¶¶ 8-14.

In addition, although express understanding of profit and loss is not required (contrary to IITK's misstatement of the law—see *Holmes,* 74 Cal.App.4th at 454 and see *Second Measure*, 143 F. Supp. 3d at 971–72), there was a clear understanding that profits and losses would be shared as the equity or ownership interests in the joint venture were agreed upon, and the parties could reasonably infer that profits and losses would be shared proportionately. *See* Singh Decl., Ex. D-1 [Farhang Dep. at 227:18-228:3]. Consistent with Ms. Farhang's deposition testimony, it was understood that as a general principle the equity would correlate to how the parties would allocate profits and losses—but IITK in 2005 made a special request that an exception be made for dilution due to external investments. Singh Decl., Ex. 23. This request reflected IITK's general understanding that equity correlate with allocation of loss and profit, and their specific request that in one area (investment) they get special preference in

the form of anti-dilution protection. *See also* Defendant's *Motion* at 10-11; Singh Decl., Exs. 4, D-3 [Chakrabarti Dep. at 145:24-148:11], and D-4 [Brar Dep. at 164:13-165:1].

There is also clear evidence of joint control, as documents show Dr. Chakrabarti exerting technical control as the Chief Technical Officer and in emails where he conducted himself as such, keeping source code and technical materials physically at IITK, while M.A. Mobile and its officers exerted control on business issues such as what customers to approach first, how to protect the trade secrets (through execution of the NDA), and packaging the business for marketing and presentations. *See* Singh Decl., Exs. 8. 9. 10, 15, 17, 19, 20, 29.  Joint control was expressly acknowledged in the PowerPoints prepared by and agreed upon by all parties which summarized the joint venture. Singh Decl., Exs. 17, D-1 [Farhang Dep. at 137:6-138:10], D-2 [Farhang Dep. at 299:13-22]; D-3 [Chakrabarti Dep. at 119:17-120:13, 121:4-21].  Contrary to Defendant's assertion, draft LOIs (many of them attorney work product IIT refuses to give back despite claw back requests) did not change the fundamental agreement on the core terms of the joint venture. Farhang Decl. at ¶18.

### III.   IITK's Reliance on *Prostar* is Misplaced And *Prostar* is Both Legally And Factually Distinguishable

Defendant relies heavily on this Court's decision in *Prostar,* 360 F. Supp. 3d at 1008*,* where this Court granted summary judgment against Prostar's claim that it formed a joint venture with Domino's Pizza. In that case, Judge Orrick found that Prostar presented "*no* evidence that Prostar and Domino's expressly agreed (either orally or in writing) to begin a joint venture." *Id*. at 10. Indeed, the parties in *Prostar* never got to the point of negotiating the terms of any joint venture. As described in the decision, the parties, Prostar, IBM, and Dominos were still in the preliminary stages of Prostar working with IBM to develop the right technology software system, which process was taking years. The evidence was that Dominos had assured IBM and Prostar that *if they developed the right software system* they could sell it to Domino's franchisees, *but the parties never actually discussed, let alone agreed to core terms of, any joint venture* with Dominos, Inc. Thus, Prostar argued only that ""the parties here worked in concert for years" to develop the GPS Solution, and both contributed to its costs and had a stake in its success." *Prostar, supra* at 10. Rather than presenting any evidence that Prostar and Dominos ever discussed a joint venture or discussed equity, profits sharing or control, Prostar

presented only an argument that they spent a lot of time developing the software based on the promise of some deal in the future. Not surprisingly, this Court concluded: "Prostar has failed to present sufficient evidence to create a triable issue that Domino's owed it a fiduciary duty because a reasonable fact finder could not conclude that the parties came to an agreement to share profits or that they exercised joint control." *Id.*

Most importantly, the Court held: "Although joint venturers need not iron out all the details of their venture, here the parties failed to agree on essential elements, like the structure of their potential financial relationship, even after years of discussions and collaboration. *See Goodworth*, 239 F. Supp. 2d at 956. The discussions [Prostar, IBM, and Domino's] did have were no more than preliminary negotiations that barely touched on terms." Similarly, in the *Goodworth* case, it was determined there was no joint venture because the parties never agreed to form a joint venture because they never agreed on core terms and the written term sheet was rejected.

That is simply not the case here. Here, unlike the plaintiffs in *Prostar* and *Goodworth*, and consistent with this Court's guidance, Plaintiff has presented significant evidence showing the negotiations by and between Plaintiff and Defendant over the NDA, and then significant written materials evidencing agreement on the core terms of the proposed Joint Venture. *See supra* at Section IIIB. Plaintiff has submitted substantial evidence showing the parties agreed on joint control, division of responsibilities, an intent to form a joint venture, heavily negotiated terms regarding equity and ownership splits, and an agreement to share in profits and costs. At a minimum, unlike the plaintiff in *Prostar*, Plaintiff here has presented sufficient evidence to create a triable issue that the parties formed a joint venture agreement (express, oral, or implied by law) with equity, profit sharing, joint control, and mutually expressed intent to form a joint venture.

Thus, Defendant's reliance on *Goodworth Holdings Inc. v. Suh* 239 F. Supp. 2d 947 (N.D. Cal. 2002), is also misplaced. First, here, IITK does not identify any core terms that were left to be decided later, citing only the principle that if core terms were reserved for future resolution, that could impact the analysis of whether a joint venture was formed. But the *Goodworth decision is easily distinguishable here.* In that case, the court found specifically that the parties had not entered into a joint venture because the *Goodworth* plaintiff had prepared a written term sheet for the business agreement with an

drop-dead date on which the offer would expire, and the defendant did not accept the offer by the deadline. Moreover, none of the parties in the *Goodworth* case took any action in furtherance of the proposed joint venture. The court concluded: "Here, Goodworth did ultimately make an offer by providing Dr. Suh its term sheet, appended to this order for ease of reference. The term sheet clearly shows that Goodworth understood that the parties had not determined crucial issues. The term sheet indicates that the division of profits, who the parties to the agreement would be, and what role each party would play in the transaction was not determined. John Norman's name is included in brackets, and the fifty percent ownership of Dr. Suh and Goodworth is in brackets, indicating that such terms were unresolved.[9] This alone is dispositive." *Id*. at 956-957.

In contrast, here, evidence of the parties' negotiations over  the core terms of the joint venture is well documented, and the parties  clearly reached agreement on equity, joint control, and other core terms necessary under California law. *See supra* at Section IIIB. Moreover, the documents demonstrate the parties immediately began working in furtherance of their joint venture as they worked out other formal details such as the corporate structure, and the technology was developed and worked on for a substantial period of time. Singh Decl., Exs. 8, 9, 10, 12, 15, 17, 19, 20, 23, 29; *see also* Defendant's Motion at 10; *see* Singh Decl., Exs. D-3 [Chakrabarti Dep. at 145:24-148:11], D-4 [Brar Dep. at 164:13-165:1]. As stated in *Boyd v. Bevilacqua* held, "[t]he law requires little formality in the creation of a joint venture and the agreement is not invalid because it may be indefinite with respect to its details." (1966) 247 Cal. App. 2d 272, 285.

### IV. Plaintiff Has Set Forth Sufficient Evidence to Support Its Claims for Breach of the NDA and Trade Secrets Misappropriation.

California Civil Code §3426.1(d) defines a trade secret as,

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Additionally, Civil Code Section 3426 *et seq*. known as the California Uniform Trade Secrets Act ("CUTSA") defines "misappropriation" as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
    (A) Used improper means to acquire knowledge of the trade secret; or
    (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
        (i) Derived from or through a person who had utilized improper means to acquire it;
        (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*See also BladeRoom Group Ltd. v. Facebook, Inc*., No. 5:15-cv-01370-EJD, 2018 WL 514923, at *7 (N.D. Cal. Jan. 23, 2018) (Misappropriation through disclosure occurs "if a person knew or had reason to know at the time of a trade secrets disclosure that his or her knowledge of the trade secret was [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.") (internal quotations omitted).

Finally, contrary to Defendant's claim that Plaintiff must present evidence of the misappropriation, courts have recognized that:

> **Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.** Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything. *Q-Co. Indus., Inc. v. Hoffman,* 625 F.Supp. 608, 618 (S.D.N.Y. 1985) (quoting *Greenberg v. Croydon Plastics Co. Inc.,* 378 F.Supp. 806, 814 (E.D. Pa. 1974) ).

*Bladeroom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984 (N.D. Cal. 2018)(emphasis added).

Here, the terms of the NDA expressly state: "[t]he Recipient may only disclose Confidential Information to those of the Recipients employees and contractors who need to know such information

for their work and who have previously agreed to be bound by terms and conditions substantially similar to those of this Agreement". Singh Decl., Ex. 2.  As set forth above, Plaintiff provided confidential trade secrets  to IITK in reliance on the NDA, and then continued as the parties agreed to form a  joint venture.  The "confidential trade secrets" provided to Defendant included (i) the confidential pocketXML source code which IITK used to develop the Railway application and other prototypes likes the JUSCO (power utility application)  (ii)  the architecture and database backend for the applications developed as part of the joint venture (iii) specific prototypes for the Indian Railways and utility companies developed for demo purposes as part of the joint venture (iv) the idea to target IBM as a key strategic partner or acquirer given its experience with backend development but its then lacking mobile workforce solution and (v) provisional and pending patent application material (which was all confidential and not released because the patent was pending until 2011) which described the novelty of the pocketXML technology. See Singh Decl. at Exs. 11, 15, 17, 24, 31-33, 34 (Rog 3 Response), Farhang Decl. at ¶15.

Only during discovery in this matter did Plaintiff learn that IITK disclosed the trade secrets to third parties without appropriate NDA protection.  Consider the following:

(i)  Plaintiff's technical expert Jason Frankovitz testified that the enhanced code developed during the joint venture (which comprised the code used for the prototypes and development platform) clearly contained code provided by M.A. Mobile to IITK. Sing Decl., Ex. 24 [Frankovitz Report at ¶ 38], and Ex. 7 (Frankovitz Rebuttal Declaration in full).  Evidence now shows that IITK provided the prototypes, which contained this code, to JUSCO without the NDA, and also to members of the engineering team who did not sign the NDA.  *See e.g.* Singh Decl. Ex. 10 (which expressly references the demo); Ex. 21 (IIT Rog Response at Response 6) where IITK is unable to produce evidence that the actual engineers executed NDAs while they were working on the technology, and where neither JUSCO, nor members of the Incubation Society, nor the Indian Railways are listed. *See* Singh Decl., Ex. 9 (at IIT00001890 showing disclosure to technical experts), and Ex. 10 (admitting disclosure of demo app which would have source code to JUSCO).

(ii) Plaintiff discovered written emails and documents where Dr. Chakrabarti is reported to have been in dialogue with a transport minister in Orissa and investors in Bombay about the technology, and

that he also authorized a trade secret presentation (which had information about the technology backend and infrastructure) to the Incubation Society. Most troubling is the fact that the Society's Board and members included third parties and external experts who were not bound by NDA. When probed during his deposition about such disclosures, Dr. Chakrabarti gave tenuous and implausible responses or could not recollect what happened. *See* Singh Decl., Ex. D-3 [Chakrabarti Dep. at 195:25-197:18, 229:22-231:11]; *see also* Singh Decl., Ex. 9 (at IIT00001890 showing disclosure to technical experts), Ex. 10 (admitting disclosure of demo app which would have source code to JUSCO), and Ex. 22 (email referencing Dr. Chakrabarti in dialogue with an Orissa transport minister and investors in Bombay while telling team to deceive Ms. Farhang into believing the project was ongoing while freezing internal efforts), and Ex. 17; see also Chakrabarti Decl., Ex. 41-43.

(iii) There is also strong circumstantial evidence that these disclosures facilitated or directly aided IBM's pilot project with the Indian Railways which used strikingly similar technology that debuted after the Incubation Society (on which an IBM representative sat) was provided access to M.A. Mobile and the joint venture's trade secrets. *See* Singh Decl., Ex. D-3 [Chakrabarti Dep. at 229:22-231:11] (where Dr. Chakrabarti contradicts himself and cannot give clear testimony as to whether he discussed the technology with IBM); Singh Decl., Ex. 9 (showing disclosure of a confidential, trade secret PowerPoint to the Incubation Society external experts and panel, where IBM was a member of the Society), and Ex. 27.  In addition, emails make reference to IIT through Dr. Chakrabarti speaking to a transportation minister in Orissa and investors in Bombay. Singh Decl., Ex. 22.  Publicly available documents show that the IBM and Indian Railways pilot project for the TTE device was first deployed in Bombay. Singh Decl., Exs. 25, 26, and 27.

It should be noted that during the joint venture, Dr. Chakrabarti claimed he had no dialogue with the Indian Railways and was not able to get their attention. Farhang Decl. at ¶24, This is implausible and more than likely a fabrication aimed to conceal that he was providing the technology to other branches of the Indian government and other interested parties he knew from industry. For example, documents provided during discovery reveal that Dr. Chakrabarti, Dean of the government institution IITK, notified the Indian Railways, another government institution, of the TTE technology in December of 2004. Singh Decl., Ex. 4;  Chakrabarti Decl., Exs. 35-36. These letters were never produced or shown to M.A.

Mobile or Ms. Farhang until after litigation commenced. Farhang Decl. at ¶24. By 2006, emails show that Dr. Chakrabarti was likely talking to investors in Bombay and a transportation minister in Orissa about the pocketXML technology. Singh Decl., Ex. 22.  By 2008, the pilot between IBM (who sat on the IIT Incubation Society which had access to the pocketXML technology) and the Indian Railways was announced, with first deployments on trains in Bombay. Singh Decl., Exs. 25, 26, and 27. By 2010, IIT announced a multimillion-dollar deal with the Indian Railways to have an Indian Railway Research Center built on the IIT Kharagpur campus. Singh Decl., Ex. 28.  During his deposition, Dr. Chakrabarti was expressly asked whether he spoke to IBM about M.A. Mobile's technology, and he answered tenuous and evasively as quoted above.  *See supra* at 11:6-19 citing (Singh Decl., Ex. D-3 [Chakrabarti Dep. at 229:22-230:5]) but in the same deposition celebrates his own role in critical partnerships with the Railways. Id.

Finally, Defendant also violated CUTSA § 3426(B)(ii) by conspiring with the engineers against Plaintiff and the joint venture. *See* Singh Decl., Exs. 6, 22. Defendant and each of the engineers had access to the confidential information for the purposes of furthering the joint venture. See Singh Decl., Ex. 14. When Defendant and the engineers conspired to keep working on the code, hide their progress from Plaintiff, facilitate unauthorized discussions with third parties including Bombay investors and a transportation minister in Orissa, and refuse to further the efforts of the joint venture, Defendant and the engineers misappropriated the trade secrets, breached the NDA, and breached the joint venture. *See supra* at Section E and F (Background Facts).

### V. Plaintiff Did Not Give Dr. Chakrabarti Complete Discretion in Violating the NDA and Disclosing Confidential Information

Contrary to Defendant's unsupported assertion that Plaintiff granted Dr. Chakrabarti with "complete discretion to determine what information was confidential and any disclosures to third parties were authorized and for M.A. Mobile's benefit," (*See* Defendant's Motion at 19) Plaintiff never granted Dr. Chakrabarti with such discretion. Farhang Decl. at ¶27; *see also* Singh Decl. Exs. 2, 14. In fact, Plaintiff only granted Dr. Chakrabarti with the discretion to hire whomever he wanted for joint venture's team of engineers. *See* Motion at 6 citing Farhang Deposition at 325:8-10.  And each of the engineers or anyone working on the joint venture was required to sign the NDA. Singh Decl. Ex. 14.

Plaintiff executed an NDA with Defendant and provided its trade secret information to Defendant in expectation of the joint venture under the reasonable assumption that the secrets would be protected by the NDA. Singh Decl. at Ex. 2, 14. Defendant and the engineering team that Defendant chose were all supposed to be working under the NDA, and therefore Defendant and its engineers continued to be bound by the NDA while making presentations on behalf of the joint venture. *Id*. Defendant claims that Plaintiff knew Defendant and the engineers were making presentations to the incubation society, Indian Railways, and JUSCO, and argues that is proof that Plaintiff knew Defendant and its engineers were giving away trade secrets. Motion at p. 12.  However, neither Defendant nor any of the engineers provided the details of its various presentations to Plaintiff, and Plaintiff was not aware that the specific disclosures and presentations contained or included the Joint Ventures' confidential information. Singh Decl., Ex. 9; Farhang Decl. at ¶¶ 20, 26-30. Additionally, neither Defendant nor any of the engineers ever solicited or received permission from Plaintiff to disclose confidential trade secret information in violation of the NDA to any third party. *Id*. Therefore, any disclosure of confidential information was a breach of the NDA and constitutes a misappropriation of trade secrets.

## VI.   There Is Substantial Evidence that Defendant Disclosed Plaintiff's Confidential Information to Third Parties

Email evidence shows that during late 2004 and early 2005, Defendant planned and orchestrated a presentation to JUSCO without the consent of Plaintiff. Singh Decl., Exs. 10, 11. The presentation took place at JUSCO and was carried out by the engineers under Defendant's supervision. See Singh Decl., Ex. D-3 [Chakrabarti Dep. at 194:16-21]. Evidence includes significant email dialogue between the engineers, who were supervised by Defendant, which intentionally exclude Plaintiff and expressly shows that the engineers presented the technology including database structure to JUSCO. Singh Decl., Ex. 10.

While Defendant argues it did not provide confidential information during the presentations of the technology to third parties, evidence suggests that the technology itself—which is confidential—was not only presented, but there was an actual demonstration of the protype, which certainly included confidential trade secrets.  Singh Decl., Ex. 10, Ex. D-3 [Chakrabarti Dep. 204:13-205:15], Ex. D-4 [Brar Dep. 257:5-14]; Ex. D-5 [Dasgupta Dep. 229:19-230:1]. These documents alone create triable issues of fact whether or not confidential info was conveyed to third parties during these presentations

1  and demonstrations, including to Indian Railways and JUSCO.  Singh Decl., Exs. 4, 9, 10, 22; Farhang

2  Decl. at ¶¶ 20, 26-30.  Mr. Frankovitz's report also makes it clear that the demos, as built, absolutely

3  included source code from the original PocketXML technology provided to IIT. Singh Decl., Ex. 7

4  (Frankovitz Declaration in full); see also Ex. 24 (Frankovitz Report).

5       In connection with confidential disclosures made to IBM India, the evidence proves that a

6  representative of IBM India was member of the incubation society. See Singh Decl., Ex. D-3

7  [Chakrabarti Dep. at 210:9-17]. Dr. Chakrabarti arranged for the engineering team to present a

8  confidential summary of the confidential technology and a demonstration to the incubation society. See

9  Singh Decl., Ex. D-3 [Chakrabarti Dep. at 222:6-225:10]. This information was available to all members

10 of the incubation society, including to the representative of IBM India. Within a short time following

11 Defendant's written instruction to the engineers to actively deceive Ms. Farhang while doing no further

12 work on the Joint Venture while Dr. Chakrabarti spoke to third party ministers and potential investors in

13 the technology, the Indian Railways announced its $30M pilot project with IBM India for what appears

14 to be strikingly similar technology. Singh Decl., Exs. 22, 27. As noted above, misappropriation is often,

15 by necessity, established through this very kind of circumstantial, indirect evidence. *Bladeroom Grp.*

16 *Ltd., supra,* 331 F. Supp. 3d at 984.  As such, Plaintiff's cause of action for misappropriation should go

17 forward to trial so this Court may evaluate testimony, emails and video excerpts for impeachment.

### **CONCLUSION**

19 Plaintiff respectfully asks the Court to deny Defendant's Motion for Summary Judgment in its

20 entirety.   The undisputed facts show that Defendant entered into a written NDA clearly governed by

21 California law, that it received valuable technology pursuant to that NDA for the purpose of deciding

22 whether to proceed with a Joint Venture to commercialize the technology, and then entered into a Joint

23 Venture and developed the technology. Unbeknownst to Plaintiff, over two years, Defendant then

24 hatched its plan to terminate the Joint Venture and misappropriate the technology.

DATED: June 12, 2019

26 SANJIV N. SINGH, A PROFESSIONAL LAW
   CORPORATION

27 /s/Sanjiv N. Singh

28 Sanjiv N. Singh, Attorneys for Plaintiff M.A. Mobile

1

**CERTIFICATE OF SERVICE**

2

3

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on June 12, 2019. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I certify under penalty of perjury that the foregoing is true and correct.

4

5

6

Dated: June 12, 2019                    Respectfully submitted,

7

                                SANJIV N. SINGH, A PROFESSIOAL LAW
8                                CORPORATION

9                                */s/ Sanjiv N. Singh*

10                                Sanjiv N. Singh
                                 Attorneys for Plaintiff M.A. Mobile

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
CASE NO.: C-08-02658-WHO