UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.A. MOBILE LTD., <br><br> Plaintiff, <br><br> v. <br><br> INDIAN INSTITUTE OF TECHNOLOGY KHARAGPUR, et al., <br><br> Defendants. | Case No. 3:08-cv-02658-WHO <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING COUNTERCLAIMS** <br><br> Re: Dkt. Nos. 596, 599, 600, 608, 615, 616, 617, 624, 628, 638, 649 |

After eleven years, two interlocutory appeals, and one denied petition for a writ of certiorari, the merits of the case have come to the fore. From 2003 to 2005, plaintiff M.A. Mobile Ltd. and defendant Indian Institute of Technology, Kharagpur ("IIT" or "IITK") collaborated to develop a technology that would permit applications to function on handheld devices without an internet connection. M.A. Mobile alleges that IIT breached an oral joint venture agreement, breached a nondisclosure agreement, and misappropriated M.A. Mobile's trade secrets. Before me are several motions, chief among them IIT's motion for summary judgment on all three claims against it. M.A. Mobile fails to present sufficient evidence to allow a reasonable fact finder to decide in its favor because its claims rely on speculation rather than evidence and inference. As set forth below, I will grant summary judgment in favor of IIT.

**BACKGROUND**

## I. FACTUAL BACKGROUND

This case arises from the soured relationship between Mandana Farhang of M.A. Mobile and Partha P. Chakrabarti of IIT. Farhang is the sole shareholder in M.A. Mobile, which is registered in California and Dominica. Deposition of Mandana Farhang ("Farhang Depo.") [Dkt. No. 600-54] 102:11–13; 105:15–16. She formed M.A. Mobile to serve as a holding company for

the intellectual property (IP) she obtained from a settlement with Ikonodyne, Inc., a company where she served as CEO and focused on raising outside capital. Farhang Depo. 16:14–18, 161:8–24; Declaration of Mandana Farhang ("Farhang Decl.") [Dkt. No. 614] ¶ 4; *see* Radke. Decl. Ex. 2 [Dkt. No. 599-74] (settlement agreement). Chakrabarti is the director of and a professor at IIT's Department of Computer Science and Engineering, although he has performed many different roles during his more than 30 years at IIT. Declaration of Partha Chakrabarti ("Chakrabarti Decl.") [Dkt. No. 599-6] ¶¶ 1, 2. The Indian government created the Indian Institutes of Technology in 1956 as an investment in technical research and education.[1] Chakrabarti Decl. ¶ 4. The IIT Kharagpur, which has its principal place of business is in Kharagpur, West Bengal, India, was the first to be established. *Id.*

### A. Initial Contact between Farhang and Chakrabarti, NDAs

On April 27, 2003, Farhang sent an email to Chakrabarti about the intellectual property she newly owned. Chakrabarti Decl. Ex. 2 (April 27, 2003 and May 21, 2003 emails from Farhang to Chakrabarti) [Dkt. No. 599-8]. She wrote that her initial goal was to "explore the IP with [Chakrabarti] to see if there [was] a potential fit and to determine if [he was] interested in being involved." *Id.* She described the technology, pocketXML ("PXML"), as follows:

> In layman's terms, the technology consists of a 'mobile markup language' based on XML, in combination with a GUI tool that enables the quick creation of mobile applications that run on Palm, Pocket PC, Linux, Epoch and Windows CE. The applications can be downloaded from a server via hopsynch and they are fully executable on the handhelds without requiring a wireless connection (although a connection can be established at any time).

*Id.* She explained that several companies had expressed interest in the technology and gave a sense of her understanding of its potential value. *Id.* Due to her lack of technical training, she was "not the right person to evaluate the technology and its development status." *Id.* She indicated an interest in Chakrabarti selecting a team and proceeding as the Chief Technology Officer. *Id.* Farhang and Chakrabarti met in person in California in May 2003. Farhang Decl. ¶ 6. In a follow-up email on May 21, Farhang indicated that once Chakrabarti signed a short NDA, she

---

[1] The Indian Institute of Technology (Kharagpur) Act, 1956 created IITK, and the Institutes of Technology Act, 1961 now governs IITK and all the IITs.

2

1    would send him a copy of the patent application, the source code, the business plan, and a

2    presentation.  Chakrabarti Decl. Ex. 2.  In the emails and during the in-person meeting, Farhang

3    "communicated only what [she] considered to be high level, non-confidential information."

4    Farhang Decl. ¶ 6.

5        On July 21, 2003, Chakrabarti told Farhang that he had received permission from IIT's

6    Dean of Sponsored Research to sign the NDA.  Chakrabarti Decl. Ex. 3 (July 21, 2003 email from

7    Chakrabarti to Farhang) [Dkt. No. 599-9].  On August 11, 2003, Chakrabarti sent his signed NDA

8    to Farhang along with a copy that his colleague Pallab Dasgupta had signed.  Chakrabarti Decl. ¶

9    16.  Farhang then sent him a CD of the source code and other materials, which Chakrabarti had

10   received by September 21, 2003.  *Id.* ¶ 17; *see* Chakrabarti Decl. Ex. 5 [Dkt. No. 599-11]

11   (September 21, 2003 email from Chakrabarti to Farhang).  He told Farhang that "[a]t first glance,

12   [the technology] look[ed] interesting to him."  Chakrabarti Decl. Ex. 5.

13       After an early review, Chakrabarti informed Farhang that the idea was "excellent."  *See*

14   Chakrabarti Decl. Ex. 6 [Dkt. No. 599-12] (emails between Farhang and Chakrabarti between

15   October 23 and November 5, 2003).  He noted that the code was "incomplete with big gaps" and

16   that there was far more work left to be done than Farhang had initially indicated.  *Id.* (November

17   5, 2003 email).  In addition, Chakrabarti noted that there was competition in the space, and it was

18   not clear what new applications this technology might have that did not already exist.  *Id.*  He also

19   asked for permission to have Subrat Panda, one of his students, sign the NDA and begin working

20   on the code.  *Id.*; *see also* Singh Decl. Ex. 14 [Dkt. No. 608-23] (email from Farhang to

21   Chakrabarti) (approving others signing NDAs and beginning work).

22        In February 2004, Chakrabarti told Farhang that engineers Panda and Rakesh Gupta had

23   signed the NDA and begun work.  Chakrabarti Decl. Ex. 7 [Dkt. No. 599-13] (February 13, 2004

24   email from Chakrabarti to Farhang).  The engineers who eventually signed onto the NDA and

25   began work were Panda, Gupta, Gurashish Brar, and Pravanjan Choudhury.[2]  Chakrabarti Decl. ¶¶

26

27   _____

28   [2] Farhang and Chakrabarti understood that the NDAs bound each individual engineer rather than
     IIT.  *See* Chakrabarti Decl. ¶ 20, Ex. 8 [Dkt. No. 599-14] (June 20, 2003 email from Farhang to
     Chakrabarti) (noting "it is not IIT we are binding, but the team of engineers as individuals").

3

19, 20; *see* Deposition of Subrat Panda ("Panda Depo."), Radke Decl. Ex. 14 [Dkt. No. 600-67] 16:10–18; 20:15–16; Deposition of Gurashish Brar ("Brar Depo."), Radke Decl. Ex. 11 [Dkt. No. 600-64] 57:3–18; Deposition of Pravanjan Choudhury ("Choudhury Depo."), Radke Decl. Ex. 12 [Dkt. No. 600-65] 13:20–25.

## B. Early Efforts

Chakrabarti and Farhang exchanged numerous emails and had numerous phone calls about their respective progress on the project, and on some occasions they experienced connectivity issues. *See* Chakrabarti Decl. Ex. 16 [Dkt. No. 599-21] (June 22 to June 25, 2004 emails between Farhang and Chakrabarti with some copied to Jenkins) (expressing Farhang's wish that they "go back to scheduling 1 call per week"). As the work progressed, Farhang "[left] the team building on the technical side completely up to [Chakrabarti]." Chakrabarti Decl. Ex. 7 (February 14, 2004 email from Farhang to Chakrabarti). He had "free rein" to hire for the technical side of the business, and Farhang decided who to hire in California for the operations side. Farhang Depo. 137:6–13. Chakrabarti and Farhang deferred to one another with respect to each one's side of the business. *Id.* at 137:19–23.

In terms of the technical work, Panda estimated that "around . . . 70 percent of the code was incomplete," and that there were "a lot of inconsistencies in the code, all across." Panda Depo. 23:2–5, 27:3–9. The engineers began working to determine whether they could make a minimum viable product out of the code. *Id.* at 27:8–11. According to Farhang, these gaps existed because she had "inadvertently failed to send IIT the CD Rom of a third-party software package called Excelon, that the PXML Technology required in order to fully run." Farhang Decl. ¶ 7. She later uploaded that software to an IIT server and learned from Brar that the technology was working with Excelon. *Id.* By March 2004, the engineers had created a report "that described the development status and identified the deficiencies of the code," and Chakrabarti sent the report to Farhang. Chakrabarti Decl. ¶¶ 21–23; *see id.* Ex. 10 [Dkt. No. 599-15] (March 15, 2004 email from Brar to Chakrabarti attaching the report); *id.* Ex. 11 [Dkt. No. 599-16] (email from Chakrabarti to Farhang attaching the report). Chakrabarti indicated to Farhang that the team "may need to redo many things in [its] own way." Chakrabarti Decl. Ex. 12 [Dkt. No. 599-17] (March

4

16, 2004 email from Chakrabarti to Farhang).

Farhang and Chakrabarti corresponded about equity in February 2004. *See* Chakrabarti Decl. Ex. 7 (February 13, 2004 email from Chakrabarti to Farhang) ("We, however, need to discuss the total percentage that will be available to the IIT team in terms of equity."). On February 14, 2004, Farhang indicated that "[her] thoughts [were] to offer [Chakrabarti] 10% of the equity and to offer each key engineer or team member an additional 1%."[3] *Id.* On March 16, 2004 Chakrabarti told Farhang that he "wanted to know more on the equity part." Chakrabarti Decl. Ex. 12 [Dkt. No. 599-17] (March 16, 2004 email from Chakrabarti to Farhang). He asked that they correspond about equity on email in order to "get to formalizing it slowly." *Id.*

On June 7, 2004 Farhang wrote that "the goal [was] to sign up as many Indian companies as possible across all industries." Chakrabarti Decl. Ex. 17 [Dkt. No. 599-23] (June 6 to June 7, 2004 emails between Farhang and Chakrabarti). She wrote that she wanted Chakrabarti to select an Indian CEO for them to hire, but before that she wanted to "get the foundation of the company and its goals very clear." *Id.* She wanted the two of them to have a "have a chance to get the framework set up and get some customers on board and make plans for the device." *Id.*

The engineering team decided to build a Traveling Ticket Examiner ("TTE") application for the Indian Railways. Chakrabarti Decl. ¶ 27. By June 2004, the engineers had developed a working application. *See* Panda Depo. 31:3–24 (reading from a June 25, 2004 email saying "the Railway application look[ed] fantastic"); *see also id.* at 17–24 ("By [September 12, 2004] we had already [sic] TTE app. It was in working condition and we were just fixing a few things as and when they come [sic]."). The engineers froze work on the application because it was complete and "working very well." *Id.* at 46:8–20.

Chakrabarti wrote to Farhang asking for authorization to proceed with a meeting with

---

[3] She further wrote, "I know this is unheard of, but there is work that has to be done in the short term to prepare for raising the $2 million so this will let everyone know that their efforts will be worth substantial rewards if we can work as a team and get this up and running." Chakrabarti Decl. Ex. 7 (email from Farhang to Chakrabarti, to which Chakrabarti responded on January 31, 2004) (estimating that they would need $2 million "immediately in order to finish development and be able to bring in some customers").

Railways in early July.[4]  Chakrabarti Decl. Ex. 16.  Farhang responded to him and to attorney Ron Jenkins asking that Jenkins create documents to allow Chakrabarti to proceed with the meeting with Railways.  Chakrabarti Decl. Ex. 16.  She requested the following:

> 1. One document between the Company 'Cool e-mobile' and IIT Kharagpur stating that the two entities will form a joint venture company called 'Cool e-mobile' that will be an incubator within IIT. As part of this agreement 2% of the company stock (in whatever form can be accepted by IIT) will be granted to IIT for the purpose of setting up an incubator to fund new entrepreneurs (details to be determined); and that until this joint venture is formed, IIT will be licensing the technology to customers (such as the Railway) and collecting fees on behalf of the joint venture (to be distributed to the joint venture upon its formation).[5]  2. A licensing agreement between IIT and the Railway. We can leave blank spaces where fees need to be worked out so PPC has the flexibility he needs to get them signed up. I am not sure if it needs to be in the agreement, but I would like them to know they will be provided devices for free (once our devices are ready) and until that time we will do our best to purchase low cost devices that they can use (PPC can we buy these through IIT)?

*Id.*  Farhang told Chakrabarti, "[Y]ou have the complete authority and flexibility to negotiate any ee [sic] arrangement that will enable us to sign [Railways] up as our first early adopter customer." *Id.*  Chakrabarti clarified that he would be presenting other project proposals to Railways on behalf of IIT, and he needed a "clear signal" from Farhang that he was allowed to talk about the technology.  *Id.*  Farhang responded that Jenkins would prepare documentation so that Chakrabarti could proceed.  *Id.*  Chakrabarti responded that they would "have to wait for a letter[6] too." *Id.*  He clarified that during the first meeting, he would only present a set of proposals rather than doing a demonstration.  *Id.*

On June 6, 2004, Chakrabarti wrote to Farhang about a teleconference.  Chakrabarti Decl. Ex. 17.  He wrote,

> I want to discuss a few things on structure and activities before we go ahead.  This is especially important in the phase when we need to find early users while we have not structured the company. This is because I will be going from IIT and so the role of IIT needs to be clarified here.

---

[4] Chakrabarti informed Farhang, "I am also told that the original developers have moved ahead to develop something very similar avoiding the xml part since it would violate the patent." Chakrbarti Decl. Ex. 16.

[5] " " appears two times in between these sentences.

[6] The context shows Chakrabarti was referring to a letter of intent.

United States District Court
Northern District of California

*Id.* The following day, Farhang responded that attorney Ronald Jenkins had "completed his ideas for the structure" of the joint venture. She wrote, "[T]he best structure for you and the engineers is to have an Indian company where all of the value is built, and that we all own. I wanted to have the company be a Joint Venture with IIT and we would give IIT the 2% shares." *Id.* Chakrabarti then told Farhang that IIT itself could not be a party to a joint venture; in a later email the same day Farhang wrote, "Thanks for clarifying on the IIT issue, I wasn't clear about it. Yes, an incubator is fine as long as it is set up as a 'joint venture' legally." *See* Chakrabarti Decl. Ex. 17; *see also* Farhang Depo. 25:25–26:14 (acknowledging learning at some point that IIT could not "directly" be a party to the joint venture and that the Society would "fulfill that obligation"); *id.* at 26:8–9 (testifying that "in [her] mind, IIT was always a party to the Joint Venture throughout the whole term"). On June 10, 2004, Farhang emailed Chakrabarti proposing the name "Cool e-mobile" for the company. Radke Decl. Ex. 18 [Dkt. No. 599-83]. She also referred back to a prior conversation about sales people and proposed a 70/30 revenue share, with the possibility of paying more to the person who convinced Railways to be a customer. *Id.* On June 25, 2003, Farhang responded to an email from the engineers and indicated that now that the TTE application was ready, the "first internal milestone [was] to sign up the Railway within two weeks." Chakrabarti Decl. Ex. 32. She wrote, "[W]e are working on all of the necessary paperwork." *Id.*

On July 7, 2004, Jenkins emailed Farhang and Chakrabarti a draft letter of intent. Chakrabarti Decl. Ex. 18 [Dkt. No. 599-24]. The draft opened as follows:

> This letter will confirm the shared intention of M.A. Mobile Ltd. (the "Company"), Ms. Mandana Farhang ("Ms. Farhang"), Dr. Partha Pratim Chakrabarti ("PPC"), and the Indian Institute of Technology Kharagpur ("IIT") (collectively, the "Parties") to form an Indian joint venture for the purpose of developing and marketing certain patent-pending technology that is presently owned outright and exclusively by the Company; developing, protecting and marketing derivations and extensions to that technology; and designing, protecting and developing a hand held device called "Tuff n' Ready" (the "Technology").

*Id.* It provided that upon execution of the letter, "the Company [would] grant to IIT a limited, royalty-free license to market and continue the development of the Technology in India until formation of the joint venture." *Id.* It further indicated that the parties would "cooperate in

formalizing the terms of this Letter of Intent with the necessary contracts and consents, and in obtaining all necessary government licenses and approvals." *Id.* It included signature lines for Jenkins on behalf of M.A. Mobile, Chakrabarti on behalf of IIT, Chakrabarti individually, and Farhang individually. *Id.* Chief Financial Officer Matt Dowling sent Chakrabarti a new draft on September 2, 2004. Chakrabarti Decl. ¶ 35.

In August 2004, Jenkins sent a revised draft letter of intent and asked Chakrabarti to sign and return it. Chakrabarti Decl. Ex. 33 [Dkt. No. 599-44]. Dowling told Chakrabarti that Farhang wanted to get Railways signed within two weeks and to bring on more customers by the end of September. *Id.* Chakrabarti responded, "As I said when we talked, it is not going to be possible to sign up the Indian Railways in such a short period beacuse [sic] I have to first process Ron's letter with ITT and then get into the formal process of writing to the Railways and having meetings. It will take more time, but we should get the process started." *Id.* At the end of August, Chakrabarti told Jenkins that he had sent the draft letter to the Institute to ask for permission to sign, but "per [their] rules, for incubation the institute need[ed] 3% holding and not 2%." Farhang Decl. Ex. 2 [Dkt. No. 614-2]. He emailed again later to say "IIT [had] approved the signing of the agreement" pending that change.[7] *Id.* On September 2, 2004, Dowling sent Chakrabarti another draft letter of intent. Chakrabarti Decl. Ex. 19 [Dkt. No. 624-19]. He wrote, "We decided to give 25% to the team and 3% to IIT for a total of 28%."[8] *Id.*

_____

[7] On June 24, 2005, Chakrabarti emailed Farhang to ask her thoughts about his "understanding that [their] 25% and IIT 3% shares [would] not get diluted on the initial investment up[]to $30[] million." Singh Decl. Ex. 23 [Dkt. No. 608-39].

[8] According to Farhang, she and IIT (through Chakrabarti) had reached agreement on the essential terms by fall 2004: " (1) I would contribute the Technology via M.A. Mobile, and indeed had already provided IIT with the core source code and extensive amounts of intellectual property and trade secrets including a copy of the Patent (The U.S. patent is attached hereto as Exhibit 1); (2) Chakrabarti would act as Chief Technology Officer and Pallab Dasgupta would act as Vice President of Engineering; (3) IIT and Chakrabarti would select, guide and manage a team of engineers (regardless of where they were physically located) to improve the Technology under the direction of Chakrabarti, CTO; (4) I would select and manage team members to handle some the business functions, as I deemed necessary; (5) IIT would use its connections with large Government and commercial enterprises to assist the partnership to sign up our early adopter customers, including the Indian Railways; (6) our equity ownership percentages in the partnership were agreed upon; and (7) it was agreed that all of us would work for equity until the Company earned customer revenue, and in this manner we shared risk in profit and loss." Farhang Decl. ¶ 11.

In November 2004, IIT formed the Technology Incubation and Entrepreneurship Training Society ("TIETS" or "the Society"). Chakrabarti Decl. ¶ 8. It was intended to train and mentor IIT students who were interested in entrepreneurship. *Id.* Chakrabarti was ex-officio Secretary of the Society, a member of the Governing Board, and early on a member of the technical committee that reviewed incubation projects. *Id.* Also in November 2004, Jenkins emailed Chakrabarti to inquire about a signed letter of intent because he had not seen one. Chakrabarti Decl. Ex. 30.

On December 8, 2004, Chakrabari wrote a letter to the chairman of the Railway Board about "long-term collaborative research" between IIT Kharagpur and Railway.[9] Chakrabarti Decl. Ex. 35 [Dkt. No. 599-48]; Singh Decl. Ex. 4 [Dkt. No. 613-7]. He described the on-train TTE assistant, which could "load specific information railway [sic] regarding passengers, check in the traveling passengers, fill up the vacant seats from waitlisted passengers, etc." *Id.* He described the technology, which "[was] being developed under IIT[']s incubation programme, as "unique and patent pending." *Id.* He requested a meeting, and he followed up again on December 27. *See id.*; Chakrabarti Decl. Ex. 36 [Dkt. No. 599-50]. Chakrabbarti did not meet with anyone from Indian Railways about the TTE application or PXML. Chakrabarti Decl. ¶ 57.

## C.    Draft Letters of Intent and Efforts with Railways and JUSCO

Emails in February 2005 indicate that the team was experiencing roadblocks. After receiving a call from Brar, Farhang emailed Chakrabarti that she would begin having "direct contact with the engineering team in order to provide them with the necessary direction they are seeking." Chakrabarti Decl. Ex. 30. He responded that he understood that she believed he was "not doing what [was] required of [him]," and he would be fine to "be out of this" but would still help his students in any way. *Id.* Farhang clarified that she did want him to be involved but felt that the company was "simply not a priority for [him]." *Id.* She wrote, "Now I am faced with one

---

[9] Farhang and M.A. Mobile's Chief Operating Officer Varsha Singh did not know Chakrabarti reached out to Railways in December 2004. *See* Farhang Decl. ¶¶ 24, 26 ("At no point in time did Chakrabarti inform me that he had sent two letters (at least one of which was on IIT's letterhead) to a Governing Board Member of the Indian Railways in December 2004, discussing Cool e-mobile's TTE Application."); Declaration of Varsha Singh ("V. Singh Decl."), Singh Decl. Ex. 30 [Dkt. No. 613-8] ¶ 5.

United States District Court
Northern District of California

particular investor who would like to give us our first amount of capital yet we don't have a company formed, or even an LOI to show him. I am sure you can understand the implications of this." *Id.* In March 2005, Jenkins emailed Chakrabarti to ask about the "blockage" to signing the letter of intent, which they needed to proceed. *Id.* Chakrabarti responded that issues needed to be "sorted out" with Farhang. *Id.*

Around this same time, the engineering team was pursuing the Jamshedpur Utilities and Services Company ("JUSCO") as a customer. On December 3, 2004, Dasgupta emailed Singh and Farhang attaching a development plan and roadmap describing the plan to build a billing application for JUSCO. Chakrabarti Decl. Ex. 38 [Dkt. No. 599-52]. On February 5, 2005, Choudhury sent an email to Chakrabarti, Dasgupta, and Brar describing a meeting with JUSCO that he, Panda, and Gupta had attended. Singh Decl. Ex. 17 [Dkt. No. 608-17]. After introductions, a JUSCO representative told the engineers about his system, and the group discussed the ways in which the application might be able to help JUSCO. *Id.*; *see* Panda Depo. 84:18–20. The engineers then presented a demo of the application on a device where it was installed. *See* Singh Decl. Ex. 17; Panda Depo. 84:7–25. The meeting was about thirty minutes to one hour long. Panda Depo. 84:12–15. The engineers never actually gave JUSCO a working application; instead, the demonstration was a visual display. Panda Depo. 83:5–11. *See* Deposition of Rakesh Gupta ("Gupta Depo."), Radke Decl. Ex. 13 [Dkt. No. 600-66] 68:7–21 (confirming when asked that the meeting with JUCO involved only "a visual display of how the demo worked" rather than a display of any of the code or architecture). Singh was not aware that this meeting took place. Declaration of Varsha Singh ("V. Singh Decl."), Singh Decl. Ex. 30 [Dkt. No. 613-8] ¶ 11.

In May 2005, the team remained focused on signing the Railways up as the first customer. *See* Chakrabarti Decl. Ex. 34 (May 11, 2005 email from Singh) (indicating the need to "expedite the signing of this agreement as it is holding up pressing matters such as the signing up of a key customer, the railways"). On May 9, Chief Operating Officer Varsha Singh emailed Chakrabarti about the steps each of them should take in "in parallel" in an effort to "sign up railways as [their] first early adopter customer." Chakrabarti Decl. Ex. 20 [Dkt. No. 599-26] (May 9 to May 11,

10

2005 emails between Singh and Chakrabarti). They planned to offer a "special invitation" to Railways wherein they would develop applications for a free demonstration to induce Railways to sign on as a customer, at which point they could arrange fees. *Id.* On May 11, Chakrabarti responded and confirmed that he would work on his side of the plan when he returned from travel. *Id.* In response to Singh's discussion of logos, Chakrabarti wrote,

> [P]lease note that this is a JV company and not a JV with ITT. The Indian Company (when it happens) will be a JV with foreign collaboration. It is proposed to be under ITTs [sic] incubation programme. We have not yet formed the Company. Almost at any stage it will be impossible for you to use ITT logo. Please do not use ITT Logo. It will cause trouble. When Cool-e is formed, I or Pallab can use two cards because we are employees of ITT and (will become) formal members of Cool-e.

*Id.* Singh responded the same day with an email that attached "the same LOI which [had] been with [Chakrabarti] the past several months, no changes or alterations whatsoever." *Id.* It continued to list a joint venture with IIT. *Id.*

On May 12, 2005, Chakrabarti responded again to Singh, with Farhang copied on the email. He wrote:

> It will be a JV Company with Indian cell company and then foreign collaboration as discussed with Auddy, you and me. ITT allow it to develop under its incubation program, that too as under the Incubation Society that ITT has set up. Please recall our discussion with Auddy. You may consult them or Ron. ITT as per Govt act cannot form a JV company with anyone. That will not work if I or even my Director signs anything. Let [us] not plan to do something that will cause a problem later.

Chakrabarti Decl. Ex. 21 [Dkt. No. 599-27].

On June 1, Farhang and Chakrabarti met in California and discussed the new arrangement in which the joint venture would proceed with the Society rather than IIT. Farhang Decl. ¶ 17. On June 2, Jenkins emailed Indian attorney R.L. Auddy to confirm "key points" that Farhang and Chakrabarti had agreed to during that meeting and that Jenkins and Auddy had discussed in a conversation earlier that day. Chakrabarti Decl. ¶ 39, Ex. 22 [Dkt. No. 599-28] (June 2005 emails between Farhang and Chakrabarti and Jenkins and Auddy). The email noted that the joint venture could not be a cell company and that Farhang supported "strong employment agreements with the engineers." *Id.* Jenkins acknowledged that IIT could not "formally be a party to the joint venture," the Society needed to be a party formally. *Id.* He offered terms under which Farhang

1   wished to retain Auddy to represent her "for the purpose of finalizing a Letter of Intent with Dr.

2   Chakrabarti and the Society." *Id.*

3        Farhang forwarded Jenkins's email to Chakrabarti, and he responded on June 4. *Id.* He

4   raised disagreement over whether there would be a cell company, and he reiterated that he "had

5   clearly mentioned that as per the rules of IIT and the Society, they cannot form JVs . . . the Society

6   being a party to the JV may not be a straightforward thing as Ron [Jenkins] seems to insist." *Id.*

7   When Jenkins separately forwarded to Chakrabarti his email to Auddy, Chakrabarti responded that

8   he had "clarified his views" with Farhang, and Farhang and Jenkins should talk. Chakrabarti

9   Decl. Ex. 23 [Dkt. No. 599-29]. On June 28, Jenkins sent Auddy and Farhang another draft letter

10  of intent that included the Society rather than IIT. Chakrabarti Decl. Ex. 27 [Dkt. No. 599-33].

11       Singh met with Railways on June 7, 2005. *See* Chakrabarti Decl. Ex. 24 [Dkt. No. 599-

12  31]. On July 5, 2005, she sent an email update to Chakrabarti, Jenkins, and Auddy with the

13  subject line "Important Issue to be accomplished." Chakrabarti Decl. Ex. 24. In it she noted that

14  "the dream of getting the railways to give [them] an appointment [had] finally been

15  accomplished," but that Jenkins and Auddy had advised that the letter of intent should be signed

16  before they proceeded. *Id.* The deadline by which they had promised to send Railways

17  documents had already passed. *Id.* She indicated that they should all act with urgency so as not to

18  "lose this golden opportunity of demonstrating the demo along with [their] team members." *Id.*

19  Singh's email forwarded an email from Farhang to Chakrabarti in which she wrote, "One thing for

20  certain that I do understand is that both Ron [Jenkins] and Auddy are uncomfortable sending the

21  proposal to the Railways until the LOI is signed and we are already very tardy in our response

22  which gives me great concern." *Id.*; *see also* Chakrabarti Decl. Ex. 30 (August 30, 2005 email

23  from Farhang to Chakrabarti and Singh) ("Varsha promised [Railways] our materials months

24  ago . . . how long we can stall I am not sure.").

25

26

27

28

12

Chakrabarti responded to Singh's email with Jenkins, Auddy, Farhang, and Dasgupta copied. *Id.* He wrote,

> Mr[.] Auddy informed me that the LOI must be signed by the authorized representative of the Society and it must be passed by its Governing Body. He advises that I cannot sign on behalf of the Society or IIT, etc. since I am an involved party. I can sign on my behalf only. I agree on this count.

*Id.* He expressed other uncertainties and questions that he planned to pose to Auddy for discussion between Auddy and Jenkins. *Id.* He said that he would present a final draft to the Society for approval. *Id.* He suggested, however, that the team not delay sending the technical documents to Railways on the promised schedule. *Id.*

> Singh responded with reservations about that suggestion:
> With railways, thanks for the assurance PPC of confirming to state the relationship, yes you will definitely be part of the team when the demonstration meeting is called for. However since here we are dealing with direct government we need to have some papers proving the existence of Cool e in India. You will agree that at this point of time we have verbal commitments, however they will need black and white proof from our end, if we fail here we can fall into serious trouble . . . You are also well aware of how the government bodies operate in India and if they find out we that we [sic] are yet to start Cool e operations and don't even have a company in place we can get into serious trouble.

*Id.* He asked Jenkins and Auddy to respond quickly to advise them on how to proceed with Railways. *Id.*

On June 19, Chakrabarti sent an email to Singh with a document for Railways. Singh Decl. Ex. 8 [Dkt. No. 613-2].[10] The document "contain[ed] a summary of both the technical details and Railways applicability." *Id.* The document was three pages long and showed an image of the Railways application running on a mobile device. *Id.* It described the features of the TTE assistant and explained what train stations would need to have for the TTE assistant to work:

---

[10] M.A. Mobile did not request to file this document under seal.

United States District Court
Northern District of California



**Indian Railways Travelers Ticket Exchequer Assistant**

Enables:

- On Board Ticketing Service
- Current Reservation
  - *after departure of train*
- RAC/Waiting List Clearance
- Real time Passenger Tracking
  - *Helps locate key people, such as doctors, VIPs*

It included a diagram of the backend database:



On July 7, Auddy clarified that Chakrabarti could not sign on behalf of IIT or the Society without "proper authority" from them; instead, the Governing Body would have to authorize a representative to sign on its behalf. Chakrabarti Decl. Ex. 24. On July 6, 2005, Chakrabarti noted, "IIT cannot hold equity and make JV's [sic] directly. It is a different kind of institution, passed by an act of Parliament. The Society is in a sense a part of IIT." *Id.* On July 8, 2005, Auddy emailed Jenkins, Farhang, and Singh with thirteen "information/particulars" Chakrabarti needed to be able to present to IIT and the Society so that the letter of intent could be ratified. Chakrabarti Decl. Ex. 26 [Dkt. No. 599-33]. The group continued to correspond about the letter of intent, which remained unsigned. *See* Chakrabarti Decl. Ex. 30 (August 30, 2005 email from Farhang to Chakrabarti and Singh) ("[Y]es I think we are all very eager to get the LOI signed and form the Company!").

On August 9, 2005, Chakrabarti emailed the engineers on behalf of the Society to let them know that they had been selected to make a 10-minute presentation at a technical committee meeting of the Incubation Society and external experts later in the month.  Chakrabarti Decl. Ex. 40 [Dkt. No. 599-55].  He asked them to confirm their attendance and to submit "a two-page summary of [their] proposal consisting of the name of the organization, the proposed technology to be developed and a short paragraph on the business plan."  *Id.*  On August 22 and 22, 2005, Choudhury sent drafts of a Powerpoint presentation to Chakrabarti and other engineers.  *See* Chakrabarti Decl. Exs. 41, 42 [Dkt. No. 599-56, 599-57]; Singh Decl. Ex. 17 [Dkt. No. 608-29].  The later Powerpoint had 10 slides, including a title slide and a thank-you slide.  Chakrabarti Decl. Ex. 42 (the Powerpoint).  It described the concept behind Cool e-mobile, the team (including Chakrabarti as co-founder and CTO), the need the technology would fill, the products the team would develop, a diagram overview of the technology, features of PXML, a screenshot of the TTE assistant application, and a business roadmap.  *Id.*  On August 23, 2005, Panda emailed a three-page technology overview and business plan.  Chakrabarti Decl. Ex. 43 [Dkt. No. 599-58].

The Society meeting took place on August 29, 2005.  Chakrabarti Decl. Ex. 44 [Dkt. No. 599-59] (meeting minutes).  The committee heard proposals from eight groups seeking technical and financial support; it recommended five, including Cool e-mobile, for immediate funding.  *Id.*  Members of the committee signed the bottom of the meeting minutes.  *See id.* (reflecting signatures from P. P. Das, S. Tripathy, R. N. Banerjee, Dhrubes Biswas, and Chakrabarti); *see also* Chakrabarti Decl. ¶ 66 (noting that IBM India employee P. Bhattacharyya, who sat on the Society board, was not present at the meeting).  The following day, Chakrabarti wrote to Farhang to tell her that three of the engineers had presented to the committee.  Chakrabarti Decl. Ex. 30.  He also wrote, "I am not sure what the status is with the Railways, but I get to understand that some equivalent technologies are coming into the space."  *Id.*  She responded the same day, "That is great news on the presentation to the Society . . . do they have to formally accept us, was this the reason for the event?"  *Id.*  Farhang understood that a "preliminary presentation was made" at the meeting, and she trusted Chakrabarti and "assumed he was doing what was best" for the team.  Farhang Depo. 388:14–389:3.

### D. Continued Negotiations and Incubation

On October 6, 2005, Chakrabarti and Farhang exchanged emails showing signs that their relationship was breaking down. *See* Chakrabarti Decl. Ex. 29 [Dkt. No. 599-38]. Chakrabarti wrote that there was "competition coming in and coming fast" and he had other projects that would require his attention. *Id.* Farhang responded that she felt unsupported, especially given the money she had spent and "significant personal sacrifices" she had taken on to take care of Chakrabarti and the team. *Id.* She indicated that "the ball was not in [her] court" with regard to the letter of intent that had been unsigned for over a year. *Id.*

On October 8, 2005, Chakrabarti acknowledged to Farhang that he had received another draft letter of intent from Auddy. Chakrabarti Decl. Ex. 28 [Dkt. No. 599-36]. The draft opened,

> This letter will confirm the shared intent of Tuff 'n Ready Global Philanthropic Holdings S.A. (the "Company"), Ms. Mandana Farhang ("Ms. Farhang"), Dr. Partha Pratim Chakrabarti ("PPC"), and the Incubation Society of the Indian Institute of Technology Kharagpur (the "Society") and the other parties who are signatories to this letter (collectively, the "Parties") to form an Indian joint venture . . . .

*Id.* The draft provided, "[T]he Society and PPC shall cooperate with the Company and Ms. Farhang in the expeditious formation and due registration of an appropriate Indian joint venture vehicle (which shall be incorporated in the form of a private limited company and shall not be a cell company) to be called 'Cool e-mobile.'" *Id.*

Chakrabarti forwarded the draft to the engineering team. Chakrabarti Decl. Ex. 29. On October 16, 2005, he replied again saying that he had explained to Auddy and Singh that the letter should be drafted to exclude him from a formal role or shares in Cool e-mobile.[11] *Id.* He told the team he would keep them informed and advise them, but he suggested that the team should discuss any issues or suggestions they had with Auddy, Singh, and Farhang. *Id.*

On November 2, 2005, Chakrabarti emailed the engineers on behalf of the Society to let them know that they had been selected for incubation. Chakrabarti Decl. Ex. 45 [Dkt. No. 599-

---

[11] Farhang's declaration impugns Chakrabarti's intentions during this time. *See, e.g.*, Farhang Decl. ¶ 18 (noting that Chakrabarti "realiz[ed] that [his] agent was not doing to plan"); *id.* ¶ 20 ("At the time, he led me to believe that he was present at the meeting, but I believe he may be changing his story on that now."); *id.* ¶ 21 ("I now know that [Chakrabarti's and the team's] demands were a dishonest effort to cause me to withdraw from the partnership so they could claim the Technology as their own (which they ultimately did).").

61].  Minutes from an April 3, 2006 meeting of the Society's governing board confirmed that Cool

e-mobile had been selected for the entrepreneurship program.  Chakrabarti Decl. Ex. 46 [Dkt. No.

600-47]; *see id.* (noting that Bhattacharyya was unable to attend).  Farhang and Singh did not learn

until later that Cool e-mobile had been selected for incubation.  Farhang Decl. ¶ 22; V. Singh

Decl. ¶ 12.

On December 9, 2005, Chakrabarti wrote to Singh asking her to "[please] work out the

LOI with the team" because "[i]t would not be a good idea to fall out in the first leg of IITs [sic]

incubation process."  Singh Decl. Ex. 5 [Dkt. No. 613-9].  Singh expressed confusion on the

requirements for incubation and to "start formalities with IIT."  *Id.*  Chakrabarti warned Singh that

prepared groups would get more publicity, and Cool e-mobile would likely miss the next board

meeting.  *Id.*

By March 2006, the relations between the two groups—Chakrabarti and the engineers on

one hand and Farhang and M.A. Mobile on the other—had broken down.  *See* Chakrabarti Decl.

Ex. 48 [Dkt. No. 599-65] (emails between Jenkins and Chakrabarti about the patent application,

and emails between Chakrabarti and the engineers about that correspondence); Chakrabarti Decl.

Ex. 49 [Dkt. No. 599-67] (email from Jenkins to Chakrabarti) (noting that three engineers did not

attend a conference call with Farhang).  On April 6, 2006, Brar sent Panda, Gupta, and Choudhury

an email with the subject line "I want to quit."  Singh Decl. Ex. 22 [Dkt. No. 608-37] (April 2006

emails between engineers).  He was concerned about the involvement of a lawyer and wrote that

"only the smell of real money (perhaps not even that now) might help change [his] mind."  *Id.*  He

felt that Farhang "should not be legally able to demand the code [they] wrote from [them] without

paying something for it," but he was willing to "give up whatever [he could] just to avoid a

confrontation with lawyers in court in US."  *Id.*  Later that day he emailed that he was feeling

better after talking to Chakrabarti, who advised that the team not quit, but not do anything.  *Id.*

Gurashish wrote that they should switch the point of contact to Panda or Gupta in order to make

the contact more inconvenient and expensive for Farhang and Singh.  *Id.*  He also wrote, "PPC

however did suggest that there are people in India (Orissa Transport minister? investors in

Bombay) who are interested and he is in talks with them.  So he said that as developers we have

17

United States District Court
Northern District of California

1    performed our job of getting the demo ready and including it in incubation program of IIT and our

2    responsibilities are clear." *Id.* Choudhury responded that he and Panda agreed that it was best to

3    stay on rather than quit all of a sudden. *Id.*

4        Chakrabarti broke off the relationship with Farhang, M.A. Mobile, and Singh. V. Singh

5    Decl. ¶ 9. On May 28, 2006, advocates wrote to the Society on behalf of Farhang to ask them to

6    appoint "an appropriate substitute for Professor Partha P. Chakrabarti who will negotiate with our

7    client in good faith the Letter of Intent . . . ." Chakrabarti Decl. Ex. 50 [Dkt. No. 599-69].

8    Advocates for IIT and the Society responded on June 7, 2006 that they "treat[ed] the negotiations

9    at an end," and Farhang should not pursue a letter of intent further. Chakrabarti Decl. Ex. 51 [Dkt.

10   No. 599-71]. After the engineering team stopped work on the technology, they put the current

11   state of the code onto a CD and gave it to Chakrabarti, who had returned it to M.A. Mobile by

12   September 2006. *See* Choudhury Depo. 84:1–14; V. Singh Decl. ¶ 9.

13       **E.      M.A. Mobile's Continued Efforts with Railways**

14       M.A. Mobile continued efforts with Railways after IIT discontinued its involvement. "To

15   [M.A. Mobile's] surprise," in 2007 Railways requested that M.A. Mobile make a presentation

16   about the technology. V. Singh Decl. ¶ 9. Farhang "scrambled to hire some engineers that [she]

17   felt were qualified to be able to build a demo." Farhang Depo. 424:4–14. She located qualified

18   engineers in Nepal through Singh's contacts and paid them to work on the technology. *See id.*

19   424:15–19, 437:13–21 (discussing one engineer), 438:6–9 (discussing that the engineer was payed

20   for his work), 438:16–23 (discussing a second engineer). After they had signed the NDA, Farhang

21   sent the CD that contained not only the original IP but also the materials IIT had added. *Id.* at

22   425:5–21. There was a meeting scheduled for October 5, 2007, but M.A. Mobile canceled it. *Id.*

23   452:20–453:25. No presentation or demonstration ever occurred because "IIT abandoned the Joint

24   venture, and [Farhang] wasn't able to do it without them." *See id.*; *see also id.* at 437:1–12.

25       IBM and Indian Railways later announced a $30 million pilot program for a mobile

26   ticketing device and program. *See* Singh Decl. Ex. 25 (document entitled "Hand Held Terminal

27   project for TTEs" downloaded from Railways website), Ex. 26 (document outlining the budget for

28   the project), Ex. 27 (March 15, 2008 article from IndiaTimes entitled "Now, palmtops to give

berth to waitlisted passengers"). It "seemed to mirror [M.A. Mobile's] TTE Application description and functions precisely." V. Singh Decl. ¶ 10. In February 2010, Railways decided to collaborate with IITK to set up "a state-of-the-art Centre for Railway Research" at IITK. Singh Decl. Ex. 28 (Railways webpage entitled "SETTING UP OF CRR AT IIT KGP").

## II.     PROCEDURAL BACKGROUND

I will provide only a brief recitation of the long procedural history of this case, which the Honorable Ronald M. Whyte presided over until November 3, 2016. *See* Order Reassigning Case [Dkt. No. 504]. On May 27, 2008, Farhang filed a complaint that listed IIT, the Society, Chakrabarti, Dasgupta, Brar, Gupta, Choudhury, Panda, and Animesh Naskar as defendants. Complaint [Dkt. No. 1]. M.A. Mobile was added as a plaintiff on February 25, 2010. *See* Second Amended Complaint [Dkt. No. 111]. The Ninth Circuit decided two appeals of denials of motions to dismiss pursuant to the Foreign Sovereign Immunities Act and common law foreign official immunity, and as a result of these proceedings, only M.A. Mobile and IIT remain parties to this case.[12] *See* USCA Memoranda [Dkt. Nos. 402, 499].

After these appeals had been resolved and a stay lifted, the case began to progress in earnest in the middle of 2017. *See* Minute Entry [Dkt. No. 515]. In May of 2019, IIT filed a motion to dismiss its counterclaims and a motion for summary judgment, and in June it filed two motions to exclude M.A. Mobile experts. *See* Motion to Dismiss Counterclaims ("MTD") [Dkt. No. 596]; Motion for Summary Judgment ("MSJ") [Dkt. No. 599-4]; Motion to Exclude Opinions and Testimony of Technical Expert ("MTE Frankovitz") [Dkt. No. 615-4]; Motion to Exclude Opinions and Testimony of Damages Expert ("MTE Staller") [Dkt. No. 615-8]. I heard argument on all of the motions on July 17, 2019. Minute Entry [Dkt. No. 643]. After hearing my tentative opinion that I would grant IIT's motion for summary judgment, M.A. Mobile filed a Rule 56(d) motion for additional discovery. Motion for Discovery ("56(d) Mot.") [Dkt. No. 649].

---

[12] The Ninth Circuit denied defendants' petitions for rehearing and rehearing en banc, and the U.S. Supreme Court denied a petition for a writ of certiorari. *See* Dkt. Nos. 500, 505.

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

IIT seeks to dismiss its own counterclaims, moves for summary judgment on M.A. Mobile's claims for breach of joint venture agreement, breach of the NDA, and misappropriation of trade secrets, and moves to exclude testimony of two of M.A. Mobile's experts. M.A. Mobile moves for additional discovery under Federal Rule of Civil Procedure 56(d). Both parties move to seal information contained in the briefing and exhibits.

## I. MOTION FOR SUMMARY JUDGMENT

### A. Joint Venture Claim

M.A. Mobile's first cause of action is for breach of the parties' oral joint venture agreement. IIT argues that summary judgment is appropriate on two grounds: (i) IIT lacked legal capacity to enter into the alleged joint venture and (ii) no joint venture was created because the

parties never agreed to essential terms.  MSJ 14-19.

### 1.    Whether an Oral Joint Venture with IIT was Valid under Indian Law

IIT argues that it could not possibly have formed a joint venture with M.A. Mobile because under Indian law, it cannot enter into oral agreements nor can it be part of for-profit ventures. MSJ 14-16.  M.A. Mobile was aware of these restrictions on IIT's involvement, as evidenced by its removal of IIT as a party to the draft letters of intent.  *Id.* at 15.  M.A. Mobile counters that I should not accept IIT's interpretation of Indian law, and instead California law should apply to the claim.  Oppo. MSJ 13.  After the hearing, M.A. Mobile filed a motion pursuant to Federal Rule of Civil Procedure 56(d), requesting time for additional discovery on this topic.  Motion for Discovery Pursuant to Rule 56(d) ("56(d) Mot.") [Dkt. No. 649].

Federal Rule of Civil Procedure 44.1 converted the determination regarding the content of foreign law from a question of fact to a question of law.  *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1872–73 (2018).  "[I]n ascertaining foreign law, courts are not limited to materials submitted by the parties; instead, they 'may consider any relevant material or source,'" including evidence materials resulting from their own research.  *Id.* at 1869–70, 1873; *see also de Fontbrune v. Wofsy*, 838 F.3d 992, 999 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Nov. 14, 2016) ("The Rule authorizes courts to conduct independent research outside the parties' submissions in determining foreign law.").  When a foreign government expresses its views, "[a] federal court should accord respectful consideration to [that submission], but it is not bound to accord conclusive effect to the foreign government's statements."  *Animal Sci.*, 138 S. Ct. at 1869.

### a.    The parties' briefing and M.A. Mobile's Rule 56(d) motion

In support of its argument that Indian law prevented IIT from forming a joint venture with M.A. Mobile, IIT submitted an expert report from Vivek Kathpalia.  Radke Decl. Ex. 9 ("Kathpalia Rpt.").  He described the powers of IITs under the 1956 Act and the 1961 Act, which repealed the former in part.  *Id.* ¶ 7; *see id.* ¶ 16 (noting that noting that the Acts cover the Indian Institute of Technology, Kharagpur).  He then gave two independent reasons why IIT lacked capacity to enter into the oral venture that M.A. Mobile alleges here.

First, a commercial joint venture is outside the scope of IIT's powers. IIT's "powers and duties are limited to research and academics and any purpose incidental to that." *Id.* ¶¶ 8, 20. "IIT's powers do not include the ability to enter into an unsigned contract or a for-profit commercial venture of any kind." *Id.* ¶ 39. Because a commercial joint venture would fall outside the scope of IIT's statutory powers, the joint venture alleged here is necessarily ultra vires and void. *Id.* ¶ 31.

Second, IIT could not have entered into an oral joint venture because its procedural guidelines require all agreements to be in signed writing. IIT must follow "a strict and mandatory procedure" to enter into contractual relationships with other institutions:

> **All contracts** for an on behalf of the Institute, except the one between the Institute and the Director, shall, **when authorised by a resolution of the Board** passed in that behalf, **be in writing** and be expressed to be made in the name of the Institute and **every such contract shall be executed on behalf of the Institute by the Director** but the Director shall not be personally liable in respect of anything under such contract.

*Id.* ¶ 27 (quoting Statute 9(13) of the 1961 Act, emphasis added in report). Kathpalia cites cases decided by Indian courts that confirm his reading that IIT "can only enter into contracts and conduct activities as long as they fall within the purview of Section 6 of the 1961 Act." *Id.* ¶ 28. According to Kathpalia's report, a contract formed outside the scope of these powers *is ultra vires* and void. *See id.* ¶¶ 31, 34.

Initially, M.A. Mobile did not dispute the contents of the Kathpalia report. Instead, it argued (and continues to argue) that I am not obligated to accept the Indian government's interpretation of its own laws and that I should not credit the report because IIT "has made conflicting statements concerning the impact of Indian law on this point." Oppo. 14; *see* Hearing Transcript ("Hr'g Tr.") [Dkt. No. 646] 13:5–7. M.A. Mobile fervently asserts that I should discount Kathpalia's report because it is "inconsistent" with past positions the Indian government has taken on its own laws in this litigation. *See* Oppo. MSJ 14; Letter 4–5; Reply Rule 56(d) Mot. 1–2 n.1.

I see no inconsistency. The mere fact that IIT did not raise this issue during the motion to dismiss stage does not amount to an inconsistent position. And while M.A. Mobile also argues

that Chakrabarti's declaration conflicts with the Kathpalia report because Chakrabarti "[did] not state that the law prohibits IITK from entering into commercial joint ventures," Oppo. 14–15, the relevant portions of Chakrabarti's remarks read as follows:

> Over the course of my 25-year career with IIT, I have understood that there are restrictions on IIT's ability to enter into commercial, for-profit activity through joint ventures. During my 30 years at IIT, I have never been aware of IIT being party to a for-profit commercial joint venture. Nor can IIT hold equity in such joint ventures. I have never been aware of IIT being party to any oral joint venture of any nature. There are procedural guidelines on the ability of IIT to enter into joint venture contracts. Such joint venture contracts must go through an approval process within IIT, must be written, and must be signed by the Director of IIT.

Chakrabarti Decl. ¶¶ 6–7. Far from being contradictory, these statements reflect an understanding that is consistent with Kathpalia's descriptions of Indian law.

After learning at the hearing that I tentatively planned to grant the motion for summary judgment based in part on this ground, M.A. Mobile improperly submitted a letter addressing the merits of Kathpalia's opinions on Indian law. *See* Letter [Dkt. No. 645]; Order on Plaintiff's Letter [Dkt. No. 647]. In it, M.A. Mobile asserts that my "independent analysis of IIT's purported expert should show that IIT was not barred from entering the joint venture as a matter of Indian law." *Id.* at 2. Instead, Section 6 of the 1961 Act confers on IIT broad powers to act in furtherance of its objectives, and there is no statute that bars such agreements. *Id.* According to M.A. Mobile, case law belies Kathpalia's conclusion regarding IIT's lack of capacity to be part of a commercial venture. *Id.*

The letter describes *UCO Bank v. Indian Institute of Technology and Anr.*, 2002 SCCOnline DRT7, a case Kathpalia relied on, in which the Indian court concluded that IIT had capacity to contract for a loan as a "necessary thing[] incidental or conducive for the attainment of all or any of [its] objects." *Id.* at 3. According to M.A. Mobile, this situation is analogous because IIT created the Society so that it could serve as the vehicle for the joint venture, only to try to distance itself from liability for the joint venture now. *Id.* at 4. In addition, "IIT has entered into and announced joint ventures with other for[-]profit entities like Wipro." *Id.* at 5. Finally, M.A. Mobile argues that I should reserve deciding this question for motions *in limine* and that it should have the chance to cross-examine IIT's experts on Indian law. Letter 4; Oppo. 14.

23

One week after submitting the letter, M.A. Mobile filed a motion for discovery under Federal Rule of Civil Procedure 56(d). In it, M.A. Mobile argues that it put forth its understanding of Indian law and *Animal Science* in good faith. Rule 56(d) Mot. 2. It raises the difficulty and expense of deposing Kathpalia in India. *See* Reply Rule 56(d) Mot. [Dkt. No. 653] 2. It sets forth the basis of its motion as follows:

> If the Court is considering granting the motion for summary judgment on the basis of Mr. Kathpalia's opinion and rejects Plaintiff's contention that the Court should conduct its own independent review of the opinion and rejects Plaintiff's argument that the Court is not bound to apply Indian law as briefed and cited in its Opposition and Letter Brief, then Plaintiff should be afforded at least the opportunity to conduct further discovery on these issues including submitting their own expert's opinion on this issue.

*Id.*; *see also* Reply Rule 56(d) Mot. 1 ("Plaintiff reasonably believed that the Court was charged with evaluating the quality of IITK's expert independently and would not dismiss the joint venture claim [laying out reasons].") M.A. Mobile specifically asks that I allow it to depose Kathpalia in the U.S., that I allow it to designate its own expert, or that I defer ruling until trial and allow it to designate an expert at that time. Singh Decl. ISO Rule 56(d) Mot. ¶ 5.

M.A. Mobile's Rule 56(d) motion is DENIED. First, IIT's Rule 44.1 notice, dated February 28, 2019, clearly communicated the issues it planned to raise under Indian law. *See* Radke Decl. ISO Oppo. Rule 56(d) Mot. Ex. 1 [Dkt. No. 651-2]. Second, M.A. Mobile had an opportunity to depose Kathpalia and made a strategic choice not to do so. *See* Low Reply Decl. Ex. 1 (emails between counsel from April 22 to May 3, 2019); Order on Plaintiff's Letter. Perhaps most importantly, I am not rejecting M.A. Mobile's contention that I should conduct an independent review; as the analysis below shows, I have done so. Summary judgment is an appropriate time to decide this question of law. *See Animal Sci.*, 138 S. Ct. at 1873 (noting that Rule 44.1 converted inquiries into foreign law into questions of law rather than fact).

### b.     Conclusions of Indian law

There is no dispute that IIT is a statutory body, created by the Indian Institute of Technology (Kharagpur) Act, 1956 and the Institutes of Technology Act, 1961 ("1961 Act").[13] In

---

[13] The 1961 Act repealed the 1956 Act with the exception of certain scheduling provisions. The Institutes of Technology Act, 1961 is located at: http://legislative.gov.in/sites/default/files/A1961-

India, there are strict laws governing bodies created by statute:

> It is a well known principle of law that statutory powers can only be exercised for the purposes for which they are granted. Equally well known is the principle that where a power is given to do a certain thing in a certain way the thing must be done in that way or not at all and that other methods of performance are necessarily forbidden.

*See* Kathpalia Rpt. Annexure 11, ECF p.133, *Vishal Builders (P) Ltd. v. Delhi Development Authority*, (1977) ILR 1Delhi724 ¶ 72. The 1961 Act gives IIT the power to "frame Statutes and Ordinances and to alter, modify or rescind the same." 1961 Act § 6(1)(i). The Act in fact makes the creation of such statutes mandatory, providing that the Council "shall" frame the first ones. 1961 Act § 27(1). The Act further sets forth the manner in which the Board may "make new or additional Statutes or may amend or repeal the Statutes." *See id.* § 27 (1)–(4). Pursuant to this power and obligation, IITK created Statute 9(13), which requires that "All contracts for and on behalf of the Institute . . . shall, when authorised by a resolution of the Board passed in that behalf, be in writing and be expressed to be made in the name of the Institute and every such contract shall be executed on behalf of the Institute by the Director, but the Director shall not be personally liable in respect of anything under such contract."[14]

In order to determine how an Indian court would resolve this question, I have reviewed cases addressing questions related to IIT's powers under the 1961 Act along with the statutes and acts IITs and other statutorily created bodies pass pursuant to their governing acts. In *UCO Bank v. Indian Institute of Technology and Anr.*, a tribunal found an ITT liable to fulfill its contractual loan obligation after concluding that the agreement was "proper and valid" under Statute 9(13) given that the directors and officials had executed it.[15] Kathpalia Rpt. Annexure 10, ECF p.115, *UCO Bank v. Indian Institute of Technology and Anr.*, 2002 SCCOnline DRT7, page 215. In *Tewari v. District Board, Agra Now the Antarium Zila Parishad Agra*, an employee argued to the Indian Supreme Court that a statutorily created body ("the Board") had acted outside its powers in

---

59.pdf.

[14] The Acts & Statutes of IITK are located at:  http://www.iitkgp.ac.in/files/acts.pdf.

[15] The tribunal also concluded that borrowing money was within the scope of the powers provided in the 1961 Act.

terminating him because the internal rule it acted under was invalid. Kathpalia Rpt. Annexure 12, ECF p.160, *Tewari v. District Board, Agra Now the Antarium Zila Parishad Agra*, 3 SCR 55 (1964) ¶¶ 10, 11. The Court disagreed and concluded that the Board's rule was valid because whereas the act governed "dismissal," the rule governed termination for reasons unrelated to punishment for misconduct.[16] The Board had properly passed the rule under the exercise of its statutory powers, and thus, "An order of determination of employment which is not of the nature of an order of dismissal, ha[d] by virtue of the rules framed under clause (*d*) of Section 84 to be exercised consistently with Rule 3-A." *Id.* ¶ 13.

I reach the following conclusions based on these cases. The 1961 Act empowered and obligated IIT to frame statutes, and under this authority IIT created the Acts and Statutes of IITK, including Statute 9(13). *See* 1961 Act (providing that the first statutes "*shall* be framed by the Council") (emphasis added). Because IIT's passage of Statute 9(13) was a valid exercise of its statutory power, it is mandatory. *See Twari v. District Board*, 3 SCR 55 ¶ 13 (noting that employment determinations "*ha[d]* by virtue of the rules framed under [the statute] to be exercised consistently with Rule 3-A") (emphasis added); *UCO Bank v. Indian Institute of Technology and Anr.*, 2002 SCCOnline DRT7, page 215 (determining an agreement was "proper and valid" where it complied with Statute 9(13)). Because Statute 9(13) requires that all agreements to which IIT is a party be written and signed, any oral agreement would fail to comply with that mandatory obligation. The oral joint venture agreement M.A. Mobile alleges is void for failing to comply with Statute 9(13).[17] No representations by Chakrabarti could have altered that fact. *Cf. Rikhy v. New delhi Municipal Committee*, 3 SCR 604 (1962), Kathpalia Rpt. Annexure 15 ECF p.186, ¶ 13 ("A party cannot by representation, any more than by other means, raise against himself an estoppel so as to create a state of things which he is legally disabled from creating. Thus, a

---

[16] The Court noted that "the expression 'dismissal' [had] acquired a limited meaning – determination of employment as a method of punishment for misconduct or other cause." *Id.* ¶ 13.

[17] I do not conclude as a matter of law that it was outside of IIT's statutory charge to enter into a joint venture agreement. Given its authority "to do all such things as may be necessary, incidental or conducive to the attainment of all or any of the objects of the Institute," and the fact that students were involved in the alleged venture, summary judgment is not appropriate on this ground. *See* 1961 Act § 6(1)(n).

United States District Court
Northern District of California

corporate or statutory body cannot be estopped from denying that it has entered into a contract which it was ultra vires for it to make. No corporate body can be bound by estoppel to do something beyond its powers, or to refrain from doing what it is its duty to do.").

M.A. Mobile argues that summary judgment is not appropriate because Chrakbarti failed to disclose initially any supposed limitations on IIT's ability to contract, instead taking repeated steps in furtherance of the parties' joint venture. Oppo. 13–14. This argument fails. As discussed in the next section, all of the parties' conduct aimed at a formal written agreement.[18] Given the context, there was nothing for IIT to disclose.[19] In addition, according to M.A. Mobile California law should apply to the breach of joint venture claim because the parties' agreement arose out of their NDA, which specified that California law would apply. Not only is the parties' asserted joint venture independent of the NDA agreements—as evidenced by the parties' repeated exchanges of draft letters of intent—but M.A. Mobile raises no California authorities that would lead to a different result on this question.

Despite my conclusion here, I will nonetheless address whether the evidence could allow a reasonable fact finder to conclude that the parties formed an oral joint venture agreement.

---

[18] There is evidence of the parties' awareness of the required formalities throughout their relationship. *See* Singh Decl. Ex. 1 (June 6, 2003 email from Chakrabarti to Farhang) ("I will possibly have to refer to my University office with the NDA as it seems to bind them up as well."); Chakrabarti Decl. Ex. 3 (July 21, 2003 email from Chakrabarti to Farhang) ("I just got approval from the Dean (Sponsored Research) to sign the NDA."); Farhang Decl. Ex. 2 (email after August 25, 2004 from Chakrabarti to Jenkins) ("IIT has approved the signing of the agreement."); Singh Decl. Ex. 5 (December 10, 20015 email from Singh to Chakrabarti) ("[W]hat has to be done to start formalities with IIT?"). I also note that because M.A. Mobile never executed a formal agreement with the Society either, my decision does not hinge on any asserted legal distinction between IIT and the Society.

[19] For this same reason, M.A. Mobile's request for leave to amend its complaint to bring a fraud claim is DENIED. Letter 7 (requesting leave to amend its fraud claim based on IIT's representations that it could be part of the joint venture) (noting that Judge Whyte dismissed the fraud claims as preempted by CUTSA). An amendment would be futile because the evidence and whole course of conduct between the parties demonstrates knowledge of the required formalities to contract with IIT or the Society.

## 2.     Whether the Parties Agreed to Essential Terms

IIT argues that even if it was capable of entering into an oral agreement, no joint venture was created because the parties did not in fact reach agreement on essential terms.  MSJ 16–19.  M.A. Mobile counters that there is evidence to support a finding that the parties intended to form a joint venture and that they agreed on material terms.  Oppo. MSJ 15–17.

The parties agree that both California law and Indian law impose similar requirements on the formation of joint venture agreements.  *See* Letter 4 (asserting that "the law of India seems quite similar to California law regarding formation of joint venture agreements based on core terms (joint control, profits, etc.) and intent"); Oppo. Rule 56(d) Mot. (noting after describing Indian law requirements that "[t]he same is true under California law").  "The essential element of a joint venture is an undertaking by two or more persons to carry out a single business enterprise jointly for profit."  *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 525 (2008).  "A joint venture agreement may be informal or oral," *id.*, but "[i]t requires an agreement under which the parties have (1) a joint interest in a common business, (2) an understanding that profits and losses will be shared, and (3) a right to joint control."  *Ramirez v. Long Beach Unified Sch. Dist.*, 105 Cal. App. 4th 182 (2002).  Although "the agreement is not invalid because it may be indefinite with respect to its details," *Lasry v. Lederman*, 147 Cal. App. 2d 480, 487 (1957), "[a] legally binding agreement . . . is not formed where essential elements are reserved for future agreement," *Goodworth Holdings Inc. v. Suh*, 239 F. Supp. 2d 947, 956 (N.D. Cal. 2002) (Alsup, J.) (granting summary judgment), *aff'd,* 99 F. App'x 806 (9th Cir. 2004).

Although joint ventures can be formed orally, "when it is clear that both parties contemplate that acceptance of a contract's terms would be signified in writing, the failure to sign the agreement means that no binding contract is created."[20]  *Goodworth*, 239 F. Supp. 2d at 958

---

[20] IIT submitted a report from Amar Gupta on Indian law governing contracts.  It reflects principles quite similar to those under California law.  *See* Expert Report of Amar Gupta Report, Radke Decl. Ex. 28 [Dkt. No. 600-81] ¶ 3.13–3.16 ("Where parties have intended to reduce their bargain to a formal writing and to be bound only by the writing, the Court can conclude no binding agreement was reached. . . . Where the intention of the parties, drawn from correspondence, is to be bound only by a formal contract, then there can be no concluded contract till such formal contract is drawn up and executed.").

(citing *Banner Entertainment, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) *as modified* (Mar. 30, 1998)). "This is so even when the party later sought to be bound by the agreement indicated a willingness to sign the agreement." *Banner*, 62 Cal. App. 4th at 358. An oral agreement can be immediately binding, even in the absence of a written agreement, if the facts and circumstances show that the parties mutually intended that result. *Goodworth*, 239 F. Supp. 2d at 358. Where a party usually enters into written agreements, that custom is evidence that it did not intend to be bound absent a formal writing. *Id.*

M.A. Mobile asserts that a joint venture existed in the fall of 2004, by which time the parties had a shared interest in developing the technology, shared joint control, and understood that profits and losses would be shared in proportion with their equity interests. Oppo. 16–17. It argues that the many exchanges of letters of intent does not change the fact that the parties had agreed on core terms. *Id.* at 17; Farhang Decl. ¶ 18 (asserting that the letter of intent "was only supposed to memorialize" the parties' "core arrangement," which "never changed" even while many drafts were circulated). It argues that there are disputed questions of fact that must be resolved at trial. Oppo. 15 (citing *Unruh-Haxton v. Regents of University of California*, 162 Cal. App. 4th 343, 370 (2008)).[21]

M.A. Mobile has provided insufficient evidence of the existence of an oral joint venture agreement. Instead, undisputed evidence in the record shows that over the course of years, the parties exchanged—but did not sign—draft letters of intent, revealing their mutual intent to reduce their agreement to writing. *See Goodworth*, 239 F. Supp. 2d at 958. Not only that, but the language in some of the drafts shows that execution of the letter would not necessarily constitute the creation of a joint venture agreement. *See* Chakrabarti Decl. Ex. 18 (July 2004 draft) ("[I]mmediately upon the execution of this Letter of Intent, the Company will grant to IIT a limited, royalty-free license to market and continue the development of the Technology in India

---

[21] M.A. Mobile's citations to cases addressing the sufficiency of a complaint are unhelpful. *See* Oppo. MSJ 15 (citing *Unruh-Haxton*, 162 Cal. App. 4th at 370) (citing *Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 971 (N.D. Cal. 2015)); *see id.* ("Interestingly, Defendant never raised [an argument about profit sharing] during its extensive albeit failed Rule 12(b)(6) attacks on the joint venture."). M.A. Mobile's burden is greater at the summary judgment stage; it must show that it has sufficient evidence to support a judgment in its favor. Conjecture is not enough.

*until formation of the joint venture*.") (emphasis added); Chakrabarti Decl. Ex. 28 (October 2005 draft) (requiring the parties' cooperation in "the expeditious formation and due registration of an appropriate Indian joint venture vehicle (which shall be incorporated in the form of a private limited company and shall not be a cell company) to be called 'Cool e-mobile'").

Undisputed evidence of custom shows that the parties engaged in formalities from the beginning of their relationship and "did not intend to be bound until a formal document was executed." *See Goodworth*, 239 F. Supp. 2d at 958. Before M.A. Mobile sent the confidential CDs, it required signed NDAs. Before Chakrabarti signed the NDA, he sought permission from IIT. On numerous occasions the parties referenced the formalities they would have to work through in order to contract with a governing institution, whether IIT or the Society. *See* Chakrabarti Decl. Ex. 33 (email from Chakrabarti) (noting the need to "process" the letter within IIT); Singh Decl. Ex. 5 (December 10, 20015 email from Singh to Chakrabarti) ("[W]hat has to be done to start formalities with IIT?"). Early in their negotiations, the parties consulted with lawyers, and on many occasions Farhang and Jenkins questioned Chakrabarti about the unexecuted letter of intent. *See* Chakrabarti Decl. Ex. 29 (email from Farhang to Chakrabarti) (noting "the ball was not in [her] court" with regard to the letter of intent that had been unsigned for over a year); Chakrabarti Decl. Ex. 30 (email from Jenkins to Chakrabarti) (asking about the "blockage" to signing the letter of intent). The parties wished to have a formal agreement in place before signing Railways as a customer, and worried that the lack of formality in their relationship would hurt their chances of doing so. Chakrabarti Decl. Ex. 24 (email from Singh to Chakrabarti, Jenkins, and Auddy) (noting that both Jenkins and Auddy wanted a signed agreement before proceeding with Railways). Even when Farhang's relations with Chakrabarti and the engineering team had fully broken down, lawyers for M.A. Mobile reached out to IIT to seek a replacement representative in order to execute a letter of intent. *See* Chakrabarti Decl. Ex. 50 (requesting appointment of a substitute who would "negotiate . . . in good faith the Letter of Intent"). Finally, Statute 9(13) itself shows that IIT had a custom of entering into written agreements and did not intend to be orally bound.

The above undisputed evidence would prevent a reasonable fact finder from concluding

30

that the parties intended their oral negotiations and discussions to bind them.  The evidence in this case comes closer to creating a triable issue than the evidence in *Prostar v. Domino's*, where I granted summary judgment because the party alleging the existence of an oral joint venture agreement produced no evidence of an agreement to share profits or a right to joint control.  *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1008 (N.D. Cal. 2018). As M.A. Mobile points out, evidence points to a shared interest in developing the technology, and Chakrabarti ran the technical side whereas Farhang ran the business and sought out funding.  *See, e.g.*, Chakrabarti Decl. Ex. 16 (June 2004 emails between Chakrabarti, Farhang, and Jenkins regarding a licensing agreement with Indian Railways) ("PPC you have the complete authority and flexibiility [sic] to negotiate any ee arrangement that will enable us to sign [Indian Railways] up as our first early adopter customer."); Chakrabarti Decl. Ex. 17 (June 7, 2004 email from Farhang) ("I have a plan for raising funds (from the US) . . . .").  The parties discussed equity on more than one occasion, and it seems they settled on certain percentages.  *See* Oppo. 16 (arguing "there was a clear understanding that profits and losses would be shared as the equity or ownership interests in the joint venture were agreed upon, and the parties could reasonably infer that profits and losses would be shared proportionately").

But based on the undisputed evidence, a fact finder could not reach a conclusion other than that the parties intended to formalize their agreement in writing.  At the hearing, M.A. Mobile argued that for a cross-border joint venture, considerations including, for example, taxes, create barriers to a formal agreement but do not constitute "essential terms" for purposes of an oral joint venture.  Hr'g Tr. 16:19–17:9.  That argument might be sufficient to explain the letter of intent language that an actual joint venture remained forthcoming, but it does not explain the parties' failures to execute the letter itself.  M.A. Mobile further argued that it should be permitted to test the credibility of Farhang on one hand and Chakrabarti on the other in order to show that a joint venture existed notwithstanding the letters of intent.  *See* Hr'g Tr. 17:10–18:13.  It should be permitted to ask why Chakrabarti continued to refer to himself as CTO and tout the technology if there was no joint venture agreement.  Crediting this evidence to the greatest extent, it no doubt shows that the parties shared a common goal and continued to make efforts in pursuit of that goal

31

until such time as negotiations broke down.  Yet in the face of undisputed evidence that the parties always intended to enter into a formal, written agreement, this evidence cannot transform negotiations and joint efforts into a legally binding joint venture agreement.

## B.  Breach of NDA and Trade Secret Misappropriation

M.A. Mobile brings claims for breach of the parties' NDA and trade secret misappropriation based on the same three allegedly improper disclosures:  to Indian Railways, to TIETS, and to JUSCO.[22]  IIT moves for summary judgment on both claims on the grounds that (i) Farhang granted Chakrabarti "complete discretion" to determine the confidentiality of information and (ii) any disclosures were authorized and done for the benefit of M.A. Mobile.  MSJ 19.

To succeed on its claim for breach of the NDA, M.A. Mobile must show that IIT made a disclosure of confidential information in violation of the NDA's terms, and those disclosures damaged M.A. Mobile.[23]  *See Zody v. Microsoft Corp.*, No. C-12-00942-YGR, 2013 WL 2468250, at *5 (N.D. Cal. June 7, 2013).  To succeed on its claim under CUTSA, M.A. Mobile must show that (i) it owned a trade secret, (ii) IIT "acquired, disclosed, or used [M.A. Mobile's] trade secret through improper means," and (iii) those actions damaged M.A. Mobile.  *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL 514923, at *2 (N.D. Cal. Jan. 23, 2018).  A trade secret is information that derives value "from not being generally known to the public or to other persons who can obtain economic value from its closure or use."  *See* Cal. Civ. Code § 3426.1(d)(1).

---

[22] M.A. Mobile alleges the following as trade secrets:  "(i) the confidential pocketXML source code which IITK used to develop the Railway application and other prototypes likes the JUSCO (power utility application) (ii) the architecture and database backend for the applications developed as part of the joint venture (iii) specific prototypes for the Indian Railways and utility companies developed for demo purposes as part of the joint venture (iv) the idea to target IBM as a key strategic partner or acquirer given its experience with backend development but its then lacking mobile workforce solution and (v) provisional and pending patent application material (which was all confidential and not released because the patent was pending until 2011) which described the novelty of the pocketXML technology."  Oppo. 21.

[23] IIT does not dispute the remaining two elements of a breach of contract claim, namely the existence of an agreement and M.A. Mobile's performance.

United States District Court
Northern District of California

### 1. Whether Chakrabarti had full discretion

There can be no misappropriation where the owner of a trade secret consents to the other party's disclosure. *See Lamont v. Conner*, No. 5:18-CV-04327-EJD, 2019 WL 1369928, at *8 (N.D. Cal. Mar. 26, 2019). The evidence shows that Farhang relied on and trusted Chakrabarti to handle the technical side of the alleged joint venture, and she certainly did not micro-manage the way in which he and the team progressed with meetings to discuss the technology. Further, there is evidence showing that Chakrabarti made Farhang aware of meetings with third parties, and in response, she expressed excitement over the team's efforts. But while Chakrabarti understood these communications as giving him full authority to decide what to disclose, Farhang apparently understood them differently. *See* Farhang Decl. ¶ 29 (explaining that her awareness "did not mean that [she] authorized IIT or the related engineers to make presentations to [JUSCO]"). Material questions of fact prevent summary judgment on this basis.

### 2. Whether M.A. Mobile presents evidence of improper disclosures

IIT argues that M.A. Mobile's claims for breach of contract and trade secret misappropriation must fail because there is insufficient evidence of any improper disclosures. M.A. Mobile responds that it has produced circumstantial evidence that is sufficient to support inferences that IIT improperly disclosed confidential information to the Society, to Railways, and to JUSCO. Oppo. 24–25. Specifically, M.A. Mobile claims that the engineers made improper disclosures during their meeting with JUSCO[24] and during the presentation to the Society and a panel of external experts, when Cool e-mobile was selected for incubation. The latter presentation constituted a disclosure to IBM because an IBM employee was present at the time.

Because direct evidence of misappropriation and misuse is not always available, plaintiffs can rely on circumstantial evidence to prove their case. "In most cases plaintiffs must construct a

---

[24] There is no dispute that the team intended to target JUSCO as a customer for the technology or that the engineers met with JUSCO and presented them a demonstration of the technology. *See* Singh Decl. Ex. 10 [Dkt. No. 608-17] (February 5, 2005 email from Choudhury entitled "MOM of JUSCO meeting") ("Then we presented them the demo of the application."); Gupta Depo. 68:7-14. There is also no dispute that the engineers presented to the Society. *See* Singh Decl. Ex. Singh Decl. Ex. 9 (August 30, 2005 email from Chakrabarti to Farhang) ("A technical committee of the Incubation Society at IIT met with external experts to examine the various incubation proposals.").

United States District Court
Northern District of California

web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (quoting *Q–Co Industries, Inc. v. Hoffman,* 625 F.Supp. 608, 618 (S.D.N.Y. 1985)) (internal quotation marks and formatting omitted).

The circumstantial evidence M.A. Mobile presents is insufficient to support a judgment in its favor because, given the context of the parties' dealings, it does not give rise to a reasonable inference of improper disclosures. M.A. relies on the *mere fact* that meetings and presentations before each group took place. But these meetings took place for the purpose of securing customers for the technology that IIT and M.A. Mobile were collaborating to develop and sell. In addition, to describe the functionality of a technology does not disclose source code, as evidenced by Farhang's explanation of the intellectual property in her earliest dealings with Chakrabarti. Neither does a visual demonstration of an application reveal anything confidential.

The fact that Railways and IBM developed similar technology does not raise M.A. Mobile's theories above the speculative level.[25] The record shows that the parties were aware that others were developing competing technologies. *See* Singh Decl. Ex. 9 (August 30, 2005 email from Chakrabarti to Farhang) ("I am not sure what the status is with the Railways, but I get to understand that some equivalent technologies are coming into the space."). Railways itself was actively pursuing that technology, as evidenced by its request for a presentation from M.A. Mobile in 2007.[26] Disclosures based on the alleged failure of some engineers to sign the NDA cannot support a judgment in M.A. Mobile's favor. Farhang was entirely aware of which engineers were working on the technology and communicated with them directly on many occasions. If

---

[25] In addition, the evidence strongly suggests that the IBM employee was not present at the Society meeting. I need not resolve this dispute in order to decide that summary judgment is appropriate.

[26] Although my decision depends on the absence of enough evidence to prove M.A. Mobile's case, rather than weighing it against IIT's evidence, I do note that IIT sought discovery from IBM, which indicated that it developed the technology in house in consultation with Indian Railways and that it did not receive assistance from any third parties, including IIT. Radke Decl. Exs. 30–31.

Chakrabarti made any improper disclosures to the engineers on the team, M.A. Mobile consented. *See Lamont*, 2019 WL 1369928, at *8. Finally, M.A. Mobile's critiques of Chakrabarti's "tenuous and implausible responses" and evasive and contradictory answers do not create a triable issue.[27] *See* Oppo. 21–23.

M.A. Mobile's improper disclosure claims rely on speculation rather than reasonable inference. IIT's motion for summary judgment on the breach of the NDA and trade secret misappropriation claims is GRANTED.

### C.     Damages

Although not a direct subject of the parties' summary judgment briefing, I make a further note about damages. Even assuming there remained material questions of fact, all of M.A. Mobile's claims would face this additional hurdle: proving damages to a reasonable certainty. In California, an unestablished business generally cannot recover damages for anticipated future profits because "their occurrence is uncertain, contingent and speculative." *Grupe v. Glick*, 26 Cal. 2d 680, 693 (1945). However, "anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability." *Id.* Such reasonable reliability can be established through evidence including "expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like." *Sargon Enterprises, Inc. v. Univ. of S. California*, 55 Cal. 4th 747, 776 (2012); *see also Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 885 (2002) (internal quotation and citation omitted) (noting a party can rely on the experience of a similar business in the industry if there is a "substantial and sufficient factual basis" for the calculation).

All of M.A. Mobile's claims for damages depend upon establishing a future event with evidence of reasonable reliability: Cool e-mobile securing Railways as a client for its TTE Application. *See* Third Amended Complaint [Dkt. No. 396] ¶ 66 (alleging the breach of the NDA caused M.A. Mobile damages in excess of $30,000,000 from the inability to secure Railways as a customer), ¶ 72 (referring to the damages set forth in ¶ 66 for the breach of joint venture

---

[27] Neither does Chakrabarti's failure to inform Farhang and Singh about his December 2014 letters to Railways create a triable issue.

agreement claim), ¶ 104 (reiterating the claim for damages for trade secret misappropriation based on the Railways contract). I have serious doubts about M.A. Mobile's ability to make this showing. The interest Railways expressed in meeting with Cool e-mobile to discuss the application is not enough. In addition, the evidence calls into question its ability to establish with reasonable reliability that it would have made a profit from a relationship with Railways. *See* Chakrabarti Decl. Ex. 16 (email from Farhang) ("I am not sure if it needs to be in the agreement, but I would like [Railways] to know they will be provided devices for free (once our devices are ready) and until that time we will do our best to purchase low cost devices that they can use.").

## II.     MOTION TO DISMISS COUNTERCLAIMS

IIT moved to dismiss its counterclaims in order to streamline the case before trial. M.A. Mobile opposed, arguing that IIT's motion was motivated by gamesmanship and a desire to delay these proceedings so that the Indian court can get ahead of this case. If any part of M.A. Mobile's claims were going to trial, I would deny the motion to dismiss because the counterclaims rely on the same body of evidence. Given that I am granting summary judgment in favor of IIT, it makes no practical sense to require IIT to proceed on its counterclaims.[28]  Accordingly, the counterclaims are DISMISSED WITHOUT PREJUDICE to re-raise them as appropriate depending on the outcome of any appeal by M.A. Mobile of this Order.

## III.    MOTIONS TO EXCLUDE

IIT moves to exclude the opinions of Jason Frankovitz, M.A. Mobile's technical expert, and Chad Staller, M.A. Mobile's damages expert. *See* Expert Report of Jason Frankovitz, Singh Dec. Ex. 24 [Dkt. No. 613-3]. I need not resolve these motions because these reports have no bearing on my decision to grant summary judgment. As indicated at the hearing, I would deny both motions but strike the Frankovitz declaration filed with M.A. Mobile's opposition, but I do note that the shakiness of these opinions further reflects the weaknesses of M.A. Mobile's case. The motions to strike are DENIED AS MOOT.

---

[28] At the hearing, counsel for M.A. Mobile agreed with my suggestion. *See* Hr'g Tr. 49:20–21 ("My inclination would be that the counterclaims would go away, as well, if you were going to [grant the motion for summary judgment].").

## IV.    MOTIONS TO SEAL

Both parties have filed motions to seal portions of their briefing and supporting exhibits. *See* Dkt. Nos. 599, 608, 615, 624, 628, 638.  Their back-and-forth exhibits the same inability to cooperate that the parties displayed during discovery.  In addition, M.A. Mobile's filings seem to exhibit a lack of understanding of this district's procedure for sealing requests, as set forth in the Civil Local Rules.[29]  I attempt to make sense of these convoluted filings below.

A party seeking to seal court records must overcome a strong presumption in favor of the public's right to access those records.  *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir.), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016).  The Ninth Circuit imposes the "compelling reasons" standard on most motions to seal, which requires a court to explain its findings "without relying on hypothesis or conjecture."  *Id.* at 1096–97.  Sealing requests must be "narrowly tailored to seek sealing only of sealable material."  Civ. L.R. 79-5(b).  Further, "[r]eference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable."  Civ. L.R. 79-5(d)(1)(A).

First, IIT filed a motion to seal in connection with its motion for summary judgment.  Dkt. No. 599.  IIT itself sought to seal only "the email addresses, telephone numbers, and other personally identifiable information of third parties" in order to protect their privacy.  IIT disagreed that the remaining portions were sealable but made the request because M.A. Mobile had designated them as confidential.  Under Civil Local Rule 79-4(e)(1), within four days M.A. Mobile was required to file a declaration establishing that all of the designated material was sealable under 79-5(d)(1)(A).  M.A. Mobile timely filed an "opposition" in which it indicated that it needed more time to respond fully and suggested that it was unlikely IIT would be able to meet

---

[29] More than once, M.A. Mobile references IIT's supposed failure to accompany its administrative motion with "a proposed order and by either a stipulation under Civil L.R. 7-12 or by a declaration that explains why a stipulation could not be obtained."  But Rule 79-5, which deals more specifically with motions to seal (and which IIT clearly cited in its first motion, *see* Dkt. No. 599), sets forth a procedure that applies to "requests to seal in which the sole basis for sealing is that the document(s) at issue were previously designated as confidential or subject to a protective order." *See* Civ. L.R. 79-5(d)(A); 79-5(e).

its burden to justify sealing.[30]  Dkt. No. 602.  M.A. Mobile filed a more complete response on June 12, contending that IIT's motion "include[d] several proposed redactions that do not contain any private or confidential information" and that IIT failed to provide compelling reasons to justify their sealing.  Dkt. No. 610.  The response indicates that M.A. Mobile wishes some exhibits and redactions to remain under seal, but it fails to acknowledge that because IIT made most of its requests on M.A. Mobile's behalf, it was required to justify the sealing through a declaration laying out compelling reasons.  The response includes no such declaration.

The parties agree that most of the exhibits should be public.  Third-party names and email addresses are sealable.[31]  *See Am. Automobile Assoc. of N. Cal., Nev., & Utah v. Gen. Motors LLC*, Case No. 17-CV-03874-LHK, 2019 WL 1206748, at *2 (N.D. Cal. Mar. 14, 2019) (finding compelling reasons existed to seal third parties' names, addresses, phone numbers, and email addresses).  Because it appears that some portions of the remaining exhibits might be sealable, I will give M.A. Mobile the opportunity to provide proper support for its requests as required by Civil Local Rule 79-5(e).  If M.A. Mobile still believes that there are compelling justifications to seal any identified at Dkt. No. 599, it must file the necessary declaration **within 20 days of the date of this Order**.  If it declines or fails to do so, I will order that the exhibits be unsealed.

M.A. Mobile filed a motion to seal in connection with its opposition to summary judgment. Dkt. No. 608.  It requested sealing of the Exhibit 7, the declaration of Jason Frankovitz, which "contains specific references to source code."  Declaration of Sanjiv Singh ISO Mot. to Seal [Dkt. No. 608-1].  That request is GRANTED as to specific lines of source code, but not as to the entire 63-page document.  *See* Civ. L.R. 79-5(b) ("The request must be narrowly tailored to seek sealing only of sealable material.").  M.A. Mobile made its other requests on behalf of IIT,[32] which

---

[30] IIT submitted a reply in which it clarified that most of its requests were made on M.A. Mobile's behalf.  Dkt. No. 603.  It wrote, "At this point, if M.A. Mobile believes that the designated documents in the summary judgment papers need no protection, IIT has no objection to unsealing those documents with the exception of personal email addresses."

[31] M.A. Mobile opposed the request to seal that information in IIT's motion for summary judgment but expressed no issue with the same request as associated with its own opposition to the motion.  *See* Singh Decl. ISO Mot. to Seal ¶ 8.

[32] Despite listing IIT as the designating party in the declaration, M.A. Mobile expressed its own view of the confidentiality of some exhibits.  *See, e.g.*, Singh Decl. ISO Mot. to Seal ¶ 9 (noting

submitted a declaration in support five days later.  Declaration of Brendan Radke ISO Mot. to Seal [Dkt. No. 622].  In it, IIT indicated that it only wished to seal third parties' email addresses, physical addresses and telephone numbers.  That request is GRANTED.  **Within 20 days of the date of this Order**, M.A. Mobile is ordered to file a version of Dkt. No. 608-13 with only narrowly tailored redactions.  To the extent that remaining documents redact more than just email addresses, physical addresses, and telephone numbers, M.A. Mobile shall re-file public versions of those documents with only the redactions approved here.

IIT filed a motion to seal associated with its motions to strike the expert reports and testimony.  Dkt. No. 615.  It requested sealing only of information and documents M.A. Mobile had designated as confidential.  M.A. Mobile responded that it was unable to "evaluate the validity of [the] motions" because counsel for IIT had failed to provide unredacted versions of the exhibits. Dkt. No. 620.  M.A. Mobile indicated that it would respond to the "defective brief" after receiving the unredacted documents.  IIT replied that it had indeed provided unredacted versions of the documents on the same day it filed the original motion to seal.  Dkt. No. 623; *see* Declaration of Brendan Radke ISO Reply Mot. to Seal [Dkt. No. 623-1] ¶ 4 (noting that IIT has used the same Secure File Transfer platform to send filed to M.A. Mobile in the past).  M.A. Mobile never filed another response or a declaration establishing that the redacted portions are sealable.  The same is true for IIT's motion to seal associated with the reply to the motions to exclude.  *See* Dkt. No. 638. M.A. Mobile has failed to comply with its obligations as the designating party; however, given that I need not resolve the underlying motions, the associated motions to seal are TERMINATED AS MOOT.

IIT filed a motion to seal associated and declaration with the errata of exhibits filed in support of summary judgment.  Dkt. Nos. 624, 624-1.  It seeks to seal physical addresses, email addresses, and telephone numbers; the request is GRANTED.

IIT filed a motion to seal associated with its reply in support of summary judgment.  Dkt. No. 628.  M.A. Mobile, which was the designating party, responded that none of the information

---

that exhibits 15 and 17 "appear[ed] confidential and should be sealed as a whole" despite listing IIT as the designating party).

requires sealing. Dkt. No. 632. Accordingly, this motion is DENIED.

## CONCLUSION

For the reasons set forth above, IIT's motion for summary judgment is GRANTED. IIT's counterclaims are DISMISSED WITHOUT PREJUDICE to re-raise them as appropriate following the outcome of an appeal of this Order. The motions to exclude are DENIED AS MOOT. The motions to seal are resolved in accordance with the discussion above; the Clerk shall UNSEAL Dkt. No. 628 in its entirety. Judgment shall be entered in accordance with this Order.

**IT IS SO ORDERED.**

Dated: September 5, 2019

William H. Orrick
United States District Judge